NATIONAL GUARD REGULATION
No. 635-100

HEADQUARTERS
DEPARTMENT OF THE ARMY
WASHINGTON, DC, 8 September 1978

# PERSONNEL SEPARATIONS

## TERMINATION OF APPOINTMENT AND WITHDRAWAL OF FEDERAL RECOGNITION

This is a complete revision of NGR 635-100. Major changes are summarized as follows: Incorporates all previous changes; removes the requirement for an officer directly appointed in the Women's Army Corps to be separated if she has not completed the WAC Officer Orientation Course; allows 2LTs 18 months to complete the Officer Basic Course, with the Adjutant General authorized to grant an additional 6 months waiver; changes the requirement for completion of a technical waiver to that of completing educational stipulations determined by the Officer Personnel Classification Board or the Federal Recognition Board; provides provision for a student who fails the Officer Basic Course to reverse those failures by extension courses within 6 months of ending date of OBC when recommended by the school faculty review board; deletes the C&GSC Phase FL requirement; deletes the 30 June 78 date from retentions beyond MRD, and adds an appendix to show all information required for a request beyond MRD. State adjutants general may supplement this regulation, if desided. If supplements to this regulation are issued by major Army commanders and US Army commanders, they are not applicable to the ARNG. One copy of each supplement will be forwarded to NGB-ARP-O, Wash DC 20310. Wherever the word "he" is used in this regulation, it is intended to include both the masculine and feminine genders, unless otherwise indicated.


| | Paragraph | Page |
|---|---|---|
| Purpose | 1 | 1 |
| Authority | 2 | 1 |
| Policy | 3 | 1 |
| Definitions | 4 | 1 |
| Criteria | 5 | 2 |
| Retentions beyond mandatory removal date | 6 | 4 |
| Reserve of the Army status | 7 | 5 |
| Records | 8 | 6 |
| APPENDIX A. SAMPLE LETTERS | | 7 |
| B. INFORMATION REQUIRED FOR RETENTION BEYOND MANDATORY REMOVAL DATE | | 9 |


**1. Purpose.** This regulation prescribes the policies, criteria and procedures governing the separation of commissioned officers of the Army National Guard.

**2. Authority.** Sections 323 and 324, title 32, United States Code.

*a.* The termination of an officer's appointment in the Army National Guard is a function of the State.

*b.* The withdrawal of Federal recognition of an officer is a function of the Chief, National Guard Bureau, acting for the Secretary of the Army.

*c.* The discharge of an officer from his appointment as a Reserve of the Army is a function of the Secretary of the Army.

**3. Policy.** *a.* All personnel actions prescribed in this regulation will be made without regard to race, color, religion, sex, and national origin.

*b.* In this regulation reference to individuals or personnel include both male and female unless otherwise specified.

*c.* All appointments are automatically terminated upon death.

**4. Definitions.** *a. Years of service.*

(1) A Reserve commissioned officer's years of service are the greater of—

(*a*) The sum of—

*1.* The officer's years of service as a commissioned officer of any component of the Armed Forces or of the Army without specification of component; and

*This regulation supersedes NGR 635-100, 22 Sep 76.

*2.* The years of constructive service accredited to the officer; or

(*b*) The number of years by which the officer's age exceeds 25 years.

(2) No service may be counted more than once. For an officer credited with constructive service, no actual service before appointment may be counted for this purpose.

(3) Service accrued while holding an appointment as a commissioned officer of the National Guard of the United States under the provisions of former Section 111, National Defense Act, but serving as an enlisted person or warrant officer is not creditable in computing years of service.

*b. Constructive service.* The years of service in an active status constructively credited upon appointment as a Reserve commissioned officer of the Army to reflect the officer's combined years of experience and education. If appointed with assignment to the Medical Corps, Dental Corps, Judge Advocate General's Corps, or Chaplain, the officer will, for the purpose of this regulation, be credited with such constructive service in an active status to which he is entitled in accordance with AR 135–100 or AR 135–101, as applicable.

**5. Criteria.** *a. Termination of State appointment.* Unless contrary to State law and regulations, the appointment of an Army National Guard officer should be terminated for the reasons listed below. If termination of appointment is contrary to State law and regulations, the Chief, National Guard Bureau, will be notified in advance and Federal recognition will be withdrawn.

(1) Attainment of maximum age.

(*a*) An Army National Guard of the United States officer occuping one of the following positions must be removed from an active status in the Army National Guard of the United States no later than the date he attains age 64.

*1.* The Chief, National Guard Bureau.

*2.* The Chief of the State Military Department. (Normally the title of this position is State Adjutant General, but the exact title is governed by the laws of the State.)

*3.* The Commanding General of the District of Columbia National Guard and the adjutants general of the Commonwealth of Puerto Rico and the Virgin Islands Army National Guard.

(*b*) Except as provided in (*a*) above, all officers who are not earlier removed from active status by reason of time in grade, length of service, or other reason must be removed from an active status in the Army National Guard of the United States on the last day of the month in which they atain age 60. The Secretary of the Army may approve retention beyond age 60 for major generals when a valid requirement exists and for whom there is no qualified replacement. Such retention will not exceed age 62 (para 6*l*).

(*c*) Officers removed from an active status by reason of attainment of maximum age may be transferred to the Retired Reserve if they are qualied and apply therefor (para 8).

(2) Completion of maximum service.

(*a*) Except as otherwise indicated, officers in the grades shown below who are not earlier removed from an active status will be removed from an active status in the Army National Guard of the United States on the date that is 30 days after completion of the total years of service, or on the anniversary date indicated, whichever is later.

*1.* Major General—35 total years of service or on the fifth anniversary of officer's date of appointment in that grade, unless otherwise retained under the provisions of AR 135–156.

*2.* Brigadier General or Colonel—30 total years of service or on the fifth anniversary of officer's date of appointment in that grade.

*3.* Lieutenant Colonel and below, all branches—28 total years of service.

(*b*) Officers removed from an active status by reason of completion of maximum service may be transferred to the Retired Reserve if they are qualified and apply therefor (para 8).

(*c*) Each officer in the reserve grade of lieutenant colonel who has been recommended for promotion and who would otherwise be removed from an active status under this paragraph, shall be retained in that status until he is appointed or refused appointment to the next higher grade. To be considered "recommended for promotion," individual must meet the following criteria within the meaning of section 3848 (b) title 10, United States Code with effective date as indicated below:

*1.* For officers not possessing certificates of eligibility in the higher grade, on the date the Federal Recognition Board adjourns.

*2.* For officers possessing certificates of eligibility for Federal recognition in the higher grade, on the date of assignment to the position for which granted the Certificate of Eligibility or on the date of promotion in the State if officer is already assigned to the position.

(3) *Resignation*

(*a*) An officer may tender a resignation through channels to the State adjutant general. If accepted, the State adjutant general will publish orders separating the officer from his Army National Guard appointment and furnish copies to the Chief, National Guard Bureau. The resig-

nation may also be concurrent from the Army National Guard and Reserve of the Army for officers without a remaining service obligation.

(b) When the resignation of an Army National Guard officer has been accepted and Federal recognition withdrawn, revocation of the separation order will not be considered as a basis for restoration of Federal recognition. If the officer desires to be reinstated, he/she must apply for reappointment to the Army National Guard.

(c) Resignation should not be accepted from officers against whom flagging action has been initiated under AR 600-31 or NGR 635-10, or those in default of property or funds.

(4) Absence without leave for 3 months.

(5) When dismissed pursuant to an approved sentence of a court-martial.

(6) Upon conviction of a felony or sentence to confinement in a Federal or State Penitentiary or correctional institution after having been found guilty of an offense by a court (other than a court-martial, other military court, or foreign court) and whose sentence has become final.

(7) Upon acceptance of a commission or appointment in another Armed Force, US Public Health Service, Environmental Science Services Administration, US Military Academy, US Naval Academy, US Air Force Academy, or US Coast Guard Academy, or upon enlistment in the National Guard. These actions are normally a vacation of appointment.

(8) Upon becoming a member of the Army Reserve.

(9) As a result of screening under any criteria contained in AR 135-133.

(10) Upon failure of a first lieutenant, captain, or major to be selected for promotion to the next higher grade after second consideration under AR 135-155, except as provided in paragraph 6a. Removal from an active status must be accomplished within 90 days after the selection board submits its report to the convening authority. Removal may be delayed, if necessary, until final determination is made with respect to a valid request for reconsideration under the Standby Board of provisions of AR 135-155.

(11) When ecclesiastical indorsement of a chaplain is withdrawn.

(12) When officers of the Army Medical Department or of the Judge Advocate General's Corps lose the privilege to practice their profession because of misconduct, unethical practice, or other similar reasons.

(13) Employment with any foreign government or any concern controlled in whole or in part by a foreign government, unless prior approval is granted by the Secretary of the Army.

(14) When the officer becomes medically disqualified for further military service (NGR 635-101).

(15) Upon the expiration of the authorized period of time an officer has been--

(a) In an overstrength status.

(b) Carried as an additional active duty officer under the release from active duty provisions of NGR 600-100.

(c) Assigned to the Inactive Army National Guard (NGR 614-1).

(d) Permitted to decline a promotion after mandatory consideration and selection, except as provided in paragraph 6a.

(e) Given to complete educational stipulations determined by a State Officer Personnel Classification Board or Federal Recognition Board for qualification in primary SSI/MOS or duty SSI/MOS pursuant to NGR 600-100 if he failed to fulfill the requirements for completion of the stipulation.

(f) Retained in an active status beyond mandatory removal date, except as provided in paragraph 6a.

(16) Upon failure to qualify for permanent or continued flying status and not transferred to an authorized nonflying position for which otherwise qualified or transferred to the Inactive Army

National Guard.

(17) Failure to accept appointment as a Reserve officer of the Army.

(18) When a student Army National Guard officer with less than 3 years commissioned service in an active status fails to complete a branch or basic entry specialty qualification course at a service school for disciplinary reasons, academic deficiencies, or deficiencies of leadership. Academic deficiencies may not be reversed by correspondence courses, except when school faculty review board recommends that student be authorized to complete extension courses to reverse failures. When authorized by the faculty review board, extension courses must be completed within 6 months following the ending date of OBC.

(19) Individuals appointed as second lieutenant before 29 February 1976, who fail to complete a branch or basic entry specialty qualification course before completing 3 years of commissioned service in an active status.

(20) Failure to complete a branch or basic entry specialty qualification course if appointed after 29 February 1976 as follows:

(a) When a second lieutenant fails to complete a branch or basic entry specialty qualification course (NGR 600-100, Appendix D Group III Courses) before completing 18 months of commissioned service in an active status.

(b) State adjutants general are authorized to waive the requirements in paragraphs (a) and (b) above for a period not to exceed 6 additional months on a case-by-case basis when fully justified. Notification of each waiver granted will be provided the Army National Guard Personnel Center, Columbia Pike Office Building, 5600 Columbia Pike, Falls Church, Virginia 22041.

(21) When a second lieutenant is not promoted on or before the date he completes 3 years of promotion service. Names of second lieutenants who will not be promoted will be reported to the Army National Guard Personnel Center 60 days before completing 3 years of promotion service.

(22) As a result of failure of selective retention (NGR 635-102).

■ (23) Failure of a lieutenant colonel to complete Command and General Staff College or equivalent course.

(a) When a lieutenant colonel fails to complete Command and General Staff College or equivalent course before the third anniversary of the effective date of his/her promotion or appointment to that grade. If the individual has a 50 percent completion certificate with an expiration date, the CGSC course must be completed before the expiration date of the certificate.

(b) AMEDD (excluding the SC 67 series) officers are exempt from this requirement. Staff Specialist branch officers assigned to Selective Service positions are exempt, unless they have not satisfied the military education requirement of NGB 600-102.

(c) The Chief, National Guard Bureau, may waive the time requirement in (a) above for a maximum of 6 months. Request for waiver with complete justification should be forwarded to NGB-ARP-O no later than 60 days before the third anniversary of the effective date of Federal recognition as lieutenant colonel. Waiver will be granted only when the best interest of the Army is served.

(24) When a general officer ceases to occupy a position commensurate with his grade or a higher grade within 30 days from the date he ceases to occupy such position.

(25) In accordance with State laws or regulations.

■ (26) Failure to achieve satisfactory progress after participation in an established weight control program (see AR 600-9).

b. Withdrawal of Federal recognition. Federal recognition of an officer of the Army National Guard will be withdrawn by the Chief, National Guard Bureau, for the following reasons:

(1) Separation or discharge from the State appointment as an officer of

Headquarters
Department of the Army
Washington, DC 20310-2500
1 June 1988

*National Guard Regulation 635-102

Effective: 1 July 1988

Personnel Separations

# OFFICERS AND WARRANT OFFICERS SELECTIVE RETENTION

Summary. This regulation provides guidance and procedures €or conducting the Officer Selective Retention Board. It includes new information on the selection process of officers and warrant officers, clarification in the scheduling of the board, board recommendations, composition of the board, and formats for board results.

Applicability

a. This regulation applies to **all** ARNG commissioned officers and warrant officers who are not in active Federal service. It is applicable to soldiers in the Inactive National Guard and those on AGR status (Title 32).

b. This regulation does not apply to the following:

(1) Commissioned and warrant officers in active Federal service on an AGR status (Title 10).

(2) General officers.

(3) Voting members of current selective retention boards.

(4) Officers below the grade of LTC who have twice failed selection for promotion and whose Federal recognition has not been withdrawn.

(5) State AGs and Assistant AGs.

(6) Technicians who are pending medical boards.

Impact on Unit Manning System. This regulation does not contain information that affects the Unit Manning System.

**Internal** Control Systems
This regulation includes requirements warranting internal controls. An internal control review checklist is included.

Supplementation. Supplementation to this regulation is authorized. If supplements are issued, send a copy to NGB-ARP-O.

Interim changes. Interim changes to this regulation are not official unless they are authenticated by the Executive, NGB. Users will destroy interim changes on their expiration dates unless sooner superseded or rescinded.

Suggested improvements. The proponent of this regulation is the National Guard Bureau. Users of this regulation are invited to send comments and suggested improvements on DA Form 2028 (Recommended Changes to Publications and Blank Forms) directly to NGB-ARP-O, Washington, DC 20310-2500.

Contents


| | Paragraph | Page |
|---|---|---|
| **Purpose** | 1 | 2 |
| **Policy** | 2 | 2 |
| **Program goals** | 3 | 2 |
| **Zone of consideration** | 4 | 2 |
| **Responsibilities** | 5 | 2 |
| **Safeguard against premature removal from an active status** | 6 | 3 |
| **Status of officers upon termination of Federal recognition** | 7 | 3 |
| **Selection boards** | 8 | 3 |
| **Operation of the nine-member board (three-panel system)** | 9 | 4 |
| **Man-day and funding support** | 10 | 5 |

**Appendixes**

| | Page |
|---|---|
| **A. Sample Notification of Consideration Letter** | A-1 |
| **B. Selective Retention Board Checklist** | B-1 |
| **C. Instructions to Selection Boards** | C-1 |
| **D. Board Proceedings Format** | D-1 |
| **E. Sample of Selection Letter** | E-1 |
| **F. Sample of Nonselection Letter** | F-1 |
| **G. Report Format** | G-1 |


*This regulation supersedes NGR 635-102, 28 September 1973.

1. Purpose
This regulation prescribes policies and procedures for establishing and conducting selection boards used in the ARNG program for selective retention of officers and warrant officers beyond 20 years of qualifying service for retired pay.

2. Policy

a. Selection consideration will be without regard to race, color, religion, gender, or national origin.

b. Unless clearly applicable to any one gender, the term commissioned officer, officer, warrant officer, individual, and the intentional use of a masculine pronoun applies to both men and women.

3. Program goals
A continuing program of selective retention is essential to provide for progression of qualified officers at proper intervals in their careers. The board goals of the ARNG program for selective retention are--

a. Ensuring that only the most capable officers are retained beyond 20 years of qualifying service for assignment to the comparatively few higher level command and staff positions.

b. Providing career incentive.

c. Ensuring an opportunity for advancement to the higher grades at the peak years of an officer's effectiveness.

4. Zone of consideration
Selection boards will be convened in each State annually to consider officers and warrant officers in the grades of colonel and below for selective retention beyond 20 years of qualifying service for retired pay.

a. Initial consideration. All officers and warrant officers who accrue 20 or more years of qualifying service as of 31 December of the preceding year will be considered by that year's board; e.g., officers accruing 20 years qualifying service in calendar year 1987 would be considered the first time in calendar year 1988. Boards may be convened anytime during the first 6 months of the calendar year.

b. Later consideration. At the discretion of the Adjutant General, all officers will be considered either annually or biennially.

c. Selective retention boards will be conducted independently from AGR tour continuation boards IAW NGR 600-5, para 6-8.

5. Responsibilities
State adjutants general are responsible for--

a. Maintaining necessary records to permit a determination of each officer's eligibility for consideration for selective retention.

b. Announcing the frequency of subsequent consideration of all officers either annually or biennially.

c. Notifying officers to be considered of the purpose, time, and place of the board (appendix A).

d. Requesting designation of Active Army board members from the CONUSA commander.

e. Announcing time and site of annual selection board.

f. Issuing orders placing ARNG board members on full-time training duty.

g. Referring personnel records to the selection board.

h. Providing administrative support to the board.

i. Ensuring that each record has a Selective Retention Board Checklist (appendix B) attached. (The Officer Personnel Management System (OPMS) manager is responsible for preparing and/or verifying the information contained thereon.)

j. Approving or disapproving the board report within 30 days of the board's adjournment date.

(1) The AG may act upon the report in the following manner:

(a) Approve the report in its entirety.

(b) Remove an officer's name from the nonselect list and place it on the select list for retention for 1 or 2 years.

(c) Modify the select list to change an officer from a 1-year retention to a 2-year retention.

(2) The AG may not remove an officer from the select list and place him or her on the nonselect list. Further, the AG may not change the retention period of a selected officer from 2 years to 1 year.

collective judgment of the board. The board should give the greatest weight to the most recent years of service and the significance of the information. This is particularly true of junior officers whose worth to the ARNG is improved by their early exposure to heavy responsibility and problem solving. Undue weight should not be given to unfavorable comments of a derogatory nature that are followed by continuous outstanding performance of duty.

Commissioned officers The factors in the following paragraphs pertain only to commissioned officers

**C-5.** General

a. Ensure uniform advancement to the higher grade at the peak years of an officer's effectiveness.

b. Ensure that only the most capable officer is retained beyond 20 years of service for assignment to the comparatively few higher level command and staff positions.

c. Ensure a potential for replacing senior commanders and staff officers.

d. Ensure adequacy of civilian and military education for performance of duties associated with higher level command and staff assignments. Officers will be required to demonstrate continued military educational advancement and refresher training, as appropriate. Attendance at resident courses, satisfactory progress in appropriate level correspondence courses, or attendance at USAR schools is evidence of efforts to improve military educational status.

**C-6.** Command and staff

a. There is no substitute for command. At the same time, it must be realized that the number of command positions is limited and that being placed in such a position is primarily a matter of assignment over which the officer has little control. For officers of the technical and administrative services, such positions are even more limited. For those officers who have not been afforded the opportunity of command, the board must carefully weight other assignments and compare the degree of responsibility, managerial skill, and personal leadership with that found in assignments at the same grade.

b. Proper development of an officer's potential requires assignment to staff positions throughout his or her career at the various grade levels. Officers having experience in both command and staff assignments with a good performance record have high retention value.

**C-7.** Specialization
The specialist has a role and responsibility that is equal to the role of the generalist. The particular assignment and educational pattern followed by a specialist is usually one that will develop the officer's strength and potential in one or more functions. In many specialty areas, specialized education and repetitive assignments are required to achieve a high level of professional proficiency.

warrant officers The factors in the following paragraphs pertain only to warrant officers

**C-8.** General

a. Ensure that only the most capable warrant officers are retained beyond 20 years of service.

b. Examine the extent to which the warrant officers have taken advantage of available means to maintain and improve their professional qualifications. Warrant officers will be required to demonstrate continued military educational advancement and refresher training, as appropriate. Attendance at resident specialty courses, satisfactory progress in appropriate correspondence courses, or enrollment in vocational or other appropriate civilian schooling is evidence of efforts to improve military educational status.

c. Warrant officers who have declined commissioning should be reviewed as refusing to assume future responsibilities commensurate with their rank and grade requirements.

HEADQUARTERS
DEPARTMENT OF THE ARMY
Washington, D.C.
15 January 1989

*National Guard Regulation
No. 680-2

Effective 1 March 1989

# Personnel Information Systems
# AUTOMATED RETIREMENT POINTS ACCOUNTING SYSTEM

**Summary.** This regulation is a revision of NGR 680-2, 18 Sep 87. It sets responsibilities and procedures for maintaining retirement records, establishes the retirement year ending date, sets notification of eligibility for retired pay at age 60, sets procedures to apply for retired pay at age 60, and includes reference to the statute of limitations on applying for retired pay. Wherever the word "he" is used in this regulation it is intended to include both the masculine and feminine genders, unless otherwise indicated.

**Applicability.** This regulation applies to the Army National Guard. The provisions of AR 135-180 are applicable, except as modified herein.

**Impact on the New Manning System.** This regulation does not contain information that affects the New Manning System.

**Internal Control Systems.** This regulation is subject to the requirements of AR 11-2. It contains internal control provisions and checklists for conducting internal control reviews.

**Supplementation.** Local supplementation of this regulation is prohibited without prior approval of the Chief, NGB.

**Interim Changes.** Interim changes to this regulation are not official unless authenticated by the Executive, NGB. Users will destroy interim changes upon their expiration dates unless sooner superseded or rescinded.

**Suggested Improvements.** The proponent of this regulation is Personnel Data Management Branch, Army National Guard Personnel Center, National Guard Bureau. Users are invited to send comments and suggested improvements on DA Form 2028 (Recommended Changes to Publications and Blank Forms) directly to Chief, NGB, ATTN: NGB-ARP-CS, 4501 Ford Avenue, Alexandria, VA 22302-1450.

Distribution. A, B, and C; 1 - Cdr, ARPERCEN (DARP-PAR)

* This regulation supersedes NGR 680-2, 18 September 1987.

Table 2-5

Award of Retirement Points

| RULE | A<br>If the training is | B<br>and these requirements are met | C<br>the points awarded are |
|---|---|---|---|
| 1 | Performance of active duty, active duty special work, active duty training, annual training or full time training duty, either paid or non-paid | on authorized orders | 1 point for each day of training (Note 1) |
| 2 | Attendance at unit training assembly (Includes UTA, MUTA, ET, SUTA, ATA, AFTP, RMA, etc) (paid or non-paid). Attendance must be satisfactory | May be assigned or attached in a paid or non-paid status | 1 point for assembly of of a minimum of 4 hours duration<br><br>1 point for each 4 hour period of a MUTA. Maximum of 2 points per calendar day. (NGR 350-1) |
| 3 | Attendance at USAR Schools | a. While in an active status in the Army National Guard.<br>b. Not in lieu of attendance at unit training assemblies | 1 point for each assembly (minimum of 4 hours duration) |
| 4 | Preparation and presentation of instruction by instructors and assistant instructors. (Note 2) | a. Instruction must be military and applicable instruction presented to Armed Forces units, State OCS, ROTC, State Law and Order Organizations, Military, Department seminars, and appropriate civilian groups.<br>b. Preparation time and satisfactory presentation will be verified by the appropriate unit commander. | 1 point for each 2 hours of preparation not to exceed 3 points. 1 points for satisfactory presentation of at least 2 hours of instruction, or for lesser periods with an aggre- of 2 hours (Note 3). |

| RULE | A<br>If the training is | B<br>and these requirements are met | C<br>the points awarded are |
|---|---|---|---|
| 5 | Command, staff and administrative duties, such as supervisor of training of subordinate units, inspections, planning of exercises, staff meetings and liaison visits. (Note 2) | Authorized orders | 1 point for a minimum of 2 hours of duty. (Commanders are not entitled to points for administrative duties, nor are ARNG techs entitled to points for duty performed in civilian status) |
| 6 | Completion of Armed Forces Extension Courses | Application for enrollment must be approved by State AG and the pertinent school | 1 point for each 3 course credit hours satisfactorily completed. (Fraction of 2/3 or more will be credited as 1 point) (Credit each retirement year anniversary date) |
| 7 | Attendance at professional or trade conventions, Armed Forces seminars, or professional meetings, or training conferences. (Note 2) | Training must be of at least 2 hours duration and contain presentation of military importance to the soldier. It also must be indorsed, sponsored, supervised, and/or conducted by one or more of the military departments. | 1 point for instruction of at least 2 hours duration. (Maximum of 1 point is authorized for any one day) |
| 8 | Performance of military medical duties | Duty must be performed without pay (IDT, AT, ADSW, ADT, FTTD, or professional fees) | 1 point for 2 hours of duty with a maximum of 2 points based on 8 hours duty per day |
| 9 | Performance of certain legal duties by ARNG JAGC officers (Note 2) | | 1 point for 2 hours of duty with a maximum of 2 points based on 8 hours duty per day |
| 10 | Performance of pastoral duties by ARNG chaplains | Duty must be performed without remmeration (AT, ADSW, ADT, FTTD) | 1 point for 2 hours of duty with a maximum of 2 points based on 8 hours duty per day |

STATE OF NORTH CAROLINA
DEPARTMENT OF CRIME CONTROL AND PUBLIC SAFETY
OFFICE OF THE ADJUTANT GENERAL
NORTH CAROLINA NATIONAL GUARD

JAMES B. HUNT, JR.
GOVERNOR

RICHARD H. MOORE
SECRETARY

GERALD A. RUDISILL, JR.
MAJOR GENERAL, NCARNG
ADJUTANT GENERAL

OTAGNC-AGTG

1 November 1996

MEMORANDUM FOR SEE DISTRIBUTION

SUBJECT: Yearly Training Guidance for Training Year 1998 (TY-98)

1. THE GUIDANCE IN THIS MEMORANDUM IS FOR TRAINING YEAR 1998 (TY-98).

2. OBJECTIVE. To provide short range training guidance that focuses on the planning, execution and assessment of training in the North Carolina Army National Guard during training year 1998 (TY-98).

3. COMMANDER'S INTENT. It is my vision that every soldier be trained to standard and motivated to excellence in all endeavors. We must recruit enthusiastic, ambitious young people and retain our experienced qualified soldiers. To accomplish this, we should create an environment that encourages everyone to feel a sense of accomplishment and enjoyment in their service while being successful, productive members of their unit. It is absolutely essential that we do a better job of retaining our soldiers!

4. ASSESSMENT. We must improve the quality of training provided to our soldiers. The continuing implementation of GF 2000 requires increased emphasis in both training and resource management. We must continue our search for new and innovative ways to enhance the training of our units and soldiers. We have accomplished many successes in the past several years but I am certain with strong leadership from our officer and noncommissioned corps, we will reach yet unobtained heights.

5. INDIVIDUAL TRAINING. Noncommissioned officers have the primary responsibility to train and develop individual soldier skills.

a. Although some units have achieved their goal of 90% 3-Digit Duty MOS Qualification (DMOSQ) (less REP-63), many others have not. This training must and will take priority over all other types of training. This includes both Inactive Duty Training and Annual Training.

STATE OF NORTH CAROLINA
DEPARTMENT OF CRIME CONTROL AND PUBLIC SAFETY
OFFICE OF THE ADJUTANT GENERAL
NORTH CAROLINA NATIONAL GUARD

JAMES B. HUNT JR.
GOVERNOR

DAVID E. KELLY
SECRETARY

GERALD A. RUDISILL, JR.
MAJOR GENERAL, NCARNG
ADJUTANT GENERAL

OTAGNC-DCSOPS-T (350-1d) 31 July 2000

MEMORANDUM FOR SEE DISTRIBUTION

SUBJECT: Yearly Training Guidance for Training Year 2002 (OCT 01-SEP 02)

1. **THIS TRAINING GUIDANCE IS FOR COMMANDERS, CSM/1SGs AND TRAINERS.**

2. **PURPOSE.** To provide battle focus for training in the NCARNG for TY-02. Post to the unit bulletin board until Sep 02.

3. **COMMANDER'S INTENT.** The NCARNG must remain ready to contribute to the nation, the state, and the community, both at home and abroad. My desired end state is that the NCARNG will be composed of units that are 100% strength, 85% DMOSQ, and able to execute pre-mobilization tasks to standards. With the high quality of our soldiers and their equipment, the challenge is to remain ready, relevant and accessible. Each unit must have an aggressive recruiting and retention plan. Recruit the best and provide them with meaningful training opportunities, and positive leadership examples. Our soldiers are our most valuable resource. Retain these experienced, qualified soldiers! In order to deploy ready forces, we must maintain our equipment and safeguard our soldiers. Maintenance training and sustainment must be assessed, planned, and executed as deliberately as any other training opportunity. Safety is leader business, every soldier's responsibility, and must be a part of each phase of training. We must be prepared for missions crossing the whole spectrum of contingencies. All units of the NCARNG must be prepared to support the planning and execution of the 30th HSB's National Training Center (NTC) rotation. This is our train up year. NTC will provide many exciting and challenging training opportunities for most soldiers and units within the NCARNG.

4. **COMMANDER'S ASSESSMENT.** We must continue to improve the quality of training provided to our soldiers. The NCARNG faces increasing demands in an environment of constrained resources. Concurrently, the advent of more sophisticated weapons systems, emerging technologies, and competing personal demands requires a balance of time, dollars and focus directed to training. We must accelerate our efforts and use more visionary training methods. Our units should maintain the highest possible proficiency on METL tasks, improve on command and staff engagement at each level, and be capable to sustain combat operations.

OTAGNC-DCSOPS-T
SUBJECT: Yearly Training Guidance for Training Year 2002 (OCT 01-SEP 02)

5. **SAFETY.** Soldiers are our most precious resource. Therefore, risk management must be built-in to the planning and execution of all training. Think safety before, during and after each training event. The state safety office provides "train the trainer" Risk Management classes, and a unit Safety NCO/Officer Course. In addition, POV safety must receive command emphasis. Seat belt use is mandatory. It is the law. We will comply. We must do a better job ensuring our soldiers are safe in civilian, as well as military vehicles. For additional safety information contact the state safety office at (919) 664-6253.

6. **INDIVIDUAL TRAINING.** NCO's have the primary responsibility to train and develop individual soldier skills.

a. **DUTY MOS Qualification (MOSQ)(less REP-63), will remain the NCARNG's top individual training priority.** DMOSQ takes priority over any other type training. It is imperative that we send highly motivated and qualified soldiers to attend the appropriate training. I will hold commanders, CSMs and 1SGs accountable to track the status of all NDMOSQ soldiers in their command and ensure they are scheduled, meet the prerequisites, and are prepared to successfully complete the training. The DMOSQ report published by DCSOPS-T and posted to the public folder is an excellent management tool to stay on top of this critical issue.

b. **Train soldiers in basic soldier tasks from the Soldiers Manual of Common Tasks.** Soldiers must be confident in their ability to execute basic soldier tasks so they will have no hesitation in performing their mission. Commanders must ensure that soldiers in all ranks pass prescribed CTT tasks biennially.

c. Driver's Training requires continuous emphasis. The driver/operator licensing program is essential to individual soldier training. We must teach safety during training programs and emphasize the extreme dangers of driving under tactical and non-tactical conditions.

7. **LEADER TRAINING.** Our leader training programs will focus on tactical and technical proficiency. All leaders **will** monitor and mentor junior soldiers in Professional Development. Leaders must demonstrate "hands-on", involved leadership at every level.

a. Utilize the Select, Train, Assign and Promote (STAP) program as the primary means for filling available NCOES vacancies. This program ensures that we select the right soldier for training, whether it is for promotion or retention.

b. We must continue to monitor soldier attendance at scheduled training. Failure to meet APFT standards and/or weight standards, and course **"no shows"** are the primary reasons our soldiers are being disenrolled from NCOES courses. The unit commander and 1SG are responsible to ensure that soldiers selected to attend NCOES courses are able to meet the minimum standard required in any area and are properly notified and counseled. This can only be accomplished when a soldier's attendance receives command emphasis. In addition, the unit must monitor the Army Training Requirements and Resource System (ATRRS) and maintain the most

**OTAGNC-DCSOPS-T**
SUBJECT: Yearly Training Guidance for Training Year 2002 (OCT 01-SEP 02)

current status of the unit member's application to attend training to ensure that all quotas received by the state are properly executed. Proper responsibility and supervision in this area will ensure that we improve the readiness of our units while saving training dollars that can be used to enhance other requirements.

c. Commanders will track and manage the educational status (both military and civilian) of their company grade officers. 1LT's and CPT's will be programmed to complete the Officer Advance Course (OAC) and Combined Arms and Service Staff School (CAS3) in a timely manner. Attendance at these courses will take priority over IDT and AT. All 1LT's will be strongly encouraged to enroll and complete the appropriate OAC prior to promotion to CPT. All officers will comply with NGR (AR) 600-100 on their civilian education.

8. **UNIT TRAINING.** Every unit must develop and maintain a METL IAW FM 25-101 and utilize SATS software to design their training program. SATS provides the capability to create, browse or modify the Training Support Packages (TSP). **All unit training schedules will be published using SATS**. The METL is a working document and a leader's tool to manage unit training. Unit training programs must be developed IAW requirements published in AR 350-1 and FORSCOM/ARNG/USAR 350-2.

a. Collective training must focus on squad and platoon gunnery and maneuver level tasks in Combat Arms (CA) units. Only when training at the initial organizational level is achieved is progression to higher organizational levels authorized. CA units with projected rotations such as the NTC or the JRTC must plan for and conduct training at levels required as gates to those rotations. Combat Support (CS) and Combat Service Support (CSS) units must train to the their level of organization.

b. All priority units (Force Support Package (FSP), Heavy Separate Brigade (HSB), and Latest Arrival Date (LAD) <30 units) will conduct the following (Para 6-3, 6-4 ARNG 350-2):

~~(1) Lane training. Annually, normally during AT.~~

(2) Command and staff training. One staff training event quarterly with one simulation supported battle staff exercise (BCBST/BCST) annually for each battalion level HQ and above.

(3) TAM. Annually.

c. All other units will conduct the following (Para 6-3, 6-4 ARNG 350-2):

(1) Lane training. Biennially.

(2) Command and staff training. One staff training event quarterly with a constructive battle staff exercise (BCST) triennially for each battalion level HQ and above.

(3) TAM. Triennially.

# Army Distance Learning

## *Potential for Reducing Shortages in Army Enlisted Occupations*

RAND

Michael G. Shanley
Henry A. Leonard
John D. Winkler

20010627 122

*Arroyo Center*

### How DL Can Improve the Effectiveness of Accelerating Training

When NCOs cannot be trained in a timely manner, the result is an increase in the shortage of trained personnel. For FY99, we estimate that 8,500 E6 and E7 positions were occupied by soldiers not formally trained (with the appropriate Basic NCO Course (BNCOC) or Advanced NCO Course (ANCOC)) for those jobs or not trained for their grade. That number represents 2.4 percent of all authorizations, and 8.9 percent of E6 and E7 authorizations. Some of the untrained are NCOs not yet formally trained for their grade, but most are "fast-trackers" serving above their grade in positions for which there would otherwise be a shortage.

With proper support and monitoring, DL could make BNCOC and ANCOC training possible earlier in the select-train-promote sequence. First, DL training can begin before scheduled residence training courses are available. Second, DL training can be taken in small pieces, on a "continuous" basis. Third, DL training can occur at home station. Fourth, modularized DL courses allow "testing out" of already mastered material, which means fast-trackers who get much of their experience through on-the-job training (OJT) would not have to sit through the parts of course material they have already mastered. Finally, DL can enhance the type of self-development training that can accelerate the institutional training process.

Given the extent of training shortages among NCOs, we find the forcewide potential for DL to reduce shortages by accelerating training relatively high. Moreover, with the new NCO Educational System (NCOES) model projecting more individual training for NCOs, we think the level of potential application of DL for BNCOC and ANCOC will increase in the future, working to avoid an increase in future training shortages.

## CONCLUSIONS

Using DL in the contexts described above offers significant potential for further reducing shortages and for reducing the marginal cost of achieving those reductions. Realizing that potential, however, requires implementing the DL program in ways that will produce the available benefits. This means early selection of courses for conver-

## DEALING WITH THE QUALITY DIMENSION OF DL

The analyses in this report (and in its companion report) carry with them the assumption that DL's potential can be fully realized in many of the Army's training programs without causing any reduction in the quality of training. Making this assumption allows us to fully explore how much DL might reduce shortages in Army occupations.

Moreover, we note that there is a considerable volume of past research supporting the contention that DL, if properly implemented, can provide training as effectively as the classroom training it replaces. For example, Barry and Runyan (1995) examined 11 studies of military courses and concluded that there was no significant difference between the performance of students in DL and RL versions of the same course. To cite another example, Phelps et al. (1992, pp. 113–125) found that knowledge gained in engineering and leadership courses offered to a group of Reserve Component officers was at worst not significantly different between RL and DL groups. Along the same lines, in a test of distance versus resident education on selected subjects from the Army Command and General Staff Officers' Course, Keene and Cary (1992, pp. 97–103) found that "students who received the distance learning instruction evinced superior knowledge of the subject matter at the end of the instruction." Finally, Farris et al. (1993) found that computer-based training could be used effectively in teaching many of the skills required for artillery fire direction specialists.

However, there can be no doubt that DL's introduction will bring about large and fundamental changes—technically, organizationally, and culturally—in how training (particularly but not only institutional training) is conducted. Viewed in this way, DL clearly poses some risks to the quality of training, especially during the transition period. The key to maintaining training quality and achieving desired learning outcomes will continue to be careful implementation and monitoring, which in turn will require continued emphasis and support throughout the Army. In the next paragraphs, we discuss areas where continued attention will be needed to uphold the overall quality of training and education as DL programs are introduced.

Maintaining the quality of training will require special emphasis on DL courseware in general. The shift to a greater dependence on

military pay and allowances ($11,000 for an E5 with 6 years of experience) for a soldier who reclassifies in the 15-week 67T AIT course.

## HOW DL CAN ENHANCE THE RECLASSIFICATION STRATEGY

The analysis above shows why the Army already uses the reclassification strategy. The focus here is on whether DL can enhance the benefits of the reclassification strategy. If DL could make reclassification more attractive to students and commanders, the strategy would (a) be able to redress a larger portion of the shortages and (b) be able to accomplish this at a lower incremental cost than exists today. In this section we argue that DL could provide a more attractive reclassification strategy in three ways. First, we argue that DL can lead to an expansion of the reclassification program because it can offer a shorter course, at least some of which could be conducted closer to home (e.g., at the home unit, at a Total Army School System (TASS) battalion, etc.). Second, DL could alleviate equipment bottlenecks at AIT because of the potential availability of unit equipment for training. Third, DL reclassification will make the process of filling shortages more efficient overall, both from the personnel acquisition and training standpoint and because it may lead to a better utilization of bonus funds. The first two points are described in more detail in the first subsection below; the final point is discussed at length following that.

### DL Courses Could Expand the Reclassification Program and Reduce AIT Equipment Bottlenecks

In general, DL reclassification courses can be shorter and more flexible than their RL counterparts, and they can involve less time away from home station. This lowers the transaction cost (in terms of time, dollar cost, and inconvenience) of filling a shortage, both for potential reclassifiers and for their commanders. Basic economics argues that lowering the transaction costs involved in obtaining a product will increase the amount demanded. Thus, the introduction of DL reclassification courses could allow the expansion of that method of filling MOS shortages.

Table 4.2

DL (TADLP) Versus AIT Course Characteristics: The Example of the 67T Reclassification Course

| Characteristic | AIT Course | DL Course (TADLP) |
|---|---|---|
| Total course length | 15 weeks | 8 weeks, 3 days |
| Residential length | 15 weeks | 4 weeks, 1 day |
| DL length | None | 4 weeks, 2 days |
| Testing out of already mastered material | No | Potential Yes |
| Potential obstacles | • Funding<br>• Training seats<br>• Equipment | Cost of added course development |

SOURCE: TADLP IPR November 1999.

Table 4.2 shows an example (67T) of a forthcoming DL reclassification course compared to the AIT course in the same occupation. Characteristics of the DL course were reported during the October 1999 DL In-Process Review (IPR) at TRADOC. The DL-supported course is 43 percent shorter in total (8 weeks, 3 days versus 15 weeks). Moreover, the DL course is 72 percent shorter in terms of time away from home station—only 4 weeks, 1 day.

Further, with a modularized DL course, there is potential for DL to shorten the course even further in cases where the trainees have already mastered some of the required skills. This could occur for 67N, 67V, and 67Y personnel, for example, who are already skilled helicopter repairmen but are reclassifying into new helicopter repair MOSs as the equipment mix of the force changes.

Finally, a DL course could overcome some of the current obstacles to undertaking more reclassification through the AIT course.[14] First, a

[14]Of course, cost issues can arise on the DL side as well. For example, although we are assuming that from the perspective of the DCSPER the front-end investment costs of DL are sunk (see the discussion in Chapter Three), additional development costs might accrue if the DL program turned out to require more funding than currently allocated to address DCSPER concerns about DL design.

lack of training seats is less likely to be an issue because students spend less time in residence. Similarly, the current equipment shortage at Fort Eustis (the AIT base) is less likely to be an issue if some of the hands-on training could be completed at the soldier's unit using unit equipment. Finally, a shorter DL course is less likely to have problems with funding. Currently, a lack of available funds can prevent reclassification training (and cross-training) in cases of "TDY and return" (as opposed to training between assignments). For TDY and return, the training funding must come from the installation and compete with its other priorities.

## DL Training Will Make the Process of Reducing Shortages More Efficient

As mentioned above, DL training offers two different ways of making reclassification more efficient at filling shortages: (1) by being less expensive from an acquisition and training perspective and (2) by potentially saving on bonuses needed for reenlistment. Each savings is discussed below in the context of SL1 reclassification.

**DL reclassification training is a less expensive way to reduce shortages.** First, if a more attractive DL course can lead to more voluntary reclassifications among the continuing force, force efficiency can be increased and the cost of force structure imbalances reduced. As argued above, in this situation the number of shortages can be reduced without the Army having to draw on newly accessed or newly retained soldiers.

Second, DL reclassification can further reduce the cost of filling shortages. Figure 4.5 makes this point, expanding on the graphic used earlier in Figure 4.4 to illustrate the lower cost of DL reclassification compared to accession and traditional reclassification in the case of 67T. While the cost of skill training is the same in the cases of accession and AIT reclassification, it is more than 43 percent less for DL reclassification because of the shorter course length. As a result, DL reclassification costs 43 percent less than AIT reclassification, and 64 percent less than the full cost of accession. Because median course length reductions across all courses are expected to be closer to 30 percent (rather than the 43 percent observed in the case of

**Department of the Army**
**Headquarters, United States Army**
**Training and Doctrine Command**
**Fort Monroe, Virginia 23651-1047**

**TRADOC Regulation 350-10**

**12 August 2002**

Training

# INSTITUTIONAL LEADER TRAINING AND EDUCATION

**Summary.** This regulation prescribes institutional training and education policies for officer (to include precommission), warrant officer (to include preappointment), and noncommissioned officer (NCO) leader development, and defines the U.S. Army Training and Doctrine Command's (TRADOC's) role in Army civilian leader development.

**Applicability.** This regulation applies to TRADOC service schools and Active Army, U.S. Army Reserve (USAR), and Army National Guard of the United States (ARNGUS) agencies responsible for officer (to include precommission), warrant officer (to include preappointment), NCO, and civilian leader training and education. Unless otherwise stated, the policies contained herein apply to members of sister and foreign services attending Army schools.

**Supplementation.** Supplementation of this regulation is not authorized without prior approval from Commander, TRADOC, 5 Fenwick Road, ATTN: ATTG-IL, Fort Monroe, VA 23651-1049.

**Management control process.** This regulation is not subject to the requirements of AR 11-2. It does not contain checklists.

**Suggested improvements.** The proponent of this regulation is the Deputy Chief of Staff for Operations and Training (DCSOPS&T). Send comments and suggested improvements on DA Form 2028 (Recommended Changes to Publications and Blank Forms) through command channels to Commander, TRADOC, 5 Fenwick Road, ATTN: ATTG-IL, Fort Monroe, VA 23651-1049, or e-mail dcstitd@monroe.army.mil. Suggested improvements may also be submitted using DA Form 1045 (Army Ideas for Excellence Program (AIEP) Proposal).

Availability. This publication is available on the TRADOC Homepage at http://www-tradoc.monroe.army.mil.

**Summary of Changes**
This TRADOC regulation—

- Aligns TRADOC institutional training policies with the Department of Army (DA) policies contained in AR 350-1.
- Establishes roles and responsibilities of the Deputy Commanding General Initial Entry Training (DCG-IET)/Commanding General Army Accessions Command (AAC).
- Corrects previously incorrect guidance concerning The Modern Army Recordkeeping System (MARKS) file number to be used to maintain academic records per AR 25-400-2.
- Defines Senior Small Group Leader (SSGL) duties and ratio to Small Group Leader (SGL) requirements.
- Changes the delegation of authority to course proponent commandants/CGs or their designated representative in the rank of colonel or higher waiver authority for small group leader-to-student ratios and clarifies the minimum instructor grade levels requirements/authorizations for the conduct of leader courses.
- Establishes linkage between TRADOC-approved common core and Common Task Test (CTT) administered by units.
- Clarifies attendance and conduct criteria of new stand-alone TASS ANCOC and BNCOC Phase I, NCOES Common Cores.
- Delineates responsibilities and time line standards for administering the Army Physical Fitness Test (APFT) as a professional development course graduation requirement.
- References AR 350-1, Individual Military Education and Training (which the current AR 350-1 will be renamed when revised).

*This regulation supersedes TRADOC Regulation 351-10, 1 May 1997.

and combined environments, captains learn to function as staff officers by improving their abilities to analyze and solve military problems, communicate, and interact as members of a staff. Through a broadened understanding of Army operations, organizations, and procedures, students complete scenario-based exercises emphasizing the processes of problem analysis, solution development, and staff officer coordination. Exercises involve realistic problems related to training, mobilization, staff planning for unit deployment, and combat operations.

(1) Attendance is mandatory for all officers; however, the respective branch proponents determine attendance requirements for selected special branches.

(2) Students will attend this phase in a «TDY and return» status ONLY. This is essential to maintain the CCC as a single permanent change-of-station course with an embedded TDY phase IAW The Joint Federal Travel Regulations (per Deputy General Counsel of the Army decision, dated 23 Jan 98).

(3) Resident attendance is mandatory for Active Guard-Reserve captains with less than 13 years commissioned service who were not enrolled or completed CGSOC, or its equivalent, as of 1 Oct 86.

c. The CCC for reserve officers is phased for captains to receive—

(1) Most common core and some branch-specific instruction, as well as staff process diagnostic in non-resident mode.

(2) Branch-specific training in a resident mode, at proponent schools, during one ADT period.

(3) Staff process training normally in 8 IDT periods and a 2-week ADT period or in an accelerated version of 2 ADT periods.

d. Officers do not receive course credit until all phases are completed successfully. Branch commandants will award MEL code 6 upon successful completion of branch-specific training. Upon successful completion of staff process training, branch commandants will award MEL code N to denote CCC completion. This procedure accounts for those students authorized delays between phases, special branch officers not required to attend staff process training to achieve branch qualification, and RC officers who complete the two phases in different training years.

e. Upon successful completion of all required phases, CCC diplomas will be awarded. As exceptions, the following officers will receive diplomas at the conclusion of branch-specific training:

(1) Special branch officers not required to attend staff process training to achieve branch qualification.

(2) International Military Students (IMS) and U.S. sister service officers who are not authorized to attend staff process training.

(3) Reserve component officers will receive separate diplomas for branch specific training and staff process training. This is required to make RC captains eligible for promotion during the 3-4 year timespan required for them to complete the CCC.

f. In most cases, CCC quotas for IMS will not exceed more than two per small group. As an exception, a third IMS may be programmed if the student is from a DA-exempt country. Identification of DA-exempted countries may be requested from TRADOC Security Assistance Training Field Activity. Additionally, IMS will be tested and must achieve minimum oral English language proficiency prior to enrollment.

**3-5. Command and General Staff Officer Course (CGSOC).** The CGSOC educates promotable captains and majors in the values and practice of the profession of arms. It emphasizes tactical and operational skills required for warfighting at the corps and division levels. Graduates of CGSOC are recognized by MEL code 4 and receive credit for Joint Professional Military Education Phase I. Military education level 4 can also be achieved through the Air Command and Staff College, the Naval War College, the U.S. Marine Corps Command and Staff College, the Western Hemisphere Institute for Security Cooperation Command and Staff College, and foreign military colleges approved/validated by CGSOC. Currently, CGSOC has a resident course and two non-resident options.

a. Resident. Active Component officers are considered for a 10-month resident attendance at Fort Leavenworth during an eligibility window that opens upon selection for major. Fifty percent of each year group by basic branch and functional area are selected during two annual consecutive boards. The goal is for attendance to occur between the 10th and 13th years of service. Additional skill qualification as strategist, joint planner, historian, or space operations is available through the electives program. The opportunity is also available with additional academic effort to pursue a Master of Military Arts and Science degree. The 19-week Reserve Component Course is conducted each academic year concurrent with term 1 of the CGSOC. Reserve Component Course students are integrated with CGSOC students.

b. Nonresident (correspondence and distributed classroom). The nonresident version is equivalent to the resident course for satisfying career schooling requirements. Nonresident CGSOC, which must be completed within 36 months of enrollment, is presented in two formats:

(1) The corresponding studies «S» format is organized into four sequential phases consisting of a number of subcourses. Each subcourse is a self-contained block of instruction containing one or more examinations

graded by CGSC School of Corresponding Studies (SOCS). Several subcourses require submission of written requirements, which are subjectively graded.

(2) RC instructors in TASS school battalions worldwide present the distributed classroom "M" format. This option is also organized into four sequential phases with subcourses equivalent to those in the correspondence «S» option. Each subcourse contains one or more examinations and written requirements. Many of the requirements are graded by the TASS school battalions, which report grades to SOCS.

c. Qualified RC officers must enroll in the CGSOC or equivalent level course before completing 18 years total commissioned service.

d. Active Component warrant officers and enlisted soldiers with a reserve commission (dual component control group) may enroll, but must attend the ADT phases either at their own expense, or on TDY if their headquarters will fund this training.

e. Department of Army civilians, General Schedule (GS)-11 or above, whose duties require knowledge of the subject matter in the curriculum, may enroll in the correspondence option. A senior rater memorandum of recommendation must accompany the application. Defense contractors are ineligible.

f. Foreign military personnel who meet eligibility requirements must receive prior approval from TRADOC Security Assistance Training Field Activity to enroll in or audit the nonresident course. See AR 12-15.

3-6. Advanced Military Studies Program (AMSP). The AMSP is an 11-month curriculum offered to selected CGSOC (and equivalent service college) graduates and allied officers leading to award of a Master of Military Art and Science degree. Following graduation, students complete the final part of the program by serving on a division or corps staff or in a U.S. Army Special Operations Command-designated operational staff position.

3-7. Army War College (AWC). Various senior service colleges (SSC) offer capstone professional military education. The Army SSC is AWC at Carlisle Barracks, PA. The AWC prepares selected military, civilian, and international leaders to assume strategic leadership responsibilities in military or national security organizations. It educates leaders and the Nation on the employment of land power as part of a unified, joint, or multinational force in support of the national military strategy; researches operational and strategic issues; and conducts outreach programs that benefit the AWC, the Army, and the Nation. Senior service college graduates are recognized by MEL code 1. To achieve its objectives, AWC—

a. Conducts resident, nonresident, and other educational programs to develop the competence of military, civilian, and international leaders to—

(1) Distinguish the uniqueness of strategic level leadership.

(2) Manage change by applying resources to the process for translating strategy into force requirements and capabilities.

(3) Advise on the role of the military, in concert with other elements of national power, in national security strategy formulation.

(4) Analyze threats and other factors that affect U.S. interests.

(5) Apply strategic thought to U.S. national security decisionmaking process.

(6) Develop theater strategies, estimates, and campaign plans to employ unified, joint, and multinational forces.

(7) Synthesize critical elements of warfare at the strategic and operational levels.

b. Conducts additional related educational courses, programs, and seminars.

c. Conducts an International Fellows Program for selected senior officers of foreign countries.

d. Conducts student and faculty strategic-level research projects in support of the Army, other military issues, warfare, programs and policies, and the military profession.

e. Maintains close and continuing working relationships with TRADOC to ensure synchronization of OES objectives.

f. Maintains liaison with other elements of the military educational system and civilian educators.

3-8. Advanced Operational Arts Studies Fellowship (AOASF). The AOASF is a 2-year senior service college-level program that produces operational planners for assignment to unified commands. Advanced Operational Arts Studies Fellowship includes graduate-level academic courses, travel to commander-in-chief headquarters, and practical exercises in campaign planning. Graduates are recognized by MEL code 1.

3-9. Pre-Command Courses (PCC). Brigade and battalion-level command designees attend one or more of the following PCCs prior to assuming command.

a. Branch-specific PCC. Instruction, provided at the officer's branch school, focuses on tactical and technical aspects of command. Attendance is mandatory for all AC and RC command designees.

Main Table of Contents

# Executive Summary

## ES-1. Overview

**Introduction**

a. This Executive Summary provides a top-level overview of the Army's operational process for developing, managing, and assuring the quality of collective, individual, and self-development training/education as well as training institutions for the Total Army. The Army's training development (TD) process, the Systems Approach to Training (SAT), is a systematic approach to making these training/education decisions. The SAT process must be used by HQ TRADOC, Total Army School System (TASS) Training Battalions, and all subordinate organizations responsible for managing or performing training development or TD-related functions, including evaluation/quality assurance of the training, personnel, products, and institutions that present the training/education; it also applies to non-TRADOC agencies/organizations having Memorandums of Understanding, Memorandums of Agreement, and contracts.

Training development is a vital component of TRADOC's mission to prepare the Army for war. As such, it is the responsibility of every civilian and soldier in management and training-related roles in the TRADOC HQ, schools, and supporting contractor offices. Our soldiers are our greatest assets. They must be the best-trained soldiers in the world--trained to fight and win on the Battlefield of Tomorrow.

Management at all levels needs both to understand the process and to ensure its efficient implementation. Doing so will save scarce resources: personnel, time, and unnecessary product development dollars.

**Index**

b. This Executive Summary covers the following:



| Content | Paragraph |
|---|---|
| Introduction | ES-2 |
| The Systems Approach to Training (SAT) Process | ES-3 |
| Training/TD Management Responsibilities | ES-4 |
| TD Efficiencies | ES-5 |
| Training Related Systems Interface | ES-6 |
| Regulation Contents | ES-7 |



## ES-2. Introduction

**Total Army Training/ Education**

a. The Army's peacetime mission is to prepare the total Army, i.e, Active and Reserve Components, to perform (fight, win, and survive) across the entire spectrum of military operations. The major concern of all commanders is to ensure their soldiers and units are trained to perform their mission to standard and survive. To ensure mission-focused training, TRADOC must train soldiers, staffs, and units to perform under realistic and stressful conditions. However, this training/education must ensure both the well being of Army personnel being trained (i.e., force protection) and protection of the environment.

**SAT Goal**

b. The goal of the SAT process is to support the Army's mission by providing mission-focused,

Case 1:00-cv-00644-NBF Document 109-17 Filed 06/13/2005 Page 25 of 25



Main Table of Contents

# Chapter VI-9
# Army Correspondence Course Program (ACCP)

## VI-9-1. Chapter Overview

**Introduction**

a. This chapter describes and provides policy and guidance for development of Army Correspondence Course Program (ACCP) products, including correspondence courses, course phases, and subcourses (modules). ACCP is part of the Total Army Distance Learning Program (TADLP) and is a viable component of the Total Army Training System (TATS) Course. The intent is for all ACCPs to be produced in paperless formats for delivery via the Internet or other electronic distance learning means.

***Note 1:*** See Chapter VI-6, Training Course Design, for policy on lesson design.

***Note 2*:** See Chapter I-1, Training Product Classification, Foreign Disclosure (FD) Restriction Statements, and Copyright/Proprietary Materials, for foreign disclosure and copyright guidance.

**Chapter Index**

b. This chapter covers the following:

| Content | Paragraph |
|---|---|
| Administrative Information | VI-9-2 |
| Correspondence Course Program Description and Requirements | VI-9-3 |
| Correspondence Course Uses | VI-9-4 |
| ACCP Implementation and Management | VI-9-5 |

## VI-9-2. Administrative Information

**Purpose**

a. The Army Correspondence Course Program provides the means to develop, produce, and distribute (implement) the following formal nonresident Army training products.

(1) TATS Course/Module. Courseware designed to support specific critical tasks and supporting skills and knowledge identified as a phase(s) or module(s) to be completed before, during, or after a resident training phase or module portion of a TATS course.

(2) Self-development programs. Specific courseware made available to support the career model recommendations.

**References**

b. Required references and Internet addresses for developing correspondence and distance learning printed materials are as follows:

**Regulatory:**

(1) AR 25-30, The Army Integrated Publishing and Printing Program

(2) Other chapters this regulation:

(a) Chapter I-1, Training Product Classification and Foreign Disclosure (FD) Restriction Statements

(b) Chapter II-10, Training and Training Development (TD) Automation

(c) Chapter III-3, Product/Material Validation


000444