IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WILLIAM A. CLARK, individually and on behalf of all others similarly situated, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 00-644 (Chief Judge Damich) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**DECLARATION BY DANIEL J. KOHNER**

I, Daniel J. Kohner, make the following declaration in accordance with 28 U.S.C. § 1746. I am aware that this declaration will be used in the United States Court of Federal Claims, and that this declaration is the legal equivalent to a statement under oath.

1. I am the Director, Manpower Programs, in the Office of the Assistant Secretary of Defense for Reserve Affairs - (OASD/RA). Our office is in the Pentagon, Washington, DC. I am a federal civil service employee at the grade of GS-15, step 7. OASD/RA has overall DoD oversight responsibility for all matters pertaining to the reserve components, to include the Army and Air National Guards and the National Guard Bureau. I have been in the Manpower Directorate for nine years (April, 1995 – present), and assumed the Director position about four years ago (June, 2000). The Director of Manpower Programs works directly for the Deputy Assistant Secretary of Defense for Reserve Affairs (Manpower and Personnel) - (DASD(M&P)).

2. The Manpower Programs Directorate of OASD/RA is responsible for establishing DoD policy and setting the requirements for categorizing and recording all reserve component (RC) personnel, and the training requirements for those categories, in accordance with Sections 10141 through 10154, and 12774 of Title 10, U.S. Code, and Title 32, U.S. Code. The training

00633

categories and requirements apply to all members of the reserve components, to include members of the Army National Guard of the United States (ARNGUS) and the Air National Guard of the United States (ANGUS) while in their status as members of the Army National Guard (ARNG) and Air National Guard (ANG), respectively. These OASD/RA policies are binding on each service secretary as well as on the Chief, National Guard Bureau.

3. As the Director, Manpower Programs for OASD/RA, I am responsible for:

1) Planning, formulating and developing policies and programs dealing with Reserve component manpower. My office also develops Defense Guidance, Program Objective Memoranda Instructions, and Defense Manpower Requirements Report changes to properly reflect, justify, and validate such policies and programs;

2) Identifying and defining major DoD planning and management problem areas. My office works with the four Service and seven RC staffs to review, analyze and interpret RC manpower program issues. I meet personally with senior officials in the Services, Defense Agencies and other appropriate agencies to affect resolution of problem areas. I also oversee independent contract studies of major policy areas designed to provide alternative approaches to manpower management.

3) Coordinating DoD policies, procedures and planning and programming guidance. I serve as the primary liaison between the OASD(RA), the Services and the RCs in those areas for which the incumbent has oversight responsibility. I am responsible for developing the RC personnel policy guidance issued by the Under Secretary of Defense for Personnel and Readiness to support each specific Contingency Operation;

4) Preparing and consolidating data, text and supporting material for the Annual Defense Report, Manpower Requirements Report, congressional testimony and subsequent

congressional questions pertaining to the RC manpower programs;

5) Developing an annual profile of RC usage and the support provided to the active forces and combatant commanders. My office also obtains detailed data, by component and by type of support, from each of the seven RCs. We assess the attrition and other impacts on the RCs associated with providing operational support to the active force;

6) Reviewing, analyzing and interpreting RC manpower as presented by the Services in the Program Objective Memoranda and Budget Submissions. My office introduces major RC manpower issues into the DoD Program and Budget Review process. We also prepare issue and program budget decision papers for decision by the Defense Resource Board and the Secretary of Defense;

7) Preparing legislative amendments to federal statutes, and DoD policy directives and implementing instructions in support of RC manpower requirements and programs.

8) Monitoring execution of RC manpower programs, to insure compliance with Departmental Guidance, Directives and Instructions;

9) Preparing press releases and public statements and speeches as required to further clarify and support RC manpower programs in support of assigned DoD missions;

10) Advising the DASD(M&P) on all aspects of RC manpower program requirements and objectives. My office represents the OASD(RA) at meetings within the Department and with other governmental agencies. We are also responsible for explaining and advocating the policy determinations of the ASD(RA), and for keeping the senior OASD(RA) leadership informed as to significant developments and potential problem areas.

4. As specified in paragraphs 1, 3, 7, and 8 of the above-prescribed duties, DoD policy development, coordination, and publication are critical elements of the OASD/RA mission. In

this regard, OASD/RA Manpower Programs has proponency – or staff responsibility - for 12 Department of Defense Directives and Instructions. Specifically, they are:

1) DoD Directive 1200.7, Screening the Ready Reserve;

2) DoD Directive 1205.5, Transfer of Members Between Reserve and Regular Components of the Military Services;

3) DoD Directive 1205.18, Full-Time Support to the Reserve Components;

4) DoD Directive 1215.6, Uniform Reserve, Training and Retirement Categories;

5) DoD Directive 1215.13, Reserve Component Member Participation Policy;

6) DoD Instruction 1215.18, Reserve Component Member Participation Requirements;

7) DoD Instruction 1215.19, Uniform Reserve, Training and Retirement Category Administration;

8) DoD Directive 1235.9, Management and Mobilization of the Standby Reserve;

9) DoD Directive 1235.11, Management of Individual Mobilization Augmentees (IMAs);

10) DoD Directive 1235.13, Management of the Individual Ready Reserve (IRR) and Inactive National Guard (ING);

11) DoD Instruction 1235.14, Administration and Management of the Individual Ready Reserve (IRR) and Inactive National Guard (ING);

12) DoD Directive 1352.1, Management and Mobilization of Regular and Reserve Retired Military Members.

I am very familiar with these regulations because I have written or revised most of these policy documents.

5. By statute and regulation, each member of the Selected Reserve ("SELRES") of the Ready Reserve subject to a statutory or contractual service obligation, which includes members of the Army and Air National Guards, must meet minimum annual training participation

requirements. Through the above listed directives and regulations, the DoD implements the training authorities, requirements, and parameters for the RCs and the ARNG/ANG that are set forth in Title 10 and Title 32 of the U.S. Code, respectively. Specifically, 10 U.S.C. §§ 10143 and 10147 establish the training requirements for all members of the Ready Reserve, which includes all members of the ARNGUS and the ANGUS. The training requirements for the ARNGUS/ANGUS is performed in their status as members of the ARNG/ANG, and are governed by 32 U.S.C. §§ 502-505.

6. All required training is conducted in one of three statuses: active duty (as defined in 10 U. S. C. § 101(d)(1)) and 32 U.S.C. § 101(12), full-time National Guard duty (as defined in 10 U.S.C. § 101(d)(5) and 32 U.S.C. § 101(19)), or inactive-duty. Active duty means full time duty in the service of the United States, and includes training duties such as a reservist's fourteen days of active duty for training required by 10 U.S.C. § 10147(a)(1), and ARNG/ANG annual training required by 32 U.S.C. § 502(a)(2). Full-time National Guard duty means training or other duty, other than inactive duty, performed by a member of the ARNGUS or ANGUS in the member's status as a member of the National Guard of a State or territory, pursuant to 32 U.S.C. § 502(f). Inactive-duty training (IDT) is required training performed in other than an active duty- or full-time National Guard duty status. Specifically, each SELRES member is required to participate in a minimum number of scheduled training periods during each year. RC members other than those in the ARNG/ANG must participate in at least 48 scheduled drills or training periods during each year. 10 U.S.C. § 10147(a)(1). Members of the ARNG/ANG must assemble for drill and instruction at least forty eight times each year as provided in section 502(a)(1) of Title 32. 10 U.S.C. § 10143. However, by DoD policy that requirement is limited to members of the SELRES, excluding Individual Mobilization Augmentees whose IDT periods may vary from

zero to forty eight. As stated in DoDI 1215.18, the purpose of these mandatory participation requirements each year is to maintain the proficiency of the unit and the skills of the individuals. Members of the ARNGUS/ANGUS satisfy their SELRES requirements by participating in the 48 drills required by 32 U.S.C. § 502(a)(1).

7. DoD Instruction 1215.19 is the principle regulation setting forth DoD policy regarding authorized IDT. While each service secretary may prescribe additional standards for IDT, they may only do so within the guidelines and parameters prescribed by DoDD 1215.6 and DoDI 1215.19. Individuals attending IDT periods are required to meet the minimum training standards established by the Secretary concerned, and may voluntarily attend extra IDT periods in a non-pay status. DoDI 1215.19, ¶ 6.5.1. IDT is defined in DoDI 1215.19, paragraph 6.2.2. as:

> Authorized training performed by members of an RC not on AD, and performed in connection with the prescribed activities of the RC of which they are a member. It consists of regularly scheduled unit training periods, additional IDT periods, and equivalent training. <u>The primary purpose of IDT is to provide individual and/or unit readiness training</u>. IDT may support AC missions and requirements; i.e., operational support, thereby adding substance to the Total Force. (Underline added for emphasis).

It is the long held understanding within DoD and the individual services that the regularly scheduled unit training periods and additional IDT periods, when ordered to be performed for compensation (as opposed to being performed in a no-pay status) encompass the regular periods of instruction or periods of appropriate duty referred to in 37 U.S.C. § 206(a)(1).

8. As outlined in DoDI 1215.18 and 1215.19, regularly scheduled unit training periods of IDT, historically and commonly understood as drills, are periods of actual military duty organized, authorized, and scheduled by the unit leadership to enhance the current readiness levels of the members and the unit. With regard to the ARNG/ANG, a regularly scheduled unit

training period is the assembly for drill and instruction required by 32 U.S.C. § 502(a)(1), and must therefore meet the additional requirements set forth in section 502 and implementing regulations.

9. Additional IDT periods are specifically defined in DoDI 1215.19:

> Additional training periods (ATPs) for units, components of units, and individuals are for accomplishing additional required training, as defined by post-mobilization mission requirements. The number of those training periods shall not exceed 30 each fiscal year (FY) for any member.
>
> Additional flying and flight training periods (AFTPs) are authorized for primary aircrew members for conducting aircrew training and combat crew qualification training to attain and maintain aircrew flying proficiency and sustain required readiness. These AFTPs shall not be in addition to the ATPs in paragraph 6.2.2.6.3.1., above. The number of these training periods shall not exceed 48 each FY for any aircrew member, unless specifically authorized by the Secretary concerned.
>
> Readiness management periods (RMPs) are used to support the following functions in preparing units for training: the ongoing day-to-day operation of the unit, accomplishing unit administration, training preparation, support activities, and maintenance functions. The number of RMPs shall not exceed 30 each FY for any member. Those training periods shall be used only where sufficient full-time support (FTS) personnel are not available to accomplish those duties. These RMPs shall not be performed on the same day another training period (IDT, ATP, or AFTP) is being performed and not more than one RMP shall be performed by an individual in 1 calendar day.

As with regularly scheduled unit training periods, ATPs are authorized for the purpose of establishing and maintaining current unit and individual readiness.

10. Equivalent Training is another subcategory of IDT. It is well and long understood in the DoD and the individual services that the term "equivalent training" refers to the "equivalent training, instruction, duty, or appropriate duties," referred to in 37 U.S.C. § 206(a)(2). While

that section grants the service secretaries the discretion and flexibility to authorize payment for IDT performed in lieu of a regularly scheduled period of instruction or appropriate duty, it is not, nor has it ever been interpreted to be, an independent training authority. It has been understood, through longstanding practice, as purely a compensation provision; the authority to require any type of IDT has been exercised exclusively from provisions in Titles 10 and 32 as described above. Equivalent training is exclusively periods of IDT performed instead of regularly scheduled IDT. DoDI 1215.18, para. E4.3.1; DoDI 1215.19, para. E2.1.4.0 Equivalent training is training that is equal in nature and duration to the training conducted during those periods of IDT for which it is substituted, and like all IDT, it must be organized, approved, and scheduled in advance by the unit leadership to enhance the readiness levels of the unit.

11. Inactive-duty training and Funeral Honors Duty, the only actual military duties for which Congress has authorized compensation in 37 U.S.C. § 206 and for which it appropriates federal funds to the DoD annually in accordance with DoD budgetary programming, does not include the completion of correspondence courses. Correspondence courses are self-paced, professional development opportunities, performed at a time and place of the individuals choosing. Such courses simply do not meet the minimum requirements to qualify as IDT as established in the applicable DoD and service specific regulations described herein. For example, to qualify as IDT, the training period must be at least four hours in duration, it must be pre-approved by competent military authority, be on proper orders or a unit training schedule, and must be conducted in uniform. Failure to complete correspondence courses could not be considered as an unexcused absence from drill, thus subjecting the soldier to the sanctions for unsatisfactory participation in SELRES training requirements, such as involuntary activation for two-years, forty-five days of involuntary ADT, or separation from the service. Even if the erroneous

perception were made that correspondence course study was in some way equivalent to IDT, there would need to be documentation that the correspondence course was at a minimum pre-approved, conducted in four-hour sessions, and while in uniform, or it would be non-compensable. Further, with regard to the ARNG/ANG, the performance of correspondence courses would have to qualify as a unit "assembly" as set forth in 32 U.S.C. § 502(a)(1) and implementing regulations. Correspondence courses are performed voluntarily while in a civilian status and therefore have never been considered duty for which compensation is authorized.

12. It is the DoD's position that all of the duty categories described above are inclusive of enhancement through readiness training, but exclusive of non-resident, non-group structured, professional development training, performed without real-time interaction between the servicemember and the service, which includes correspondence courses. An example depicting the difference is that DoD I 1215.19 specifically prohibits the conduct of IDT in a designated imminent danger area, but correspondence course study is not specifically prohibited. This is so because the conduct of IDT is fundamentally different in nature, more structured and more formal, than correspondence course study. Additionally, correspondence course study is performed by a member without any specific guidelines or parameters on daily or session time periods, as opposed to IDT daily and session periods, which are prescribed both in law and DoD policy.

13. Accordingly, the intent of DoD policy has historically been, and continues to be, that correspondence course study is separate and distinct from, and does not qualify as IDT, to include equivalent training, since there is no military command or control over the time used to perform correspondence course study. Performance of correspondence courses is voluntary training, performed at the individual's own pace, for which compensation, other than retirement

and promotion points, has never been authorized.

I have read the foregoing 10 page declaration and I certify under penalty of perjury that it is true and correct.

Daniel J. Kohner
Director, Manpower Programs
OASD/RA

Executed this 26th day of April, 2004.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WILLIAM A. CLARK, individually and on behalf of all others similarly situated, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 00-644 (Chief Judge Damich) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**DECLARATION BY COLONEL ERNEST C. AUDINO**

I, Colonel Ernest C. Audino, make the following declaration in accordance with 28 U.S.C. § 1746. I am aware that this declaration will be used in the United States Court of Federal Claims, and that this declaration is the legal equivalent to a statement under oath.

1. I am the Chief of the National Guard Bureau Training Division (NGB-ART). As the Chief, I am responsible for the responsibilities of my division, which are the following:

   a. Planning, programming, budgeting, and executing resources required for training Army National Guard soldiers;

   b. Training policy formulation and implementation; and

   c. Planning, programming, budgeting and executing the Army National Guard schools program.

2. The Army National Guard ("ARNG"), in both its capacity as the organized militia of the several states and territories, and as a reserve component of the United States Army (The Army National Guard of the United States ("ARNGUS")), is an integral part of the first line of defense of the United States. The mission of the ARNG is to provide units organized, equipped, and

trained to fight and win in time of war or national emergency in support of the Army's war plans, and to be prepared for mobilization at all times. All ARNG training is in support of this federal mission.

3. The statutory authority for training the ARNG is contained in Title 32 of the U.S. Code, and is governed by National Guard Regulation (AR)("NGR") 350-1, Training: Army National Guard Training. I can state unequivocally that the National Guard Bureau ("NGB") does not consider the pay and compensation provisions of Title 37 of the U.S. Code as an authority to require or conduct ARNG or ARNGUS training of any kind. All ARNG training duty must be pre-approved by command authority and performed pursuant to validly issued orders or training schedules. In my 14 years of service in the ARNG/ARNGUS, I have never seen any authority ever cited on orders or training schedules other than the applicable provisions of Title 32. For this reason, the only three military statuses recognized for members of the ARNG/ARNGUS are Title 10, Title 32, and state duty, commonly referred to as state active duty ("SAD"). Title 10 duty is training or other duties performed in federal service under the command and control of the President and the Army leadership. Title 32 training is federal training performed in a state status under the command and control of each state's governor, in accordance with federal standards. SAD are duties performed in a pure state status for state purposes and does not satisfy any of the training requirements placed on members of the ARNG/ARNGUS by Title 10 and Title 32.

4. With regard to inactive-duty training ("IDT") of the ARNG, the only training authority is 32 U.S.C. 502(a)(1). Although 32 U.S.C. 502(f) allows for the performance of training or other duty in addition to the drills required by section 502(a)(1), this authority is not used to authorize periods of IDT. It is only used as an authority for full time National Guard duty ("FTNGD") and other duties specifically authorized by law. Section 502(f) is used as an authorization for Title 32

Active Guard and Reserve ("AGR") duty as set forth in Army Regulation 135-18, Army National Guard and Army Reserve: The Active Guard Reserve (AGR) Program, (Jun. 19, 1996); counter-drug missions as specifically authorized by 32 U.S.C. 112; Innovative Readiness Training as specifically authorized by 10 U.S.C. 2012 and 32 U.S.C. 508; and Weapons of Mass Destruction ("WMD")/Civil Support Teams ("CST") operations as specifically authorized by 10 U.S.C. 12301(c). Governing NGB and Army regulations do not authorized performance of IDT periods based on section 502(f).

5. All required ARNG training is conducted in one of three statuses: active duty (as defined in 32 USC 101(12)), FTNGD (as defined in 32 U.S.C. 101(19)), or IDT in a Title 32 status. With regard to IDT, the authorized categories – regularly scheduled IDT, additional IDT, and equivalent training, are set forth in NGR 350-1, which conforms to applicable DoD directives and instructions and Army policy. All authorized periods of IDT share common features/criteria: they must be pre-approved by the command, documented on a unit training schedule or specific orders, be performed in uniform at the designated place of duty, be conducted under the supervision of the command, and be performed within the time periods specified in NGR 350-1. The specific criteria that must be met before any period of IDT may be credit for any purpose are set forth in NGR 350-1.

6. Within the NGB, it is understood that the regularly scheduled unit training periods and additional IDT periods are assemblies for drill and instruction required by 32 U.S.C. 502(a)(1), and when ordered to be performed for compensation (as opposed to being performed in a no-pay status) and encompass the regular periods of instruction or periods of appropriate duty referred to in 37 U.S.C. 206(a)(1).

7. Equivalent Training is another subcategory of IDT. "Equivalent training" refers to the

"equivalent training, instruction, duty, or appropriate duties," referred to in 37 U.S.C. 206(a)(2). Equivalent training is exclusively periods of IDT performed instead of regularly scheduled IDT. Equivalent training is training that is equal in nature and duration to the training conducted during those periods of IDT for which it is substituted, and like all IDT, it must be organized, approved, and scheduled in advance by the unit leadership to enhance the readiness levels of the unit.

8. Unlike IDT, correspondence courses are self-paced, unsupervised, professional development courses. No one is or can be forced to enroll in correspondence courses. The impact of not taking correspondence courses is possible decreased competitiveness with a soldier's peers, and in the case of those courses that are linked to promotion, such as the Basic Noncommissioned Officer Course ("BNCOC"), possible ineligibility for promotion. However, promotion, like service in the ARNG, is voluntary with the soldier; no enlisted soldier is required to be promoted to remain in the service of the ARNG or ARNGUS. Furthermore, no soldier can be ordered to attend BNCOC in residence; he or she cannot be ordered to participate by correspondence. Correspondence courses, by their very nature, cannot qualify as a regularly scheduled Unit Training Assembly ("UTA") (regularly scheduled IDT), additional IDT, or equivalent training as set forth in NGR 350-1. Any order to complete correspondence courses as a period of IDT would be without authority. Correspondence course work is done while in a civilian status, is not 32 U.S.C. 502(a)(1) training, and therefore is not considered by the NGB as duty or training for which compensation is authorized.

I have read the foregoing _5_ page declaration and I certify under penalty of perjury that it is true and correct.

Ernest C. Audino
COL, NGB
Chief, Training Division

Executed this 23rd day of April, 2004.

00547