IN THE UNITED STATES COURT OF FEDERAL CLAIMS

WILLIAM A. CLARK, JAMES P. DAVERN, ROBERT E. FREEBURG, WILLIE R. JOHNSON, ROBERT A. MUSTIN, CAROL RISSER, JOHN DOES 1 through 4, and JANE DOES 2 through 3, individually, and on behalf of all others similarly situated,

Plaintiffs,

v.

UNITED STATES OF AMERICA,

Defendant.

No. 00-644C
(Judge Firestone)

**PLAINTIFFS' MOTION TO COMPEL DISCOVERY AND EXTEND DISCOVERY DEADLINES**

Richard T. Dorman
CUNNINGHAM, BOUNDS, VANCE, CROWDER, and BROWN, LLC
1601 Dauphin Street
Mobile, Alabama 36660
Tel: (334) 471-6191
Fax: (334) 479-1031

Charles J. Cooper
David Thompson
COOPER & KIRK, P.L.L.C.
555 11th St, N.W. Suite 750
Washington, DC 2005
Tel: (202) 220-9600
Fax: (202) 220-9601

Helen K. Michael
Robert H. Shulman
Peter L. Tracey
John F. Stanton
Christina Fahmy
HOWREY LLP
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Tel: (202) 783-0800
Fax: (202) 383-6610

Counsel for Plaintiffs

## TABLE OF CONTENTS

Page

I. INTRODUCTION .......... 1

II. FACTUAL BACKGROUND .......... 4

A. Initial Proceedings and Minimal Discovery .......... 4

B. 2006 Discovery .......... 5

C. 2007 Discovery .......... 7

III. GOVERNING STANDARDS .......... 12

IV. ARGUMENT .......... 14

A. The Government Has Improperly Subjected Plaintiffs to a Game of "Blind Man's Bluff" in Discovery .......... 14

1. The Government Has Not Conducted a Reasonable Search to Comply with Plaintiffs' Discovery Requests .......... 14

2. The Materials the Government Has Produced Also Fail to Comply with the Discovery Rules .......... 22

3. The Justifications that the Government Has Proffered for its Lack of Production are Not Tenable .......... 24

a. Undue Burden .......... 24

b. Lack of Specificity .......... 25

c. "Lack of Control" Over State Guard Organizations .......... 26

B. This Court Should Order the Government to Fulfill its Discovery Obligations and Extend the Discovery Deadlines .......... 28

CONCLUSION .......... 31

## TABLE OF AUTHORITIES

*ABB Joint Venture v. United States*,
75 Fed. Cl. 442 (2007) .......... 22, 23

*In re Agent Orange Prod. Liability Litigation*,
98 F.R.D. 522 (E.D.N.Y. 1983) .......... 14, 20

*Americold Corp v. United States*,
28 Fed. Cl. 747 (1993) .......... 12

*Ass'n of Am. Physicians & Surgeons v. Clinton*,
837 F. Supp. 454 (D.D.C. 1993) .......... 23

*Ayers v. Continental Casualty Co*,
240 F.R.D. 216 (N.D. W.Va. 2007) .......... 11

*Bartley v. Isuzu Motors, Inc.*,
158 F.R.D. 165 (D. Colo. 1994) .......... 21

*Bregman v. District of Columbia*,
182 F.R.D. 352 (D. D.C. 1998) .......... 24

*Britt v. Naval Investigative Service*,
886 F.2d 544 (3d Cir. 1989) .......... 11

*Cabot v. United States*,
35 Fed. Cl. 80 (1996) .......... 25, 27

*Clark v. United States*,
322 F.3d 1358 (Fed. Cir. 2003) .......... 26, 27

*Coleman v. Blockbuster, Inc.*,
238 F.R.D. 167 (E.D. Pa. 2006) .......... 28

*Decorative Ctr. of Houston, L.P. v. Direct Response Pubs., Inc.*,
208 F. Supp. 2d 719 (S.D. Tex. 2002) .......... 28

*Doe v. Karadzic*, 1997 U.S. Dist. LEXIS 1073 (S.D.N.Y. 1997) .......... 27

*Douglas v. Victor Capital Group*,
1997 WL 716912 (S.D.N.Y. Nov. 17, 1997) .......... 20

*FDIC v. LeGrand*, 43 F.3d 163 (5th Cir. 1995) .......... 12

*Fautek v. Montgomery Ward & Co.*, 96 F.R.D. 141 (N.D. Ill. 1982) .......... 11

*Gordon v. District of Columbia*, 480 F. Supp. 2d 112 (D. D.C. 2007) .......... 28

*Govas v. Chalmers*, 965 F.2d 298 (7th Cir. 1992) .......... 21

*Green v. Fulton*, 157 F.R.D. 136 (D. Me. 1994) .......... 27

*Hickman v. Taylor*, 329 U.S. 495 (1947) .......... 11

*Hoffman v. Stump*, 1998 U.S. App. LEXIS 30768 (6th Cir. Dec. 2, 1998) .......... 27

*Jones v. Syntex Laboratories*,
2001 U.S. Dist. LEXIS 17926 (N.D. Ill. Oct. 30, 2001) .......... 27

*M.A. Mortenson Co. v. United States*, 15 Cl. Ct. 362 (1988)
*aff'd on other grounds*, 996 F.2d 1177 (Fed. Cir. 1993) .......... 13

*Miller v. Waseca Medical Center.*, 205 F.R.D. 537 (D. Minn. 2002) .......... 28

*Morgan Smith Automobile Products, Inc. v. GM Corp.*,
54 F.R.D. 19 (E.D. Pa. 1971) .......... 11

*Morris v. United States*, 37 Fed. Cl. 207 (1997) .......... 12

*Nat'l Ass'n of Radiation Survivors v. Turnage*,
115 F.R.D. 543 (N.D. Cal. 1987) .......... 13

*National Lawyers Guild v. Attorney General*,
94 F.R.D. 600 (S.D.N.Y. 1982) .......... 12, 23, 28

*Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340 (1978) .......... 22

*Pacific National Cellular v. United States*, 41 Fed. Cl. 20 (1998) .......... 11

*Perpich v. Department of Defense*, 496 U.S. 334 (1990) .......... 26

*Perry v. Golub*, 74 F.R.D. 360 (N.D. Ala. 1976) .......... 12

*Petroleum Ins. Agency, Inc. v. Hartford Acc. & Indemn. Co.*,
106 F.R.D. 59 (D. Mass. 1985) .......... 24

*Poole v. Textron, Inc.*, 192 F.R.D. 494 (D. Md. 2000) .......... 24

*Robbins & Myers, Inc. v. J.M. Huber Corp.*,
2003 WL 21384304 (W.D.N.Y. May 9, 2003) .......... 24

*Rozier v. Ford Motor Corp.*, 573 F.2d 1332 (5th Cir. 1978) .......... 11

*Schaap v. Executive Industries, Inc.*, 130 F.R.D. 384 (N.D. Ill. 1990) .......... 24

*Sigros v. Walt Disney World, Co.*, 190 F. Supp.2d 165 (D. Mass. 2002) .......... 28

*Soto v. City of Concord*, 162 F.R.D. 603 (N.D. Cal. 1995) .......... 27

*United States v. Optrex America*,
2004 Ct. Intl Trade LEXIS 76 (July 1, 2004) .......... 20

*United States v. Osorio*, 929 F.2d 753 (1st Cir. 1991) .......... 13

*United States v. Proctor & Gamble Co.*, 356 U.S. 667 (1958) .......... 11

*United States v. Weinblatt*, 11 F.R.D. 398 (S.D.N.Y. 1951) .......... 26

*Wagner v. Dryvit System*, 208 F.R.D. 606 (D. Neb. 2001) .......... 21

*Wahad v. FBI*, 813 F. Supp. 224 (S.D.N.Y. 1993) .......... 12

*Zanowic v. Reno*, 2000 U.S. Dist. LEXIS 13845 (S.D.N.Y. Sept. 25, 2000) .......... 28

# I. INTRODUCTION

This Court should grant Plaintiffs' motion to compel discovery and to extend the deposition discovery cutoff presently scheduled for January 15, 2007 because the government has failed to meet its document production obligations in this case and has precluded Plaintiffs from being able to prepare for or take meaningful depositions. In response to 59 requests for production, the government produced only a *single* box of documents—a box replete with copying errors, containing documents without sequential production numbers, missing over 100 documents the government claims it produced, and also missing numerous other, easily retrievable documents responsive to Plaintiffs' requests. Although Plaintiffs repeatedly called these deficiencies to the government's attention, the government has failed to cure many of these defects. Moreover, the government produced many, but not all, of the missing documents identified on its production index only in the last few days, long after the close of written discovery and less than two weeks before the government proposed to produce its first 30(b)(6) witness. The government also has been dilatory and misleading during the meet and confer process, repeatedly failing to provide promised information and providing misleading and incorrect information.

The magnitude of the government's noncompliance with its discovery obligations did not come to light until December 3, 2007, when Plaintiffs' counsel went to search for documents in the Pentagon Library. Prior to this trip, Plaintiffs had repeatedly requested that the government produce current and superseded versions of the regulations relating to individual training, including correspondence coursework. The government refused, claiming, *inter alia*, that the request was unduly burdensome because the regulations

were not maintained either electronically or in a single location. The government instead demanded that Plaintiffs specify the exact regulations they sought and then refused to conduct any further search after Plaintiffs provided the requested list of specific regulations. On November 20, 2007, over one month after the close of written discovery and less than two months prior to the close of deposition discovery, the government advised Plaintiffs that they were free to search for whatever regulations (both Army and Air Force) they could find in the Pentagon Library.

Contrary to the government's representations during the meet and confer process about the undue burden of locating the requested regulations, Plaintiffs' counsel, during the December 3rd visit to the Pentagon Library, discovered that all current and prior versions of Army and National Guard regulations dating back to the 1950s are well-organized and well-marked and are housed on six shelves. In one hour, Plaintiffs' counsel was able to locate all the available historical copies of the Army and National Guard regulations that had been specifically requested. By the end of the day, Plaintiffs' counsel had accumulated a box of regulations and pamphlets the government had failed to produce, effectively doubling the government's incomplete production to date in a mere eight hours.[1] A visit to the Pentagon Library three days later yielded an additional half box of relevant documents the government had failed to produce. Plaintiffs were unable to obtain any Air Force Regulations, because, contrary to the government's express representations, those documents are not housed in the Pentagon library.

---

[1] Plaintiffs' counsel did not have access to the card catalog at the Pentagon library—the publicly available catalog does not have the same content—but expects that a review of that catalog would reveal that even more responsive documents are housed at that facility.

The December 3rd visit also revealed that Plaintiffs had been misled by the government in other material respects. For example, the government's counsel had advised, that other than the versions of regulations currently in effect, which are available on the Internet, no regulations are available in electronic form. Contrary to that representation, one of the government's paralegals advised that a number of the superseded regulations are available to military staff in electronic format.

Plaintiffs also learned that the government's counsel had been well aware that there were serious deficiencies in its August 2006 production. Another government paralegal informed Plaintiffs' counsel that, upon receipt of a copy of the box of documents produced to Plaintiffs in August 2006, it took that paralegal "a month" to sort out what was missing because the box was so badly organized. This paralegal also advised that the completed document set occupied ten large binders, a much larger quantity of documents than was produced to Plaintiffs. This paralegal stated that the government's counsel had been made aware of these defects. The government has failed to remedy as of this filing.

Plaintiffs have spent months meeting and conferring in good faith with the government's counsel. It is now apparent that the government has treated the discovery process like a game of "blind man's bluff," forcing Plaintiffs to guess at what responsive documents may be available based on misleading and incomplete information.

The government's obstructionist conduct has prevented Plaintiffs from obtaining the documents necessary to prepare for and obtain deposition discovery on the key issues in this litigation: which courses Plaintiffs completed and which courses were required. Concomitantly, and with full knowledge of outstanding discovery defects that remain to

be cured, the government has refused to agree to an extension of time of the cutoff for deposition discovery. The current close of deposition discovery is scheduled for January 15, 2008. With this date fast approaching, Plaintiffs have no choice but to seek relief from this Court, both to compel the government to produce the remaining responsive documents and to extend the deposition discovery deadline so that Plaintiffs have time to prepare for and obtain deposition testimony on a complete discovery record.

This relief is plainly appropriate in view of the government's discovery misconduct, the absence of any even arguable prejudice to the government, and the manifest unfairness that would result to Plaintiffs if the government were permitted to succeed in blocking Plaintiffs from obtaining deposition discovery on a fully developed documentary record. Plaintiffs also reserve the right to seek other appropriate relief from the government as redress for the unnecessary expense Plaintiffs have incurred as a result of the government's dereliction of its discovery obligations.

## II. FACTUAL BACKGROUND

### A. Initial Proceedings and Minimal Discovery

As this Court recounted in its August 17, 2007 Order, Plaintiffs filed this action in 2000, seeking payment for required correspondence courses completed without compensation by members of the Army and Air National Guard. *See* Doc. 162 at 2-9 (recounting case's history). Although this case has been pending for seven years, the government still has not provided Plaintiffs with written discovery necessary to resolve the dispute about their entitlement to payment. For the first four years of this litigation, the government avoided providing such discovery by filing a motion to dismiss, which was granted by Judge Damich, but reversed by the Federal Circuit. *See id.* at 4-5. Upon remand by the Federal Circuit, Plaintiffs were finally granted leave to take limited written

discovery in 2004. *See* Exhibit 1, July 15, 2004 Order, in connection with opposing government's summary judgment motion, which was also denied. *See* Doc. 162 at 6-7.

**B. 2006 Discovery**

After this case was transferred to this Court by Judge Damich, this Court entered a May 16, 2006 order authorizing discovery on the two issues that the Federal Circuit and the Claims Court have repeatedly held are central to this litigation since 2003: which correspondence courses are required and which required courses have been completed by Plaintiffs. Doc. 162 at 7.

On June 22, 2006, Plaintiffs served their Second Set of Requests for Production of Documents on the government (hereinafter "Second Set"). *See* Exhibit 2 hereto. This series of 59 requests sought production of documents created by the federal and state Guard organizations of which Plaintiffs are members. These documents were necessary to substantiate which courses Plaintiffs had completed, and the reasons why these courses were required.

In response, the government produced a ***single*** box of documents for inspection and copying. Fahmy Decl. ¶ 5. Despite Plaintiffs' stated reservations about the size of the government's production[2], Plaintiffs' counsel reviewed the documents on August 1, 2006 and asked for copies of the proffered set. *See id.*

The copies were not produced until two weeks later, and the copying was deficient in several key respects. Fahmy Decl. ¶ 6 & Ex. D. First, despite Plaintiffs' second instruction in the requests, the documents were not sequentially numbered with production numbers. This made it extremely difficult to manage the production and to

[2] The relevant historical copies of the Army Correspondence Course catalog alone would fill one box.

identify deficiencies. Fahmy Decl. ¶ 13. Second, the copy set did ***not*** correspond to documents Plaintiffs' counsel had reviewed on site. Fahmy Decl. ¶ 8. Third, the government produced an index of the documents that ostensibly were contained in the box, but this index did ***not*** correspond with the contents of the box. Fahmy Decl. ¶ 7 & Ex. E. Fourth, the documents in the box contained incomplete and incorrectly copied documents. Fahmy Decl. ¶¶ 8, 13.[3] Finally, the government failed to produce several categories of clearly responsive documents. Fahmy Decl. ¶¶ 6, 13 & Ex. D.

After receiving a copy of the government's production, Plaintiffs began to enumerate these deficiencies in a series of letters to the government and telephonic meet and confer conferences with the government in August 2006. Fahmy Decl. ¶ 8. The government did not cure any of the defects. The government did not produce any additional documents during the next month.

Following an amendment to the operative statute, discovery was stayed in this case in September 2006. *See* Doc. 162 at 7-8. The government then filed yet another motion to dismiss, and the Plaintiffs cross-moved for judgment on the government's affirmative defense based on this statutory amendment. This Court denied both motions and held that the Court must next "determine whether the Plaintiffs were entitled to compensation for correspondence courses under the law in effect at the time their claims were filed." *Id.* at 17.

[3] For example, a timeline specifying required courses for Air Guard members was folded prior to copying, so that the middle third of the timeline was obscured and did not appear on the copy. Additionally, the government produced tables of contents for several obviously relevant reports without producing the actual reports themselves. In some instances, the government provided only a full table of contents for a report, but only a few pages of the document itself.

### C. 2007 Discovery

On August 8, 2007, this Court permitted Plaintiffs to reopen discovery with respect to the named Plaintiffs and established a period for written discovery followed by deposition discovery, with a deadline of January 15, 2008 for deposition discovery. *See* Doc. 166. Plaintiffs informed the government that the outstanding document requests should be sufficient to address these issues. *See* Fahmy Decl. ¶ 12 & Ex. I.

Plaintiffs resumed the meet and confer process initiated the prior summer by sending a letter on August 20, 2007 that emphasized Plaintiffs' concern that a single box of production seemed facially insufficient to respond to 59 requests. Plaintiffs also asked that the government affirm whether it would undertake to obtain responsive documents from the state Guard organizations to which Plaintiffs belonged. Finally, Plaintiffs identified several samples and categories of responsive documents the government had failed to produce. Fahmy Decl. ¶ 13-14.

The parties continued to meet and confer throughout the next few months. However, despite numerous emails and lengthy telephone conferences, by the close of written discovery, the government still had not produced even all of the documents listed on its own production index. Fahmy Decl. ¶ 14. The index lists over 300 documents, yet there were at least 100 documents missing that plaintiffs managed to identify. *See id.*[4] Because the government failed to sequentially number its document production, despite Plaintiffs' express request and the government's failure to object to that request, it has

[4] On November 29, 2007 Plaintiffs' counsel informed Defendant counsel that it thought it might need to ask the court to intervene given the production problems. On November 30, 2007, Defendant counsel sent over fourteen of the missing documents. On December 5, 2007, Plaintiffs received fifty more. Fahmy Decl. ¶ 15. However, despite these last minute productions, Defendant have still not managed to produce all the documents on their own production index, let alone all the documents responsive to the Second Set of Requests for Production.

been impossible for Plaintiffs to determine whether they have identified all of the documents listed on the index that were not included in the production box.

Despite the many examples Plaintiffs had provided the government to illustrate the other deficiencies in the government's document production, the government also has failed to cure these defects. Among other things, there are several requests for which the government has failed to produce any documents whatsoever, and many more requests for which the government has failed to produce categories of responsive documents. *See id.* Included among the categories of documents the government has failed to produce are various Army, Air Force, and National Guard regulations relating to individual training that were in effect during the time period in which Plaintiffs completed the correspondence courses for which they seek compensation.

Of particular concern were the Air Force regulations and instructions. Although Plaintiffs' opposition to the government's 2006 motion for summary judgment cited no less than *eleven* Air Guard regulations and instructions in support of their arguments that correspondence coursework was required, the government's production in response to the Second Set contained only *one* Air Guard regulation.

When the deadline for written discovery closed, the government still had not cured the defects in its document productions. Discussions with the government continued, however, and Plaintiffs continued to meet and confer with the government in an effort to resolve various discovery disputes. In response to the government's protestations that Plaintiffs' request for production of the requested regulations was unduly burdensome, Plaintiffs undertook a further independent review and provided the government with a list of a subset of federal regulations relating to individual training or

correspondence coursework for Air and Army Guard members and the time period for which it sought those regulations. *See id.*[5]

After receiving this list, the government informed Plaintiffs during a call on November 20 (over one month past the close of written discovery, and less than two months before the close of deposition discovery), for the first time stated that it would not look for any further regulations because such a search ostensibly would be unduly burdensome. Fahmy Decl. ¶ 20. The government then proposed that Plaintiffs' counsel search for the regulations in the Pentagon Library. *Id.* Without waiving their objections to this procedure, Plaintiffs' counsel agreed to take this step in an effort to obtain copies of all the pertinent regulations. *Id.*

Plaintiffs' counsel visited the Pentagon library on December 3, 2007. Fahmy Decl. ¶ 22. Despite the assurances of the government during the November 29th meet and confer session that the Pentagon Library contained both Army and Air Force regulations (*see* Fahmy Decl. ¶ 21), Plaintiffs' counsel was informed by Pentagon personnel upon arriving at the library that there were ***no*** Air Force regulations in the Pentagon Library. Fahmy Decl. ¶ 22. Instead, according to Pentagon personnel, any Air Force documents—including regulations and instructions—could be found at Maxwell Air Force Base in Alabama. *Id.*

Plaintiffs' counsel proceeded to review the Army and National Guard regulations at the library. Contrary to the government's representations about the supposed burden of

[5] These regulations are not all publicly available. Some *current* versions of the regulations are obtainable on the Internet (though many are difficult to locate). Fahmy Decl. ¶ 16. With respect to *superseded* versions, it appears that the government in sole possession (either in its archives or through an electronic database accessible to government personnel) of the regulations that were in effect during the time period in which each Plaintiff completed his or her correspondence coursework.

locating the versions of various regulations in effect when Plaintiffs took the correspondence courses at issue, all of the current and superseded regulations are stored on six shelves of the Pentagon library and are organized in numerical order. Fahmy Decl. ¶ 23. Prior versions of each regulation are organized in chronological order in a folio clearly marked with the regulation number. *Id.* Within an hour, Plaintiffs' counsel was able to pull the necessary folios and extract the prior versions of all the Army and National Guard regulations and pamphlets specifically requested by the government. Fahmy Decl. ¶ 24. In less than eight hours, a full box of additional responsive documents that the government had never produced had been assembled and photocopied. *Id.* When Plaintiffs' counsel returned on December 6th, counsel collected another half box of responsive documents that the government had failed to produce. *Id.*

Also contradicting the government's assertions about the burden of locating the requested regulations, Plaintiffs' counsel also learned during the Pentagon library visit that, contrary to the statement of the government's counsel, the government has access to certain superseded regulations and pamphlets in electronic form in a database that is not available to the public. Fahmy Decl. ¶ 25. Based on the information obtained during the trip to the Pentagon library, it is clear that the government's objections of "undue burden" with respect to the regulations sought by Plaintiffs were unjustified.

After several months of meet and confer discussions, the government also now has asserted that it will not produce documents from the state Guard organizations to which Plaintiffs belong, arguing that such documents are not in its possession, custody, or control. Fahmy Decl. ¶ 20. The documents requested plainly seek discoverable information because they relate to individual training requirements for National Guard

members, including correspondence course work, that are imposed to satisfy federal training and force readiness mandates.

Plaintiffs first asked the government whether it would produce the requested state documents on August 20, 2007. Fahmy Decl. ¶ 12. The government's counsel repeatedly promised to reach out to the state Guard organizations to seek the remaining documents. Several months passed without a definite response. On November 20, 2007, the government said that it had produced all responsive documents in its possession, and, for the first time, stated that it could not procure additional documents under the custody and control of the various state Guard organizations. Fahmy Decl. ¶ 20. Plaintiffs have served subpoenas on each state Guard organization in which a named representative served to secure production of the requested documents. Fahmy Decl. ¶ 19

In the process of negotiating with the states Guard organizations, Plaintiffs learned that each such organizations had previously provided documents to government counsel. Plaintiffs asked each state Guard organization to produce copies of those documents directly to Plaintiffs. During the meet and confer process, the Assistant Attorney General of Alabama, Jack Wallace, sent a spreadsheet that he claimed listed all the documents produced by the state guard organizations to the National Guard Bureau in connection with this litigation. *See* Exhibit 3 hereto, November 29, 2007 Email from Jack Wallace to Peter Tracey with attached index. A review of the index shows that only the first 20 documents had been produced to Plaintiffs; the remaining twenty-three documents are not listed on the government's production index for the box produced in response to the Second Set. On November 28, 2007, Major Maximino Gonzalez from the

National Guard Bureau sent the five Hawaii documents and five Alabama YTG memoranda listed on the Wallace index that had not yet been produced to Plaintiffs.[6]

The government has failed to undertake even a minimally diligent investigation in response to Plaintiffs' requests for production, has asserted baseless objections and made outright misstatements of fact in an effort to evade its discovery obligations, and has failed to prevent Plaintiffs from obtaining the information necessary to conduct meaningful deposition discovery. Now, the government has refused to agree to extend the deposition discovery deadline. Because the governing rules forbid this kind of gamesmanship, Plaintiffs' Motion to Compel and to Extend Discovery Deadlines should be granted.

## III. GOVERNING STANDARDS

"The Supreme Court has clearly stated that the rules governing discovery are to be liberally applied." *Planning Research Corp. v. United States*, 4 Cl. Ct. 283, 296 (1983) (citing *Hickman v. Taylor,* 329 U.S. 495, 507 (1947)); *accord Morgan Smith Auto. Prods., Inc. v. GM Corp.,* 54 F.R.D. 19, 20 (E.D. Pa. 1971) (noting that in civil cases, discovery should be allowed with "utmost liberality").[7] The liberality rule applies with the greatest force when, as here, most of the relevant materials sought are in the possession of the opposing party. *See, e.g., Planning Research Corp.,* 4 Cl. Ct. at 296; *cf.*

---

[6] Plaintiffs are continuing the meet and confer process with the state organizations in the hopes of obtaining the needed documents. However, as discussed in greater detail, there are several types of responsive documents generated by the states and sent to the Department of the Army, as well as documents generated by the Department of Army and sent to the states that the government has failed to produce, that the plaintiffs may not be able to obtain from the states.

[7] Because this Court's Rules are closely patterned after the Federal Rules of Civil Procedure, cases from federal courts interpreting the Federal Rules are considered persuasive authority. *See, e.g., Pac. Nat'l Cellular v. United States*, 41 Fed. Cl. 20, 24 n.3 (1998) (citing several cases).

*Britt v. Naval Investigative Serv.*, 886 F.2d 544, 551 (3d Cir. 1989) (ordering discovery when "most of the evidence relating to this issue is likely to be exclusively in the possession of the government").

"The aim of these liberal discovery rules is to 'make a trial less of a game of blind man's bluff and more a fair contest with the basic issues and facts disclosed to the fullest practical extent." *Rozier v. Ford Motor Corp.*, 573 F.2d 1332, 1346 (5th Cir. 1978) (quoting *United States v. Proctor & Gamble Co.*, 356 U.S. 667, 683 (1958)). In sum, "[g]amesmanship to evade answering [discovery requests] as required is not allowed." *Ayers v. Continental Cas. Co.*, 240 F.R.D. 216, 221 (N.D.W. Va. 2007).

It is axiomatic that "[p]arties are required to respond to requests to produce in a complete and accurate fashion." *Fautek v. Montgomery Ward & Co.*, 96 F.R.D. 141, 145 (N.D. Ill. 1982). A party resisting producing documents in discovery has the burden of justifying the non-production. *See, e.g., FDIC v. LeGrand*, 43 F.3d 163, 172 (5th Cir. 1995); *accord White Mountain Apache Tribe v. United States*, 4 Cl. Ct. 575, 584 (1984).

This Court has full discretion to control the discovery process in matters pending before it. *See Americold Corp. v. United States*, 28 Fed. Cl. 747, 755 (1993); *accord Morris v. United States*, 37 Fed. Cl. 207, 214 (1997) ("This court's ability to control the course of litigation with restraint and discretion is broad and powerful, and, as a consequence, argues strongly for forthwith responsive compliance [to discovery requests]"); *M.A. Mortenson Co. v. United States*, 15 Cl. Ct. 362, 363-64 (1988) (imposing sanctions on government for failure to respond to discovery requests), *aff'd on other grounds*, 996 F.2d 1177 (Fed. Cir. 1993).

## IV. ARGUMENT

### A. The Government Has Improperly Subjected Plaintiffs to a Game of "Blind Man's Bluff" in Discovery

Although this case has been pending since 2000, Plaintiffs have been able to obtain only minimal discovery from the government. The protracted history of discovery non-compliance, discussed *supra* at pages 4-12, is of particular concern here where the offending party is the federal government, which "is charged with the enforcement of law and should set examples for others to follow." *Wahad v. FBI,* 813 F. Supp. 224, 227 (S.D.N.Y. 1993) ("While sanctions are severe measures, they are appropriate particularly in cases such as this where it is the government that disobeys court orders").[8]

#### 1. The Government Has Not Conducted a Reasonable Search to Comply with Plaintiffs' Discovery Requests

The law is clear that parties have a duty to respond to production requests in a complete and accurate manner. Accordingly, all parties, including the government, are obligated to conduct reasonable searches to fulfill their discovery obligations. *See, e.g., United States v. Osorio,* 929 F.2d 753, 761 (1st Cir. 1991) (holding that "prosecutor charged with discovery obligations cannot avoid finding out what 'the government'

[8] *See also Nat'l Lawyers Guild v. Attorney Gen.,* 94 F.R.D. 600, 615 (S.D.N.Y. 1982) ("This case is celebrating its fifth anniversary. The [governmental] defendants did not even put a dent in their discovery obligations until the past year. Their conduct has been dilatory, uncooperative, and obstructionist"); *Perry v. Golub,* 74 F.R.D. 360, 366 (N.D. Ala. 1976) ("The public interest requires not only that Court orders be obeyed but further that Governmental agencies which are charged with the enforcement of laws should set the example of compliance with Court orders. Regrettably, as this case once again demonstrates, Governmental agencies too often set the contrary example of resistance to discovery. Day in and day out, counsel for private litigants routinely exchange documents, frequently without a request for production being filed, while some Governmental agencies seem to take the attitude that their files are for their use only").

knows, simply by declining to make reasonable inquiry of those in a position to have relevant knowledge"); *Nat'l Ass'n of Radiation Survivors v. Turnage*, 115 F.R.D. 543, 556 (N.D. Cal. 1987) (sanctioning government's lawyer who failed to make reasonable inquiries among various government agencies in response to plaintiff's discovery requests).

It is patently clear that the government has not complied with its obligation to make reasonable inquiries in response to Plaintiffs' discovery requests. To give one example, when the government's counsel invited Plaintiffs' counsel to conduct a review of the relevant regulations at the Pentagon Library (a suggestion that, as discussed *infra*, was improper in itself), the government's counsel represented that the Pentagon had copies of both Army and Air Force regulations. When Plaintiffs' counsel visited the Pentagon Library, however, counsel was informed that only Army regulations were housed at the Pentagon, and any Air Force regulations were most likely at Maxwell Air Force Base in Alabama.

To date, Plaintiffs still do not have copies of the relevant Air Force regulations. Indeed, the government's production to-date in response to the Second Set contains only *one* Air Guard regulation. Yet, Plaintiffs' opposition to the government's 2006 motion for summary judgment, Plaintiffs cited no less than *eleven* Air Guard regulations and instructions in support of its arguments that correspondence coursework was required. Clearly, the government has not located the relevant Air Force regulations and should be directed to make a more detailed search for the regulations. *See, e.g., In re Agent Orange Prod. Liab. Litig.*, 98 F.R.D. 522, 524-25 (E.D.N.Y. 1983) (ordering government to

undertake more detailed search when it failed to produce several requested reports and plaintiff obtained one such report through another source).

During negotiations regarding the subpoena duces tecum, Plaintiffs served owing to the government's failure to comply with it discovery obligations, Plaintiffs also have determined that the government did not produce copies of all of the documents provided by the State Guard organizations of which they are members. Among other things, the index by Assistant Attorney General Jack Wallace listing the documents the State Guard organizations had produced to the National Guard Bureau reveals that the government failed to produce at least twenty relevant state documents it had in its possession. The government has only begun to cure this deficiency in the past several days, and not all the documents have been produced. Furthermore, as discussed in greater detail below, there are several types of responsive documents transmitted from the State Guard organizations to TRADOC and the Department of the Army, including unit status reports, as well as documents created by the Department of the Army, like federal Yearly Training Guidances (*see* Exhibit 4, attached hereto, First U.S. Army Training Guidance), that the government has failed to produce.

The small number of documents that the government produced in response to Plaintiffs' Second Set also demonstrates that the government has failed to comply with its obligations to conduct a reasonable investigation, in conjunction with facts discussed *supra* at pps. 6-12, the government's behavior raises serious concerns about deliberate obstruction of the discovery process). Plaintiffs' 59 document requests sought production of federal and state documents relating to the scheme governing individual military education and training in the Air and Army Guard and the role correspondence

coursework has played in satisfying federal training requirements throughout the period in which Plaintiffs took these courses from the 1970s until the present. It is inconceivable that the single box of documents produced by the government in response to the Second Set requests represents the universe of responsive documents. Indeed, the responsive regulations that Plaintiffs copied from the Pentagon library alone fill more than one box.

Underscoring the deficiency of its production, the government has not made a complete production of documents responsive to several key requests in Plaintiffs' Second Set, including Requests 8, 12, 13, 19, 20, 21, 27, 28, 33, 36, and 37. As shown below, each of these requests seek information that is relevant to the issues this Court has identified for discovery relating to which correspondence courses have been required and which required courses have been completed by Plaintiffs. The government, therefore, should be compelled to produce the requested documents.

- **<u>Request 8:</u>** This requests production of "rosters or organizational charts and other groups for the committees and involved in training, training development and/or accreditation for the Specified Courses completed by Plaintiffs and the in-resident equivalents of these courses." *See* Exhibit 2 hereto at 8. Plaintiffs require this information to identify percipient witnesses with knowledge of the purposes served and requirements satisfied by the correspondence coursework completed by Plaintiffs. Indeed, the government has asserted that Plaintiffs are obligated specifically to identify such percipient witnesses by name and job title. Plaintiffs also require the requested organizational charts to prepare for and take 30(b)(6) depositions. The government has precluded Plaintiffs from conducting this deposition discovery by producing only a few charts for Air Guard training committees, but failing, as far as Plaintiffs have been able to determine, to have produced any charts with respect to the Army.

- **<u>Requests 12-15</u>:** These requests all relate to the development of the specific courses taken by plaintiffs, either in residence or via correspondence, and whether these courses satisfy as prerequisites for promotion, for MOS/AFSC duty qualification, for advancement in any career field, or for deployment eligibility. *See* Exhibit 2 hereto at 11-13. These requests seek information

bearing directly on whether Plaintiffs' correspondence coursework was required because the requests seek regulations pertaining to whether Plaintiffs were obligated to complete the correspondence course at issue to satisfy individual military training requirements. The government still has not produced Air Guard regulations responsive to these requests, and Plaintiffs have not yet had an opportunity to review the Army Guard regulations just obtained from the Pentagon library to determine the sufficiency of the government's production of Army regulations, or to prepare for depositions.

- **<u>Requests 19-20</u>:** These requests seek, in part, documents relating to the role individual training, including correspondence coursework, plays in ensuring that Guard members and their units are battle ready and satisfy deployment requirements. Exhibit 2 hereto at 16. Documents responsive to this request, which have not been produced by the government, include quarterly readiness reports or unit status reports prepared by each level of the State Guard chain of command that inform the Department of the Army of which percentage of each level's personnel are sufficiently trained in their MOS and METL tasks to be deployable. *See* Exhibit 5 attached hereto, AR 22-1, Unit Status Reporting at 1-2.

- **<u>Request 21</u>:** This request seeks information relevant to whether the Plaintiffs in the Air Guard have completed required correspondence courses because it seeks production of correspondence and other documents signed, authored or issued by commanders at any level informing Air National Guard members of (1) what courses have been established for AFSC qualification or advancement, (2) the importance of career development courses (which are offered by correspondence and were taken by various Plaintiffs to attain job proficiency, career progression, and/or unit readiness; or (3) the importance of professional military education, including classes offered by correspondence that were completed by various Plaintiffs, and courses for leadership development, career progression, and/or unit readiness. *See* Exhibit 2 hereto at 17. The government has failed to produce documents that address the link between coursework and advancement, both in terms of rank, position, and AFSC. It also stands to reason that the Air Guard would have a similar structure to the Army Guard with training requirements being passed down the command chain. Because the government has failed to produce all such documents from the states in which the named Air Guard plaintiffs have served, the production is deficient and the government should be compelled to supplement it.

- **<u>Requests 27 and 28</u>:** seek production of documents relating to (1) "function, mission and responsibilities" of the "Army Distance Learning Program ('TADLP')" which administers distance learning programs, including correspondence coursework, and to "the approval or use of correspondence courses to satisfy mission or training needs," and (2) the "function, mission and responsibilities of the corollary Air Force agencies administering correspondence coursework and other individual military education and to

"the approval or use of correspondence courses to satisfy mission or training needs." *See* Exhibit 2 hereto at 21-22. In order to prove that correspondence courses are designed to meet individual military education requirements, Plaintiffs are certainly entitled to relevant documents from the agencies that create and administer the courses, and are therefore likely to know their purposes.

- __Request 33:__ This request addresses the MOS training plans and Mission Essential Task Lists ("METL"). As explained in Field Manual 7-0, which is "the Army's capstone training doctrine" (p. iv), "[u]nit training consists of three components: collective training that is derived directly from METL and MTPs, leader development that is embedded in the collective training tasks and in discrete individual leader focused training, and ***individual training that establishes, improves, and sustains individual soldier proficiency in tasks directly related to the unit METL.*** " *See* Exhibit 6 hereto, FM 7-0, ¶ 1-34. METLs are used in conjunction with another document known as a Yearly Training Guidance (YTG) to determine necessary unit and individual training. The various levels of the Guard, beginning with the Department of the Army create YTGs or Yearly Training Guidance which explain what training must be accomplished during the year to ready Guard members to meet certain specified goals, including the tasks specified in the relevant METLs. Each member of the state Guard is therefore subject to the training requirements laid out in the YTGs issued by the various levels of his state Guard, as well as any federal YTGs. Unit and individual training performed to gain proficiency in METL tasks is required training. This training is often completed through correspondence courses, therefore these documents are unquestionably relevant and should be produced.

- __Requests 36 and 37__: These requests address the format of correspondence courses completed by Plaintiffs, asking for documents related to a decision to offer a course via correspondence, in-residence training or both; and documents relating to converting courses from in residence or correspondence course formats, respectively. These requests seek information relevant to establishing that correspondence courses serve the same functions as in-residence courses, another form of required individual military education for which Guard members are compensated.

The government also has failed to satisfy its discovery obligations because it has seven requests for production in response to which government has failed to produce a single document: Requests 34, 35, 41, 42, 49, 50, 59 of Plaintiffs' Second Set. Fahmy Decl. ¶ 13. As discussed further below, each of these requests seeks documents bearing directly on the issues this Court has identified for discovery regarding what

correspondence courses are required and which required courses have been completed by plaintiffs.

- **<u>Request 34</u>**: This request seeks documents relating to "the Career Field Education and Training Plans ("CFETP") for Air Force Specialty Code ("AFSC") 2F0X1," Plaintiff Davern's military job classification. Exhibit 2 hereto at 26. This request seeks relevant information because CFETPs are "comprehensive education and training document[s] that identifies life-cycle education/training requirements, training support resources, and a minimum core task requirements" for each Air Force Specialty. *See* Exhibit 7 attached hereto, Form CFETP, available at http://icodap.org/papers/Misc/cfetp.doc. 2F0X1 is the CFETP for Plaintiff James Davern, so the CFETP requested would detail which training Mr. Davern needed to complete to advance in his specialty. The government has represented that it does not have any CFETPs. However, the government has failed to produce the form CFETP cited above, which specifically states that CFETPs are prepared for each and every Air Force Specialty. *Id.* at 2. The government also has not yet produced the complete personnel record of Plaintiff James Davern, which should contain a CFETP.

- **<u>Request 35</u>**: This Request seeks "documents relating to the information given to new Army and Air Guard, Non-Commissioned Officers, Warrant Officers and Field Grade officers regarding training and training requirements with respect to military job "qualification, promotion qualification, position qualification, and deployment eligibility." Exhibit 2 hereto at 26. The government asserts that no such documents exist. However, one named Plaintiff was given a booklet entitled *How to Succeed in the National Guard by Really Trying* when he first joined the Guard. The booklet lays out the career progression for Army Guard commissioned officers, and the required coursework at each stage. *See* Exh. G to Fahmy Decl. Additionally, during Plaintiff counsel's trips to the Pentagon library, they discovered several shelves of booklets and leaflets on different subjects related to every aspect of Guard service. Fahmy Decl ¶ 27. Without access to the complete card catalog, Plaintiffs are unable to identify the complete universe of potentially responsive booklets. Plaintiffs would ask that they be permitted access to the internal catalog available at the Pentagon Library to resolve these issues.

- **<u>Requests 41 and 49</u>**: These requests seek documents relating to the Army Distance Learning/Training Technology Applications Subcommittee, and "its function, mission and responsibilities, or the approval or use of correspondence courses to satisfy mission or training needs." As explained in the attached publication, http://www.wood.army.mil/chmdsd/pdfs/2003%20Sep/Gibson-Helms.pdf, which the government failed to produce, the Subcommittee was specifically established in 1997 to evaluate the future role of distance learning, including correspondence coursework, in Army training. Attached hereto as Exhibit 8,

at 1. Given the involvement of the Subcommittee in evaluating the purpose and role of correspondence coursework, it almost certainly produced and considered documents relating the training requirements these courses satisfy.

- **Request 42:** This Request seeks documents relating to the Directorate, Common Leader Training, another military organization that has had responsibility for individual military education and training. This agency was a proponent agency for the development of leader training for the Army, Army Guard, and Army Reserve. Leader training is required for battle readiness, and is provided through correspondence coursework. *See* Exhibit 9 attached hereto, North Carolina National Guard Yearly Training Guidance for Training Year 1998. Although government has represented that the Directorate is now defunct, it should, at a minimum, be compelled to search for documents created during the periods in which the Army National Guard Plaintiffs completed their various correspondence courses.

- **Request 50**: This Request seeks documents related to the responsibilities of Chief of the National Guard Bureau to "(1) establish peacetime military education prerequisites in appropriate regulations . . . and (2) support peacetime training requirements." Exhibit 2 hereto at 35. This Request seeks information relevant to the central issue of what training requirements have been established or prescribed for Guard members. Army Regulation 350-1, which the government itself has relied upon and has represented as applicable to the National Guard, states that the Chief of the National Guard Bureau has these responsibilities. It is inconceivable that there are no documents related to such an important responsibility. Plaintiffs have requested the deposition of Colonel Ernest Audino, one of the government's summary judgment declarants, and the former Chief of the NGB's Training Division during time periods relevant to this lawsuit. The documents sought by this request obviously have great relevance to the deposition of Colonel Audino, and must be produced before that deposition can occur.

- **Request 59**: This Request seeks "all documents relating to DOD's justification for its policy and practice of refusing to pay compensation to National Guard members for completion of correspondence courses." Exhibit 2 hereto at 41. The government put this matter at issue in the declaration of Command Sergeant Major McNamara, which it filed in support of the reply brief arguing that summary judgment was appropriate because Guard personnel supposedly are not required to do any correspondence coursework. Mr. McNamara referenced this "longstanding understanding" that Guard members would not be compensated for such coursework. *See* Doc. No. 60, McNamara Decl. ¶. 18. If the government's assertions have any merit, there must be documentary support for the existence of this policy.

Plaintiffs require all of this information discussed above to prepare for and to take meaningful depositions. Where, as here, the government has failed to produce any

documents in response to relevant requests, a further search is warranted. *See Agent Orange,* 98 F.R.D. at 524-25 (ordering government to undertake more detailed search when discovery production was not satisfactory). Plaintiffs' Motion to Compel and to Extend Discovery Deadline accordingly should be granted.

**2. The Materials the Government Has Produced Also Fail to Comply with the Discovery Rules**

Plaintiffs also are entitled to the requested relief because the government's minimal document production is incomplete, disorganized, and fails to satisfy basic requirements established by discovery rules. Among other things, the government can provide no legitimate explanation for its failure to produce even all of the documents listed on its own production index. Moreover, after Plaintiffs requested the documents produced for inspection in June 2006 be copied, the copy set did ***not*** match the documents Plaintiffs' counsel had reviewed on site. Also, the government produced an index of the documents that were purportedly produced in the box, but that index did ***not*** match up with the contents of the box. Furthermore, the documents in the box contained incomplete and incorrectly copied documents. Courts do not stand for such a disorganized response to discovery requests. *Cf. United States v. Optrex Am.*, 2004 Ct. Intl. Trade LEXIS 76, at *13 (July 1, 2004) ("At oral argument, the court would also have government's counsel explain why government's counsel should not be sanctioned for delivering to Defendant's counsel thirteen boxes of unorganized documents (later reduced to three) during discovery").

The government's counsel has long known that its production box did not match its own index, as Plaintiffs began identifying deficiencies in August 2006. Independent of Plaintiffs' complaints, when one of the government paralegals received a copy of the

production box, it took her "a month" to reorganize the box and locate all the missing documents, a problem of which she made government counsel aware. Fahmy Decl. ¶ 26. The corrected set occupied more than 10 binders, far more documents than were included in the government's August 2006 production box. *Id.* Despite hearing about these severe deficiencies both from Plaintiffs, as well as their own employees, the government's counsel made no effort to replace the bulk of these documents until this past week. Fahmy Decl. ¶ 15.

Making matters still worse, the government failed to affix "Bates-Stamp" numbering to the documents that they have been produced, thus frustrating management of the government's production and rendering the issues with the government's production exceedingly difficult and costly for Plaintiffs to identify. For this very reason, courts generally require parties to Bates-Stamp documents produced in litigation. *See, e.g., Wagner v. Dryvit Sys.,* 208 F.R.D. 606, 608 (D. Neb. 2001); *Douglas v. Victor Capital Group*, 1997 WL 716912, at *1 (S.D.N.Y. Nov. 17, 1997). Indeed, Plaintiffs specifically requested that the government Bates stamp the documents it produced, and the government did not object to this request. *See* Exh. 2. The government also should be compelled to cure its deficiency in its document production.[9]

[9] Also to the extent that the government has "produced" the regulations responsive to Plaintiffs' second set by directing Plaintiff to visit the Pentagon's Library, such a direction was improper. Among other things, the government made this assertion over a month after the close of written discovery. *See, e.g., Bartley v. Isuzu Motors, Inc.*, 158 F.R.D. 165, 167 (D. Colo. 1994) (noting that responses to discovery requests after discovery is completed are improper). In addition, the government improperly required Plaintiffs to do their own copying during the Pentagon Library visit. *See, e.g., ABB Joint Venture v. United States,* 75 Fed. Cl. 442, 443 (2007) ("Under the discovery rules, 'the presumption is that the responding party must bear the expense of complying with discovery requests'" (quoting *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 358 (1978))). Plaintiffs reserve the right to seek reimbursement from the government for the

**3. The Justifications that the Government Has Proffered for its Lack of Production are Not Tenable**

The party resisting production in discovery has the burden of demonstrating a viable justification for the non-production. *See supra* at 13. The government cannot meet that burden here because none of the objections the government has asserted in response to Plaintiffs' discovery requests have merit.

**a. Undue Burden**

The government has advanced the unsubstantiated objection that Plaintiffs' discovery requests seeking regulations and other relevant documents are unduly burdensome. The information obtained during Plaintiffs' recent trip to the Pentagon Library shows that this blanket objection cannot be credited. Upon visiting the Pentagon Library, Plaintiffs' counsel discovered two clearly marked and well-organized rows of current Army and National Guard regulations, which were adjacent to four shelves of superseded regulations that also were clearly marked and well-organized. Fahmy Decl. ¶ 23. The superseded regulation shelves contain folios marked by regulation number, and for each such regulation contains all the versions and change logs for that regulation dating back as far as they are available, which for most regulations appeared to be at least the 1960s. *Id.* Contrary to the government's claims of undue burden, it would have required minimal effort for the government to copy and forward these materials to Plaintiffs. Fahmy Decl. ¶ 24.

---

time spent performing the copying tasks which should have been borne by the government.

The government also has made no effort to substantiate its claims of undue burden, with respect to any other category of documents requested by Plaintiffs. The government cannot withhold documents based on any claim of undue burden without providing concrete information supporting that claim.[10]

**b. Lack of Specificity**

The government has also objected Plaintiffs' requests are vague and ambiguous, and has requested that Plaintiffs specifically identify the documents being sought. These, too, represent improper discovery tactics.

In the first place, there was nothing vague or ambiguous regarding Plaintiffs' requests. The definitions Plaintiffs used were largely verbatim of the definitions found in the Army and Air Force regulations themselves. The government's contention that it does not understand Plaintiffs' definitions is pure sophistry and improper gamesmanship. *See, e.g., Robbins & Myers, Inc. v. J.M. Huber Corp.*, 2003 WL 21384304, at *5 (W.D.N.Y. May 9, 2003) (criticizing party for refusing to produce documents on the grounds that "the phrase 'the subject matter of this litigation' was vague and ambiguous"); *Bregman v. District of Columbia*, 182 F.R.D. 352, 362 (D. D.C. 1998) (rejecting party's contention that request to produce of documents which "in any way pertain[s] to the allegations of your complaint" was vague or ambiguous).

[10] *See, e.g., Ass'n of Am. Physicians & Surgeons v. Clinton*, 837 F. Supp. 454, 458 n.2 (D.D.C. 1993) (government's claim that discovery requests were "burdensome" will not be accepted "without specific estimates of staff hours needed to comply, and defendants submitted no such estimates"); *Nat'l Lawyers Guild*, 94 F.R.D. at 607 (government "had yet to provide any legal support for their position that the United States, unlike a private litigant, could lawfully devote plainly insufficient manpower and resources to its discovery obligations"); *accord AAB Joint Venture*, 75 Fed. Cl. at 458-59 (rejecting government's conclusory claim that interrogatory request was burdensome).

The government's demands for a specific enumeration of the documents being requested were also improper. *Cf. Schaap v. Executive Industries, Inc.*, 130 F.R.D. 384, 388 (N.D. Ill. 1990) (because discovery is liberally granted, parties are not required to set forth specific exactitude in requests). Indeed, the requesting party usually is not in a position to know all of the specific documents that may exist. *See, e.g., Petroleum Ins. Agency, Inc. v. Hartford Acci. & Indem. Co.*, 106 F.R.D. 59, 63 (D. Mass. 1985).

**c. "Lack of Control" Over State Guard Organizations**

The government's claim that it "lacked control" over state guard units to produce the documents and records requested by Plaintiff is also without merit. In the discovery context, "control" is interpreted broadly. *See, e.g., Poole v. Textron, Inc.*, 192 F.R.D. 494, 501 (D. Md. 2000). As cogently explained by Judge Lydon, "[i]f the producing party has the legal right or the practical ability to obtain the documents, then it is deemed to have 'control,' even if the documents are actually in the possession of a non-party. 'Control' comprehends not only possession but also the right, authority, or ability to obtain the documents." *Cabot v. United States*, 35 Fed.Cl. 80, 83 (1996). Under these standards, government has the requisite "control" over the state organizations with respect to the individual military education and training matters related to Plaintiffs' requests for production.[11]

[11] Plaintiffs seek two primary categories of documents from the states. First, Plaintiffs seek complete copies of their military personnel records, which obviously are relevant to demonstrating courses the representatives actually completed. As of this filing, the government has failed to furnish a complete record for any named representative except for Mr. Clark. Second, Plaintiffs seek documents related of the state and federal YTGs and METLs. Fahmy Decl. ¶ 12.

As noted by the Federal Circuit earlier in this litigation, state guard organizations are subject to federalization at any time, and training, subject to the "discipline" of Congress even while training in their states as members of their respective state Guard organizations. *See Clark v. United States*, 322 F.3d 1358, 1366 (Fed. Cir. 2003) (citing *Perpich v. Dept. of Defense*, 496 U.S. 334 (1990)). This control over the state National Guard organizations and their training is sufficient to find that the federal government has "control" over the state guard records for discovery purposes here. *See, e.g., United States v. Weinblatt*, 11 F.R.D. 398, 399 (S.D.N.Y. 1951) (federal government had "control" of documents in state's possession when federal government had legal ability to recall documents at any time); *accord Green v. Fulton*, 157 F.R.D. 136, 142 (D. Me. 1994) (police department had "control" over records that were in town's possession when police chief had authority to recall records).

Moreover, because Plaintiffs here are seeking discovery to vindicate federal rights, the state adjutant generals in possession of the relevant records may be considered federal agents. *See, e.g., Hoffman v. Stump*, 1998 U.S. App. LEXIS 30768, at *21 (6th Cir. Dec. 2, 1998). In addition, courts have held that an entity possesses "control" of documents if they were created for the entity's benefit. *See, e.g., Soto v. City of Concord*, 162 F.R.D. 603, 620 (N.D. Cal. 1995). Here, there is no question that Plaintiffs performed their coursework for the benefit of the federal government. *See* May 18, 2007 Hearing Tr. at 41-42 (suggesting that Plaintiffs deserve compensation "because the federal government wants skilled people"); *see also Clark*, 322 F.3d at 1368 (noting that correspondence courses were prescribed by Secretary of Army).

In an effort to secure needed discovery, Plaintiffs now have presented subpoena *duces tecum* to the State Guard organizations of which they are members. Plaintiffs' pursuit of this alternate discovery mechanism does not, however, excuse the government's failure to comply with its own discovery obligations. Use of this alternative mechanism also has required Plaintiffs to undertake time-consuming negotiations with four separate groups of lawyers representing these Guard organizations. Those regulations are ongoing and, in view of the government's unfounded assertions of "lack of control" over these organizations, also warrant an extension of the deadline for deposition discovery.

**B. This Court Should Order the Government to Fulfill its Discovery Obligations and Extend the Discovery Deadlines**

Plaintiffs have received only a small fraction of the requested documents from the government that are believed to exist. The government's responses have been dilatory, uncooperative, and obstructionist. *See Nat'l Lawyers Guild,* 94 F.R.D. at 615 (awarding sanctions when government engaged in similar discovery abuses). As discussed *supra,* the government has not fulfilled its production obligations, and Plaintiffs simply are not in a position to proceed with depositions without the necessary documents. In addition to entering an order compelling the government to provide further discovery, the Court, therefore, also should extend the deadline to enable Plaintiffs' cut-off for deposition discovery.

Such relief is appropriate when, as here, a party is unable to prepare its case because the opposing side has failed to comply with its discovery obligations, an extension of the discovery deadline unquestionably is appropriate. *See, e.g., Gordon v.*

*District of Columbia*, 480 F. Supp.2d 112, 118 (D. D.C. 2007) (extending discovery when "some documents have not been produced"); *Coleman v. Blockbuster, Inc.*, 238 F.R.D. 167, 172 (E.D. Pa. 2006) (extending discovery when Plaintiffs "have yet to obtain any substantial discovery as a result of Defendant's defiance"); *Decorative Ctr. of Houston, L.P. v. Direct Response Publs., Inc.*, 208 F. Supp.2d 719, 736 (S.D. Tex. 2002) (granting extension of discovery when no meaningful prejudice to defendant would result, and reasons for late designation included plaintiffs' inability to obtain a deposition of defendant and refusal of defendant to respond fully to interrogatories); *Sigros v. Walt Disney World, Co.*, 190 F. Supp.2d 165, 169 (D. Mass. 2002) (extending discovery when plaintiff averred documents not produced and "[t]here is nothing in the record indicating that the plaintiffs' need for an extension arises from any lack of diligence on their part"); *Miller v. Waseca Med. Ctr.*, 205 F.R.D. 537, 541 (D. Minn. 2002) (extending discovery to conduct depositions when "Defendants also experienced difficulty in obtaining documents in response to their Document Requests").

To provide some assurance that the government has at least minimally complied its discovery obligations, Plaintiffs also request the opportunity to review the internal card catalogs of both the Pentagon Library and Maxwell Air Force Base to determine whether additional responsive documents have not yet been produced. As explained above, Plaintiffs' visits to the Pentagon library, although brief, have revealed additional types of documents responsive to Plaintiffs' requests that the government has not yet produced. With respect to the library at Maxwell Air Force Base, the government produced only the tables of contents to relevant studies and pamphlets, and under that Air Force instructions and regulations that the government has failed are housed there as

well. This relief also is appropriate to provide at least some assurance that the government has made a complete document production.

In view of the government's repeated failure to comply with its discovery obligations, Plaintiffs propose that the parties submit a status report no later than one month after Plaintiffs have certified to the government that they obtained copies of all additional responsive documents located in the Pentagon Library, and the government has certified to Plaintiffs that it has produced all of the documents that are called for by the order compelling discovery. This period will give Plaintiffs time to determine whether the government has, in fact, corrected the deficiencies in the government's document production. Based on this status report, Plaintiffs propose that the court hold a status conference to address any further discovery disputes if necessary. Otherwise, a new cutoff for deposition discovery can then be set. Based on the incomplete information presently available about the number of depositions that Plaintiffs will need to take, Plaintiffs anticipate that a period of sixty days following the status conference at which a new discovery cutoff is set should suffice.

## CONCLUSION

For all of the foregoing reasons, Plaintiffs' Motion should be granted. This Court should compel the government to comply with Plaintiffs' production requests and fulfill its discovery obligations, as well as ordering the government to give Plaintiffs access to the card catalog of the Pentagon Library and the library at Maxwell Air Force Base, and extending the January 15, 2008 deadline for deposition discovery.

Respectfully submitted,

/s/ Helen K. Michael

Helen K. Michael
Peter L. Tracey
Robert H. Shulman
John F. Stanton
Christina Fahmy
HOWREY LLP
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Tel: (202) 783-0800
Fax: (202) 383-6610

Richard T. Dorman
CUNNINGHAM, BOUNDS, VANCE, CROWDER, and BROWN, LLC
1601 Dauphin Street
Mobile, Alabama 36660
Tel: (334) 471-6191
Fax: (334) 479-1031

Charles J. Cooper
David Thompson
COOPER & KIRK, P.L.L.C.
555 11th St, N.W. Suite 750
Washington, DC 2005
Tel: (202) 220-9600
Fax: (202) 220-9601

Counsel for Plaintiffs

# EXHIBIT
# 1

# In the United States Court of Federal Claims

No. 00-644C

(Filed: July 15, 2004)

**************************************

WILLIAM A. CLARK,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

**************************************

FILED
JUL 15 2004
U.S. COURT OF FEDERAL CLAIMS

## ORDER

It is hereby ordered that Plaintiffs are allowed to take discovery in the following areas to prepare their defense to Defendant's Motion for Summary Judgment. Defendant shall furnish to Plaintiffs the following documents and things, including information stored in electronic form:

(1) regulations, policy statements, and other documents establishing the directives of the service secretaries and their delegates with respect to Guard members' obligation to be capable of meeting the responsibilities to which they are assigned, and the importance of being qualified for promotion and of continuing professional development;
(2) standards, requirements, or processes for retention in and promotion to each of the various ranks of the National Guard;
(3) other requirements that correspondence courses satisfy, such as entry to or advancement in certain military specialties or careers;
(4) types of credit that Guard members receive for completing correspondence work;
(5) information on correspondence courses offered as substitutes for "in residence" courses and the number of slots in such programs for Guard members;
(6) information on "time in grade" maximums for Guard members. This request relates to the military's contention that Guard members are not subject to the same standards that active duty personnel face that require them to move up in rank or face discharge; and
(7) copies of specific regulations needed to oppose the motion that are not publicly available.

This discovery shall apply to materials relevant to service in both the National Guard and the National Guard of the United States, but shall be limited to materials applicable to the named Plaintiffs in this case.

Plaintiffs shall provide their discovery requests to the Government on or before July 19, 2004 and discovery shall close on September 10, 2004.

EDWARD J. DAMICH
Chief Judge

# EXHIBIT

# 2

IN THE UNITED STATES CLAIMS COURT OF FEDERAL CLAIMS

| | |
|---|---|
| WILLIAM A. CLARK, JAMES P. DAVERN, ROBERT E. FREEBURG, WILLIE R JOHNSON, ROBERT A. MUSTIN, JOHN DOES 1 through 4, and JANE DOES 1 through 3, individually, and on behalf of all others similarly situated, | ) |
| Plaintiffs, | ) |
| vs. | ) CASE NO. 00-644C (Judge Firestone) |
| UNITED STATES OF AMERICA, | ) |
| Defendant. | ) |

**PLAINTIFFS' SECOND SET OF DOCUMENT REQUESTS**

Pursuant to Rules 26 and 34 of the Rules of the United States Court of Federal Claims and this Court's May 16, 2006 order, Plaintiffs William A. Clark, James P. Davern, Robert E. Freeburg, Willie R. Johnson, Robert A. Mustin, John Does I through 4 and Jane Does 1 through 3 (hereinafter "Does" and collectively "Plaintiffs") request that the defendant United States answer the following request for the production of documents and things within 30 days of the date of service by making responsive documents and things available for inspection and copying at the offices of Howrey, LLP, 1299 Pennsylvania Avenue, N.W., Washington, D.C. 20004.

## I. INSTRUCTIONS AND DEFINITIONS

### A. Instructions

1. These document requests should be answered by the Defendant United States for any agency, instrumentality, or any branch of the military that has responsive information, including but not limited to the Department of Defense, the Department of the Army, the Department of the Air Force, the United States Army, the United States Air

Force, the United States Army Reserve, the United States Air Force Reserve, the National Guard of the United States, the National Guard Bureau, the Air National Guard of the United States, the Army National Guard of the United States, the Air National Guard, the Army National Guard, all organizations and instrumentalities of the above listed organizations, and any other organization related to federal military or state militia forces.

2. Documents produced in response to these documents requests should be stamped with sequential production numbers.

3. In responding to these requests please organize and label documents to correspond with the particular document request to which they respond.

4. Should any communications regarding these document requests necessitate the disclosure of PROTECTED INFORMATION, such communications must be made pursuant to the terms of the Protective Order entered in the case.

5. These requests are continuing in character and are made pursuant to applicable provisions of the Rules of the United States Court of Federal Claims. Defendant is under a duty to seasonably amend a prior response to a request for production if Defendant learns that the response is in some material respect incomplete or incorrect. In addition, Defendant is requested to produce for inspection and copying any documents not previously produced that it may from time to time obtain, locate, identify or acquire the ability to produce.

6. If you contend that you are entitled on the basis of any claim of privilege to withhold any information or documents in response to these requests for production, provide the following information with respect to such documents:

(a) For each document, identify the author or authors of the document, all actual and intended recipients of the document, the date the document was created, and a description of the document;

(b) State the basis or bases of the grounds for the claim of privilege;

(c) Identify the person on whose behalf the claim of privilege is being asserted;

(d) State the subject matter of the information or document; and

(e) Specify the requests for production to which the information or document is responsive.

7. Unless otherwise indicated, the time period for these document requests is from 1970 to the present.

8. If any of the following requests for documents cannot be answered in full after exercising due diligence to secure the requested documents, Defendant shall so state and answer to the extent possible, specifying reasons for any inability to answer the remainder and stating whatever information Defendant has concerning the unanswered portions. If any answers are qualified in any particular manner, Defendant shall set forth the details of such qualification.

**B. Definitions**

1. For purposes of these document requests, terms not specifically defined shall be given their ordinary meaning.

2. "Amended Complaint" shall mean Plaintiffs' Amended Complaint filed in Case No. 00-644C in the Court of Federal Claims.

3. "Plaintiffs" refers collectively to the parties listed in the Amended Complaint, including William A. Clark, James P. Davern, Robert E. Freeburg, Willie R. Johnson, Robert A. Mustin, John Does 1 through 4 and Jane Does 1 through 3. At times herein, the term "Plaintiffs" is also used to mean each respective Plaintiff named and listed in Amended Complaint.

4. "You" or "your" includes Defendant United States, and all its agencies and instrumentalities, including but not limited to the Department of Defense, the Department of the Army, the Department of the Air Force, the United States Army, the United States Air Force, the United States Army Reserve, the United States Air Force Reserve, the

National Guard of the United States, the National Guard Bureau, the Air National Guard of the United States, the Army National Guard of the United States, the Air National Guard, the Army National Guard, all organizations and instrumentalities of the above listed organizations, and any other organization related to federal military or state militia forces.

5. "Document" is defined to be synonymous and equal in scope to usage of this term in COFC Rule 34(a). A document refers to a complete original or a true, correct, and complete copy and any non-identical copies of any written, graphic, typed, printed, filmed, recorded or electronic information in the custody and control of the United States or its agencies and instrumentalities no matter how produced, recorded, stored or reproduced, including computer generated or stored data (together with any instructions, programs, or passwords necessary to search and retrieve such data), as well as, without limitation, any writing, letter, telegram, electronic mail or message, statement, book, report, study, analysis, digest, record, handwritten note, working paper, chart, graph, diagram, drawing, photograph, videotape, audio recording, diary, notes of interviews or communications, as well as all applicable statutes, regulations, policy guidance, directives, pamphlets, field manuals, memoranda, or implementing correspondence or instructions issued by any organization.

6. "In residence" when used to modify the terms "course," "instruction," or "training" refers to the type "course," "instruction," or "training" that is provided at a training institution where students attend in the presence of an instructor, who conducts the training while in an active duty or inactive duty status.

7. "Correspondence" when used to modify the terms "course," "instruction," or "training" refers to the type "course," "instruction," or "training" that is provided by means other than as in residence "course," "instruction," or "training," and includes, but is not limited to, the courses described in the Army Correspondence Course Catalog ("ACCP") and course catalogs issued by the Air Force Institute for Advanced Distributed Learning ("AFIADL").

8. "National Guard" refers to the Organized Militia of the several states as defined in 37 U.S.C. §§ 101(6), (7) and (9) and includes the Air National Guard and Army National Guard. "National Guard" also refers to the National Guard of the United States, including the Air National Guard of the United States and the Army National Guard of the United States (see the Court's Order Dated July 15, 2004).

9. "Policy" means any practice, procedure, directive, routine, rule, course of conduct or code of conduct, written or unwritten, formal or informal, recorded or unrecorded, which was recognized, adopted, issued or followed by you.

10. "Prerequisite" means expected as a prior condition.

11. A "prerequisite course" is a course or subcourse offered either in residence or via correspondence or Distance Learning which must be completed prior to enrollment in another course.

12. "Secretary" means the Secretary of the Army or the Secretary of the Air Force or any person or office acting pursuant to authority of the Secretary, and "Secretaries" means both the Secretary of the Army and the Secretary of the Air Force, along with any person or office acting pursuant to the authority of either Secretary.

13. "Specified Courses" refer to the correspondence courses or any subcourse thereof completed by Plaintiffs, which include, but are not limited to the following: Air Force 3-level course (AFSC 2F0X1), Air Force 5-level course (AFSC 2F0X1), Air Force 7-level course (AFSC 2F0X1), Adjutant General Officer Branch Qualification Course, Advanced Enlisted Professional Development Course, Air Command and Staff College, AMEDD Officer Branch Qualification Course, AMEDD Officer Advanced Course, Army War College, Associate Logistics Executive Development Course, Automated Logistical Specialist, Aviation Accident Prevention Management Course, Aviation Logistics Manager Course, Aviation Maintenance Officer Course, Aviation Maintenance Management, Aviation Officers Advanced Course, Aviation Warrant Officer Advanced Course, Basic Enlisted Professional Development Course, Battalion Motor Officer Course, Combat

Logistics Supply and Support Course, Combined Arms and Services Staff School, Command and General Staff Officer Course, Commander's Safety Course, Hazardous Materials Handling Course, Infantry Officer Basic Course, Infantry Captains Career Course (also known as the Infantry Officer Advanced Course), Maintenance Leader Course, Mechanical Maintenance NCO Course, Military Personnel Officer Course, NCO Academy, NCO Leadership Course, NCO Preparatory School, Ordnance Officer Advanced Course, Refrigerant Recovery Course, Reserve Component Basic Non Commissioned Officer Course ("RC-BNCOC"), Senior NCO Academy, Supply Management Officer Correspondence Course, Support Operations Course, Warrant Officer Advanced Course.

14. "Military Education Systems" refer to the education systems or series of courses to which certain of the Specified Courses belong, which include, but are not limited to the following: the Officer Education System ("OES"), the Non Commissioned Officer Training System ("NCOES"), the Warrant Officer Education System ("WOES"); Career Development Courses ("CDC"), and Professional Military Education ("PME").

15. The terms "relating to," "related to," and "relate to" mean addressing, constituting, containing, concerning, discussing, describing, identifying, involving, analyzing, reflecting, regarding, referring to, showing, describing, mentioning, stating, or pertaining to a given subject in whole or in part.

16. The terms "and" and "or" have both conjunctive and disjunctive meanings.

17. The terms "any" or "each" shall be construed to include and encompass "all."

18. The use of the word "the" shall not be construed as limiting the scope of any request.

19. The terms "thing" or "things" refers to any tangible object other than a document as defined herein, and includes objects of every kind and nature.

20. Use of the singular is also to be taken to include the plural, and vice-versa.

## II. DOCUMENT REQUESTS

1. All documents reflecting course descriptions of any Specified Course as well as any in residence equivalent(s) or phase(s) of a Specified Course, and any component course or subcourse of a Specified Course.

2. All documents supporting denials and assertions Defendant made in its Answer to the Amended Complaint.

3. All documents signed, authored or issued by commanders at any level relating to the need for National Guard members to complete any Specified Course or Courses, any in residence equivalent(s) or phase(s) of a Specified Course, any prerequisite course for any Specified Course, or any courses or subcourses within any of the Military Education Systems.

4. Irrespective of the time limitation contained in Instruction 7 of these document requests, for each Specified Course, in residence equivalent or phase, any prerequisite course for any Specified Course, or any component course or subcourse of a Military Education System, all documents relating to:

   (a) when the course was initially created;

   (b) the reason(s) or justification(s) for its creation;

   (c) what training need it satisfied;

   (d) when the course or any portion thereof was first offered in correspondence format;

   (e) the reason(s) or justification(s) for offering the course or portion thereof in correspondence format;

   (f) course accreditation;

(g) Training and Doctrinal Command ("TRADOC") approval for the creation, development, accreditation of the course;

(h) TRADOC standards for the course;

(i) Air Force Education and Training Command ("AETC"), Air University or AFIADL approval for the creation, development, accreditation of the course;

(j) AETC, Air University and AFIADL standards for the course.

5. All documents identifying any Specified Course, in residence equivalent or phase, any prerequisite course for any Specified Course, or any component course or subcourse of a Military Education System as:

(a) a prerequisite for promotion to any rank;

(b) a prerequisite for Military Occupational Speciality ("MOS") or Air Force Specialty Code ("AFSC") duty qualification;

(c) a prerequisite for advancement in any military position, specialty or career field;

(d) satisfying the training requirements for deployment eligibility; and/or

(e) a prerequisite to any in residence course of instruction.

6. All documents relating to any process or system, paper or electronic, used to record, track or document the enrollment in or completion of any individual or self-development training by a National Guard member.

7. All documents relating to the enrollment processes for the Specified Courses, including, but not limited to, any approvals or authorizations required to enroll in any Specified Course.

8. All rosters or organizational charts of every committee, working group, and other groups relating to or involved in training, training development and/or accreditation for the Specified Courses and their in residence portions or versions.

9. All rosters or organizational charts of every committee, working group, or any other group related to or involved in assessing or studying compensation to members of the National Guard for completing correspondence courses.

10. For any individual involved in any committee, working group, or other group identified as responsive to Document Request Number 9, all documents in such individuals' files related to any surveys or studies on compensating National Guard members for completing correspondence courses.

11. In addition to documents provided in response to Document Request Number 10, all other documents relating to any surveys or studies performed on providing compensation for completion of correspondence or distance learning courses.

12. Irrespective of the time limitation contained in Instruction 7 of these document requests, all documents relating to the development, creation, certification and accreditation of each Specified Course.

13. All documents to, from or relating to the proponent schools of the Specified Courses that relate to the proponent schools' function, the proponent schools' mission, the proponent schools' responsibilities, or the proponent schools' development, approval and/or accreditation of each Specified Courses.

14. All documents identifying any Specified Course, any Military Education System, or any course within the Military Education Systems as:

(a) a prerequisite for promotion to any rank;

(b) a prerequisite for MOS/AFSC duty qualification;

(c) a prerequisite for advancement in any military specialty or career field;

(d) satisfying the training requirements for deployment eligibility; and/or

(e) a prerequisite to any in residence course of instruction.

15. For all in residence courses for which completion of any of the Specified Courses is a prerequisite, all documents identifying such in residence courses as:

(a) a prerequisite for promotion to any rank;

(b) a prerequisite for MOS/AFSC duty qualification;

(c) a prerequisite for advancement in any military specialty or career field; and/or

(d) satisfying the training requirements for deployment eligibility.

16. All documents discussing the process by which the Secretaries or their delegates approve of the use of correspondence courses, including the Specified Courses, that are within either the ACCP or any AFIADL catalog as military instruction.

17. All documents discussing the criteria for listing those courses, including the Specified Courses, that are published in the ACCP catalog and the AFIADL catalogs.

18. All current and superseded studies or policy statements relating to individual training, Distance Learning, or correspondence courses, conducted or issued at any level in the Air Force, Army, Air National Guard and Army National Guard.

19. All documents reflecting the use and/or need for individual training or self-development training to support mission and/or deployment requirements.

20. All correspondence and other documents signed, authored or issued by commanders at any level informing National Guard members of (1) what courses have been established for MOS or AFSC qualification or advancement, or (2) the importance of OES,

WOES and NCOES courses to MOS proficiency, career progression, cadre development and/or unit readiness.

21. All correspondence and other documents signed, authored or issued by commanders at any level informing National Guard members of (1) what courses have been established for AFSC qualification or advancement, (2) the importance of CDC courses to AFSC proficiency, career progression, and/or unit readiness; or (3) the importance of PME courses to leadership development, career progression, and/or unit readiness.

22. All documents discussing the importance of completing military education courses, whether such courses are correspondence courses or in residence courses.

23. All documents relating to the need for National Guard members to complete individual or self-development training through correspondence courses for any reason, including meeting mission requirements.

24. All documents to, from or relating to the NGB that relate to training requirements for Air National Guard ("ANG") members in Air University courses and Army National Guard ("ARNG") soldiers in The Army School System ("TASS") courses.

25. All documents to, from or relating to the Structure and Manning Decision Review ("SMDR") and the Army Program for Individual Training ("ARPRINT") process (as well as the equivalent program in the Air Force) that relate to its function, mission, and responsibilities, or the approval and/or use of correspondence courses to satisfy mission and/or training needs.

26. All documents to, from or relating to The Army Training System ("TATS") that relate to its function, mission, and responsibilities, or the approval and/or use of correspondence courses to satisfy mission and/or training needs.

27. All documents to, from or relating to the Army Distance Learning Program ("TADLP") that relate to its function, mission, and responsibilities, or the approval and/or use of correspondence courses to satisfy mission and/or training needs.

28. All documents to, from or relating to AETC, Air University or the AFIADL that relate to its function, mission, and responsibilities, or the approval and/or use of correspondence courses to satisfy mission and/or training needs.

29. All documents relating to the "Army Distance Learning Plan" and any Air Force plan relating to distance learning.

30. All documents related to the list of Common Military Training ("CMT") requirements, and all versions of the CMT from 1970 to the present.

31. All documents related to any list of military training requirements maintained by the Air Force, the Air National Guard of the United States or the Air Force National Guard.

32. All documents relating to the "Directorate of Common Leader Training" discussing its function, mission, responsibilities, and the approval and/or use of correspondence courses to satisfy mission and/or training needs.

33. All documents relating to the MOS training plans or Mission Essential Task Lists ("METL") for the units of the Army National Guard Plaintiffs at the time these Plaintiffs completed the Specified Courses.

34. All documents relating to the Career Field Education and Training Plans ("CFETP") for Air Force Specialty Code ("AFSCs") 2F0X1 at the time the Air National Guard enlisted Plaintiffs completed the Specified Courses.

35. All documents relating to the information given to new enlistees, new Non-Commissioned Officers, new Warrant Officers, new Commissioned Officers and new Field

Grade officers regarding training and training requirements with respect to MOS/AFSC qualification, promotion qualification, position qualification, and deployment eligibility.

36. All documents, including third-party reports or studies, relating to whether to offer a course as an in residence course, a correspondence course, or a mixed format course.

37. Irrespective of the time limitation contained in Instruction 7 of these document requests, all documents relating to converting the Specified Courses or courses within the Military Education Systems from in residence courses or phases of in residence courses to correspondence courses or offering such courses in a correspondences course format, including, but not limited to, any documents issued to or from TRADOC, TADLP, AETC, Air University and AFIADL.

38. All documents relating to how the Secretaries or their delegates, including but not limited to the National Guard Bureau, the Army National Guard and the Air National Guard, have used correspondence courses as a component of National Guard training.

39. All documents relating to any policies relating to constructive waiver of individual or self-development training, including but not limited to the Specified Courses and the Military Educational Systems.

40. All documents relating to the reasons for establishing or maintaining military educational requirements for different ranks, including, but not limited to, documents that relate to the policies of and the purposes served by the Reserve Officer Personnel Management Act ("ROPMA").

41. All documents to, from or relating to the Distance Learning/Training Technology Applications Subcommittee to the Secretary of the Army that relate to its function, mission, and responsibilities, or the approval and/or use of correspondence courses to satisfy mission and/or training needs.

42. All documents to, from or relating to the Directorate, Common Leader Training, that relate to its function, mission, and responsibilities, or the approval and/or use of correspondence courses to satisfy mission and/or training needs.

43. All documents to, from or relating to the individuals responsible for the Training Requirements Analysis System ("TRAS") that relate to its function, mission, and responsibilities, or the approval and/or use of correspondence courses to satisfy mission and/or training needs.

44. All documents to, from or relating to the HQDA, Deputy, Chief of Staff, G-3, that relate to its function, mission, and responsibilities, or the approval and/or use of correspondence courses to satisfy mission and/or training needs.

45. All documents to, from or relating to the organizations with responsibility for identifying or setting training requirements for members of the Army National Guard of the United States or the Army National Guard that relate to such organizations' function, mission, and responsibilities, or the approval and/or use of correspondence courses to satisfy mission and/or training needs.

46. All documents to, from or relating to the organizations with responsibility for identifying or setting training requirements for members of the Air National Guard of the United States or the Air National Guard that relate to such organizations' function, mission, and responsibilities, or the approval and/or use of correspondence courses to satisfy mission and/or training needs.

47. All correspondence to, between, or from Assistant Secretary of the Army (Manpower and Reserve Affairs); DCS, G-3; DCS, G-I; Chief, National Guard Bureau (CNGB); Chief, Army Reserve (CAR); and PERSCOM, FORSCOM, TRADOC relating to the Specified Courses, the Military Education Systems, or courses required for MOS

qualification or advancement, including special qualification identifiers ("SQI") or special additional skill identifiers ("ASI").

48. All correspondence to, between, or from the Secretary of the Air Force, or any assistant Secretary of the Air Force and any other organization within the Air Force, or Air National Guard of the United States or the Air National Guard relating to the Specified Courses, the Military Education Systems, or courses required for AFSC qualification or advancement, including special or additional skill qualification.

49. All files of, reports to or by, and briefings to or by, and other documents relating to, members of the Secretary of the Army's Education Committee and the Distance Learning/Training Technology Applications Subcommittee that relate to either Committee's function, mission, and responsibilities, or the approval and/or use of correspondence courses to satisfy mission and/or training needs.

50. All documents related to the responsibilities of Chief of the NGB to (1) establish peacetime military education prerequisites in appropriate regulations governing the Air National Guard, Army National Guard, Air National Guard of the United States, and Army National Guard of the United States; and (2) support peacetime training requirements for members of the Air National Guard, Army National Guard, Air National Guard of the United States, and Army National Guard of the United States in either in residence or correspondence courses.

51. Any and all documents created by or provided to the Distributed Learning Advisory Committee that relate to its function, mission, responsibilities, and the approval and/or use of correspondence courses to satisfy mission and/or training needs.

52. All documents created by the Department of Defense ("DOD"), Office of the Deputy Chief of Staff ("ODCS"), National Guard Bureau ("NGB"), General Accounting Office ("GAO"), the Office of Management and Budget ("OMB"), any office or officer of

the White House, or any other executive agency relating to this case, the completion of correspondence courses by members of the National Guard, or whether or to what extent National Guard members are entitled to compensation for completing correspondence courses, including, but not limited to, the Specified Courses.

53. All documents relating to communications with Congress, including any committee, subcommittee, or individual member, or any individual on a member's staff, relating to this case, the completion of correspondence courses by members of the National Guard, or whether or to what extent National Guard members are entitled to compensation for completing correspondence courses, including, but not limited to, the Specified Courses.

54. Organizational charts for the Secretariat of the Air Force and the Secretariat of the Army, National Guard Bureau, all training commands in the Air Force, Army, Air National Guard and Army National Guard, all organizations with responsibility for identifying training requirements in the Air Force, Army, Air National Guard and Army National Guard and any organization that participated in the creation, approval, implementation, administration, accreditation and justification for the creation of the Specified Courses.

55. All documents relating to the criteria used to determine whether to create, accredit and implement an in resident course for use as military training.

56. All documents relating to the criteria used to determine whether to create, accredit and implement a correspondence course for use as military training.

57. All documents relating to training requirements for the deployment of members of the Air National Guard, Army National Guard, Air National Guard of the United States, and Army National Guard of the United States.

58. All documents discussing the importance of military education courses.

59. All documents relating to DOD's justification for its policy and practice of refusing to pay compensation to National Guard members for completion of correspondence courses.

Respectfully submitted,

Helen K. Michael
Alan B. Sutton
HOWREY, L.L.P.
1299 Pennsylvania Ave., NW
Washington, DC 20004
(202) 783-0800

Richard T. Dorman
CUNNINGHAM, BOUNDS, YANCE, CROWDER & BROWN, LLC
1601 Dauphin Street
Mobile, AL 36664
(251) 471-6919

Charles J. Cooper
COOPER & KIRK, P.L.L.C.
1500 K Street, N.W., Ste. 200
Washington, D.C. 20005
(202) 220-9600
*Attorneys for Plaintiffs*

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on June 22, 2006, a copy of the foregoing "PLAINTIFFS' SECOND SET OF DOCUMENT REQUESTS" was served by hand delivery.

Helen K. Michael

# EXHIBIT 3

## Yokay, Steven

**From:** Tracey, Peter
**Sent:** Friday, December 07, 2007 11:33 AM
**To:** Yokay, Steven
**Subject:** Fw: Here is a listing of the documents requested

**Attachments:** State Documents Received Matrix.xls

State Documents Received Matri...

Peter Tracey
Traceyp@howrey.com
-------------------------
Sent from my BlackBerry Wireless Handheld

----- Original Message -----
From: Wallace, Jack <JWallace@ago.state.al.us>
To: Tracey, Peter; _Dorman, Richard
Sent: Thu Nov 29 13:01:16 2007
Subject: Here is a listing of the documents requested

Upon our request, National Guard Bureau furnished to the Alabama National Guard and the other National Guard organizations involved with a matrix of the documents furnished by each state. Please note that this matrix covers all the documents furnished by the states to the National Guard Bureau.

# PUBLICATIONS MATRIX

| Doc # | Document Name | Reg/Ins Number | Date | Request | Medium of Production |
|---|---|---|---|---|---|
| 22 | AF Correspondence Info-Student History Query-Robert Freeburg | | 23-Nov-2004 | 6 | Hard copy |
| 23 | ACCP Student Status Query-William Clark | | 17-Nov-2004 | 6 | Hard copy |
| 24 | ALARNG METL for 151 Army Band For 1995-2002 | | | 33 | Hard copy |
| 25 | ALARNG METL for 711 Signal Battalion For 2002 | | | 33 | Hard copy |
| 26 | AF Correspondence Info-Student History Query-James Davern | | 23-Nov-2004 | 6 | Hard copy |
| 27 | Officer Selection & Promotion | MSARNG Reg 600-100 | 1-Dec-2001 | 3,5,14,20,40 | Hard copy |
| 28 | MS NG-Command Training Guidance for 2000 and 2001 | | 5-Feb-1999 | 3,18,19,20,45 | Hard copy |
| 29 | MS NG-Command Training Guidance for 2001 and 2002 | | 6-Oct-1999 | 3,18,19,20,45 | Hard copy |
| 30 | MS NG-Command Training Guidance for 2002 and 2003 | | 1-Sep-2000 | 3,18,19,20,45 | Hard copy |
| 31 | NC NG-Yearly Training Guidance for 2002 | | 31-Jul-2000 | 3,18,19,20,45 | Hard copy |
| 32 | NC NG-Yearly Training Guidance for 1998 | | | 3,18,19,20,45 | Hard copy |
| 33 | OH NG-Command Training Guidance for 01/02 | | 1-Oct-1999 | 3,18,19,20,45 | Hard copy |

PUBLICATIONS MATRIX

| | | | | | |
|---|---|---|---|---|---|
| 34 | Qualitative Retention Program | MNARNG PAM 135-205 | 1-Jun-2004 | 3,20,45 | Hard copy |
| 35 | MN NG-Qualititive Retention Program FY 05 Memo | | 15-Oct-2004 | 3,20,45 | Hard copy |
| 36 | OH NG-Selective Retention Board Under NGR 635-102 | | 4-Feb-2000 | 3,20,21,22,24 | Hard copy |
| 37 | Officer Promotion & Career Management | MNNG Reg 600-100 | 6-Jun-2003 | 3,20,21,22,24 | Hard copy |
| 38 | Enlisted Promotions Under Enlisted Promotion Program (EPP) | TAGPA PAM 600-200 | 2-Jan-2004 | 3,18,19,20,45 | Hard copy |
| 39 | PA NG-The Adjutant General's Training Guidance 2002 | | 20-Jun-2001 | 3,18,19,20,45 | Hard copy |
| 40 | AL NG-Officer & Warrant Officer Selective Retention | | 22-May-2004 | 3,20,45 | Hard copy |
| 338 | Issues in Federal Litigation, National Guard Bureau PowerPoint Presentation | | | | hard copy |
| | AL NG Memorandum of Instruction for Qualitative Retention Board | | 22-Mar-2004 | | Hard copy |
| | CTARNG-SR350-1 Operations & Training-Connecticut Army National Guard | | 19-Jul-1994 | | Hard copy |
| | CTARNG-SR350-1 Part II-Operations & Training-Connecticut Army National Guard | | 19-Jul-1994 | | Hard copy |
| | CTARNG-SR350-1 Part II-Training Change 6-Operations & Training Connecticut Army National Guard | | 19-Jul-1994 | | Hard copy |
| | CTARNG-SR350-1 Training Change 6-Operations & Trainiing Connecticut Army National Guard | | 19-Jul-1994 | | Hard copy |

# PUBLICATIONS MATRIX

| | | | | | |
|---|---|---|---|---|---|
| | CTNG Cir 350-01 Part II Training Year 2002 and Training Year 2003 Command Training Guidance & Five Year Training Calendar | | 1-Oct-2000 | | Hard copy |
| | CTNG Cir 350-01 Training Year 2002 & Training Year 2003 Command Training Guidance & Five Year Training Calendar | | 1-Oct-2000 | | Hard copy |
| | HING Information Paper on ANG Officer Promotions | | 24-Aug-2004 | | Hard copy |
| | HING Selective Retention Board Instructions | | 23-May-1995 | | Hard copy |
| | HING Special Order MB-3 Appointment of Selective Retention Board & Instructions | | 23-May-1995 | | Hard copy |
| | ALARNG Training Year Guidance 06-07 | | | | Hard copy |
| | ALARNG Training Year Guidance 95-96 | | | | Hard copy |
| | ALARNG Training Year Guidance 96-97 | | | | Hard copy |
| | ALARNG Training Year Guidance 97-98 | | | | Hard copy |
| | ALARNG Training Year Guidance 99-00 | | | | Hard copy |
| | ALARNG EPPS Enlisted Personnel Promotion System Slide Presentation | | | | Hard copy |
| | ALARNG SMDR 600-100 Officer Promotion & Career Management System | | 6-Jun-2003 | | Hard copy |
| | ALARNG SMDR 600-200 Enlisted Personnel Promotion System (EPPS) | | 1-Feb-2005 | | Hard copy |

PUBLICATIONS MATRIX

| | | | | | |
|---|---|---|---|---|---|
| | ALARNG SMDR 600-200 Enlisted Personnel Promotion System (EPPS) with changes 1 & 2 | | 1-Feb-2003 | | Hard copy |
| | ALNG Organization Bulletin No 2-03 Administrative Chain of Command | | 1-Jan-2003 | | Hard copy |
| | ALNG QRB Letter Templates | | | | Hard copy |
| | CTNG Cir 350-02-08 Training Year 2004 and Training Year 2005 Command Training Guidance and Five Year Training Calendar | | 1-Oct-2002 | | Hard copy |
| | CTNG Cir 350-03-06 Training Year 2005 & Training Year 2006 Command Training Guidance and Five Year Training Calendar | | 1-Oct-2003 | | Hard copy |

# EXHIBIT
# 4

DEPARTMENT OF THE ARMY
HEADQUARTERS FIRST UNITED STATES ARMY
4705 N WHEELER DRIVE
FOREST PARK GA 30297-5000

AFKA-CG 30 JUL 2000

MEMORANDUM FOR SEE DISTRIBUTION

SUBJECT: First U.S. Army Training Guidance for FY 01/02

1. References:

a. FM 25-101, SEP 1990, Battle Focused Training

b. FM 25-100, NOV 1988, Training the Force

c. FORSCOM/ARNG Reg 350-1, OCT 98, Active Component Training/Specialized Training In FORSCOM Active Army and Reserve Component Units

d. FORSCOM/ARNG/USAR Reg 350-2, JUN 99, Reserve Component Training in the America's Army

2. Commander's Training Guidance:

a. Purpose. In the new millennium the Army's core competency remains to fight and win our nation's wars. However, the growing role of the Army in worldwide peacekeeping operations ensures that all of us can expect to deploy overseas in support of a real world operation. With that in mind, we must continue to train to meet our warfighting obligation to the nation, while remaining sufficiently flexible and agile in our training and thinking to react to the peacekeeping requirement. This training guidance is intended to provide all leaders and soldiers throughout First U.S. Army systemic guidance, philosophy and vision aimed at focusing our training efforts during 2001 and 2002 in a manner that continues to produce the best trained and most mobile warfighting forces in the world; forces equally competent in combat and in peacekeeping.

b. Vision/Intent. First U.S. Army must use all available resources to assist units of all sizes throughout our 27 states, one territory, one commonwealth, and the District of Columbia, with well planned, professionally executed and properly assessed training that covers the full spectrum of our METL. We must stress the importance of mental competence, physical fitness, and warfighting. Additionally, we must emphasize discipline; it is the glue that binds soldiers, sections and units together on the battle field. We must have and demonstrate discipline in understanding and respecting the rules and regulations that govern our military. We must be disciplined in training, drills and tasks. We must have the discipline to train as we will fight, and

the discipline to ensure our training is to standard. Without this emphasis and focus we will waste precious resources and the time and energy of our soldiers. Finally we must instill flexibility and agility in both our training and planning; the Army cannot expect the new century to be business as usual.

c. Endstate: That this command never puts soldiers or units in harms way unless they are fully prepared to fight and survive in a combat environment.

3. Areas of Emphasis.

a. The Commanding Generals Training Assessment of First U.S. Army's Mission Essential Training List (METL):

(1) Training Support and Assessment (P)
(2) Mobilization and Deployments (P)
(3) Military Support to Civilian Authorities (P)

b. Training Priorities Based on the METL Assessment:

(1) Training Support and Assessment: Overall the process of support and assessment is solid. Emphasis must be made on eliminating "last minute" changes to scheduled training and assessment plans for the training. "Last minute" changes not only effect the unit in which the change is taking place, but it also creates a rippling effect that often impacts negatively on several other units' training. Occasionally there maybe valid reasons for changes and cancellations, but more often, better long and short term planning can eliminate many last minute changes. Accordingly, any training change request that affects resources outside of the training unit must be coordinated through Headquarters, First U. S. Army, Deputy Chief of Staff, Training, and approved by the Commanding General, First U.S. Army. As part of our premobilization training emphasis, we will also continue efforts aimed at improving our First U.S. Army simulations potential with specific focus on USAR priority GOCOMS and ARNG Divisions.

(2) Mobilization and Deployments: Emphasis must be placed on making deploying units successful. Deployment dates and complete task organizations need to be announced/published as early as possible in order to maximize available time for preparation/training of individuals, unit training and to eliminate wasted effort attempting to plan and coordinate deployments based on rumors.

(a) We must utilize Overseas Deployment Training (ODT) Exercises in Central and South America as opportunities to conduct SRPs, EXEVALs (Lanes/TAMs) and to implement tactical as well as technical training into the planning process and the training scenarios of the ODTs.

(b). Recent Army wide decisions have led to the ARNG divisions picking up the Bosnia Stabilization Force (SFOR) mission for several rotations and there is every reason to believe that the SFOR mission is one that will remain with the CONUSAs well into the future. First U.S.

AFKA-CG
SUBJECT: CG's Annual Training Guidance for 2001 and 2002

Army will play a significant role in training the deploying force, resourcing equipment and personnel shortfalls, and thoroughly preparing the identified unit to deploy to a still unsettled land, Command and Control Multi-National Forces, and how to react efficiently and effectively to violations of International Peace Agreements. This is a wholly new mission for the Army National Guard; one requiring the dedicated efforts of all First U.S. Army units and resources. In this new mission, more than in any other area, scheduled and resourced training must be aggressively executed and cancelled training eliminated completely. First U.S. Army will remain the central point of contact and lead agency for SFOR coordination. Training Support Divisions will be the field agency responsible for providing and overseeing the training in the field. The deploying unit remains responsible for soldier and small unit proficiency, as well as soldier readiness for deployment. Expect the MRE to involve all levels of command throughout the First U.S. Army AOR. First U. S. Army will also continue efforts to improve our planning, mobilization, and deployment mission potential within our AOR. We must enhance our power projection and power support platforms along with improving the garrison support unit commander's ability to respond in the event of partial or full mobilization. This will in part be accomplished by a robust First U.S. Army Planning and Evaluation Program.

(3) Military Support to Civilian Authorities: The MSCA mission remains a significant and demanding mission within First U.S. Army. With the unpredictable nature of natural and manmade disasters, it is imperative that every level realizes that at any time they can be tasked to support a MSCA mission. Overall, this is an area within First U.S. Army that we continue to strive for better ways to serve this Country during difficult situations such as hurricanes, tornadoes, and Weapons of Mass Destruction (WMD). The Deputy Chief of Staff, Operations, First U.S. Army is the staff proponent for planning and tasking in a MSCA scenario, and will develop the appropriate standard operating procedures for reacting to MSCA related events. Divisions and brigades will include in their METL and their training plans a level of training and effort that will provide a ready force, capable or reacting to natural disasters, and providing the states and the country with a dedicated force for this critical mission.

c. Soldier, Leader and Collective Training:

(1) Training should be focused on first achieving the basic fundamentals necessary for performing as a soldier; physically fit, meet Army height and weight standards, proficient with their assigned weapon, be MOS qualified, and CTT proficient. By definition, soldiers who fail to meet the standards or are undisciplined cannot make a positive long-term contribution to collective or unit readiness. I encourage all unit leaders to be aggressive in planning and executing training, and in some cases more is indeed better. However the basics are the building blocks for all future success, and proficiency in basic soldiering skills remains a requirement for a trained and ready Army. Leaders that allow soldiers and units to fail in basic standards do both the soldier and the nation a grave disservice. Money, time and resources expended to train units whose soldiers have not mastered the basics will be wasted.

(2) The importance of the "direct contact" leader (our Sergeants, Staff Sergeants, Team Leaders, Squad Leaders and Section Leaders) in our chain of command can not be over emphasized. In many ways they are the critical link to our training program. If senior leader orders, instructions and guidance are not turned into action by our direct contact leaders, then our

ability to train units will be negatively impacted. Unless the junior leadership is competent; disciplined and mission focused, the best of training plans will not be executed.

(3) Readiness of individual soldiers is a unit responsibility with specific emphasis on the direct contact supervisor. Over the course of the last six months, Soldier Readiness Checks conducted at Theater Specific Individual Readiness Training (TSIRT), Fort Benning, GA, on those soldiers deploying to Bosnia provided mixed feedback. Some units experienced 85% readiness and others as low as 0%. Identification cards; ID tags, shots records, dental exams, personnel records wills (when legally indicated) powers of attorney, and other legal documents must always be updated. Leaders must ensure that as many of these basic readiness issues as possible are constantly conducted and updated at home station.

d. Management Systems on Scheduled Training:

(1) The Yearly Training Plan (YTP) as described in FM 25-100 is the foundation of effective training. Taking into account the unit's most recent TAM and USR, the YTP should include training objectives oriented on unit METL, AT dates, CPX/FTX scheduling, MOSQ training, evaluations and support requirements. Additionally, it is imperative that time to prepare and plan for the events described above is calculated into the YTP. Failure to incorporate time for proper planning inevitable leads to higher rates of training cancellations; unprofessional products, and low soldier morale while wasting precious time and resources.

(2) Training Support Synchronization Process:

(a) The primary objective for the training support synchronization process is to develop training plans which facilitate maximum coverage of priority and "all other" units by CONUSA OC/T and simulations assets. Detailed planning combined with some flexibility with training dates is necessary to maximize training support capabilities. Changes occurring after the "lock-in" creates a rippling effect that impacts on other scheduled training support. This scheduling process supports the Reserve Component (RC) planning timelines outlined in FM 25-101.

(b) Time line for major events for planning TY02:



AFKA-CG
SUBJECT: CG's Annual Training Guidance for 2001 and 2002

(c) Each of the major events for planning TY02 is briefly described below:

**15 Aug 00:** FORSCOM World Wide Training Scheduling Conference (WWTSC). This conference is used to: 1) confirm/designate unit participation in known real world requirements and JCS exercises through FY02; 2) project unit participation in known real world requirements and JCS exercises for FY03-05; and 3) review and confirm CTC rotation through FY06.

**Aug-Sep 00:** Unit commanders in coordination with training supporters conduct post-AT assessment to fine tune the TY01 training plan and develop the TY02 training plan (prior to the pre-RSWs).

**Aug 00:** USARC Collective Training Scheduling Workshop (CTSW). Conducted by USARC to source JCS and USARC exercise requirements and ODT requirements.

**Sep 00:** NGB Training Operations and Exercises (TOES) Conference. Conducted by NGB to source JCS exercise and ODT requirements.

**Oct 00:** Pre-Regional Scheduling Workshops (pre-RSWs). Conducted by Simulations Brigades and Brigades (TS) with supported RC commands to identify tentative AT02 plans in preparation for the RSWs. Training support requirements (e.g., gunnery, lanes, simulations, and TAMs) are identified and confirmed. Additional training support requirements (e.g., functional assistance and MTT requests) may also be identified.

**Nov 00:** Regional Scheduling Workshops (RSWs). Conducted by Divisions (TS) to develop synchronized AT02 plans within AOR and identify training support requirements requiring cross leveling by First U.S. Army. Gunnery, lanes, simulations, TAMs and other training support are scheduled in coordination with the training supporters and the training sites. Specific dates are: 14-16 Nov for 78th Div (TS); 1-3 Nov for 85th Div (TS); 6-8 Nov for 87th Div (TS).

**6-8 Feb 01:** Training Support Synchronization Conference (TSSC). Conducted by First U.S. Army to finalize and "lock-in" the AT02 plan to include cross leveling across the three Divisions (TS). Any unresolved training support issues and/or conflicts are identified and addressed.

**Mar-May 01:** Yearly Training Briefings (YTBs). RC Commands brief their AT02 Training Plans to the YTP approval authority (Brigades TS for FSP/LAD<30 units except General Officer Commands.

**Apr-May 01:** Mission Support Briefings (MSBs). Divisions/Brigades (TS) brief training support plans to First U.S. Army.

(d) Units changing AT sites/dates after the TSSC risk losing their scheduled training support. Requests for training support received after lock-in will be filled with remaining capability (if any).

AFKA-CG
SUBJECT: CG's Annual Training Guidance for 2001 and 2002

e. Allocation of Resources:

(1) Budget: The FY 01 guidance is currently resourced at 20% below FY 00. This presents unique management challenges for leaders at all level. We must continue to intensively manage our monetary resource and eliminate waste and optimize training opportunities.

(2) Formation of a Commander's Resource Management Assistance Team by First U.S. Army: The purpose of this Team would be to periodically visit TSBs in order to assess current contracts, agreements on maintenance, installation support and related functions. This Team assists commands and commanders with, where feasible, lowering operating costs while receiving the quality and quantity of services needed from outside agencies to support the mission. Additionally, it will help First U.S. Army create standards for support and services while assisting unit commanders with getting the most from their scarce resources.

(3) Battle Staff Training: There is no shortage of slots for the Battle Staff Course at Fort McCoy. If we have NCOs who need the training, leaders must identify the soldier, request the slot, and ensure that the soldier is prepared.

(4) Contracting: Contracts, contracting, and contractors will not get in the way of mission accomplishment. If the contract does not support the unit mission, change it. If a contractor insists on placing constraints or limitations on mission accomplishment in order to make his mission a lot easier, get another contractor. If a contracting officer places his relationship with the contractor above his responsibility to do right by the unit he represents, get a replacement. Contractors support the mission; units do not compromise standards to support the contractor.

f. Evaluations and Feedback:

(1) All training must be evaluated. Leaders must continuously evaluate training to determine how well units, leaders and soldiers are meeting training objectives and standards. Evaluations are an invaluable tool intended for use by the evaluated unit to identify shortcomings and structure future training. Evaluations are conducted with a critical eye, but solely for our units to improve combat readiness. The direction of future training needs and priorities can only be made by evaluating current training.

(2) The First U.S. Army OC/T certification and lane preparation is a solid process that continues to positively evolve. These OC/Ts provide an excellent training tool for the commander. Both Priority and "all others" unit commanders need to make their training support and evaluation requirements known to First U.S. Army. Preconceived ideas that a request for support is not available is not valid. Only the Commanding General, First U.S. Army can disapprove a unit's request of IDT/AT/or Simulations support. Additionally, ensure that units ask for what they really need. Unit leaders conducting AT (and other training) need to emphasize on leading their units training, not acting as OCs of the training taking place. The BCTP, Operations Group Charlie offers an Observer Trainer Academy eight times annually in conjunction with a brigade Warfighter Exercise. This Observer Trainer Academy is tailored to Simulation Brigade personnel, however, units in the field, as well as Training Support Divisions

and Brigades will consider adding this valuable course to the evolving OC/T certification process within the unit.

(3) After Action Reviews: All AARs will include an assessment for the supported unit on the proficiency of the organization in basic soldiers skills (physical fitness, weapons proficiency, individual/CTT skills and soldier discipline) and feedback on the effectiveness of direct contact leaders (team, squad and section leaders). The OC/Ts may address these issues with specific examples of meeting or failing to meet the standard for each category or submit a recommendation list of sustains and/or improves. After Action Reviews are not ambushes of the exercising unit; make them productive and focused.

(4) All company/platoon/squad AARs should attempt to identify three to five individual tasks which had the greatest impact on the outcome of the mission and require more training focus in the upcoming IDTs. The OC/Ts should coach the unit to identify a TTP that they can fix prior to the next battle (lane). Attempting to "fix" more than one TTP at a time will most likely fail to produce the improvements required and leave the unit no better trained. OC/T's are to avoid flooding the evaluated unit with a litany of areas requiring improvement. Identify the areas that need the most attention, and focus future efforts on helping the evaluated unit address those issues.

(5) Training Assessment Model (TAM) evaluations:

(a) FORSCOM Regulation 350-2 requires periodic TAM evaluations for all Reserve Component (RC) units. Priority units (eSB, FSP, RO, LAD<30) require annual external TAM evaluations. "All others" units require a triennial TAM evaluation. The TY2001 external TAM evaluation schedule has already been completed and recorded in the FORSCOM Training Evaluation Scheduling System (TESS). External TAMs for TY02 will be programmed during the Regional Scheduling Workshops (RSW) conducted by the Divisions (Training Support) during November 2000 and "locked-in" at the First U. S Army Training Support Synchronization Conference in February 2001.

(b) RC commands (States, RSCs, DRCs) desiring TAM exemptions for their units must submit exemption requests to the supporting Brigade (TS), through the Division (TS), to First U.S. Army. Commanding General First U. S. Army retains approval/disapproval authority for all TAM exemption requests. Considerations for TAM exemption are listed in FORSCOM Regulation 220-3. TAM exemption requests must be processed in a timely manner by the RC Chain of Command and training support organizations to preclude wasting valuable resources.

g. Simulations: Battle simulations provide realistic and cost effective ways to train units/commander/staffs. This area of training will continue to receive more attention in the future.

(1) Simulations Brigades focus at the brigade task force level. We need a solid, robust Battalion/Brigade Task Force training program. First U.S. Army simulations may also address staff training for USAR GOCOMS and Wartraced subordinate units if properly scheduled and

planned in advance. Priority USAR GOCOMS are not automatically exempted from simulations requirements.

(2) Warfighting commands are strongly encouraged to utilize the Simulations Brigades with First U.S. Army to maximize their command and staff readiness. Cancellations of confirmed training opportunities with the Simulations Brigades is unacceptable. As with any other cancelled training, planning time and other resources are squandered with no value added.

h. Retention and Recruiting: Recruiting and retention have become an important part of the job of the active component leadership within the TSBs; though quality must be placed ahead of quantity. Positions are better unfilled than to have unqualified or unprofessional soldiers in front of one of our supported units.

i. Risk Management: Risk management is an individual and leader responsibility. We must understand and train on risk management doctrine as described in FM 101-5, as well as FM 100-14, Risk Management. Good risk management ensures combat power by preventing accidents that damage equipment and/or that harm our most precious resource, our soldiers. Risk management is everyone's business and an essential part of the training planning process. However, under no circumstances will Risk Management become a cloak behind which our leaders and units avoid tough realistic training. Our nation's enemies will not have the same concern for our soldiers as we might and effective, consequently demanding training at home station, safely planned and executed, will pay enormous dividends on future battlefields.

4. Conclusion. The dynamics of the new millennium make our mission to serve this Nation more challenging than in any time in recent history. These challenges require all members of this great Army, whether Active Component, National Guard, Army Reserve or Civilian, to pull together to ensure success. Real world missions are no longer something the Reserve Component just train for; SFOR and KFOR are real world peacekeeping missions in which the Reserve Component is a vital and active participant. More than ever, it is imperative that we enforce all standards of training and discipline. The greatest equipment in the world is worthless without soldiers who know how and when to correctly utilize this equipment. In the same context, soldiers who are not disciplined and trained can have inconceivable negative consequences towards the safety of their unit and the international stability of a peacekeeping or combat mission. To prepare our soldiers for these missions, we must ensure we wisely use every tool at our disposal. With limited resources and limited time, wasted or cancelled training eats at the very foundation of our future success. It is no coincident that the United States of America is not only the greatest nation on this planet, but also has the most powerful and best trained soldiers in the world. This Army has helped to make this Nation great. To ensure the future success of this country, we must continue to keep our Army trained and disciplined. No one component can handle this worldwide mission alone; we must all work together for the common good of our Army and our Nation. You all play an essential role in the success the Army; no longer "One Army", but The Army.

AFKA-CG
SUBJECT: CG's Annual Training Guidance for 2001 and 2002

Encl
1. Training Calendar

John M Riggs
John M. Riggs
Lieutenant General, U.S. Army
Commanding

DISTRIBUTION:
Deputy Commanding Generals, First U.S. Army
Commander, Divisions (TS)
Commander, Training Support Brigades
Senior Army Adviser, Army National Guard, First U.S. Army
Chief, Field Training Groups
Chief of Staff, First Army
Command Sergeant Major, First U.S. Army
Chiefs, General and Special Staff Agencies

Our business is Readiness!

CF:
Director, Army National Guard
The Adjutants General, First U.S. Army
Commander, ARNG Divisions
Commander, Enhanced Separate Brigades
Commander, Regional Support Commands
Commander, USAR GOCOMS
Commander, FORSCOM
Commander, USARC
DCSOPS, FORSCOM
Commander, Fifth U.S. Army
Garrison Commanders
Garrison Support Unit Commanders

# CAMP SHELBY ANNUAL TRAINING SCHEDULE

2 MAR 2001

**11-25 MAY 2002** — <------ NON-AR BDE ------>

| 11-May | 18-May | 25-May |
|---|---|---|
| 2-117 FA BN | ALARNG | 433 |
| 3-117 FA BN | ALARNG | 424 |
| 142 SC HHC | ALARNG | 217 |
| 279 SC | ALARNG | 140 |
| camp 1 total | | 1214 |
| MP's | | TBD |
| USAH | | TBD |
| DEN DET | | TBD |
| MEDEVAC | | TBD |

**25 MAY-8 JUNE 2002** — <------ 155 AR BDE ------>

| 25-May | 1-Jun | 8-Jun |
|---|---|---|
| 41ST ARMY BAND | MSARNG | 42 |
| A/98 CAV | MSARNG | 146 |
| 106 SPT BN | MSARNG | 825 |
| 2-114 FA BN | MSARNG | 610 |
| 150 EN BN | MSARNG | 600 |
| 1-155 IN BN | MSARNG | 693 |
| 155 BDE HHC | MSARNG | 130 |
| 1-198 AR BN | MSARNG | 479 |
| 2-198 AR BN | MSARNG | 479 |
| 255 MI CO | MSARNG | 100 |
| camp 2 total | | 4104 |
| MP's | TBD | 50 |
| USAH | TBD | 100 |
| DEN DET | TBD | 15 |
| MEDEVAC | TBD | 30 |

**15-29 JUNE 2002** — 31 AR BDE

| 15-Jun | 22-Jun | 29-Jun |
|---|---|---|
| 31 SPT BN | ALARNG | |
| 31 BDE HHC | ALARNG | 255 |
| E/31 CAV | ALARNG | 95 |
| 1-131 AR BN | ALARNG | 454 |
| 1-167 IN BN | ALARNG | 277 |
| 230 EN BN | TNARNG | 500 |
| 1-203 ADA | ALARNG | 320 |
| 1117 MT TM | ALARNG | 15 |
| 2117 MT TM | ALARNG | 75 |
| camp 3 total | | 1991 |

**13-27 JULY 2002** — <------ TNARNG ------>

| 13-Jul | 20-Jul | 27-Jul |
|---|---|---|
| 184 TC BDE | MSARNG | 128 |
| 30TH TC | TNARNG | 50 |
| 731 OD TM, MLRS | TNARNG | 19 |
| 1115 OD DET | TNARNG | 24 |
| 267 MP CO | TNARNG | 158 |
| 2-115 FA BN,155MM | TNARNG | 490 |
| 196 HHB | TNARNG | 209 |
| 1-181 FA BN MLRS | TNARNG | 580 |
| 1-115 FA BN SP | TNARNG | 490 |
| 168 MP BN HHC | TNARNG | 54 |
| 771ST MT CO | TNARNG | 116 |
| camp 4 total | | 2318 |
| MP's | | 50 |
| USAH | | 100 |
| DEN DET | | 15 |
| MEDEVAC | | 30 |

**27 JULY-10 AUGUST 2002** — <------ MSARNG ------>

| 27-Jul-02 | 3-Aug | 10-Aug |
|---|---|---|
| 31 RTOC | MSARNG | 84 |
| 102 PA TM | MSARNG | 182 |
| 112 MP HD | MSARNG | 62 |
| 113 MP CO | MSARNG | 153 |
| 1-114 FA BN | MSARNG | 555 |
| 114 MP CO | MSARNG | 164 |
| 114 ASG HC | MSARNG | 141 |
| 168 EN GP | MSARNG | 119 |
| 185 AVN HC | MSARNG | 61 |
| 1-185TH | MSARNG | 317 |
| K-185TH | MSARNG | 38 |
| G-185TH | MSARNG | 88 |
| 1-204 ADA | MSARNG | 134 |
| 223 EN BN | MSARNG | 718 |
| 298 CS HD | MSARNG | 64 |
| 367 MT CO | MSARNG | 229 |
| 631 BDE HB | MSARNG | 143 |
| 890 EN BN | MSARNG | 763 |
| 1204 OD DET | MSARNG | 15 |
| 3656 MT CO | MSARNG | 166 |
| 711 SC BN (-) | ALARNG | 109 |
| camp 5 total | | 4305 |
| total | AT 02 | 13932 |
| MP's | TBD | 50 |
| USAH | TBD | 100 |
| DEN DET | TBD | 15 |
| MEDEVAC | TBD | 30 |

**Pre-Camp Conf.**

| | | |
|---|---|---|
| 25 MAY -8 JUN | 27 JUL-10 AUG | 26-Jan-02 |
| 15-29 JUNE | 11-25 May | 2-Feb-02 |
| 13-27 JULY | | 9-Feb-02 |

# EXHIBIT
# 5

Army Regulation 220–1

Field Organizations

# Unit Status Reporting

Headquarters
Department of the Army
Washington, DC
19 December 2006

UNCLASSIFIED

Headquarters
Department of the Army
Washington, DC
19 December 2006

*Army Regulation 220–1

Effective 19 January 2007

## Field Organizations

# Unit Status Reporting

By Order of the Secretary of the Army:

PETER J. SCHOOMAKER
*General, United States Army*
*Chief of Staff*

Official:

JOYCE E. MORROW
*Administrative Assistant to the Secretary of the Army*

**History.** This publication is a rapid action revision.

**Summary.** This regulation on U.S. Army unit status reporting has been revised to include pertinent information on unit readiness reporting requirements as well as instructions for preparing and submitting reports.. In conjunction with AR 220–20, this regulation serves as a comprehensive reference regarding the readiness of Army units for their wartime missions based on the status of their personnel, equipment, equipment readiness, and training. It implements policy and instructions in the Chairman of the Joint Chiefs of Staff Instruction 3401.02A and the Chairman of the Joint Chiefs of Staff Manual 3150.02A.

**Applicability.** This regulation applies to the Active Army, the Army National Guard of the United States (ARNGUS), including periods when operating in an Army National Guard (ARNG) capacity, and the United States Army Reserve (USAR). During mobilization and deployments, the proponent may modify or direct the responsible Army Command, Army Service Component Command, Direct Reporting Unit and/or the Director, Army National Guard/Chief, National Guard Bureau, when applicable, to supplement provisions contained in this regulation in order to accommodate special unit status reporting requirements.

**Proponent and exception authority.** The proponent of this regulation is the Deputy Chief of Staff, G–3/5/7. The proponent has the authority to approve exceptions to this regulation that are consistent with controlling law and regulation. The proponent may delegate this approval authority, in writing, to a division chief within the proponent agency or its Direct Reporting Unit or field operating agency, in the grade of colonel or the civilian equivalent. Activities may request a waiver to this regulation by providing justification that includes a full analysis of the expected benefits and must include formal review by the activity's senior legal officer. All waiver requests will be endorsed by the commander or senior leader of the requesting activity and forwarded through their higher headquarters to the policy proponent. Refer to AR 25–30 for specific guidance.

**Army management control process.** This regulation contains management control provisions and provides a Management Control Evaluation Checklist for evaluating management controls.

**Supplementation.** Supplementation of this regulation and establishment of command and local forms are prohibited without prior approval from Headquarters, Department of the Army (DAMO-ODR), Washington, DC 20310–0400.

**Suggested improvements.** Users are invited to send comments and suggested improvements on DA Form 2028 (Recommended Changes to Publications and Blank Forms) directly to HQDA (DAMO–ODR), Washington, DC 20310–0400.

**Distribution.** This publication is available in electronic media only and is intended for command levels A, B, C, D, and E for Active Component organizations, the Army National Guard/Army National Guard of the United State, and the United States Army Reserve.

**Contents** (Listed by paragraph and page number)

**Chapter 1**
**Overview,** *page 1*
Purpose • 1–1, *page 1*
References • 1–2, *page 3*
Explanation of abbreviations and terms • 1–3, *page 3*
Responsibilities • 1–4, *page 3*
Basic USR concepts • 1–5, *page 6*

*This regulation supersedes AR 220–1, dated 16 March 2006.



UNCLASSIFIED

**Contents—Continued**


Personal Computer—Army Status of Resources and Training System • 1–6, *page 7*

**Chapter 2**
**General Instructions,** *page 7*
The USR • 2–1, *page 7*
Units required to submit USRs ("measured units") • 2–2, *page 8*
Units excused from submitting USRs • 2–3, *page 11*
Types of reports • 2–4, *page 11*
Reporting channels • 2–5, *page 13*
Actions by higher commanders • 2–6, *page 21*
Security classification and declassification of reports • 2–7, *page 21*
Retention of reports • 2–8, *page 22*
Release of and access to Global Status of Resources and Training System/Army Status of Resource and Training System information • 2–9, *page 22*

**Chapter 3**
**Instructions for Measured Units,** *page 23*
General • 3–1, *page 23*
C-level definitions • 3–2, *page 23*
Standard rules and procedures • 3–3, *page 24*
C–5 reporting instructions • 3–4, *page 25*
Level 6 reporting • 3–5, *page 27*
Reporting data • 3–6, *page 27*
Basic unit information and time-sensitive update requirements • 3–7, *page 28*

**Chapter 4**
**Personnel Data,** *page 30*
General • 4–1, *page 30*
Determine required strength • 4–2, *page 30*
Determine assigned strength percentage • 4–3, *page 31*
Determine available strength percentage • 4–4, *page 31*
Determine available military occupational specialty qualified percentage • 4–5, *page 33*
Determine available senior-grade percentage • 4–6, *page 35*
Calculate personnel level (P-level) • 4–7, *page 35*
Determine personnel turnover percentage • 4–8, *page 35*
Instructions for completing the RPTDUIC Section (Joint Reporting Requirements) and the ARMYRPT Section (Army Unique Requirements) on PC–ASORTS menu screens • 4–9, *page 35*
Mandatory personnel reporting remarks • 4–10, *page 37*

**Chapter 5**
**Equipment on Hand Data,** *page 41*
General • 5–1, *page 41*
Equipment authority • 5–2, *page 42*
Reportable equipment • 5–3, *page 42*
Applying substitutes and ILO equipment in determining quantity of reportable equipment on hand • 5–4, *page 43*
Evaluating component part availability • 5–5, *page 44*
Reserve Component equipment • 5–6, *page 45*
Equipment not on site • 5–7, *page 45*
Loans from Army prepositioned stocks • 5–8, *page 45*
How to determine pacing items • 5–9, *page 45*
Calculating the S-level • 5–10, *page 45*
Completing equipment on hand portions in the RPTDUIC section (Joint reporting requirements) and the ARMTRPT section (Army unique requirements) on PC–ASORTS menu screens • 5–11, *page 47*
Mandatory entries for all measured units • 5–12, *page 49*
NBC equipment status reporting • 5–13, *page 53*

**Contents—Continued**

**Chapter 6**
**Equipment Readiness Data,** *page 56*
General • 6–1, *page 56*
Determine reportable equipment • 6–2, *page 56*
Basis for the R-level computation • 6–3, *page 57*
Determine available hours/days • 6–4, *page 57*
Determining the equipment readiness level (R-level) • 6–5, *page 58*
Complete the equipment readiness portion of the RPTDUIC section (Joint Reporting Requirements) and the ARMYRPT section (Army Unique Requirements) on PC–ASORTS menu screens. • 6–6, *page 59*
Mandatory remarks for equipment readiness • 6–7, *page 60*

**Chapter 7**
**Training Data,** *page 62*
General • 7–1, *page 62*
Reporting METL tasks and task proficiency assessments • 7–2, *page 63*
Determining T–METL • 7–3, *page 66*
Determining T–Days • 7–4, *page 67*
Determining T-level • 7–5, *page 68*
T–Days attributable to NBC requirements (NBC T–Days) • 7–6, *page 69*
PRE MOB T–days (RC units) • 7–7, *page 71*
Squad/crew/team/system manning and qualification data • 7–8, *page 72*
Summary of reported training data • 7–9, *page 78*
Reporting resource constraints • 7–10, *page 79*

**Chapter 8**
**Mission Accomplishment Estimate,** *page 79*
General • 8–1, *page 79*
Purposes of the mission accomplishment estimate • 8–2, *page 80*
Instructions for determining the mission accomplishment estimate • 8–3, *page 80*
Determining the mission accomplishment estimate for hospital units • 8–4, *page 81*
Reporting on ability for sustained operations • 8–5, *page 81*
Mission accomplishment estimate bands of effectiveness • 8–6, *page 82*
C-level and corresponding mission accomplishment estimate ranges • 8–7, *page 82*
Commander's subjective mission accomplishment estimate evaluation and C-level comparison • 8–8, *page 82*

**Chapter 9**
**Overall Unit Level and Special Instructions.,** *page 83*
Overall unit level • 9–1, *page 83*
Army unique data • 9–2, *page 83*
Joint reporting data • 9–3, *page 84*
Commander's remarks • 9–4, *page 86*
READY and REASN remarks • 9–5, *page 86*
Preparation of general remarks • 9–6, *page 88*
Higher command remarks • 9–7, *page 89*
Special instructions when a unit is alerted, activated, mobilized, deployed/employed, partially deployed, or conducting split-based operations. • 9–8, *page 89*
Validation reporting • 9–9, *page 90*

**Chapter 10**
**Composite Reports,** *page 90*
General • 10–1, *page 90*
Special Instructions for composite reporting • 10–2, *page 92*
Reserve Component training level • 10–3, *page 93*
Determining measured area levels and C-levels for composite reports • 10–4, *page 94*
Completing composite reports—general • 10–5, *page 98*

**Contents—Continued**

RPTDUIC and ARMYRPT sections on PC–ASORTS menus • 10–6, *page 98*
ARMYRPT section (Army unique requirements) • 10–7, *page 100*
Mandatory remarks for composite report • 10–8, *page 100*

**Chapter 11**
**Unit Status Reporting Before, During, and After Deployment/Employment,** *page 100*
General • 11–1, *page 100*
Percent effective (PCTEF) data reporting • 11–2, *page 101*
Deployed reporting procedures for FF- and AA-level units • 11–3, *page 106*
Derivative unit identification code reporting procedures • 11–4, *page 109*
Instructions for completing the deployed unit status report (standard short form) • 11–5, *page 111*

**Chapter 12**
**Multiple Component Unit Reporting,** *page 112*
General • 12–1, *page 112*
Concept for multiple component unit status reporting • 12–2, *page 112*
Reporting procedures for multiple component AA-level units • 12–3, *page 112*

**Appendixes**

**A.** References, *page 114*

**B.** Equipment Readiness Codes, *page 117*

**C.** Pacing Items of Equipment, *page 121*

**D.** Personnel Availability Criteria, *page 122*

**E.** Reason Codes, *page 125*

**F.** Exempt/Non-Type Classified Items, *page 131*

**G.** Special Terms and Labels for Data Fields and Data Sets Used in PC–ASORTS, *page 133*

**H.** Implementing Instructions for the Defense Readiness Reporting System-Army (DRRS–A) and Unit Status Reporting Requirements Supporting Emerging Army Force Generation (ARFORGEN) Concepts, *page 135*

**I.** Current Status and Activity Codes, *page 147*

**J.** Management Control Evaluation Checklist, *page 153*

**K.** Basic Unit Information (BUI) Data Entry Instructions and Screen Shot Examples, *page 155*

**Table List**

Table 2–1: Report submission timelines, *page 10*
Table 3–1: C-5 reporting, *page 26*
Table 3–2: Relationships between report types and report forms/sets/remarks, *page 27*
Table 4–1: Level for available, MOSQ, and senior-grade strengths, *page 35*
Table 5–1: Equipment on hand criteria (high density individual LINs, 21 or more items, includes pacing items), *page 44*
Table 5–2: Equipment on hand criteria (low density individual LINs, 20 or less items, includes pacing items), *page 46*
Table 5–3: Descriptive criteria for determining the NBC S-level, *page 54*
Table 6–1: Level for percentage of equipment fully mission capable, *page 58*
Table 7–1: Translating the T–METL percentage into a T–METL status level, *page 67*
Table 7–2: Estimating training days[1], *page 67*
Table 7–3: Translating T–METL and T-days into T-level[1], *page 69*
Table 7–4: Reportable categories for authorized squads/crews/teams/systems, *page 74*
Table 7–5: Squad/crew/team/system manning and qualification criteria, *page 75*
Table 9–1: Reason codes for C–5 reporting, *page 86*
Table 10–1: Composite level criteria (PER, EOH, & ER), *page 94*

**Contents—Continued**

Table 11–1: Descriptive criteria for determining the training level in deployed reports, *page 108*
Table D–1: Determining personnel availability–decision matrix (to determine if individual Soldiers in various situations should be considered available), *page 123*
Table E–1: Primary reason overall level not C–1, *page 125*
Table E–2: Primary reason overall level not C-1 because of deployment of subordinate elements (Applicable to composite reporting units only), *page 125*
Table E–3: Reason codes for other than P–1, *page 126*
Table E–4: Reason codes for other than S–1, *page 127*
Table E–5: Reason codes for other than R–1, *page 127*
Table E–6: Reason codes for other than T–1, *page 129*
Table E–7: NBC equipment supply/readiness and training status codes, *page 129*
Table E–8: USR requirements, *page 130*
Table E–9: USR exemptions, *page 130*
Table E–10: Training events and activities, *page 131*
Table G–1: List of the names of data field labels and data sets, *page 134*
Table H–1: Additional ARFORGEN data points and information requirements included in USR, *page 140*
Table H–2: Current operations equipment (COPE) levels, *page 141*
Table H–3: Levels for commander assessments of tactical/maneuver and technical proficiency, *page 142*
Table H–4: Levels for commander assessments of staff proficiency, *page 143*
Table H–5: ARFORGEN data points and information requirements included in the ARMS display, *page 145*
Table I–1: Part I: Current status and activity codes, *page 148*
Table I–1: Part II: Current status and activity codes, *page 150*

**Figure List**

Figure 1–1: USR management oversight decision tree (unclassified), *page 5*
Figure 2–1: Typical USR channels, AC, and USAR (when not on active duty) measured units, *page 14*
Figure 2–2: Typical USR channels, USAR measured units while on active duty, *page 15*
Figure 2–3: Typical USR channels, ARNGUS/ARNG units while not on active duty, *page 16*
Figure 2–4: Typical USR channels, ARNGUS/ARNG units while on active duty, *page 17*
Figure 2–5: Typical USR channels, ARSOF units, *page 18*
Figure 2–6: Typical USR channels, multiple component units, *page 19*
Figure 2–7: USR channel options for measured units while under the USR purview of an ASCC, *page 20*
Figure 4–1: Determining required strength, *page 31*
Figure 4–2: Determining assigned strength and available strength, *page 33*
Figure 4–3: Personnel data set (unclassified screenshot example), *page 36*
Figure 4–4: Personnel grade strength of unit (2PSPER) set (unclassified screenshot, *page 37*
Figure 4–5: MOS shortage report (2RQPER) set (unclassified screenshot example), *page 38*
Figure 4–6: Additional skill identifier shortage report (2ADDSKIL set) (unclassified screenshot example), *page 39*
Figure 4–7: Language skill/LIC shortage report (2LANGAGE set) (unclassified screenshot example), *page 40*
Figure 4–8: Nonavailable report (PSPER set). (unclassified screenshot example), *page 41*
Figure 5–1: Determining which equipment items should be included in S–Level (EOH) calculations, *page 43*
Figure 5–2: Equipment availability data (unclassified screenshot example), *page 48*
Figure 5–3: Pacing item status report (2PIESTAT set) (unclassified screenshot example), *page 49*
Figure 5–4: Equipment that is S–Level 4 (2ERCFOUR set) (unclassified screenshot example), *page 50*
Figure 5–5: Equipment shortage report (2EOHSHRT set) (unclassified screenshot example), *page 51*
Figure 5–6: S–4 ERC B & C LINs report (unclassified screenshot example), *page 52*
Figure 5–7: Borrowed, loaned and sub/ILO equipment report (unclassified screenshot example), *page 53*
Figure 5–8: NBC status and environmental factors reports (unclassified screenshot example, *page 55*
Figure 5–9: NBC equipment remarks example, *page 56*
Figure 6–1: Determining which equipment items should be included in R–Level (ER) calculations, *page 57*
Figure 6–2: Determining R–Levels for all reportable equipment (unclassifed example), *page 59*
Figure 6–3: Equipment condition (EQCONDN) and mission capability (EQMCRDAT) sets (unclassified screenshot example), *page 60*
Figure 6–4: Pacing item operational percentage report (2PIERRAT set) (unclassified screenshot example), *page 61*

**Contents—Continued**

Figure 6–5: Operational percentage report (2ERCERRT set) (unclassified screenshot example), *page 62*
Figure 7–1: METL reporting process, *page 65*
Figure 7–2: PC–ASORTS METL screenshot (unclassified screenshot example), *page 66*
Figure 7–3: Training data set (unclassified screenshot example), *page 68*
Figure 7–4: NBC status and environmental factors reports (unclassified screenshot example, *page 70*
Figure 7–5: NBC training GENTEXT remarks (unclassified screenshot example), *page 71*
Figure 7–6: Squad/crew/team/system status data (unclassified screenshot example), *page 73*
Figure 7–7: Training rating (TRRAT) GENTEXT remarks (unclassified screenshot example), *page 78*
Figure 8–1: Overall sets (unclassified screenshot example), *page 80*
Figure 9–1: Army report (ARMYRPT) set, Army reporting requirements (unclassified screenshot example), *page 84*
Figure 9–2: Reported UIC (RPTDUIC) set, Joint reporting requirements (unclassified screenshot example), *page 85*
Figure 9–3: Ready GENTEXT remarks (unclassified screenshot example), *page 87*
Figure 9–4: Reason (REASN) GENTEXT remarks (unclassified screenshot example), *page 88*
Figure 10–1: Notional listing of subordinate units for composite reporting calculations (unclassified example), *page 94*
Figure 10–2: Composite reporting calculation methodology (Type I composite report), *page 95*
Figure 10–2: Composite reporting calculation methodology (Type I composite report)—continued, *page 96*
Figure 10–3: Type II composite report (unclassified screenshot example), *page 98*
Figure 11–1: Determining the PCTEF data reporting timeline, *page 103*
Figure 11–2: Deployed report (short form) (unclassified screenshot example), *page 106*
Figure B–1: Illustration of the process and procedures for determining ERC and pacing items, *page 120*
Figure B–2: Description of the process and procedures for determining ERC and pacing items, *page 121*
Figure F–1: LIN exemption request process, *page 133*
Figure H–1: DRRS–A task assessment methodology, *page 137*
Figure H–2: DRRS–An overall assessment methodology, *page 138*
Figure K–1: PC–ASORTS screen number 1, AA-level UIC (unclassified screenshot example), *page 158*
Figure K–2: PC–ASORTS screen number 2, AA-level UIC (unclassified screenshot example), *page 159*
Figure K–3: PC–ASORTS screen number 3, AA-level UIC (unclassified screenshot example), *page 160*
Figure K–4: PC–ASORTS screen number 4, AA-level UIC (unclassified screenshot example), *page 161*
Figure K–5: PC–ASORTS screen number 1, FF-level UIC (unclassified screenshot example), *page 162*
Figure K–6: PC–ASORTS screen number 2, FF-level UIC (unclassified screenshot example), *page 163*
Figure K–7: PC–ASORTS screen number 3, FF-level UIC (unclassified screenshot example), *page 164*
Figure K–8: PC–ASORTS screen number 4, FF-level UIC (unclassified screenshot example), *page 165*

**Glossary**

# Chapter 1
# Overview

## 1–1. Purpose

The unit status report (USR) is a commander's report. Unit commanders are solely responsible for the accuracy of the information and data they enter into their reports. They should review the information and data applicable to their units that is available at authoritative Army data bases and report, in their judgment, the most accurate information and data. It requires objective and subjective measurements of the status of resources and training in the unit and conveys the unit commander's concerns and personal assessments of the unit's overall mission readiness to the chain of command. Reports are used by commanders at higher levels and senior Army leaders to synchronize operational planning and resource management. Accordingly, unit commanders will submit timely, accurate and complete reports that neither mask nor exaggerate readiness deficiencies. This regulation establishes the Army's unit status reporting system, explaining in detail what status information Army units are required to report, how reports are prepared, and how reports are submitted. This regulation is complemented by Army Regulation 220–20, which establishes policy and procedures for the registration of operational Army organizations, to include those operational Army organizations that are required to submit USRs. The information and data contained in USRs are entered into and maintained in the Army Status of Resources and Training System (ASORTS) database, which serves as the central registry and authorized database of record for all operational Army organizations and units (it will become the Defense Readiness Reporting System-Army (DRRS-A) database in FY 07; see appendix H). The ASORTS database also contains attribute data indicating the unit's present location, current command relationships, mobilization status (if applicable), and information regarding personnel and major equipment items. Where indicated, this regulation must be used in conjunction with AR 220–20. Supporting data and information maintained at official Web sites pursuant to provisions in this regulation will be revised and/or updated in accordance with the processes and procedures established by this regulation and, when applicable, in AR 220–20.

*a.* Measured units use the Personal Computer–Army Status of Resources and Training System (PC–ASORTS) (the system will be replaced by NetUSR in FY07; see appendix H) to prepare Army USRs. Reports are processed in ASORTS, which updates the Global Status of Resources and Training System (GSORTS). GSORTS is the authoritative database of record used by the Chairman, Joint Chiefs of Staff (CJCS), the Joint Staff, the Services, the unified commands, and the combat support agencies as an internal management tool and for other purposes. GSORTS is the single automated reporting system within the Department of Defense that is the central registry of all operational units of the U.S. Armed Forces and certain foreign organizations. GSORTS indicates the status level of selected resources and training required by units to undertake the wartime missions for which they are organized or designed. GSORTS provides this information on measured units at a specific point in time. This information supports, in priority order, crisis response planning; deliberate or peacetime planning; and management responsibilities to organize, train, and equip combat-ready forces for the unified commands. Chairman of the Joint Chiefs of Staff Manual (CJCSM) 3150.02A requires the commanders of all measured units to report their units' status in the areas of personnel, equipment on hand, equipment readiness, and training. The Army requires additional data that increases the value of the USR as a resource management and operations tool for Headquarters, Department of the Army (HQDA). The supplemental data required by the Army enables the commanders of measured units to more clearly portray the effects of resource application in their units. Commanders of measured units submit their USR information via administrative control (ADCON channels) that normally include the Army Command (ACOM), Army Service Component Command (ASCC), Direct Reporting Unit (DRU), and the Director, Army National Guard (DARNG)/Chief, National Guard Bureau (CNGB) for Army National Guard (ARNG)/Army National Guard of the United States (ARNGUS) units not on active duty, through HQDA to the Joint Staff. Accordingly, further references in this regulation to "the responsible ACOM/ASCC/DRU and/or the DARNG/CNGB, when applicable" should be interpreted to mean the applicable command/organization having ADCON authority or formally specified responsibilities for USR management oversight. USR information also is made available to interested commands, agencies, and combatant commanders. The information and data contained in the USR enables commanders and staffs at all levels to analyze and address key unit status indicators. At the installation level and below, the USR assists commanders in identifying resource shortfalls to facilitate cross-leveling actions, if appropriate, to alleviate the shortfall. At HQDA and at the level of the responsible ACOM/ASCC/DRU and/or DARNG/NGB, when applicable, USRs provide information that can be used as the basis for resourcing requests and/or decisions. For joint planners and combatant commanders, the USR provides an important assessment of the ability of individual units to undertake the wartime or primary missions for which they are organized or designed and, when applicable, the missions currently assigned. The USR is not a unit report card and should not be used as a tool to evaluate or compare the accomplishments of subordinate units or their commanders.

*b.* The Army's USR system enables the commanders of reporting organizations to uniformly determine and accurately report an overall level indicating the ability of their units to accomplish the wartime missions for which the units are organized or designed (also referred to in this publication as the "designed/wartime mission") via the C-level (also referred to in this publication as the category level, overall level, and READY field). When applicable, the system also captures the ability of units to accomplish currently assigned or directed missions via the percent effective (PCTEF) level. For each of these status-level assessments (C-level and PCTEF-level), the USR system indicates the

degree to which a unit has achieved prescribed levels of fill for personnel and equipment, the operational readiness status of available equipment, and the training proficiency status of the unit. The PCTEF level is discussed in paragraph 11–2. The C-level is based on objective and subjective calculations and assessments in the following measured areas:

(1) *Personnel (PER).* The personnel status of the unit (P-level) is based upon the number and type of required personnel who are available to the unit for the execution of the wartime or primary mission for which the unit is organized or designed (see chap 4).

(2) *Equipment on hand (EOH).* The equipment supply status of the unit (the S-level) is based on the quantity and type of required equipment that is available to the unit for the execution of the wartime or primary mission for which the unit is organized or designed (see chap 5).

(3) *Equipment readiness (ER).* The readiness status of the unit's equipment (the R-level) is based on the operational readiness condition (serviceability) of the unit's on-hand and reportable (for maintenance) equipment (see chap 6).

(4) *Training.* The unit's training status (the T-level) is based upon the commander's assessment of the unit's training proficiency on mission-essential tasks, the commander's estimate of the number of training days required to achieve or sustain full mission-essential task list (METL) proficiency, and the commander's assessment of the impact to unit training readiness of any unexecuted training events. For selected squads, sections, crews, and teams, commanders at all levels also determine and report, if applicable, for information and analysis at higher levels, the number of these elements that meet established standards and criteria for manning and qualification (see chap 7).

*c.* Additionally, the Army's USR system provides information to HQDA that—

(1) Assists in the portrayal of Army-wide conditions and trends.

(2) Assists in the identification of factors that degrade the unit status.

(3) Assists in the identification of resource shortfalls, if any, by comparing the actual levels of personnel and equipment assets in units with the wartime or primary mission requirements.

(4) Assists HQDA and intermediate commands in making resource allocation decisions.

(5) Informs senior decision makers' assessments regarding the employability and deployability of measured units.

*d.* Reports submitted in accordance with this regulation satisfy—

(1) The requirements of the Army portions of CJCSI 3401.02A and CJCSM 3150.02A.

(2) HQDA requirements for timely operational and management information.

(3) Unit status information requirements established by Section 117, Title 10, United States Code (10 USC 117).

*e.* Because USRs in GSORTS are part of the Joint Staff Department of Defense (DOD) readiness reporting system, reporting criteria and guidelines are standardized for all Services, to the extent possible. A major goal of GSORTS is to provide useful and accurate information to the combatant commanders regarding the status of the units they will receive in theater, to include accurate estimates of how long it will take for those units to become fully trained on METL. The prescribed standard that each measured unit commander must use as the basis for determining his unit's status or for estimating required training days is the wartime or primary mission requirement for which the measured unit is organized or designed. The procedures and standards for measuring and reporting unit status are fixed by JCS and Service policy and cannot be modified by subordinate commands/organizations or measured units without authorization.

(1) Accordingly, for USR purposes, the determination of a unit's C-level and the related measured area levels will be accomplished only by measuring the current status of resource and training in the unit against its wartime or primary mission requirements. Furthermore, the wartime or primary mission requirements of units will be based only on the unit's designed organization as established by the applicable modification table of organization and equipment (MTOE), the table of distribution and allowance (TDA) or, when these documents are not available and/or are not applicable, by force structure guidance issued by HQDA (DAMO–FMF) or the responsible ACOM/ASCC/DRU and/or DARNG/NGB, when applicable. Organic relationships between units are formally established and are not normally altered except by TOE (table of organization and equipment) redesign, with changes approved and documented by HQDA. In this publication the term "organic" is used to describe the relationship between a unit with an AA-level UIC (unit identification code) and its subordinate units/elements as documented on the unit's MTOE/TDA. The terminology "designed/established" is used in this publication to indicate relationships between units that may not be supported by MTOE/TDA documentation but that are organic in nature or have been prescribed by higher headquarters to establish the designed structure of a specific organization. The terms "attach" and "attached" are used in this publication to indicate a temporary placement of units or personnel in an organization per Joint Publication 1-02 and not to indicate support responsibilities or relationships between units.

(2) When deployed as a task force (TF) or other ad hoc organization in support of current Army operational requirements (that is, smaller-scale contingencies (SSC), stability operations, support operations, and so forth), commanders of measured units will continue to report (in the USR) the status of resources and training in their units measured against the wartime or primary mission for which the unit is organized or designed based upon the actual MTOE/TDA unit organization requirements or, when applicable, the designed/established organization requirements. Ad hoc organizations are those forces/elements that have been tailored and oriented toward a specific contingency or current operational requirement. Even if the ad hoc unit is operating under a derivative unit identification code (DUIC)

FM 7-0
(FM 25-100)

# TRAINING THE FORCE

OCTOBER 2002

**DISTRIBUTION RESTRICTION:**
Approved for public release, distribution is unlimited

**HEADQUARTERS**
**DEPARTMENT OF THE ARMY**

# Preface

The U. S. Army exists for one reason—to serve the Nation. From the earliest days of its creation, the Army has embodied and defended the American way of life and its constitutional system of government. It will continue to answer the call to fight and win our Nation's wars, whenever and wherever they may occur. That is the Army's non-negotiable contract with the American people.

The Army will do whatever the Nation asks it to do, from decisively winning wars to promoting and keeping the peace. To this end, the Army must be strategically responsive and ready to be dominant at every point across the full spectrum of military operations.

Today, the Army must meet the challenge of a wider range of threats and a more complex set of operating environments while incorporating new and diverse technology. The Army meets these challenges through its core competencies: Shape the Security Environment, Prompt Response, Mobilize the Army, Forcible Entry Operations, Sustained Land Dominance and Support Civil Authorities. We must maintain combat readiness as our primary focus while transitioning to a more agile, versatile, lethal, and survivable Army.

Doctrine represents a professional army's collective thinking about how it intends to fight, train, equip, and modernize. When the first edition of FM 25-100, Training the Force, was published in 1988, it represented a revolution in the way the Army trains. The doctrine articulated by FMs 25-100, Training the Force, and 25-101, Battle Focused Training, has served the Army well. These enduring principles of training remain sound; much of the content of these manuals remains valid for both today and well into the future. FM 7-0 updates FM 25-100 to our current operational environment and will soon be followed by FM 7-1, which will update FM 25-101.

FM 7-0 is the Army's capstone training doctrine and is applicable to all units, at all levels, and in all components. While the examples in this manual are principally focused at division and below, FM 7-0 provides the essential fundamentals for all individual, leader, and unit training.

Training for warfighting is our number one priority in peace and in war. Warfighting readiness is derived from tactical and technical competence and confidence. Competence relates to the ability to fight our doctrine through tactical and technical execution. Confidence is the individual and collective belief that we can do all things better than the adversary and the unit possesses the trust and will to accomplish the mission.

FM 7-0 provides the training and leader development methodology that forms the foundation for developing competent and confident soldiers and units that will win decisively in any environment. Training is the means to achieve tactical and technical competence for specific tasks, conditions, and standards. Leader Development is the deliberate, continuous, sequential, and progressive process, based on Army values, that develops soldiers and civilians into competent and confident leaders capable of decisive action.

Closing the gap between training, leader development, and battlefield performance has always been the critical challenge for any army. Overcoming this challenge requires achieving the correct balance between training management and training execution. Training management focuses leaders on the science of training in terms of resource efficiencies (such as people, time, and ammunition) measured against tasks and standards. Training execution focuses leaders on the art of leadership to develop trust, will, and teamwork under varying conditions—intangibles that must be developed to win decisively in combat. Leaders integrate this science and art to identify the right tasks, conditions, and standards in training, foster unit will and spirit, and then adapt to the battlefield to win decisively.

sergeant major (CSM) to first sergeant and then to other NCOs and enlisted personnel. In addition, NCOs train soldiers to the non-negotiable standards published in MTPs and soldiers training publications (STP). Commanders will define responsibilities and authority of their NCOs to their staffs and subordinates.

## UNIT RESPONSIBILITY

1-34. Unit training consists of three components: collective training that is derived directly from METL and MTPs, leader development that is embedded in the collective training tasks and in discrete individual leader focused training, and individual training that establishes, improves, and sustains individual soldier proficiency in tasks directly related to the unit METL. Commanders conduct unit training to prepare soldiers and leaders for unit missions. All units concentrate on improving and sustaining unit task proficiency.

## RELATIONSHIP BETWEEN INSTITUTION AND UNIT

1-35. The goal of unit training is to develop and sustain the capability to deploy rapidly, and to fight and win as part of a combined arms team in a variety of operational and organizational environments. Training in both the institution and the unit works together toward achieving this goal. Institutions provide foundational training and education and, when combined with individual unit experience, provide soldiers and leaders what they need to succeed in each subsequent level of service throughout their careers, appropriate to new and increasing levels of responsibility. The institutions also provide reach-back capability for functional and duty position-related training or reference materials throughout a soldier's service. Unit commanders, through subordinate leaders, build on the foundation provided by Army schools to continue developing the skills and knowledge required for mission success, as articulated in the unit's METL. Unit commanders are responsible for sustaining small unit leader and individual soldier skills to support the unit's mission. Institutions are responsible to stay abreast of requirements and developments in the field to ensure the foundations they set prepare soldiers for duty in their units.

## OPERATIONAL TRAINING AND MAJOR EXERCISES

1-36. Leader, individual soldier, and unit training and development continue during operational missions and major training events. These events enhance leader development and combat readiness. They improve leader skills and judgment while increasing unit collective proficiency through realistic and challenging training and real-time operational missions.

1-37. Major training events such as situational training exercises (STX), EXEVALs, and deployment exercises provide feedback to assist commanders in assessing the effectiveness of their leader, individual soldier, unit, and maintenance training programs. Units and individuals establish and sustain their tactical and technical training proficiency. Leaders learn to solve tactical problems, and to give appropriate and meaningful orders. They get feedback on the quality of their decisions and obtain an understanding of impact

# EXHIBIT
# 7

DEPARTMENT OF THE AIR FORCE
Headquarters US Air Force
Washington, DC *20330-1030*

CFETP *XXXXXX*
Parts I and II
*DATE*

# AFSC XXXXXXX

## Name of AFSC

# CAREER FIELD EDUCATION

# AND TRAINING PLAN

**CAREER FIELD EDUCATION AND TRAINING PLAN (Enlisted CFETP Template)**
*(Name of AFSC)* **SPECIALTY**
**AFSC** *(Numerical Code)*

**Table of Contents**

**PART I**

Preface ____ 1

Abbreviations/Terms Explained ____ 1

Section A, General Information ____ 5
Purpose of the CFETP
Use of the CFETP
Coordination and Approval of the CFETP

Section B, Career Progression and Information ____ 6
Specialty Description
Skill/Career Progression
  Apprentice Level (3)
  Journeyman Level (5)
  Craftsman Level (7)
  Superintendent Level (9)
Training Decisions
Community College of the Air Force
Career Field Path

Section C, Skill Level Training Requirements ____ 10
Purpose
Specialty Qualification Requirements
  Apprentice Level (3)
  Journeyman Level (5)
  Craftsman Level (7)
  Superintendent Level (9)

Section D, Resource Constraints ____ 11

Section E, Transitional Training Guide ____ 11

**PART II**

Section A, Specialty Training Standard ____ 12

Section B, Course Objective List ____ 14

Section C, Support Materials ____ 14

Section D, Training Course Index ____ 14

Section E, MAJCOM Unique Requirements ____ 15

Supersedes:
OPR:
Approved By:

*(Name of AFSC)* **SPECIALTY**
**AFSC** *(Numerical Code)*
**CAREER FIELD EDUCATION AND TRAINING PLAN**

**Part I**

***Preface***

1. This Career Field Education and Training Plan (CFETP) is a comprehensive education and training document that identifies life-cycle education/training requirements, training support resources, and a minimum core task requirements for this specialty. The CFETP will provide personnel a clear career path to success and will instill rigor in all aspects of career field training. ***NOTE:*** Civilians occupying associated positions will use Part II to support duty position qualification training.

2. The CFETP consists of two parts; both parts of the plan are used by supervisors to plan, manage, and control training within the career field.
2.1. Part I provides information necessary for overall management of the specialty. Section A explains how everyone will use the plan; Section B identifies career field progression information, duties and responsibilities, training strategies, and career field path; Section C associates each level with specialty qualifications (knowledge, education, training, and other); Section D indicates resource constraints. Some examples are funds, manpower, equipment, facilities; Section E identifies transition training guide requirements for SSgt through MSgt.
2.2. Part II includes the following: Section A identifies the Specialty Training Standard (STS) and includes duties, tasks, technical references to support training, Air Education and Training Command (AETC) conducted training, wartime course and core task and correspondence course requirements; Section B contains the course objective list and training standards supervisors will use to determine if airmen satisfied training requirements; Section C identifies available support materials. An example is a Qualification training package (QTPs which may be developed to support proficiency training). These packages are identified in AFIND8, *Numerical Index of Specialized Educational Training Publications*; Section D identifies a training course index supervisors can use to determine resources available to support training. Included here are both mandatory and optional courses; Section E identifies MAJCOM unique training requirements supervisors can use to determine additional training required for the associated qualification needs.

3. Using guidance provided in the CFETP will ensure individuals in this specialty receive effective and efficient training at the appropriate point in their career. This plan will enable us to train today's work force for tomorrow's jobs. At unit level, supervisors and trainers will use Part II to identify, plan, and conduct training commensurate with the overall goals of this plan.

***ABBREVIATIONS/TERMS EXPLAINED***

**Advanced Training (AT).** Formal course which provides individuals who are qualified in one or more positions of their Air Force Specialty (AFS) with additional skills/knowledge to enhance their expertise in the career field. Training is for selected career airmen at the advanced level of the AFS.

**Air Force Job Qualification Standard/Command Job Qualification Standard (AFJQS/CJQS).** A comprehensive task list which describes a particular job type or duty position. They are used by supervisors to document task qualifications. The tasks on AFJQS/CJQS are common to all persons serving in the described duty position.

**Allocation Curves.** The relation of hours of training in different training settings to the degree of proficiency which can be achieved on specified performance requirements.

**Career Field Education and Training Plan (CFETP).** A CFETP is a comprehensive, multipurpose document encapsulating the entire spectrum of education and training for a career field. It outlines a logical growth plan that includes training resources and is designed to make career field training identifiable, to eliminate duplication, and to ensure this training is budget defensible.

**Career Training Guide (CTG).** A document that uses Task Modules (TMs) in lieu of tasks to define performance and training requirements for a career field.

**Continuation Training.** Additional training exceeding requirements with emphasis on present or future duty assignments.

**Core Task.** A task Air Force career field managers (AFCMs) identify as a minimum qualification requirement within an Air Force specialty or duty position

**Course Objective List (COL).** A publication, derived from initial/advanced skills course training standard, identifying the tasks and knowledge requirements, and respective standards provided to achieve a 3-/7-skill level in this career field. Supervisors use the COL to assist in conducting graduate evaluations in accordance with AFI 36-2201, Developing, Managing and Conducting Military Training Programs.

**Enlisted Specialty Training (EST).** A mix of formal training (technical school) and informal training (on-the-job) to qualify and upgrade airmen in each skill level of a specialty.

**Exportable Training.** Additional training via computer assisted, paper text, interactive video, or other necessary means to supplement training.

**Field Technical Training (Type 4).** Special or regular on-site training conducted by a field training detachment (FTD) or by a mobile training team.

**Instructional System Development (ISD).** A deliberate and orderly, but flexible process for planning, developing, implementing, and managing instructional systems. It ensures personnel

are taught in a cost efficient way the knowledge, skills, and attitudes essential for successful job performance.

**Initial Skills Training.** A formal resident course which results in award of the entry level.

**Occupational Survey Report (OSR).** A detailed report showing the results of an occupational survey of tasks performed within a particular AFS.

**On-the-Job Training (OJT).** Hands-on, over-the-shoulder training conducted to certify personnel in both upgrade (skill level award) and job qualification (duty position certification) training.

**Optimal Training.** The ideal combination of training settings resulting in the highest levels of proficiency on specified performance requirements within the minimum time possible.

**Qualification Training (QT).** Actual hands-on task performance training designed to qualify an individual in a specific duty position. This portion of the dual channel on-the-job training program occurs both during and after the upgrade training process. It is designed to provide the performance skills required to do the job.

**Qualification Training Package (QTP).** An instructional package designed for use at the unit to qualify, or aid qualification, in a duty position or program, or on a piece of equipment. It may be printed, computer-based, or in other audiovisual media.

**Representative Sites.** Typical organizational units having similar missions, weapon systems or equipment, or a set of jobs, used as a basis for estimating average training capacities and costs within the Training Impact Decision System (TIDES).

**Resource Constraints.** Resource deficiencies, such as money, facilities, time, manpower, and equipment that preclude desired training from being delivered.

**Skills Training.** A formal course which results in the award of a skill level.

**Specialty Training.** A mix of formal training (technical school) and informal training (on-the-job) to qualify and upgrade airmen in the award of a skill level.

**Specialty Training Package and COMSEC Qualification Training Package.** A composite of lesson plans, test material, instructions, policy, doctrine, and procedures necessary to conduct training. These packages are prepared by AETC, approved by National Security Agency (NSA), and administered by qualified communications security (COMSEC) maintenance personnel.

**Specialty Training Standard (STS).** An Air Force publication that describes skills and knowledges that airman in a particular Air Force specialty needs on the job. It further serves as a contract between the Air Education and Training Command and the user to show the overall training requirements for an Air Force specialty code that the formal schools teach.

**Standard.** An exact value, a physical entity, or an abstract concept, established and defined by authority, custom, or common consent to serve as a reference, model, or rule in measuring quantities or qualities, establishing practices or procedures, or evaluating results. A fixed quantity or quality.

**Task Module (TM).** A group of tasks performed within an Air Force specialty that are performed together and that require common knowledge, skills, and abilities. TMs are identified by an identification code and a statement.

**Total Force.** All collective Air Force components (active, reserve, guard, and civilian elements) of the United States Air Force.

**Training Capacity.** The capability of a training setting to provide training on specified requirements, based on the availability of resources.

**Training Impact Decision System (TIDES).** A computer-based decision support technology being designed to assist Air Force career field managers in making critical judgments relevant to what training should be provided personnel within career fields, when training should be provided (at what career points), and where training should be conducted (training setting).

**Training Planning Team (TPT).** Comprised of the same personnel as a U&TW, however TPTs are more intimately involved in training development and the range of issues are greater than is normal in the U&TW forum.

**Training Requirements Analysis.** A detailed analysis of tasks for a particular AFS to be included in the training decision process.

**Training Setting.** The type of forum in which training is provided (formal resident school, on-the-job, field training, mobile training team, self-study etc.).

**Upgrade Training (UGT).** Mandatory training which leads to attainment of higher level of proficiency.

**Utilization and Training Pattern.** A depiction of the training provided to and the jobs performed by personnel throughout their tenure within a career field or Air Force specialty. There are two types of patterns: 1) Current pattern, which is based on the training provided to incumbents and the jobs to which they have been and are assigned; and 2) Alternate pattern, which considers proposed changes in manpower, personnel, and training policies.

**Utilization and Training Workshop (U&TW).** A forum of MAJCOM Air Force Specialty Code (AFSC) functional managers, Subject Matter Experts (SMEs), and ATC training personnel that determines career ladder training requirements.

## *Section A - General Information*

**1. Purpose.** This CFETP provides information necessary for Air Force Career Field Managers (AFCFM), MAJCOM functional managers (MFMs), commanders, training managers, supervisors and trainers to plan, develop, manage, and conduct an effective career field training program. This plan outlines the training that individuals in this AFS should receive in order to develop and progress throughout their career. This plan identifies initial skills, upgrade, qualification, advanced, and proficiency training. Initial skills training is the AFS specific training an individual receives upon entry into the Air Force or upon retraining into this specialty for award of the 3-skill level. Normally, this training is conducted by AETC at one of the technical training centers. Upgrade training identifies the mandatory courses, task qualification requirements, and correspondence course completion requirements for award of the 3-, 5-, 7-, 9-skill levels. Qualification training is actual hands-on task performance training designed to qualify an airman in a specific duty position. This training program occurs both during and after the upgrade training process. It is designed to provide the performance skills/knowledge required to do the job. Advanced training is formal specialty training used for selected airmen. Proficiency training is additional training, either in-residence or exportable advanced training courses, or on-the-job training, provided to personnel to increase their skills and knowledge beyond the minimum required for upgrade. The CFETP has several purposes, some are:
1.1. Serves as a management tool to plan, manage, conduct, and evaluate a career field training program. Also, it is used to help supervisors identify training at the appropriate point in an individual's career.
1.2. Identifies task and knowledge training requirements for each skill level in the specialty and recommends education/training throughout each phase of an individuals career.
1.3. Lists training courses available in the specialty, identifies sources of training, and the training delivery method.
1.4. Identifies major resource constraints which impact full implementation of the desired career field training process.

**2. Uses.** The plan will be used by MFMs and supervisors at all levels to ensure comprehensive and cohesive training programs are available for each individual in the specialty.
2.1. AETC training personnel will develop/revise formal resident, non-resident, field and exportable training based on requirements established by the users and documented in Part II of the CFETP. They will also work with the AFCFM to develop acquisition strategies for obtaining resources needed to provide the identified training.
2.2. MFMs will ensure their training programs complement the CFETP mandatory initial, upgrade, and proficiency requirements. Identified requirements can be satisfied by OJT, resident training, contract training, or exportable courses. MAJCOM-developed training to support this AFSC must be identified for inclusion into plan.
2.3. Each individual will complete the mandatory training requirements specified in this plan. The lists of courses in Part II will be used as a reference to support training.

**3. Coordination and Approval.** The AFCFM is the approval authority. MAJCOM representatives and AETC training personnel will identify and coordinate on the career field training requirements. The AETC training manager for this specialty will initiate an annual

review of this document by AETC and MFMs to ensure currency and accuracy. Using the list of courses in Part II, they will eliminate duplicate training.

***Section B - Career Progression and Information***

**4. Specialty Description.**
4.1. **Specialty Summary.**
4.2. **Duties and Responsibilities.**

**5. Skill/Career Progression.** Adequate training and timely progression from the apprentice to the superintendent skill level play an important role in the Air Force's ability to accomplish its mission. It is essential that everyone involved in training must do their part to plan, manage, and conduct an effective training program. The guidance provided in this part of the CFETP will ensure each individual receives viable training at appropriate points in their career.
5.1. **Apprentice (3) Level.**
5.2. **Journeyman (5) Level.**
5.3. **Craftsman (7) Level.**

5.4. **Superintendent (9) Level.**

**6. Training Decisions.** The CFETP uses a building block approach (simple to complex) to encompass the entire spectrum of training requirements for the *(Identify name of AFS)* career field. The spectrum includes a strategy for when, where, and how to meet the training requirements. The strategy must be apparent and affordable to reduce duplication of training and eliminate a disjointed approach to training.

6.1. **Initial Skills.**

6.2. **Five Level Upgrade Requirements.**
6.3. **Seven Level Upgrade Requirements.**
6.4. **Proficiency Training.**

**7. Community College of the Air Force.** Enrollment in CCAF occurs upon completion of basic military training. CCAF provides the opportunity to obtain an Associates in Applied Sciences Degree. In addition to its associates degree program, CCAF offers the following:
7.1. **Occupational Instructor Certification.** Upon completion of instructor qualification training, consisting of the instructor methods course and supervised practice teaching, CCAF instructors who possess an associates degree or higher may be nominated by their school commander/commandant for certification as an occupational instructor.
7.2. **Trade Skill Certification.** When a CCAF student separates or retires, a trade skill certification is awarded for the primary occupational specialty. The College uses a competency based assessment process for trade skill certification at one of four proficiency levels: Apprentice, Journeyman, Craftsman/Supervisor, or Master Craftsman/Manager. All are transcribed on the CCAF transcript.

7.3. **Degree Requirements.** All airmen are automatically entered into the CCAF program. Prior to completing an associates degree, the 5-level must be awarded and the following requirements must be met:

| | Semester Hours |
|---|---|
| Technical Education | 24 |
| Leadership, Management, and Military Studies | 6 |
| Physical Education | 4 |
| General Education | 15 |
| Program Elective | 15 |
| Technical Education; Leadership, Management, and Military Studies; or General Education | |
| Total | 64 |

7.3.1. **Technical Education** (24 Semester Hours): A minimum of 12 semester hours of Technical Core subjects/courses must be applied and the remaining semester hours applied from Technical Core/Technical Elective courses.

7.3.2. **Leadership, Management, and Military Studies** (6 Semester Hours): Professional military education and/or civilian management courses.

7.3.3. **Physical Education** (4 Semester Hours): This requirement is satisfied by completion of Basic Military Training.

7.3.4. **General Education** (15 Semester Hours): Applicable courses must meet the criteria for application of courses to the General Education Requirements (GER) and be in agreement with the definitions of applicable General Education subjects/courses as provided in the CCAF General Catalog.

7.3.5. **Program Elective** (15 Semester Hours): Satisfied with applicable Technical Education; Leadership, Management, and Military Studies; or General Education subjects/courses, including natural science courses meeting GER application criteria. Six semester hours of CCAF degree applicable technical credit otherwise not applicable to this program may be applied. See the CCAF General Catalog for details regarding the Associates of Applied Science for this specialty.

7.4. Additional off-duty education is a personal choice that is encouraged for all. Individuals desiring to become an Air Education and Training Command Instructor should be actively pursuing an associates degree. A degreed faculty is necessary to maintain accreditation through the Southern Association of Colleges and Schools.

**8. Career Field Path.**

8.1. **Manpower Table.**

**Table A6.1. Manpower Table.**

| | CMSgt | SMSgt | MSgt | TSgt | SSgt | SrA | A1C | Amn | AB |
|---|---|---|---|---|---|---|---|---|---|
| Base Level | X | X | X | X | X | X | X | X | X |
| MAJCOM Staff | X | X | X | X | X | X | X | X | X |
| HQ USAF Staff | X | X | X | X | X | X | X | X | X |
| FOA/DRU | X | X | X | X | X | X | X | X | X |
| Total | XX | XX | XX | XX | XX | XX | XX | XX | XX |

8.2. **Enlisted Career Path.**

**Table A6.2. Enlisted Career Path**

| **Education and Training Requirements** | **GRADE REQUIREMENTS** Rank | Average Sew-On | Earliest Sew-On | High Year Of Tenure (HYT) |
|---|---|---|---|---|
| **Basic Military Training school** | | | | |
| **Apprentice Technical School** (3-Skill Level) | Amn<br>A1C | 6 months<br>16 months | | |
| **Upgrade To Journeyman** (5-Skill Level)<br>- Complete 3 months duty position/apprentice experience **before** beginning journeyman training.<br>- Minimum 12 months on-the-job training.<br>- Complete appropriate CDC if/when available.<br>- Sew-on SrA for award of the 5-skill level. | SrA | 3 years | 28 months | 10 Years |
| **Airman Leadership School (ALS)**<br>- Must be a SrA with 48 months time in service or be a SSgt Selectee.<br>- Resident graduation is a prerequisite for SSgt sew-on (Active Duty Only). | **Trainer**<br>- ALS graduate.<br>- Possess the same AFSC at a higher skill level than the trainee, and be certified to train others.<br>- Must attend formal OJT Trainer Training and appointed by Commander. | | | |
| **Upgrade To Craftsman** (7-Skill Level)<br>- Minimum rank of SSgt.<br>- 18 months OJT.<br>- Complete appropriate CDC if/when available.<br>- Advanced Technical School. | SSgt | 7.5 years | 3 years | 20 Years |
| | **Certifier**<br>- Possess at least a 7-skill level in the same AFSC, if possible but not required.<br>- Attend formal OJT Certifier Course and appointed by Commander.<br>- Be a person other than the trainer. | | | |
| **Noncommissioned Officer Academy** (NCOA)<br>- Must be a TSgt or TSgt Selectee.<br>- Resident graduation is a prerequisite for MSgt sew-on (Active Duty Only). | TSgt<br>MSgt | 12.5 years<br>16 years | 5 years<br>8 years | 20 Years<br>24 Years |
| **USAF Senior NCO Academy (SNCOA)**<br>- Must be a SMSgt or SMSgt Selectee.<br>- Resident graduation is a prerequisite for CMSgt sew-on (Active Duty Only). | SMSgt | 19.2 years | 11 years | 26 Years |
| **Upgrade To Superintendent** (9-Skill Level)<br>- Minimum rank of SMSgt.<br>- Must be a resident graduate of SNCOA (Active Duty Only). | CMSgt | 21.5 years | 14 years | 30 Years |

*Section C - Skill Level Training Requirements*

**9. Purpose.** Skill level training requirements in this career field are defined in terms of tasks and knowledge requirements. This section outlines the specialty qualification requirements for each skill level in broad, general terms and establishes the mandatory requirements for entry, award and retention of each skill level. The specific task and knowledge training requirements are identified in the STS at Part II, Sections A and B of this CFETP.

**10. Specialty Qualification:**
10.1. **Apprentice Level Training:**

10.1.1. **Specialty Qualification.**
10.1.1.1. **Knowledge.**
10.1.1.2. **Education.**
10.1.1.3. **Training.**
10.1.1.4. **Experience.**
10.1.1.5. **Other.**
10.1.2. **Training Sources and Resources.**
10.1.3. **Implementation.**
10.2. **Journeyman Level Training:.**

10.2.1 **Specialty Qualification.**
10.2.1.1. **Knowledge.**
10.2.1.2. **Education.**
10.2.1.3. **Training.**
10.2.1.4. **Experience.**
10.2.1.5. **Other.**
10.2.2. **Training Sources and Resources.**
10.2.3. **Implementation.**
10.3. **Craftsman Level Training:**
10.3.1 **Specialty Qualification.**
10.3.1.1. **Knowledge.**
10.3.1.2. **Education.**
10.3.1.3. **Training.**
10.3.1.4. **Experience.**
10.3.1.5. **Other.**
10.3.2. **Training Sources and Resources.**
10.3.3. **Implementation.**
10.4. **Superintendent Level Training:**
10.4.1 **Specialty Qualification.**
10.4.1.1. **Knowledge.**
10.4.1.2. **Education.**
10.4.1.3. **Training.**
10.4.1.4. **Experience.**
10.4.1.5. **Other.**

10.4.2. **Training Sources/Resources.**
10.4.3. **Implementation.**

*Section D - Resource Constraints*

**11. Purpose.** This section identifies known resource constraints which preclude optimal/desired training from being developed or conducted, including information such as cost and manpower. Narrative explanations of each resource constraint and an impact statement describing what effect each constraint has on training are included. Also included in this section are actions required, office of primary responsibility, and target completion dates. Resource constraints will be, as a minimum, reviewed and updated annually.

**12. Apprentice Level Training:**
12.1. **Constraints.**
12.1.1. **Impact.**
12.1.2. **Resources Required.**
12.1.3. **Action Required.**
12.2. **OPR/Target Completion Date.**

**13. Five Level Training:**
13.1. **Constraints.**
13.1.1. **Impact.**
13.1.2. **Resources Required.**
13.1.3. **Action Required.**
13.2. **OPR/Target Completion Date.**

**14. Seven-Level Training:**
14.1. **Constraints.**
14.1.1. **Impact.**
14.1.2. **Resources Required.**
14.1.3. **Action Required.**
14.2. **OPR/Target Completion Date.**

*Section E. Transitional Training Guide*

**15. Purpose.** This transition guide will lay the direction/control to prepare our personnel for the 21st century. Also, tomorrow's challenges will be measured by how well we plan today, and our strength and direction are assured only through proper control. Only your genuine commitment to meeting this challenge head on will ensure the Air Force and our specialty benefit fully.

**16. Conditions.**

16.1 **Duration.**
16.2. **Target Group.**

**17. Transition Training Plan (TTP) Administration.**
17.1. **Requirements.**
17.2. **Training Methods.**
17.3. **Certification Requirements.**
17.4. **Program Management.**

**18. Status Reporting.** Base functional managers will report TTP status to their MFM quarterly, by the fifth duty day of February, May, August, and November, for the entire transition training period. MFMs will report TTP status to AFCFM semiannually, by the 15th of May and November, for the entire transition training period. When reporting, please use the following format:

**Part II**

***Section A - Specialty Training Standard***
**1. Implementation.** This STS will be used for technical training provided by AETC for classes beginning (*Date*) and graduating (*Date*).

**2. Purpose.** As prescribed in AFI 36-2201, this STS:
2.1. Lists in the column 1 (Task, Knowledge, and Technical Reference) the most common tasks, knowledge, and technical references (TR) necessary for airman to perform duties in the 3-, 5-, and 7-skill level. Number task statements sequentially i.e., 1.1, 1.2, 2.1. Column 2 (Core Tasks) identifies, by asterisk (*), specialty-wide training requirements.
2.2. Provides certification for OJT. Column 3 is used to record completion of tasks and knowledge training requirements. Use automated training management systems to document technician qualifications, if available. Task certification must show a certification/completed date. (*As a minimum, use the following column designators: Tng Comp, Certifier Initials*).
2.3. Shows formal training and correspondence course requirements. Column 4 shows the proficiency to be demonstrated on the job by the graduate as a result of training on the task/knowledge and the career knowledge provided by the correspondence course. See CADRE/AFSC/CDC listing maintained by the unit training manager for current CDC listings.
2.4. **Qualitative Requirements.** Attachment 1 contains the proficiency code key used to indicate the level of training and knowledge provided by resident training and career development courses.
2.5. Becomes a job qualification standard (JQS) for on-the-job training when placed in AF Form 623, **On-The-Job Training Record**, and used according to AFI 36-2201. When used as a JQS, the following requirements apply:
2.5.1. **Documentation.** Document and certify completion of training. Identify duty position requirements by circling the subparagraph number next to the task statement. As a minimum, complete the following columns in Part 2 of the CFETP: Training Completed, Trainee Initials, Trainer Initials, Certifier Initials (if applicable). An AFJQS may be used in lieu of Part II of the

CFETP only upon approval of the AFCFM. ***NOTE:*** The AFCFM may supplement these minimum documentation procedures as needed or deemed necessary for their Career Field.

2.5.1.1. **Converting from Old Document to CFETP.** Use the new CFETP to identify and certify all past and current qualifications. For those tasks previously certified and required in the current duty position, evaluate current qualifications and, when verified, recertify using current date as completion date and enter certifier's initials. For previous certification on tasks not required in the current duty position, carry forward *only* the previous completion date. If and when these tasks become a duty position requirement, recertify with current date and certifier's initials.

2.5.1.2. **Documenting Career Knowledge.** When a CDC is not available: the supervisor identifies STS training references that the trainee requires for career knowledge and ensures, as a minimum, that trainees cover the mandatory items in AFI 26-2108. For two-time CDC course exam failures: supervisors identify all STS items corresponding to the areas covered by the CDC. The trainee completes a study of STS references, undergoes evaluation by the task certifier, and receives certification on the STS. ***NOTE:*** Career Knowledge must be documented prior to submitting a CDC waiver.

2.5.1.3. **Decertification and Recertification.** When an airman is found to be unqualified on a task previously certified for his or her position, the supervisor lines through the previous certification or deletes previous certification when using automated system. Appropriate remarks are entered on the AF Form 623A, **On-The-Job Training Record Continuation Sheet**, as to the reason for decertification. The individual is recertified (if required) either by erasing the old entries and writing in the new or by using correction fluid (if the entries were made in ink) over the previously certified entry.

2.5.2. **Training Standard.** Tasks are trained and qualified to the go/no go level. Go means the individual can perform the task without assistance and meet local demands for accuracy, timeliness, and correct use of procedures.

2.6. Is a guide for development of promotion tests used in the Weighted Airman Promotion System (WAPS). Specialty Knowledge Tests (SKTs) are developed at the USAF Occupational Measurement Squadron by senior NCOs with extensive practical experience in their career fields. The tests sample knowledge of STS subject matter areas judged by test development team members as most appropriate for promotion to higher grades. Questions are based upon study references listed in the WAPS catalog. Individual responsibilities are in chapter 14 of AFI 36-2606, *US Air Force Reenlistment, Retention, and NCO Status Programs* (formerly AFR 35-16, volume 1). WAPS is not applicable to the Air National Guard.

3. **Recommendations.** Report unsatisfactory performance of individual course graduates to (*Identify complete AETC technical school's mailing address.*) Reference specific STS paragraphs.

BY ORDER OF THE SECRETARY OF THE AIR FORCE
OFFICIAL

***Section B - Course Objective List***

**4. Measurement.** Each objective is indicated as follows: **W** indicates task or subject knowledge which is measured using a written test, **PC** indicates required task performance which is measured with a performance progress check, and **PC/W** indicates separate measurement of both knowledge and performance elements using a written test and a performance progress check.

**5. Standard.** The standard is 70% on written examinations. Standards for performance measurement are indicated in the objective and delineated on the individual progress checklist. Instructor assistance is provided as needed during the progress check, and students may be required to repeat all or part of the behavior until satisfactory performance is attained.

**6. Proficiency Level.** Most task performance is taught to the "2b" proficiency level which means the students can do most parts of the task, but does need assistance on the hardest parts of the task (partially proficient). The student can also determine step by step procedures for doing the task.

**7. Course Objective.** These objectives are listed in the sequence taught by Block of Instruction.
7.1. **Initial Skills Course:**
7.1.1. **Block I.**
7.1.2. **Block II.**
7.2. **Advanced Skills Course:**
7.2.1. **Block I.**
7.2.2. **Block II.**

**OR**

***NOTE:*** There is currently no advanced course. This area is reserved.

***Section C - Support Material***

**8.** The following list of support materials is not all inclusive; however, it covers the most frequently referenced areas.

| Course Number | Course Title | Developer |
|---|---|---|

**OR**

***NOTE:*** There is currently no advanced course. This area is reserved.

***Section D - Training Course Index***

**9. Purpose.** This section of the CFETP identifies training courses available for the specialty and shows how the courses are used by each MAJCOM in their career field training programs.

**10. Air Force In-Residence Courses.**

| COURSE NUMBER | TITLE | LOCATION | USER |
|---|---|---|---|

**11. Extension Course Institute (ECI) Courses**

| COURSE NUMBER | TITLE | LOCATION | USER |
|---|---|---|---|

**12. Exportable Courses**

| COURSE NUMBER | TITLE | LOCATION | USER |
|---|---|---|---|

**13. Courses Under Development/Revision**

| COURSE NUMBER | TITLE | LOCATION | USER |
|---|---|---|---|

***Section E - MAJCOM Unique Requirements***

**1.** The following list of MAJCOM unique responses is not all inclusive; however, it covers the most frequently referenced areas.

| Course Number | Course Title | Location |
|---|---|---|

OR

***NOTE:*** There are currently no MAJCOM unique requirements. This area is reserved.

# EXHIBIT
# 8




# Transforming Training Through the Increased Use of Distance Learning

*By Ms. Sandra Gibson and Mr. Larry Helms*

*This article is a reprint from MILITARY POLICE, April 2003.*

***"The delivery of standardized individual, collective, and self-development training to soldiers and units anywhere and anytime through the application of information technologies."***

—The U.S. Army definition of distributed learning

The Strategic Plan for Transforming DOD Training, 1 March 2002, recognizes that "transformed training" is the key enabler to transforming the Department of Defense. An essential component for transforming training is the increased use of distance learning methodologies.

In some form or other, distance learning has been an alternative to the traditional classroom for many years. The term *distance learning* was coined by Otto Peters and other practitioners at the University of Tubingen in the 1960s.[1] The term has evolved to *distance education* and most recently *distributed learning* (DL). As early as the 1940s, the U.S. military began employing print-based correspondence courses. Other media delivery used by the military through the years included television; "teleteaching," which used commercial dial-up telephones; electronic blackboards; and more recently, personal computers. In November 1997, the Distance Learning/Training Technology Applications Subcommittee of the Secretary of the Army's Education Committee was established to review and evaluate the status of DL within Army training. In a June 1999 briefing to the Secretary of the Army,[2] the subcommittee recommended that the U.S. Army Training and Doctrine Command (TRADOC) adopt the Internet as The Army Distributed Learning Program (TADLP) distribution backbone, enabling training to be Web-centric in the long term. The subcommittee also added that the Army must use CD-ROMs as a convenient, necessary interim measure while transitioning to the Web. This article provides an update on the status of DL development at the U.S. Army Maneuver Support Center (MANSCEN) Directorate of Training Development (DOTD), Fort Leonard Wood, Missouri, and more specifically, near-term plans for implementing the DL courseware being developed.

During the stand-up of MANSCEN, senior leaders recognized that DL would play a major role in future Army Transformation processes and opted to establish a Multimedia Development Team (MDT) within DOTD. The DOTD MDT has the responsibility to conduct MANSCEN DL contract oversight for contractor-developed courseware, develop selected in-house multimedia products, and upgrade legacy MANSCEN school courseware. The MDT staff is comprised of instructional designers, training technicians, a visual information specialist, and a computer scientist specifically trained to facilitate courseware development at MANSCEN.

To establish the MDT workload, the MANSCEN schools' courseware redesign and development requests are reviewed by MDT and approved by DOTD. Course priorities are determined, based on a careful review of the TRADOC TADLP courseware redesign list published each fiscal year. TRADOC schools may at any time nominate courses to be added to the redesign list. Course nominations are reviewed at TRADOC and prioritized reflecting the Army's strategic needs. Courses accepted on the list are the Army's top priority for DL course redesign. TRADOC allocates DL funds on a priority basis to redesign about forty courses per year. Once the DOTD MDT annual course redesign and development requirements are established, a decision is made whether to conduct some of the funded courseware development work in-house (by requesting a waiver from TRADOC) or to proceed with contracting the work to one of the TRADOC courseware




development contractors. In any case, MDT personnel work closely with MANSCEN DOTD Warrior and school training developers throughout each phase of the development.




Early MANSCEN courseware development efforts were primarily targeted for CD-ROM-based delivery. In 2002, the emphasis changed to developing Web-based courseware. The time required to complete an average forty-hour DL course redesign project in TRADOC is 24-30 months.[3] In an attempt to reduce the overall time required to create courseware at MANSCEN, DOTD has implemented a Rapid Courseware Development Model (RCDM). This model is a new approach not currently used by other TRADOC schools. We requested and received approval to augment the in-house MDT with personnel contracted to develop Instructional Media Design Packages and storyboards on-site under the close watch of MDT. This approach uses highly skilled contracted instructional designers and writers working alongside the in-house MDT, allowing them to be able to redesign and develop 100 hours of interactive courseware this fiscal year. We believe the DOTD RCDM will prove to be a very successful initiative to reduce interactive courseware development time.

Having a reliable, proven avenue for DL implementation is just as important as courseware development. We must have a method and procedures for delivering the completed courseware and providing the essential support that students require in order to have a successful experience with DL. To that end, we developed what we are calling the MANSCEN Advanced Distributed Learning University (ADLU), a three-phased (crawl-walk-run) implementation plan for DL. The overall mission of the ADLU includes—

- Providing the infrastructure and support to facilitate individual, collective, and self-development training anywhere and any time.
- Leveraging cutting-edge DL technologies and methodologies to provide soldiers a lifelong learning experience in a positive, effective, cost-efficient, stimulating, and motivating environment that supports Army Transformation.
- Improving individual and unit readiness.
- Supporting Army DL initiatives.
- Seamlessly integrating the MANSCEN infrastructure with the Army Knowledge Online as the primary gateway to MANSCEN DL.

Major General R.L. Van Antwerp, MANSCEN commander, approved the MANSCEN ADLU Implementation Plan in October 2002, with the first phase of the plan being a test of our student support infrastructure, as well as establishment of the MANSCEN help desk, staffing roles, responsibilities, requirements, and operating procedures.

One of the key components of the MANSCEN ADLU student support interim infrastructure is the DOTD Aspen Learning Management System (LMS). The LMS will allow MANSCEN ADLU students a means to access MANSCEN courseware online. TRADOC is in the process of establishing an objective learning management system (OLMS). When it is fully functional, we will transition to the OLMS. Courses developed to TRADOC's established standards will be compatible with either system. An LMS/OLMS allows us to track such things as student enrollment, student progress, course completion, and student success (test scores).

The MANSCEN ADLU pilot is not only designed for success, but our intent is to harvest valuable experiential data on how best to implement an ADLU at Fort Leonard Wood. To that end, an operations council and a strategic council (council of colonels) will be used to develop, execute, monitor, and review the ADLU pilot. The strategic council, chaired by the DOTD, will—

- Identify the goals and the overall direction for the pilot and subsequent phases.
- Establish and staff the operations council.
- Represent the interests of the MANSCEN schools' commandants (to be represented by the Directors of Training from the Chemical, Engineer, and Military Police Schools) and the Noncommissioned Officers Academy commandant.
- Provide resource recommendations for the ADLU follow-on phases.

The operations council, chaired by the Chief of the Multimedia Development Division, DOTD, will—

- Monitor and manage the ADLU pilot and subsequent phases.
- Actively review and examine the post-pilot results to harvest lessons learned and incorporate them into the subsequent ADLU phases.

- Coordinate student participation for courses identified in the ADLU pilot plan.
- Recommend ADLU improvements and changes to the strategic council.

The first "window of opportunity" for the test or pilot phase of the ADLU Plan is the April-June 2003 time frame. Courseware scheduled for testing includes the—

- 12B10 (Reclass) Combat Engineer Training.
- Nuclear, Biological, Chemical Defense Course.
- Military Police Total Army Training System Advanced Noncommissioned Officers Course.

Our plan is to fully test the infrastructure by including courses for all three proponent schools and students from a variety of locations using various technology levels of automation equipment (varying bandwidths and computer configurations). Such a plan requires a considerable amount of coordination and decision-making. We are currently coordinating with the proponent schools to provide e-mentors/instructors, the National Guard Bureau to provide students for the pilot, the Directorate of Information Management to establish help telephone lines, the Directorate of Common Leader Training to develop a one-day e-mentor instruction class, and Army Training Requirements and Resources System personnel to ensure that students receive the appropriate credit for the courses they complete. During the pilot phase, a help desk will be manned 12 hours a day, 7 days a week to provide course assistance. The e-mentors/instructors will be trained to provide basic technical assistance to the students in addition to their subject matter expertise.

At the conclusion of the ADLU pilot phase, the strategic council and the operations council will analyze data collected, based on preestablished goals and success metrics, and formulate lessons learned and ADLU resource requirements from the experience. These lessons learned and recommended improvements and changes will be carried forward to the next MANSCEN ADLU implementation phase.

**Endnotes**

[1] M. Moore and G. Kearsley, *Distance Education: A Systems View.* Belmont, California: Wadsworth Publishing Company, 1996.

[2] A. Chute and H. Mehlinger, *Reportout of the Distance Learning /Training Technology Applications Subcommittee to the Secretary of the Army.* Washington, D.C., June 1999.

[3] U.S. Army Audit Agency, Audit Report: A:2002-XXX-FFF. *Courseware Development for Distance Learning*, 18 July 2002, p.1.

**References**

Abell, M. (2000). *Soldiers as Distance Learners: What Army Trainers Need to Know.* Paper presented at the Interservice/Industry Training, Simulations, and Education Conference (I/ITSEC), 2000.

U.S. Army Maneuver Support Center. *Advanced Distributed Learning University Plan (Phase I) for MANSCEN.* Fort Leonard Wood, Missouri, 2000.

U.S. Army Training and Doctrine Command. *Army Distance Learning Plan.* Fort Monroe, Virginia, 1996.

Wisher, R., Sabol, M., and Moses, F. *Distance Learning: The Soldier's Perspective.* U.S. Army Research Institute Special Report 49, 2002.

***UPDATE:*** *The pilot phase of the ADLU Plan was conducted as scheduled with some success. The establishment of a student base was challenging because of the ongoing Operation Iraqi Freedom. We ended up with a much smaller number of students than we envisioned, but we still gained invaluable experience and collected data to guide the follow-on phases of the MANSCEN ADLU program. During the pilot, we were able to fully test our LMS and identify associated problems, and we got a much more realistic concept of the resources required to implement DL. The after-action report for the pilot is currently being finalized.*

*Following completion of the pilot phase, a decision was made to transition responsibility for the execution of the ADLU Implementation Plan from DOTD to the Directorate of Common Leader Training (DCLT). The handover date for that action was 15 July 2003, and DCLT is in the process of developing a strategy for conducting the follow-on phases.*

# EXHIBIT
# 9

STATE OF NORTH CAROLINA
DEPARTMENT OF CRIME CONTROL AND PUBLIC SAFETY
OFFICE OF THE ADJUTANT GENERAL
NORTH CAROLINA NATIONAL GUARD

JAMES B. HUNT JR.
GOVERNOR

DAVID E. KELLY
SECRETARY

GERALD A. RUDISILL, JR.
MAJOR GENERAL, NCARNG
ADJUTANT GENERAL

OTAGNC-DCSOPS-T (350-1d)

31 July 2000

MEMORANDUM FOR SEE DISTRIBUTION

SUBJECT: Yearly Training Guidance for Training Year 2002 (OCT 01-SEP 02)

1. **THIS TRAINING GUIDANCE IS FOR COMMANDERS, CSM/1SGs AND TRAINERS.**

2. **PURPOSE.** To provide battle focus for training in the NCARNG for TY-02. Post to the unit bulletin board until Sep 02.

3. **COMMANDER'S INTENT.** The NCARNG must remain ready to contribute to the nation, the state, and the community, both at home and abroad. My desired end state is that the NCARNG will be composed of units that are 100% strength, 85% DMOSQ, and able to execute pre-mobilization tasks to standards. With the high quality of our soldiers and their equipment, the challenge is to remain ready, relevant and accessible. Each unit must have an aggressive recruiting and retention plan. Recruit the best and provide them with meaningful training opportunities, and positive leadership examples. Our soldiers are our most valuable resource. Retain these experienced, qualified soldiers! In order to deploy ready forces, we must maintain our equipment and safeguard our soldiers. Maintenance training and sustainment must be assessed, planned, and executed as deliberately as any other training opportunity. Safety is leader business, every soldier's responsibility, and must be a part of each phase of training. We must be prepared for missions crossing the whole spectrum of contingencies. All units of the NCARNG must be prepared to support the planning and execution of the 30th HSB's National Training Center (NTC) rotation. This is our train up year. NTC will provide many exciting and challenging training opportunities for most soldiers and units within the NCARNG.

4. **COMMANDER'S ASSESSMENT.** We must continue to improve the quality of training provided to our soldiers. The NCARNG faces increasing demands in an environment of constrained resources. Concurrently, the advent of more sophisticated weapons systems, emerging technologies, and competing personal demands requires a balance of time, dollars and focus directed to training. We must accelerate our efforts and use more visionary training methods. Our units should maintain the highest possible proficiency on METL tasks, improve on command and staff engagement at each level, and be capable to sustain combat operations.

OTAGNC-DCSOPS-T
SUBJECT: Yearly Training Guidance for Training Year 2002 (OCT 01-SEP 02)

5. **SAFETY.** Soldiers are our most precious resource. Therefore, risk management must be built-in to the planning and execution of all training. Think safety before, during and after each training event. The state safety office provides "train the trainer" Risk Management classes; and a unit Safety NCO/Officer Course. In addition, POV safety must receive command emphasis. Seat belt use is mandatory. It is the law. We will comply. We must do a better job ensuring our soldiers are safe in civilian, as well as military vehicles. For additional safety information contact the state safety office at (919) 664-6253.

6. **INDIVIDUAL TRAINING.** NCO's have the primary responsibility to train and develop individual soldier skills.

a. **DUTY MOS Qualification (MOSQ)(less REP-63), will remain the NCARNG's top individual training priority.** DMOSQ takes priority over any other type training. It is imperative that we send highly motivated and qualified soldiers to attend the appropriate training. I will hold commanders, CSMs and 1SGs accountable to track the status of all NDMOSQ soldiers in their command and ensure they are scheduled, meet the prerequisites, and are prepared to successfully complete the training. The DMOSQ report published by DCSOPS-T and posted to the public folder is an excellent management tool to stay on top of this critical issue.

b. **Train soldiers in basic soldier tasks from the Soldiers Manual of Common Tasks.** Soldiers must be confident in their ability to execute basic soldier tasks so they will have no hesitation in performing their mission. Commanders must ensure that soldiers in all ranks pass prescribed CTT tasks biennially.

c. Driver's Training requires continuous emphasis. The driver/operator licensing program is essential to individual soldier training. We must teach safety during training programs and emphasize the extreme dangers of driving under tactical and non-tactical conditions.

7. **LEADER TRAINING.** Our leader training programs will focus on tactical and technical proficiency. All leaders **will** monitor and mentor junior soldiers in Professional Development. Leaders must demonstrate "hands-on", involved leadership at every level.

a. Utilize the Select, Train, Assign and Promote (STAP) program as the primary means for filling available NCOES vacancies. This program ensures that we select the right soldier for training, whether it is for promotion or retention.

b. We must continue to monitor soldier attendance at scheduled training. Failure to meet APFT standards and/or weight standards, and course **"no shows"** are the primary reasons our soldiers are being disenrolled from NCOES courses. The unit commander and 1SG are responsible to ensure that soldiers selected to attend NCOES courses are able to meet the minimum standard required in any area and are properly notified and counseled. This can only be accomplished when a soldier's attendance receives command emphasis. In addition, the unit must monitor the Army Training Requirements and Resource System (ATRRS) and maintain the most