IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WILLIAM A. CLARK, JAMES P. DAVERN, ROBERT E.FREEBURG, WILLIE R. JOHNSON, ROBERT A. MUSTIN, CAROL RISSER, JOHN DOES 1 through 4, and JANE DOES 2 and 3, individually, and on behalf of all other similarly situated, | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 00-644<br>(Judge Firestone) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION TO COMPEL**

Richard T. Dorman
CUNNINGHAM, BOUNDS, VANCE, CROWDER, and BROWN, LLC
1601 Dauphin Street
Mobile, Alabama 36660
Tel: (334) 471-6191
Fax: (334) 479-1031

Charles J. Cooper
David Thompson
COOPER & KIRK, P.L.L.C.
555 11th Street, N.W., Suite 750
Washington, DC 20005
Tel: (202) 220-9600
Fax: (202) 220-9601

Helen K. Michael
John F. Stanton
Christina Fahmy
HOWREY LLP
1299 Pennsylvania Ave, N.W.
Washington, D.C. 20004
Tel: (202) 783-0800
Fax: (202) 383-6610

COUNSEL FOR PLAINTIFFS

# TABLE OF CONTENTS


Page(s)

TABLE OF AUTHORITIES .......... ii

I. INTRODUCTION .......... 1

II. ARGUMENT .......... 4

A. The Burden is on the Government to Justify Its Nonproduction .......... 4

B. The Government Has Failed to Produce All Responsive Regulations .......... 5

C. The Government Fails to Justify its Nonproduction Regarding Other Requests .......... 9

1. Boilerplate Objections of Vagueness and Burden are Insufficient to Justify Nonproduction .......... 10

2. The Government's Statute of Limitations Objections Are Misplaced and Unavailing .......... 11

3. No Other Legitimate Reason Exists for the Government's Nonproduction .......... 12

D. The Government Has Not Produced all State Documents .......... 16

III. THIS COURT SHOULD GRANT PLAINTIFFS' REQUESTED RELIEF .......... 18

CONCLUSION .......... 20

## TABLE OF AUTHORITIES

*AAB Joint Venture v. United States,*
75 Fed. Cl. 448 (2007) ........................................15

*In re Adelphia Committees Corp.,*
338 B.R. 546 (S.D.N.Y. Bankr. 2005) ........................................18

*Assoc. of Am. Physicians & Surgeons v. Clinton,*
837 F. Supp. 454 (D.D.C. 1993) ........................................4

*Batson v. Neal Spelce Associates, Inc.,*
112 F.R.D. 632 (W.D. Tex. 1986) ........................................19

*Cabot v. United States,*
35 Fed. Cl. 80 (1996) ........................................5, 12

*Carlson Cos. v. Sperry & Hutchinson Co.,*
374 F. Supp. 1080 (D. Minn. 1973) ........................................12

*Chilcutt v. United States,*
4 F.3d 1313 (5th Cir. 1993) ........................................19

*Coca-Cola Bottling Co. v. Coca-Cola Co.,*
110 F.R.D. 363 (D. Del. 1986) ........................................19

*Contracom Commodity Trading Co. v. Seaboard Corp.,*
189 F.R.D. 655 (D. Kan. 1999) ........................................10

*Cooper Industrial, Inc. v. British Aerospace, Inc.,*
102 F.R.D. 918 (S.D.N.Y. 1984) ........................................16

*Essex Builders Group, Inc. v. Amerisure Ins. Co.,*
230 F.R.D. 682 (M.D. Fla. 2005) ........................................16

*F.D.I.C. v. United States,*
527 F. Supp. 942 (S.D.W. Va. 1981) ........................................11

*Godfrey v. United States,*
997 F.2d 335 (7th Cir. 1993) ........................................5

*H & S Manufacturing, Inc. v. United States,*
66 Fed. Cl. 301 (2005) ........................................4

*Harlem River Consumers Co-op., Inc., v. Associated Grocers of Harlem, Inc.,*
64 F.R.D. 459 (S.D.N.Y. 1974) ........................................18

*Jinks-Umstead v. England*,
227 F.R.D. 143 (D.D.C. 2005) .......... 18

*MGP Ingredients, Inc. v. Maritimes, Inc.*,
2007 U.S. Dist. LEXIS 80502 (D. Kan. Oct. 30, 2007) .......... 12

*Nat'l Assn. of Radiation Survivors v. Turnage*,
115 F.R.D. 543 (N.D. Cal. 1987) .......... 9

*O'Connor v. Boeing N. America, Inc.*,
185 F.R.D. 272 (C.D. Cal. 1999) .......... 18

*Oneida, Ltd. v. United States*,
43 Fed. Cl. 611 (1999) .......... 11

*Redland Soccer Club, Inc. v. Department of Army*,
55 F.3d 827 (3d Cir. 1995) .......... 10

*Renda Marine, Inc. v. United States*,
58 Fed. Cl. 57 (2003) .......... 15

*Sanchez v. U.S. Airways, Inc.*,
202 F.R.D. 131 (E.D. Pa. 2001) .......... 12

*Schism v. United States*,
316 F.3d 1259 (Fed. Cir. 2002) .......... 4

*St. Paul Reinsurance Co. v. Commercial Finance*,
198 F.R.D. 508 (N.D. Iowa 2000) .......... 10

*T. E. Quinn Truck Lines, Ltd. v. Boyd, Weir & Sewell, Inc.*,
91 F.R.D. 176 (W.D.N.Y. 1981) .......... 12

*Tecom, Inc. v. United States*,
66 Fed. Cl. 736 (2005) .......... 4

*Trigon Insurance Co. v. United States*,
204 F.R.D. 277 (E.D. Va. 2001) .......... 15

*United States v. Chemical Foundation, Inc.*,
272 U.S. 1 (1926) .......... 4

*United States v. Roses, Inc.*,
706 F.2d 1563 (Fed. Cir. 1983) .......... 5

*Zubulake v. UBS Warburg, LLC,*
220 F.R.D. 212 (S.D.N.Y. 2003) .......................................................................15

## I. INTRODUCTION

In response to the numerous examples of its failure to fulfill its discovery obligations that Plaintiffs provided in their motion to compel, the government has responded with self-serving assertions that it has conducted "exhaustive searches" and that it has "been vigilant in searching for and producing responsive documents." Gov't Br. at 1, 3. The conspicuous factual omissions and express admissions of noncompliance in the declarations filed in support of the government's opposition, however, belie the government's strident claims of compliance.

These declarations (like the government's opposition brief) do not even address the most glaring examples of the government's discovery misconduct. Among other things, the government's declarants do not dispute that the government originally produced only a single box of documents in response to Plaintiffs' Second Set of Requests for Production, that this box contained an incomplete production of documents replete with copying and other errors, and that the government was well aware of these defects, but failed to remedy them at any time before being presented with the instant motion to compel. The government's declarants also do not dispute that, contrary to the government's repeated assertions that collecting superseded versions of Army Guard regulations would be too burdensome, these regulations were readily available in the Pentagon library. Nor do these declarants contest that the government only directed Plaintiffs to search for regulations in the Pentagon library after the close of written discovery.

The government's declarants also make affirmative statements demonstrating that the government has failed to produce documents responsive to Plaintiffs' discovery

requests. For example, Major Rockenbach admits that she did not produce responsive Air Guard instructions and regulations because she simply ***assumed,*** without conducting any investigation, that they had already been produced (which they had not). Rockenbach Decl., ¶ 10, p. 4. Major Rockenbach further admits that she did not produce relevant documents in their entirety, but only produced portions of documents. *Id.* Mr. Gonzalez, in turn, admits that the government did not produce unit status reports requested by Plaintiffs, claiming, contrary to the regulation he cites, that all such reports would be classified. *See* Gonzalez Decl., ¶ 15. For his part, Colonel Roou admits that the government did not produce various Career Field Education and Training Plans requested by Plaintiffs because such documents were destroyed, notwithstanding the pendency of this litigation. Roou Decl., ¶ 5.

Far from complying with its discovery obligations, the government has treated the written discovery process like a game of blind man's bluff in which Plaintiffs have been compelled to guess at what responsive information may exist based on misleading and inaccurate information.[1] Indeed, the government has continued to engage in such tactics

---

[1] The government employed these very same tactics during the last round of written discovery. As Plaintiffs wrote in their opposition to the motion for summary judgment in reference to the prior round of discovery:

> Pursuant to the Court's Order of July 15, 2004, Plaintiffs served document requests on Defendant on July 19, 2004. Defendant responded on October 4, 2004 with a preliminary set of documents, mostly regulations that Plaintiffs have previously obtained. In the ensuing months, Plaintiffs reiterated their requests and identified specific documents required as responsive to the original document requests. Each time Defendant produced documents, Plaintiffs noted references to other responsive documents, which Plaintiffs then specifically requested. This piecemeal production process continued until the close of the discovery period on February 11, 2005. . . .

D.E. 106 (Pl. Brief in Opp. to Def's S.J. Mot. (dated 6/5/2005)) at 3-4 n.5.

even since Plaintiffs filed the instant motion to compel. It was not until her deposition on Wednesday, January 16, 2008 that the government revealed Ms. Carol Risser's personnel records, despite that the request for production of all such records had been pending since June 22, 2006, and that Ms. Risser had become a named Plaintiff on August 21, 2007. D.E. 167. Moreover, the government did not even produce a copy of these records in advance of the deposition, claiming that it had only had a copy of the file for a few days before the deposition, and that production of this file (of only 15-odd pages) had been delayed by the bates-stamping process.

Because the government has repeatedly failed to comply with its discovery obligations, Plaintiffs' motion to compel should be granted. Given the government's failure to conduct an adequate search for responsive documents, Plaintiffs' counsel should be given access to the libraries at the Pentagon, Maxwell Air Force Base, and Bolling Air Force Base to search for responsive documents themselves. Plaintiffs' counsel also should be given the assistance necessary to conduct an informed search, including access to the card catalogs at these facilities and to library reference personnel. Once that process is complete, Plaintiffs propose that the Court hold a status conference to address any additional discovery issues revealed by this document review process, and set a schedule for the conclusion of deposition discovery. Plaintiffs respectfully submit that this staged, court-supervised process is necessary to ensure that the government has at least minimally complied with its discovery obligations, and to enable Plaintiffs to obtain and complete meaningful deposition discovery on the issues the Court has identified regarding what correspondence courses have been required and what required courses have been completed by Plaintiffs.

## II. ARGUMENT

### A. The Burden is on the Government to Justify Its Nonproduction

The government's opposition does not dispute the well-settled principle that the discovery rules are to be liberally applied (*see* Pl. Mot. at 12-13), but erroneously claims that "well nigh irrefragable proof" is required to overcome a purported presumption that the government has fulfilled its discovery obligations. *See* Gov't Br. at 8 (citing *United States v. Chem. Found., Inc.*, 272 U.S. 1 (1926) and *Schism v. United States,* 316 F.3d 1259, 1302 (Fed. Cir. 2002)). *Chemical Foundation* and *Schism* have no relevance here because neither was a discovery case.[2] In the discovery context, the government, like any other party resisting discovery, has the burden of justifying its non-production. *See* Pl. Mot. at 13 (citing cases); *Ass'n of Am. Physicians & Surgeons v. Clinton*, 837 F. Supp. 454, 458 n.2 (D.D.C. 1993) (government's claim that discovery requests were "burdensome" would not be accepted "without specific estimates of staff hours needed to comply, and defendants submitted no such estimates"). As explained below, the government has not come close to meeting its burden.

*Chemical Foundation* also would be of no assistance to the government here if it were applicable to discovery disputes. The "well-nigh irrefragable" standard invoked by the government has been repudiated. *See, e.g., H & S Mfg., Inc. v. United States,* 66 Fed. Cl. 301, 311 n.19 (2005) ("The Government's long-touted desideratum that 'irrefragable proof' is needed to demonstrate the absence of good faith . . . has been given its last rites"); *Tecom, Inc. v. United States*, 66 Fed. Cl. 736, 762-69 (2005) (discussing precedents and concluding that "irrefragable proof" standard is invalid or has been

[2] Moreover, the government fails to note that the portion of *Schism* that it cites came from the dissenting opinion.

abandoned). Courts applying *Chemical Foundation* now recognize that any presumption that government officials have fulfilled their duties is rebutted upon a showing of "irregularity." *See, e.g., United States v. Roses, Inc.,* 706 F.2d 1563, 1566-67 (Fed. Cir. 1983). Such a showing shifts the *Chemical Foundation* presumption back onto the government to demonstrate that it has properly fulfilled its duties. *See id.* at 1567; *cf. Godfrey v. United States,* 997 F.2d 335, 339 (7th Cir. 1993) (conclusory affidavits from government lawyer proclaiming the fulfillment of duties are insufficient). As demonstrated in Plaintiffs' Motion and as discussed in further detail below, more than enough "irregularities" in the government's production exist to rebut any *Chemical Foundation* presumption, even if it were applicable here.

### B. The Government Has Failed to Produce All Responsive Regulations

One of the government's rationales for its nonproduction is that regulations are the only type of documents that ostensibly are relevant at this stage of the proceedings. *See, e.g.,* Gov't Br. at 6 ("any document that is not regulatory in nature has no benefit to this case"). This assertion has no merit because, as discussed in Plaintiffs' Motion (at 17-22) and further below, numerous other types of documents requested also seek information reasonably calculated to lead to the discovery of relevant material regarding what correspondence courses are required and what required courses have been completed by Plaintiffs. *See, e.g., Cabot v. United States*, 35 Fed. Cl. 80, 84 (1996) (explaining discovery standard). This information includes documents that explain, interpret or implement the regulatory scheme requiring completion of correspondence courses; documents explaining the workings and purposes of individual military education and training system, which includes correspondence coursework; documents

explaining the role such individual military education plays in ensuring that individual Guard members and their units are battle ready and satisfy deployment requirements, as well as other requested material bearing directly on whether correspondence course work is a form of individual military education required by the service Secretaries.

The government's admission regarding the relevance of regulations nonetheless belies its claims of having satisfied its discovery obligations because the government still has plainly failed to produce all responsive regulations. The government does not dispute that it refused to produce a complete set of Army and National Guard regulations and pamphlets in effect during the period in which the named Plaintiffs completed Army correspondence coursework, invoking unsubstantiated claims of undue burden. *See* Pl. Mot. at 9, 24-25 & n.10. Nor does the government even attempt to dispute the facts demonstrating that these burden objections had no merit. As discussed in Plaintiffs' Motion (at 9-10), Plaintiffs' counsel ascertained during the Pentagon library trips taken after the close of written discovery in December 2007 that all current and superseded versions of regulations and pamphlets were collected together in clearly marked folios. *Id.*

The declarations the government filed in support of its opposition also make clear that it knowingly failed to produce relevant regulations. In her Declaration, for example, Major Rockenbach candidly admits that she failed to produce Air Force instructions, which represent a type of regulation:

> I did not produce any Air Force instructions which the plaintiff's [sic] previously cited in motions as I was under the impression they had been previously produced in the first document production since plaintiff's [sic] had copies of them and were citing to them in motions.

Rockenbach Decl., ¶ 10, p. 4. Major Rockenbach does not state that she made any effort to check with her colleagues to determine whether these documents had actually been produced—rather she just ***assumed,*** without justification, that they had been produced. They were not. As Plaintiffs stated in the summary judgment filing to which Ms. Rockenbach refers as a basis for failing to produce such documents, Plaintiffs themselves located the Air Force instructions cited in their opposition to the motion for summary judgment, owing to the deficiency of the government's 2004 production. *Cf.* D.E. 106 (Pl. Brief in Opp. to Def's Mot. for Summary Judgment (filed 6/5/2005)) at 3-4 n.5 (detailing numerous deficiencies in government's 2004 production). Major Rockenbach similarly does not state that she even made an effort to determine whether the documents cited by Plaintiffs comprised the complete universe of responsive regulations and instructions. In fact, this production was far from complete, and did not include, among much else, versions of regulations and instructions in effect when the named Air Guard Plaintiffs completed required coursework.

The government cannot absolve itself of its responsibility for failing to produce Air and Army Guard regulations and related documents by suggesting that Plaintiffs should have searched the Pentagon and Maxwell Air Force Base libraries. Gov't Br. at 4-5 & n.4. As a threshold matter, the government identified only one location for inspection and copying of documents responsive to Plaintiffs' Second Set of Requests: Major Jerrett Dunlap's office. The Pentagon and Maxwell Air Force Base libraries were not mentioned during the meet and confer process on these discovery requests until ***after the close of discovery***, when the government's counsel directed Plaintiffs to search for relevant regulations and instructions themselves. Also contrary to the government's

assertions (*id.* at 4), Plaintiffs were not given "unfettered" access to either library. Plaintiffs' counsel cannot enter either library without a government escort. Plaintiffs' counsel also did not search either library for regulations in connection with their First Set of Requests, which are not presently at issue. They made only one trip to each for that purpose, and searched only for preliminary historical information about the establishment and administration of the Army and Air Force correspondence course programs. It was only after the close of written discovery that Plaintiffs were given access to the Pentagon library to search for regulations, at which time Plaintiffs' counsel made two additional trips. All told, Plaintiffs' counsel has spent less than 25 hours in the Pentagon library in connection with Plaintiffs' Second Set of Requests, and counsel spent the vast majority of that time photocopying documents.[3]

There is equally no merit to the government's attempts to justify its nonproduction on the ground that Plaintiffs ostensibly has access to relevant regulations. Gov't Br. at 1-2 n.2. The government does not explain the basis for this assertion. To the extent it is alluding to regulations that may be obtained through the internet, however, only some of these documents are available online, and only current versions of these can

---

[3] Major Dunlap's claim (Dunlap Decl., ¶ 17) that Plaintiffs' counsel was "assisted with legal research" at the Pentagon library on three occasions is incorrect. During the first trip to the Pentagon library, which was taken to obtain information other than regulations, Plaintiffs' counsel was not allowed access to the card catalog, and were not given any assistance by the reference librarians. Fahmy Decl., ¶ 2. Lacking such access and assistance, Plaintiffs' counsel walked through various stacks and pulled whatever looked relevant. This laborious process yielded twelve documents, which Defendant was asked to photocopy and produce. *Id.* During the second two trips taken after the close of written discovery in December 2007, Plaintiffs' counsel were directed to where the regulations were housed, and government paralegals then helped Plaintiffs' counsel pull regulations from a list Plaintiffs' counsel provided. D.E. 172 (Fahmy Decl. (dated 12/7/07)), ¶ 22-27. Plaintiffs' counsel again was not permitted to use a card catalog to search for other relevant documents. Such assistance cannot possibly be deemed "legal research."

be so obtained; the prior versions of regulations are removed as soon as they are superseded. Because the named Plaintiffs completed many of their required correspondence courses years ago, the internet affords no access to the regulations in effect at times when such their required coursework was performed. As Chief Judge Damich recognized while presiding over this case, moreover, the regulations that are available on the internet are "very difficult to locate." D.E. 15 (1/23/01 Hearing Tr.) at 7:1-3.[4]

The government's dilatory approach to Plaintiffs' request for the production of regulations that the government concedes are of prime relevance at this stage of the proceedings cannot be reconciled with a self-serving contention the government conducted an unprecedented, "exhaustive" search. *Cf. Nat'l Ass'n of Radiation Survivors v. Turnage,* 115 F.R.D. 543, 554 (N.D. Cal. 1987) (sanctioning government for failing to produce clearly responsive documents and no valid basis for nonproduction existed).

**C. The Government Fails to Justify its Nonproduction Regarding Other Requests**

Plaintiffs' Motion set forth the specific requests as to which an order compelling production was being sought, and explained why the requested documents were responsive, as well as the grounds for concluding that the government's production was deficient. In response, the government makes conclusory assertions about its supposed

[4] The government's "equal access" theory also has no legal basis. Courts have consistently rejected a "both sides had access to the information" theory as a justification for nonproduction. *See, e.g., St. Paul Reinsurance Co. v. Commercial Fin.,* 198 F.R.D. 508, 514 (N.D. Iowa 2000) ("courts have unambiguously stated that this exact objection is insufficient to resist a discovery request"; citing decisions); *United States v. 58.16 Acres of Land*, 66 F.R.D. 570, 573 (E.D. Ill. 1975) (ordering government to answer interrogatory notwithstanding government's objection that other party had equal access to information).

compliance with its discovery obligations,[5] but fails to address Plaintiffs' specific showing that requested documents have not been produced. Production of these documents should be compelled.

### 1. Boilerplate Objections of Vagueness and Burden are Insufficient to Justify Nonproduction

The government's objections that the Plaintiffs' discovery requests ostensibly are vague and overbroad do not justify its failure to produce requested documents. *E.g.*, Gov't Br. at 1, 3; Dunlap Decl., ¶ 7; Rockenbach Decl., ¶ 8. The government fails to meet its burden of explaining how the terminology used by Plaintiffs was vague or overbroad. *See* Pl. Mot. at 24-46; *see also Redland Soccer Club, Inc. v. Dept. of Army,* 55 F.3d 827, 856 (3d Cir. 1995) (government's contention that interrogatory was overly broad, burdensome, oppressive and irrelevant was inadequate objection; government must show specifically how each interrogatory is not relevant or how each question is overly broad, burdensome or oppressive; citation omitted); *St. Paul Reinsurance Co.*, 198 F.R.D. at 513 (party resisting discovery must specifically explain precisely "how CFC's request is vague, ambiguous and unintelligible"; citing additional authorities).[6]

---

[5] For example, the government admits that it did not Bates stamp the few documents it did produce. The government erroneously claims that Plaintiffs' counsel agreed to accept productions without Bates stamps. There was no such agreement, and Plaintiffs' Second Set of Requests specifically instructs the government to produce documents with Bates stamps, an instruction to which Defendant failed to object. *See* Fahmy Decl., ¶ 6 & Ex. A. In his declaration, Major Dunlap asserts that the documents have now been Bates stamped and reproduced. They have not. On January 4, 2007, Plaintiffs' counsel was handed a CD with "Bates stamped documents." This CD contained the government's production. Some of the documents had Bates stamps. Many of the documents were not on the CD at all. In their place was a single sheet that said "Stipulated: Exempt from Bates Stamp Indexing." *See* Fahmy Decl., ¶ 7 & Ex. B. There is no such stipulation, and the government once again has made a deficient production.

[6] Such objections also cannot justify a blanket refusal to produce requested documents. *See, e.g., Contracom Commodity Trading Co. v. Seaboard Corp.,* 189 F.R.D. 655, 666

### 2. The Government's Statute of Limitations Objections Are Misplaced and Unavailing

The government also contends (Br. at 6) that any documents or records pre-dating 1994 are exempt from discovery on the ground that the statute of limitations ostensibly bars any claims for compensation prior to that time. This objection lacks merit for several reasons.

First, the government has waived this discovery objection. The government did not assert any objection on statute of limitations grounds in its responses to Plaintiffs' Second Set of Requests. *See generally* Fahmy Decl., ¶ 6 & Ex. A. It is well-established that a party "may not ignore timely discovery requests, unilaterally, and then at a later time assert an objection." *F.D.I.C. v. United States,* 527 F. Supp. 942, 950 (S.D.W. Va. 1981); *accord Oneida, Ltd. v. United States,* 43 Fed. Cl. 611, 616-17 (1999) (plaintiff failed to assert work product objections in a timely manner to documents it unilaterally withheld from defendant).

Second, the government's belated attempt to limit discovery to documents created in and after 1994 disregards the plain terms of this Court's May 16, 2006 Order (D.E. 131), which allowed for discovery with respect to which correspondence courses the five named Plaintiffs had completed, and which correspondence courses were required by the Service Secretaries. A number of the named Plaintiffs took required courses prior to 1994. *See, e.g.,* D.E.. 106 (Pl. Brief in Opp. to Def's Mot. for Summary Judgment (dated 6/5/2005)), Freeburg Decl., ¶ 5; *id.*, Johnson Decl., ¶¶ 8-9. Under the plain terms of the May 16 order, Plaintiffs, therefore, are entitled to the production of documents pre-dating 1994.

---

(D. Kan. 1999) ("Despite the overly broad nature of Requests 17 and 19, defendants have the duty to respond to the extent they are not objectionable").

Third, and relatedly, the government's belated statute of limitations objection erroneously conflates discoverability with admissibility. *See, e.g., MGP Ingredients, Inc. v. Mars, Inc.*, 2007 U.S. Dist. LEXIS 80502, at **6-7 (D. Kan. Oct. 30, 2007) (rejecting objection to discovery for same reason); *Carlson Cos. v. Sperry & Hutchinson Co.*, 374 F. Supp. 1080, 1103 (D. Minn. 1973). The standards for discovery are much broader than those for admissibility. *See Cabot*, 35 Fed. Cl. at 84. Even if pre-1994 documents ultimately were determined on statute of limitations grounds to be inadmissible for the purposes of establishing liability, such documents still would be discoverable because they may lead to the discovery of admissible evidence. Indeed, the government has tacitly acknowledged this fact by producing a number of pre-1994 documents. *See* Production Index, attached hereto as Exhibit 1. The government should not be allowed to prejudge this issue by withholding discovery based on the claimed application of a six-year limitations period. *See, e.g., Sanchez v. U.S. Airways, Inc.*, 202 F.R.D. 131, 135 (E.D. Pa. 2001) ("It is not for a party to determine, by a unilateral review of documentation, whether information is relevant to the case"); *T. E. Quinn Truck Lines, Ltd. v. Boyd, Weir & Sewell, Inc.*, 91 F.R.D. 176, 180 (W.D.N.Y. 1981) ("Parties to a dispute may not unilaterally decide that theirs is the victorious posture and refuse to cooperate in discovery procedures aimed at thoroughly exploring all aspects of the issues before a court").

### 3. No Other Legitimate Reason Exists for the Government's Nonproduction

The government also has failed to rebut Plaintiffs' showing that, in addition to regulations, it has not produced a variety of other documents that are responsive to

Plaintiffs' discovery requests.[7] Indeed, Major Rockenbach admits in her declaration that the government has knowingly produced only excerpts of a number of documents responsive to Plaintiffs' Second Set of Requests. Rockenbach Decl., ¶ 10, p. 4.

The declarations submitted by the government also reveal several other deficiencies in its document production. Major Dunlap's declaration, for example, references only a *single* "organizational chart" produced in response to Request No. 8, which seeks organizational charts related to training authorities. Dunlap Decl., ¶ 18. Given Major Dunlap's repeated references to the numerous of training agencies and proponent schools he claims to have contacted in his search (*id.*, ¶¶ 3-6), it is inconceivable that only one responsive organizational chart for training organizations exists.

In his Declaration, Mr. Gonzalez acknowledges that the government did not produce unit status reports, which are responsive to Request No. 19. *See* Gonzalez Decl., ¶ 15. There is no merit to Mr. Gonzalez's claim (*see id.*) that all unit status reports are classified under AR-220-1, another regulation that the government did not produce. That regulation specifically states that the secret classification will be removed after 8 years. AR 220-1, Unit Status Reports, ¶ 2-7(e)(2).[8] Plaintiffs have sought unit status reports pre-dating 2001, and these reports now should be declassified. There also is no basis for Mr. Gonzalez's attempts to find fault with Plaintiffs for not specifically requesting unit status reports by name in their discovery requests. *See* Gonzalez Decl., ¶ 15. As

---

[7] Given the magnitude of the deficiencies in the government's production, Plaintiffs address here only a few of the most notable examples.

[8] In addition, the regulation specifies that "HQDA retains USRs and the associated comments submitted by Army units to HQDA after 1989," and accordingly there should be no difficulty locating such documents. AR 220-1, ¶ 2-8.

discussed in Plaintiffs' Motion (p. 26), a requesting party is not required to specify a document with exactitude in its discovery request. Such a requirement would deprive the requesting party of any responsive documents except those known in advance to exist, and would violates the most basic principles of discovery. *See id.* (citing authorities).

Mr. Gonzalez's statement that the unit status reports are the only documents covered by Request 19 is inaccurate as well. The request seeks "all documents reflecting the use and/or need for individual training or self-development training to support mission and/or deployment requirements." It is evident that the government has failed to produce a whole range of documents (including regulations) concerning how individual training is required to prepare Guard members for deployment, including the very regulation cited by Gonzalez with respect to Unit Status Reports, AR 220-1.

It also is evident that the government has not produced all documents responsive to Request Nos. 27, 36, and 37, which seek documents relating to the Army Distance Learning Program, an agency administering correspondence course training, and documents relating to whether to offer particular courses via in-residence programs, for which Guard members are compensated, or correspondence courses, for which they are not. According to Major Dunlap, the majority of responsive documents consist of Army regulations. Dunlap Decl., ¶ 17. As discussed *supra*, the government's production of regulations was incomplete and deficient. Moreover, Major Dunlap does not represent that the government has produced all documents responsive to these requests or offer any reason why it has not. *Id.*

Colonel Roou admits in his declaration that the government has not produced documents responsive to Request 34, which asks for the relevant Career Field Education

and Training Plans ("CFETPs"). The stated reason for this noncompliance is such documents have been destroyed. *See* Roou Decl., ¶ 5.

Like any other litigant, the government had a "duty to preserve material evidence not only during litigation but also during that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation." *Renda Marine, Inc. v. United States*, 58 Fed. Cl. 57, 60-61 (2003) (quotation omitted); *accord AAB Joint Venture,* 75 Fed. Cl. at 440-41 (same). This obligation extends to all information that the government "knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery and/or is the subject of a pending discovery request." *Zublake v. UBS Warburg, LLC,* 220 F.R.D. 212, 217 (S.D.N.Y. 2003) (citation omitted). CFETPs are unquestionably relevant to this litigation because they specify the training obligations and necessary skills for the career development of ***all*** noncommissioned officers in the Air Guard. *See, e.g.*, Risser CFETP, Ex. 2 (attached hereto). Although the government offers no information as to when the destruction of these relevant documents occurred, it appears to have violated its obligation to preserve these documents. Because this case was brought as a nationwide class action seeking compensation for both Army and Air Guard personnel who have completed required correspondence coursework, the government has been on notice of the relevance of these documents since the case was filed in 2000. *See Trigon Ins. Co. v. United States,* 204 F.R.D. 277, 289 (E.D. Va. 2001) (sanctioning government for destroying potentially relevant documents and rejecting government' defense that plaintiff "did not specifically ask for 'draft reports'" in discovery requests); *Renda Marine,* 58 Fed. Cl. at 61

(government's destruction of emails pursuant to department retention policy does not trump duty to preserve evidence possibly relevant to litigation); *Turnage,* 115 F.R.D. at 557-58 (government should have known of relevancy of documents).

**D. The Government Has Not Produced all State Documents**

The government also advances the baseless contention (Gov't Br. at 5) that it does not have "control" over the state guard documents relating to individual military education and training, which were among those sought in Plaintiffs' Second Set of Production Requests. The government appears to erroneously equate "control" with "possession." As explained in Plaintiffs' Motion (pp. 26-28), the mere fact that a party does not have physical possession of documents does not exempt it from production.[9] Because the federal government plainly exercises the legal authority over individual Guard training, including correspondence coursework, and has the power to federalize state guard units at any time, the federal government is deemed to have "control" over documents in state guard units for discovery purposes. *See* Pl. Mot. at 27 (citing several authorities).

Recent events, moreover, have confirmed that the government possesses such control. When it became apparent that the government had not produced all of the documents previously provided by the state guard organizations and requested that the

[9] *See also Essex Builders Group, Inc. v. Amerisure Ins. Co.,* 230 F.R.D. 682, 685 (M.D. Fla. 2005) ("If Travelers is arguing that the information is possessed only by the Owner's personnel, it must make an effort to interview those witnesses and obtain the requested information"); *United States v. Skeddle,* 176 F.R.D. 258, 261-62 (N.D. Ohio 1997) (requiring government to produce records in possession of defendant's former employer when employer was cooperating with government in criminal investigation); *Cooper Indus., Inc. v. British Aerospace, Inc.,* 102 F.R.D. 918, 919-20 (S.D.N.Y. 1984) (requiring party to produce records in possession of business affiliate when "it is inconceivable that defendant would not have access to these documents and the ability to obtain them for its usual business").

organizations in question produce these documents, Plaintiffs' counsel instead were provided with copies of the missing documents by the government's counsel. Fahmy Decl., ¶ 5.[10] The government also has been the conduit for documents provided by the state Guard organizations after Plaintiffs were forced to subpoena these organizations, contrary to the government's assurances through the close of written discovery that it would work with state guard organizations to obtain the requested documents. Pl. Mot. at 11. All documents produced by these organizations in response to these subpoenas to date have been sent to counsel for the government, which has then produced them to Plaintiffs. Fahmy Decl., ¶ 5.

The documents produced, albeit belatedly, by the state Guard organizations do not, however, completely satisfy Plaintiffs' production request. In particular, there are several categories of documents about which the parties continue to negotiate. To the extent that the state Guard organizations do not provide all of the requested information voluntarily, the government should be compelled to obtain and produce it. Plaintiffs should be able to provide the Court with further information about the status of these

[10] Mr. Gonzalez inaccurately claims (Gonzalez Decl., ¶ 10) that these documents were previously produced. During the meet and confer process, Plaintiffs' counsel identified both verbally and in writing specific document types that it had not received, including in particular, the Yearly Training Guidances. Plaintiffs' counsel searched the entirety of the government's prior productions, and also reviewed both the government's production in the response to the Second Set and the matrix of documents the government claims to have produced in response to the Second Set, and confirmed that the documents were ***not*** produced. As Mr. Gonzalez does correctly state, the government's counsel did ultimately produce the missing documents, after being informed that Plaintiffs planned to file a motion to compel, and well over a month after discovery close.

negotiations by the time of the next proposed status conference regarding discovery issues.[11]

## III. THIS COURT SHOULD GRANT PLAINTIFFS' REQUESTED RELIEF

Given the government's dilatory discovery conduct, it appears that the only way to ensure at least minimal compliance with its discovery obligations is for Plaintiffs to be granted access to the libraries at the Pentagon, Maxwell Air Force Base, and Bolling Air Force Base so that they can search for responsive documents themselves. The government cannot, however, simply open these repositories and invite Plaintiffs to "go fish."[12] Rather, the government must assist Plaintiffs' counsel in navigating the libraries and allow them access to materials and personnel that could facilitate the search. *Cf. O'Connor v. Boeing N. Am., Inc.,* 185 F.R.D. 272, 278 (C.D. Cal. 1999) ("Without detailed specification by category and location of responsive documents, the burden of deriving the answers to the interrogatories is not the same for the parties; rather, it would be easier for persons employed by the defendants to locate responsive documents").

---

[11] Plaintiffs also are in the process of meeting and conferring with the government regarding various other issues relating to written discovery.

[12] *See, e.g., Jinks-Umstead v. England,* 227 F.R.D. 143, 155 (D.D.C. 2005) (Navy's offer of access to database maintaining information did not satisfy discovery order requiring Navy to produce summaries relevant to workload); *In re Adelphia Comms. Corp.,* 338 B.R. 546, 551 (S.D.N.Y. Bankr. 2005) ("The Court does not endorse a method of document production that merely gives the requesting party access to a 'document dump,' with an instruction to the party to 'go fish'; citation omitted); *Doe v. Nat'l Hemophilia Found.*, 194 F.R.D. 516, 520 (D. Md. 2000) ("the so-called 'go fish' [i.e., invitation to search document repositories] response to plaintiff's discovery requests which defendants [] have relied on until now does not comply with the Federal Rules of Civil Procedure"); *Harlem River Consumers Co-op., Inc., v. Associated Grocers of Harlem, Inc.,* 64 F.R.D. 459, 463 (S.D.N.Y. 1974) ("A broad statement that the information sought is available from a mass of documents and that the documents are available for inspection simply is not a sufficient response to satisfy the aims of discovery").

To enable Plaintiffs to determine which documents in these facilities are relevant, and shorten the amount of time necessary to search these facilities, Plaintiffs request access to the card catalogs at each library, and the assistance of a reference librarian to facilitate the research and review process. Plaintiffs also request that the government allow them to bring in a copy vendor to make copies of the relevant documents, with the caveat that Plaintiffs will not attempt to obtain access to or copy any classified material.

After the Plaintiffs' counsel have conducted the reviews at the Pentagon, Maxwell Air Force Base and Bolling Air Force Base libraries, Plaintiffs propose that the parties submit a joint status conference statement no later than March 31, 2008, and a status conference be set shortly thereafter. In their status conference submission, Plaintiffs will identify any discovery issues remaining to be resolved status with respect to their Second Set of Requests so that the Court can address any outstanding issues and set a schedule for the conclusion of discovery. At that time, Plaintiffs also expect to have concluded their discussions with the states and will identify any remaining issues with respect to those productions.[13]

---

[13] As discussed in Plaintiffs' Motion (at 23-24 n.9), Plaintiffs reserve the right to seek fees and costs for expenses incurred as a result of the government's failing to fulfill its discovery obligations. Furthermore, this Court also has authority to presume that any requested documents that the government has willfully failed to produce would support Plaintiffs' theory of the case. *See, e.g., Chilcutt v. United States*, 4 F.3d 1313, 1324 (5th Cir. 1993); *Batson v. Neal Spelce Associates, Inc.,* 112 F.R.D. 632, 643-44 (W.D. Tex. 1986); *Coca-Cola Bottling Co. v. Coca-Cola Co.,* 110 F.R.D. 363, 369 (D. Del. 1986).

## CONCLUSION

For all of the foregoing reasons, Plaintiffs' motion to compel should be granted.

Respectfully submitted,

/s/ Helen K. Michael

Helen K. Michael
John F. Stanton
Christina Fahmy
HOWREY LLP
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Tel: (202) 783-0800
Fax: (202) 383-6610

Richard T. Dorman
CUNNINGHAM, BOUNDS, VANCE, CROWDER, and BROWN, LLC
1601 Dauphin Street
Mobile, Alabama 36660
Tel: (334) 471-6191
Fax: (334) 479-1031

Charles J. Cooper
David Thompson
COOPER & KIRK, P.L.L.C.
555 11th Street, N.W., Suite 750
Washington, DC 20005
Tel: (202) 220-9600
Fax: (202) 220-9601

Counsel for Plaintiffs

Dated: January 18, 2008

# Exhibit 1
# to Reply Memorandum

PUBLICATIONS MATRIX

| Name of Organization/Individual Contacted | Business Affiliation and Title | Current Business Address | DOD Affiliation, Address, and title | Home address if nolonger DOD | Responsive documents provided |
|---|---|---|---|---|---|
| MAJ Jonathan Dunn | Assistant to the Commander, NG-Army Training Support Center | Bldg. 1725, 6th St, Ft. Eustis, VA 23602 | Same | NA | 2-17 |
| Todd Milliard | OTJAG - Military Law and Operations | 1777 N Kent St, 10th Floor, Rosslyn, VA 22209-2194 | Same | NA | NA |
| Marilyn Hicok | Chief, DL Support Team | Bldg. 1725, 6th St, Ft. Eustis, VA 23602 | Same | NA | 22,23,26 |
| Ralph Steinway | Training Programs Manager, Army G1 | Room 1D377, Pentagon, Washington, D.C. 20310-0300 | Same | NA | 41,274 |
| LTC Allen K Lewis | Chief, Distributed Learning, Army G3 | Room 1E141, Pentagon, Washington, D.C. 20310 | Same | NA | 49-59 |
| LTC Gary Kayser | US Army Reserve Command, G7, Individual Training Div. | 1401 Dreshler St. SW, Fort McPherson, GA 30330 | Same | NA | NA |
| William Voorhies | US Army Reserve Command, G7 (Correspondence Courses/Distance Learning) | 1401 Dreshler St. SW, Fort McPherson, GA 30330-2000 | Same | NA | 272-273 |
| William Jones | Deputy Commander, Army Training Support Center (ATSC) | 1721 Patton Ave., Ft. Eustis, VA 23604 | Same | NA | NA |
| SGM Bertram Vaughn | Department of the Army, G3 (Constructive Waiver) | 1500 Defense Pentagon, Washington, D.C. 20301-1500 | Same | NA | 42 |
| COL Eric Lindner | Office of the Assistant Secretary of Defense, Reserve Affairs | 1500 Defense Pentagon, Washington, D.C. 20301-1500 | Same | NA | NA |
| CPT Christopher Nuneviller | Office of the Command Judge Advocate, Human Resources Command | 200 Stovall Street, Room 7N69, Hoffman II, Alexandria, VA, 22332 | Same | NA | 1 |
| Mr. Dan Kohner | Office of the Secretary of Defense, Reserve Affairs (Manpower and Personnel) | 1500 Defense Pentagon, Washington, D.C. 20301-1500 | Same | NA | 271 |
| Jim Collier | Administrator, Adjutant General Officer Branch Qualification Course | Adjutant General School, Fort Jackson, SC 29207 | Same | NA | NA |
| Viola Beem | Administrator, Associate Logistics Executive Development Course; Support Operations Course | Army Logistics Management College, Fort Lee, VA 23801 | Same | NA | NA |

PUBLICATIONS MATRIX

| | | | | | |
|---|---|---|---|---|---|
| MAJ Arlena Brooks | Administrator, Automated Logistics Specialist Course; Supply Management Officer Correspondence Course | US Army Quartermaster Center and School, 1831 A Ave., Fort Lee, VA 23801 | Same | NA | NA |
| Susan Ginn | Administrator, Aviation Accident Prevention Management Course; Aviation Logistics Manager Course; Aviation Warrant Officer Advanced Course | US Army Aviation Center & Fort Rucker, Fort Rucker, AL 36362 | Same | NA | NA |
| Don Wright | Administrator, Commander's Safety Course | US Army Safety Center, Bldg. 4905 5th Ave., Fort Rucker, Al 36362-5363 | Same | NA | NA |
| Mr. Cunningham | Administrator, Hazardous Materials Handling Course | School of Military Packaging Technology, 360 Lanyard Rd., Aberdeen Pfooving Ground, MD 21005 | Same | NA | NA |
| Ms. Lee Capraro | Administrator, Infantry Officer Basic Course; Infantry Captains Career Course | US Army Infantry School, Fort Bening, GA 31905-5593 | Same | NA | NA |
| SSG Bryan Fenter | Administrator, Battalion Motor Officer Course; Maintenance Leader Course | US Army Armor Center and Fort Knox, Fort Knox, KY 40121-5000 | Same | NA | NA |
| Diane Brand | Administrator, Mechanical Maintenance NCO Course; Ordnance Officer Advanced Course | US Army Ordance Mechanical Maintenance School, Suite 227, 401 1st Street, Fort Lee, VA 23801 | Same | NA | NA |
| Colonel Wayne Woodard | State Judge Advocate-The Adjutant General of North Carolina, Office of the Staff Judge Advocate | Headquarters, State Area Command, 4105 Ready Creek Road, Raleigh North Carolina, 27607 | Same | NA | 31,32 |
| Captain Ruth Cresenzo | The Adjutant General of North Carolina, Office of the Staff Judge Advocate | Headquarters, State Area Command, 4105 Ready Creek Road, Raleigh North Carolina, 27607 | Same | NA | 31,32 |
| Lieutenant Colonel Duncan Aukland | Staff Judge Advocate-The Adjutant General of Ohio, Office of the Staff Judge Advocate | Headquarters, State Area Command, 2825 W. Dublin Granville Road, Columbus Ohio, 43235-2789 | Same | NA | 33,36 |
| Colonel Brian Morgan | Staff Judge Advocate-The Adjutant General of Alabama, Office of the Staff Judge Advocate | JFHQ-TAG-JAG, P.O. Box 3711, Montgomery Alabama, 36109-0711 | Same | NA | 24,25,40 |

PUBLICATIONS MATRIX

| | | | | | |
|---|---|---|---|---|---|
| Lieutenant Colonel C. Robert Spinelli | Staff Judge Advocate-The Adjutant General of Pennsylvania, Office of the Staff Judge Advocate Joint Forces Headquarters | Office of the Staff Judge Advocate, Joint Forces Headquarters-Pennsylvania,c/o Department of Military and Veteran's Affairs, Building 7-1, Fort Indiantown Gap, Annville Pennsylvania, 17003-5005 | Same | NA | 38,39 |
| Lieutenant Colonel John Brossart | Staff Judge Advocate, The Adjutant General of Minnesota, Office of the Staff Judge Advocate | Headquarters, Joint Forces Headquarters, Department of Military Affairs, 5th Floor, Veterans Service Building, 20 West 12th Street, St. Paul Minnesota 55155-2098 | Same | NA | 34,25,37 |
| Captain Mark M. Majors | Joint Staff Judge Advocate (AGR)-The Adjutant General of Missisippi, Office of the Staff Judge Advocate | Joint Forces Headquarters-Mississippi, JFHQ-TAG-JA, P.O. Box 5027, Jackson Mississippi 39296-5027 | Same | NA | 19,20, 21, 27,28,29,30 |
| Col Kathleen Grabowski | AF/DPDL , Chief Directorate of Airman Development and Sustainment | Room 4B684, Pentagon, Washington, DC | Same | NA | 62-67; 83-109; 111-260 |
| Dr Todd Fore | AF/A1PT Training and Education Execution | Room 5D167 Pentagon, Washington, DC | Same | NA | NA |
| Joseph McDade, SES | AF/A1D | Room 4E161, Pentagon, Washington, DC | Same | NA | NA |
| Yvonne Kinkaid | Historian, AF Historical Studies Office | AF/HRA-OL-A 3 Brookley Ave Box 94 Bolling AFB DC 20032 | Same | NA | 111 |
| Irene Pearson-Morrow | AU/CFR Air University Registrar | 60 Shumacher Ave Maxwell AFB, AL 36112-6337 | Same | NA | 69-80 |
| Carol Smith | AU/CFR Air University Registrar | 60 Shumacher Ave Maxwell AFB, AL 36112-6337 | Same | NA | NA |
| Dr. Glen Spivey | ACSC/ EA | 225 Chennault Circle, Maxwell AFB, AL 36112 | Same | NA | NA |
| Dr. Doug Savell | CEPME/CA | 550 McDonald St, Maxwell-Gunter AFB, AL 36114 | Same | NA | NA |
| Adelaide Cherry | AFIADL/CA | 50 S. Turner Blvd bldg 832, Maxwell-Gunter AFB, AL 36118-5643 | Same | NA | NA |
| Mr. George Cully | AU History Office, Director and Historian | 60 Shumacher Ave Maxwell AFB, AL 36112-6337 | Same | NA | NA |

PUBLICATIONS MATRIX

| | | | | | |
|---|---|---|---|---|---|
| Lt Col Thomas Doyon | Senior Legislative Counsel, Secretary of the Air Force Legislative Affairs Office SAF/LLP | Room 4C689, Pentagon, Washington, DC | Same | NA | NA |
| Diana Rotenbury | Procedures Policies and Enlisted Matters Reserve of the Air Force Selection Board Secretariat | 6760 E Irving Place #2000 Denver, CO 80280-2000 | Same | NA | 261 |
| Maj Francis Minogue and Mr. Charles Stubbefield | AETC Legal Office Civil Law Division | 61 Main Circle Suite 1, Randolph AFB, Texas 78150-4544 | Same | NA | NA |
| Mr. John Kongable and TSgt Tracy Bailey | AU Legal Office | 50 Lemay Plaza South, Maxwell AFB, AL 36112-6334 | Same | NA | NA |
| Mr. Leo Harman | Chief, Academic Devlopment Branch, A1/AFDLE | Room, 4B684, Pentagon, Washington, DC | Same | NA | 276-293 |
| LTC Mike Langham | Command Judge Advocate | US Army Combat Readiness Center, Fort Rucker, AL 36362 | Same | NA | NA |
| Susan Ginn | Chief, Warrior Training, | Directorate of Training and Doctrine, US Army Aviation Warfighting Center, Fort Rucker, AL 36362 | Same | NA | NA |
| Robert Carter | Deputy Director | Directorate of Training and Doctrine, US Army Aviation Warfighting Center, 4507 Andrews Avenue, Fort Rucker, AL 36362 | Same | NA | NA |
| Michelle L. Holt | Secretary General Staff | US Army Soldier Support Institute, Fort Jackson, SC 29207 | Same | NA | NA |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

PUBLICATIONS MATRIX

| Doc # | Document Name | Reg/Ins Number | Date | Request |
|---|---|---|---|---|
| 1 | Memo Subject: Readiness Priority Additional Skill Identifiers (RPASI) Inventory Targets | | 24-Jul-2001 | 47 |
| 2 | Army Correspondence Course Program (ACCP) | DA Pam. 351-20 | 1-Apr-1986 | 1,4,12,13,18,19,36,37,38,47,51 |
| 3 | Army Correspondence Course Program (ACCP) | DA Pam. 351-20 | 1-Apr-1987 | 1,4,12,13,18,19,36,37,38,47,51 |
| 4 | Army Correspondence Course Program (ACCP) | DA Pam. 351-20 | 22-Jul-1988 | 1,4,12,13,18,19,36,37,38,47,51 |
| 5 | Army Correspondence Course Program (ACCP) | DA Pam. 351-20 | 27-Apr-1990 | 1,4,12,13,18,19,36,37,38,47,51 |
| 6 | Army Correspondence Course Program (ACCP) | DA Pam. 351-20 | 1-Apr-1993 | 1,4,12,13,18,19,36,37,38,47,51 |
| 7 | Army Correspondence Course Program (ACCP) | DA Pam. 351-20 | 1-Apr-1994 | 1,4,12,13,18,19,36,37,38,47,51 |
| 8 | Army Correspondence Course Program (ACCP) | DA Pam. 351-20 | 1-Apr-1995 | 1,4,12,13,18,19,36,37,38,47,51 |
| 9 | Army Correspondence Course Program (ACCP) | DA Pam. 351-20 | 1-Oct-1996 | 1,4,12,13,18,19,36,37,38,47,51 |
| 10 | Army Correspondence Course Program (ACCP) | DA Pam. 351-20 | 1-Oct-1997 | 1,4,12,13,18,19,36,37,38,47,51 |
| 11 | Army Correspondence Course Program (ACCP) | DA Pam. 351-20 | 1-Oct-1998 | 1,4,12,13,18,19,36,37,38,47,51 |
| 12 | Army Correspondence Course Program (ACCP) | DA Pam. 351-20 | 1-Oct-1999 | 1,4,12,13,18,19,36,37,38,47,51 |
| 13 | Army Correspondence Course Program (ACCP) | DA Pam. 350-59 | 26-Oct-2001 | 1,4,12,13,18,19,36,37,38,47,51 |
| 14 | Army Correspondence Course Program (ACCP) | DA Pam. 350-59 | 1-Oct-2002 | 1,4,12,13,18,19,36,37,38,47,51 |
| 15 | Army Correspondence Course Program (ACCP) | DA Pam. 350-59 | 1-Oct-2003 | 1,4,12,13,18,19,36,37,38,47,51 |
| 16 | Army Correspondence Course Program (ACCP) | DA Pam. 350-59 | 1-Oct-2005 | 1,4,12,13,18,19,36,37,38,47,51 |
| 17 | Army Correspondence Course Program (ACCP) | DA Pam. 350-59 | 1-Oct-2006 | 1,4,12,13,18,19,36,37,38,47,51 |
| 18 | Separation Procedures of Reg. Reserve Comm. Officers | DODI 1332.40 | 16-Sep-1997 | 6,12,13 |
| 19 | 1st US Army-CG's Annual Training Guidance 2001 and 2002 | | 30-Jun-2000 | 3,18,19,20,45 |
| 20 | 1st US Army-CG's Annual Training Guidance FY 03/04 | | 30-Sep-2002 | 3,18,19,20,45 |
| 21 | Interim Change No: 102 Warrant Officer Fed Rec | NGR 600-101 | 25-Apr-1994 | 3,20,24 |
| 22 | AF Correspondence Info-Student History Query-Robert Freeburg | | 23-Nov-2004 | 6 |
| 23 | ACCP Student Status Query-William Clark | | 17-Nov-2004 | 6 |
| 24 | ALARNG METL for 151 Army Band For 1995-2002 | | | 33 |
| 25 | ALARNG METL for 711 Signal Battalion For 2002 | | | 33 |
| 26 | AF Correspondence Info-Student History Query-James Davern | | 23-Nov-2004 | 6 |
| 27 | Officer Selection & Promotion | MSARNG Reg 600-100 | 1-Dec-2001 | 3,5,14,20,40 |
| 28 | MS NG-Command Training Guidance for 2000 and 2001 | | 5-Feb-1999 | 3,18,19,20,45 |
| 29 | MS NG-Command Training Guidance for 2001 and 2002 | | 6-Oct-1999 | 3,18,19,20,45 |

PUBLICATIONS MATRIX

| | | | | |
|---|---|---|---|---|
| 30 | MS NG-Command Training Guidance for 2002 and 2003 | | 1-Sep-2000 | 3,18,19,20,45 |
| 31 | NC NG-Yearly Training Guidance for 2002 | | 31-Jul-2000 | 3,18,19,20,45 |
| 32 | NC NG-Yearly Training Guidance for 1998 | | | 3,18,19,20,45 |
| 33 | OH NG-Command Training Guidance for 01/02 | | 1-Oct-1999 | 3,18,19,20,45 |
| 34 | Qualitative Retention Program | MNARNG PAM 135-205 | 1-Jun-2004 | 3,20,45 |
| 35 | MN NG-Qualititive Retention Program | | 15-Oct-2004 | 3,20,45 |
| 36 | OH NG-Selective Retention Board Under NGR 635-102 | | 4-Feb-2000 | 3,20,21,22,24 |
| 37 | Officer Promotion & Career Management | MNNG Reg 600-100 | 6-Jun-2003 | 3,20,21,22,24 |
| 38 | Enlisted Promotions Under Enlisted Promotion Program (EPP) | TAGPA PAM 600-200 | 2-Jan-2004 | 3,18,19,20,45 |
| 39 | PA NG-The Adjutant General's Training Guidance 2002 | | 20-Jun-2001 | 3,18,19,20,45 |
| 40 | AL NG-Officer & Warrant Officer Selective Retention | | 22-May-2004 | 3,20,45 |
| 41 | Army Training Requirements and Resources System | | | 2, 7 |
| 42 | Army Training and Leader Development | AR 350-1 | 13-Jan-2006 | 2,7,8,16,17,18,19,20, 21,22,23,24,25,26,27, 29,30,31,36,37,38,39, 43,47,51,54,55,56,57, 58 |
| 43 | 10 U.S.C. § 1002(a) 2005 | | | 2 |
| 44 | 10 U.S.C. § 12732(a)(2)(B) 2005 | | | 2 |
| 45 | Uniform Reserve, Training and Retirement Catagories Admin | DODI 1215.19 | 12-Dec-2000 | 2, |
| 46 | Training and Retirement Point Credits and Unit Level Strength | AR 140-185 | 1-Jul-1987 | 2 |
| 47 | Declaration Command Sergeant Major (Retired) McNamara | | 22-Apr-2004 | 2 |
| 48 | Promotion of Commissioned Officers and Warrant Officers Other Than General Officers | AR 135-155 | 13-Jul-2004 | 2 |
| 49 | Memorandum for Reserve Component Coordination Council (RCCC) | | 10-Oct-2003 | 8,44,54 |
| 50 | Draft Memorandum Subject: Compensation for Completion of Required Training Through Distributed Learning Modes | | 10-Feb-2003 | 9,10,18 |
| 51 | Message Subject: Army Distributed Learning Policy | | 14-Feb-2006 | 8,9,16,17,18,38,44,54 |
| 52 | The Army Distributed Learning Program (TADLP) Concept of Operations (CONOPS) for the Army Training Information System (ATIS) and the Army Learning Management System (ALMS) | | 1-Jun-2006 | 8,16,17,18,38,51,54, 56 |
| 53 | Draft Reserve Component Distributed Learning Compensation Report of Alternatives and Recommendations for the Office of the Assistant Secretary of Defense for Reserve Affairs | | | 10,18,52 |

PUBLICATIONS MATRIX

| | | | | |
|---|---|---|---|---|
| 54 | Study Recommendations | | | 10,18,52 |
| 55 | Reserve Component Distributed Learning Compensation Alternatives Study | | 30-Apr-2004 | 10,18,52 |
| 56 | Reserve Component Brief-Out Meeting | | 30-Apr-2004 | 9,10,18,52 |
| 57 | Memorandum Subject: Reserve Component Distributed Learning (DL) Compensation | | 1-Jun-2004 | 9,10,18,52 |
| 58 | Information Paper Subject: RC Pay for Distance Learning | | 1-Apr-2003 | 11,18,52 |
| 59 | Message Subject: Implementation of the Army Distance Learning Program | | 4-Dec-2000 | 11,18,38,44,56,57 |
| 60 | Training In Units | AR 350-41 | 19-Mar-1993 | 30 |
| 61 | Directorate Of Common Leader Training | | | 32 |
| 62 | Memorandum Subject: Request Change in Enlisted PME Promotion Waiver Policy | | 20-Apr-2006 | 14, 39 |
| 63 | Message Subject: Updated Enlisted PME Waiver Poliy | | 1-Dec-2002 | 14, 39 |
| 64 | Memorandum Subject: Air Force Enlisted PME Metrics | | 8-Mar-2003 | 14, 39 |
| 65 | Email: Enlisted PME Waivers | | 26-Dec-2002 | 14, 39 |
| 66 | Message: Clarification of Policy on Declining Resident Enlisted PME | | 1-Dec-1995 | 14, 22 |
| 67 | College for Enlisted PME History | | 1-Dec-1997 | 13, 28 |
| 68 | Air University (AU) Organization and Mission | AF Regulation 23-52 | 23-May-1985 | 13, 28 |
| 69 | Air University 2005/2006 Course Catalogue (linked) | | 1-Jul-2005 | 36,37,38,46,57 |
| 70 | AU -Addendum to 0506 Catalogue AWC Elective | | | 36,37,38,46,57 |
| 71 | AU -Addendum to 0506 Catalogue ACSC Course Listing | | | 36,37,38,46,57 |
| 72 | Air University 2004-2005 Course Catalogue (linked) | | | 36,37,38,46,57 |
| 73 | AU - Addendum to 0405 Catalogue AWC Elective | | | 36,37,38,46,57 |
| 74 | AU - Addendum to 0405 Catalogue ACSC Course Listing | | | 36,37,38,46,57 |
| 75 | Air University 2003-2004 Course Catalogue (linked) | | | 36,37,38,46,57 |
| 76 | AU- Addendum to 0304 Catalogue ACSC Course Listing | | | 36,37,38,46,57 |
| 77 | Air University 2002-2003 Course Catalogue (linked) | | | 36,37,38,46,57 |
| 78 | Air University 2001-2002 Course Catalogue | | | 36,37,38,46,57 |
| 79 | Air University 2000-2001 Course Catalogue | | | 36,37,38,46,57 |
| 80 | Air University 1999-2000 Course Catalogue | | | 36,37,38,46,57 |
| 81 | Offier Personnel: You and Your Promotions- The AF Officer Promotion System | AF Pamphlet 36-32 | 15-Jun-1990 | 22, 35 |
| 82 | Professional Military Education for Air Force Officers: Comments and Criticisms | | 1-Jun-1991 | 4, 13, 28, 36 |

PUBLICATIONS MATRIX

| | | | | |
|---|---|---|---|---|
| 83 | Message: Detailed Results of the Enlisted Evaluation System Review | | 1-May-1995 | 18 |
| 84 | Talking Paper on Curtailing the SNCOA Correspondence Course 8 | | 9-Feb-2000 | 7, 36 |
| 85 | Position Paper on Senior NCO Academy Correspondence Course | | 30-Jan-1992 | 7, 36 |
| 86 | Message: Ative Duty Participation in Paper Based ECI Course 8 | | 1-Mar-2000 | 7, 36 |
| 87 | Letter re: new CD Rom version of Senior NCOA | | 6-Nov-1995 | 7, 36, |
| 88 | Memo re: ANG ability to attend SNCOA in residence | | 19-Nov-1992 | 7, 36, 38,46, |
| 89 | SSS: Implementation of Year of Training Enlisted PME Initiatives | | 5-Oct-1992 | 7, 36, 38, 46 |
| 90 | Letter and response re: new SNCOA correspondence course | | 1-May-1995 | 7, 36, 37, 38, 46 |
| 91 | Memorandum: MSgts to SNCOA | | 12-Apr-1995 | 7, 36, 37, 38, 46 |
| 92 | Letter: SCNOA correspodence course | | 28-Feb-2000 | 7, 36, 37, 38, 46 |
| 93 | Message: Implementation Instructions for USAf Senior NCO Academy | | 1-May-1996 | 7, 36, 37, 38, 46 |
| 94 | King Paper on Disconitnuing Active Duty Enrollment in ECI Course 0008 | | | 7, 36 |
| 95 | Educational Program compared to a traditional in-residence program Vol I | | 1-Sep-1995 | 36 |
| 96 | Effects of Student Achievement and Attitudes of a Distance Learning Seminar Educational Program compared to a traditional in-residence program Vol II | | 1-Sep-1995 | 36 |
| 97 | Noncommissioned Officer Professional Military Education | AF Reg 53-39 | 7-Nov-1983 | 1,4,5,6,7,13,14,15,18,22,23,55,56,58 |
| 98 | SSS and attachments: proper sizing of NCO Academy and consolidating Airman Leadership Schools | | 28-Aug-1998 | 4, 13, 14, 15, 18, 22, 23, 28, 36, 37, 55, 58 |
| 99 | Enlisted PME from a total force perspective- Action Memorandum | | 11-May-1993 | 18, 46 |
| 100 | Enlisted PME from a total force perspective- Action Memorandum | | 14-May-1993 | 18, 46 |
| 101 | Enlisted PME from a total force perspective- Action Memorandum | | 4-May-1993 | 18, 46 |
| 102 | Enlisted PME from a total force perspective- Action Memorandum | | 20-May-1993 | 18, 46 |
| 103 | and Active Duty Enlisted PME Attendance Eligibility | | 22-Jul-1993 | 7, 14, 15 |
| 104 | Interim Policy- NCO and SNCO Academy Student Selection | | 20-Sep-1991 | 7, 14, 15 |
| 105 | Message: Year of Training Initiatives for Enlisted PME | | 1-Nov-1992 | 4,7,14, 15, 36 |
| 106 | USAf Enlisted Professional Military Education Procedural Guidance | | 1-Feb-2005 | 7, 13, 28 |
| 107 | Enlisted Military Education Review Council Working Group Minutes | | 2-Mar-2006 | 9 |
| 108 | Talking Paper on the Extension Course Institute (ECI) | | 7-Jan-1992 | 4,7, 13, 28 |
| 109 | Course Outlines: Educational Programs Cadre | | 3-Oct-1995 | 1, 4, 8, 13, 28 |

PUBLICATIONS MATRIX

| | | | | |
|---|---|---|---|---|
| 110 | Search Results: Abstracts from Air Force History Studies Office database of keywords:History of ACSC, SOS, or Air Univeristy, and Air Force Specialty Codes | | 12-Jul-2006 | 4, 5, 13 |
| 111 | Briefing Slides: NCO Professional Military Education | | | 4 |
| 112 | Establishment of Enlisted Professional Military Education Policy Working Group (Joint Education) | | 5-Mar-2004 | 8 |
| 113 | Talking Paper on NCO Professional Military Education | | 16-Sep-1988 | 1, 4, 5, 7, 13, 15, 18, 22 |
| 114 | Talking Paper on Senior NCO Academy | | 26-Jul-1996 | 1, 4, 5, 7, 13, 15, 18, 22 |
| 115 | Talking paper on Enlisted Professional Military Education | | 8-Dec-1997 | 1, 4, 5, 7, 13, 15, 18, 22 |
| 116 | Talking Paper on Senior NCO Academy | | 7-Nov-1996 | 1, 4, 5, 7, 13, 15, 18, 22 |
| 117 | Talking Paper on Senior NCO Academy | | 4-Sep-1996 | 1, 4, 5, 7, 13, 15, 18, 22 |
| 118 | Talking Paper on Senior NCO Academy | | 28-Aug-1996 | 1, 4, 5, 7, 13, 15, 18, 22 |
| 119 | Talking Paper on Professional Military Education | | 28-Oct-1996 | 1, 4, 5, 7, 13, 15, 18, 22 |
| 120 | Talking Paper on Senior NCO Academy Update | | 28-Aug-1996 | 1, 4, 5, 7, 13, 15, 18, 22 |
| 121 | Talking Paper on USAFE Professional Military Education | | 7-Jun-1996 | 1, 4, 5, 7, 13, 15, 18, 22 |
| 122 | Talking paper on Enlisted Professional Military Education | | 13-Jul-1994 | 1, 4, 5, 7, 13, 15, 18, 22 |
| 123 | Background Paper on Senior NCO Academy | | 26-May-1995 | 1, 4, 5, 7, 13, 15, 18, 22 |
| 124 | Background Paper on Enlisted Professional Military Education | | 12-May-1995 | 1, 4, 5, 7, 13, 15, 18, 22 |
| 125 | Talking paper on Enlisted Professional Military Education | | 14-Feb-1995 | 1, 4, 5, 7, 13, 15, 18, 22 |
| 126 | Talking Paper on Airman Leadership School | | 30-Jan-1997 | 22 |
| 127 | Talking Paper on Noncommissioned Officer Academy | | 30-Jan-1997 | 1, 4, 5, 7, 13, 15, 18, 22 |
| 128 | Talking Paper on Senior Noncommissioned Officer Academy | | 30-Jan-1997 | 1, 4, 5, 7, 13, 15, 18, 22 |
| 129 | SSS: Package DPDE01 Enlisted PME Program Review | | 23-Jul-2001 | 4, 7, 14,18, 28, 58 |
| 130 | SSS: EPME Program Review | | 9-Jul-2001 | 4, 7, 14,18, 28, 58 |
| 131 | Distribution of class seats | | | 7 |
| 132 | Senior NCOA Quota Management flowchart (E-8 selections) | | | 7 |
| 133 | Senior NCOA Quota Management flowchart (E-6 & E-7 selections) | | | 7 |
| 134 | Talking paper on Importance of Career Advisors | | 22-Mar-2000 | 4, 22 |
| 135 | EPME Staffing Selection criteria for MSgts to attend resident SNCOA | | 4-Jan-1996 | 14, 15, 36, 58 |
| 136 | Bullet Background Paper on Development of Program /Future Projections for conus NCOA quotas | | 5-Mar-1999 | 1, 4, 14, 15, 36, 58 |
| 137 | Talking paper on EPME funding | | 20-Apr-1999 | 1, 4, 14, 15, 36, 58 |
| 138 | Talking paper on PACAF EPME Funding concerns | | 20-Apr-1999 | 1, 4, 14, 15, 36, 58 |
| 139 | Talking paper on EPME Programs | | 10-Oct-2003 | 1, 4, 14, 15, 36, 58 |
| 140 | Civilian participation in EPME | | 27-Jul-1998 | 1, 4, 14, 15, 36, 58 |
| 141 | Talking Paper on EPME | | 19-Jan-1999 | 1, 4, 14, 15, 36, 58 |
| 142 | Talking Paper on conus Challenges Concerning NCO Academies | | 17-Sep-1998 | 1, 4, 14, 15, 36, 58 |

PUBLICATIONS MATRIX

| | | | | |
|---|---|---|---|---|
| 143 | Talking paper on Future Outlook for EPME | | 11-Feb-1999 | 1, 4, 14, 15, 36, 58 |
| 144 | Talking Paper on EPME Basing Plan | | 1-Feb-1999 | 1, 4, 14, 15, 36, 58 |
| 145 | Talking paper on EPME Education Funding | | 1-Feb-1999 | 1, 4, 14, 15, 36, 58 |
| 146 | Talking paper on PACAF EPME Funding concerns | | 1-Feb-1999 | 1, 4, 14, 15, 36, 58 |
| 147 | Talking paper on NCO Academy Future | | 2-Apr-1999 | 4 |
| 148 | Talking paper on NCOA | | 13-Mar-1999 | 1, 4, 14, 15, 36, 58 |
| 149 | Talking paper on Satellite NCOA Program | | 8-Mar-1999 | 7, 46, 48, 58 |
| 150 | Talking paper on PACA EPME funding concerns | | 23-Aug-1999 | 1, 4, 14, 15, 36, 58 |
| 151 | Talking paper on NCO Academy Future | | 13-Aug-1999 | 4 |
| 152 | Tallking paper on Status Update for Conus Enlisted PME Facilities | | 12-Aug-1999 | 5,13, 14, 18, 22, 28, 58 |
| 153 | Slide Presentation: Air Force EPME | | | 1, 4, 14, 15, 36, 58 |
| 154 | Talking Paper on Airman Leadership School (ALS) | | 4-Nov-1999 | 1, 4, 14, 15, 36, 58 |
| 155 | Slide Presentation: ALS Snapshot | | | 1, 4, 14, 15, 36, 58 |
| 156 | Talking paper on NCOA | | 4-Nov-1999 | 1, 4, 14, 15, 36, 58 |
| 157 | Slide Presentation: NCOA Snapshot | | | 1, 4, 14, 15, 36, 58 |
| 158 | Talking Paper on SNCOA | | 2-Nov-1999 | 1, 4, 14, 15, 36, 58 |
| 159 | Slide Presentation: SNCOA Snapshot | | | 1, 4, 14, 15, 36, 58 |
| 160 | Background paper on ALS | | 30-Jan-1992 | 1, 4, 14, 15, 36, 58 |
| 161 | Background paper on changes in NCO PME | | 30-Jan-1992 | 1, 4, 14, 15, 36, 58 |
| 162 | Position Paper on SSgt/TSgt Eligibility for Inresidence NCOA | | 30-Jan-1992 | 4,7, |
| 163 | Bullet Background paper on USAF NCO PME | | 1-May-1991 | 1, 4, 14, 15, 36, 58 |
| 164 | Talking paper on NCO PME Issues | | 4-Mar-1991 | 1, 4, 14, 15, 36, 58 |
| 165 | Memo: NCO PME Current issues, concerns and intiatives | | | 1, 4, 14, 15, 36, 58 |
| 166 | Talking Paper on NCO Academies | | 19-Oct-1993 | 1, 4, 14, 15, 36, 58 |
| 167 | SNCOA: MSgt attendence and reinstating SNCOA Correspondence course | | 27-Jun-1996 | 4,7, |
| 168 | Talking paper on Enlisted Professional Military Education | | 8-Mar-1993 | 4,7 |
| 169 | Talking Paper on ALS and NCOA | | 13-Jul-1992 | 4, 7, |
| 170 | Talking Paper on EPME 1990 thru 1995 | | 14-Feb-1995 | 1, 4, 7, 14, 15, 36, 58 |
| 171 | Taking paper on EPME | | 13-Jul-1994 | 4, 7, |
| 172 | Talking paper on EPME | | 10-Dec-1993 | 4, 7, |
| 173 | Talking paper on EPME | | 10-Dec-1993 | 4, 7, |
| 174 | Taking paper on EPME | | 10-Dec-1993 | 4, 7, |
| 175 | Talking Paper on NCO Academies | | 5-Oct-1993 | 4, 7, |
| 176 | Thank you Memo: from CSAF Fogleman to Gen Boles | | 6-Dec-1995 | 4, 16, 18, 19, 28, 46, 58 |
| 177 | Memo to CSAF Fogelman re: Distance Learning technologies in CEPME | | 6-Nov-1995 | 4, 16, 18, 19, 28, 46, 58 |
| 178 | Memo to HQ AETC from CSAF Folgelman re: MSgts into SNCOA | | 1-May-1995 | 56 |
| 179 | SNCO Corespondence Course Development | | no date | 16, |

PUBLICATIONS MATRIX

| | | | | |
|---|---|---|---|---|
| 180 | Email: re: Education Data in the PDS for enlisted members | | 2-May-1996 | 14 |
| 181 | SSS: Enlisted PME Continuum Curriculum Development w/ atchs | | 10-May-2006 | 16 |
| 182 | Memo: re: Selection procudures for MSgt Attendance to the SNCOA | | 15-Sep-1995 | 7 |
| 183 | Message: Enlisted PME Correspondence | | 1-Jun-1994 | 4, 16, 18, 19, 28, 46, 58 |
| 184 | Message: Priority Selection to NCO Academy | | 1-Nov-1998 | 7 |
| 185 | Handwritten Memo: from CMS Johnson to CMS Lokovic re: Total Force PME w. attachments- In residence PME & ANG NCOA proposals | | 28-Apr-1993 | 1, 4, 5, 7, 12, 13, 15, 18, 22, 23, 24, 46, 48, 58 |
| 186 | Position paper on NCOA Seminar Program | | 8-Feb-1993 | 18, 36, 4, 37 |
| 187 | Talking paper on the Satellite NCOA Program | | 8-Mar-1999 | 46, 48, 58 |
| 188 | Memo re: ANG Satellite NCO Academy w/ attachs, NCOA newsletter and Satallite handbook | | | 1, 4, 5, 7, 12, 13, 15, 18, 22, 23, 24, 46, 48, 58 |
| 189 | Point Paper on ANG PME Center | | 7-Apr-1993 | 1,4,5,7,8 |
| 190 | Taking Paper on Role of Special Operations within EPME | | 7-Mar-2000 | 4, 5 |
| 191 | Talking paper on ALS | | 4-Nov-1999 | 1, 4, 14, 15, 18, 36, 58 |
| 192 | Slide on NCO Development | | | 5, 14,15,22, 23, 24 |
| 193 | SNCO Academy snapshot | | | 1, 4, 14, 15, 18, 36, 58 |
| 194 | Talking paper on Status Update for Conus EPME Facilities | | 2-Jul-1999 | 5,13, 14, 18, 22, 28, 58 |
| 195 | Talking Paper on NCOA Future | | 13-Aug-1999 | 5, 22, 58 |
| 196 | Talking paper on Status Update for Conus EPME Facilities | | 2-Jul-1999 | 7, 18, 24, 28 |
| 197 | Memo for record DPPE to NURAC re: ALS curriculum hours | | 17-Apr-1991 | 16, 18 |
| 198 | Implementation of NCO Leadership Course as it existed in 1952 | | | 1, 4, 5, 14, 15 |
| 199 | Memo: Enlisted PME Update Briefing for CMSAF Workshop | | 7-Mar-1991 | 4, 12 |
| 200 | 18 Pg memo on NCOA criteria and curriculum | | | 1, 4, 5, 12, 14, 15, 18, 22, 28, 58 |
| 201 | Notes: NCO Implementation 3- tier structure plan (16 pgs) | | 5-Feb-1991 | 1, 4, 5, 12, 14, 15, 18, 22, 28, 58 |
| 202 | NCO PME Centers (NCOPC & NCOLS) | | 1-Feb-1991 | 1, 4, 5, 12, 14, 15, 18, 22, 28, 58 |
| 203 | Action memo: PME Curriculum tasking for AU w/ AU task letter | | 17-Apr-1991 | 1, 4, 5, 12, 14, 15, 18, 22, 28, 58 |
| 204 | EES Module Outline | | 17-Apr-1991 | 1, 4, 5, 12, 14, 15, 18, 22, 28, 58 |
| 205 | Handwritten memo re: new curriculum and taskings17 Apr 91 | | 17-Apr-1991 | 1, 4, 5, 12, 14, 15, 18, 22, 28, 58 |
| 206 | Handwritten memo to Chief Nurre re: MSgts that haven't attended NCOA | | 12-Apr-1991 | 1, 4, 5, 12, 14, 15, 18, 22, 28, 58 |

PUBLICATIONS MATRIX

| | | | | |
|---|---|---|---|---|
| 207 | Memo re: ALS hours being shorteend and students live at home vice dorm | | date not legible | 1, 4, 5, 12, 14, 15, 18, 22, 28, 58 |
| 208 | Handwritten note: re: Draft suggested ALS course outline 15 pgs | | 16-Apr-1991 | 1, 4, 5, 12, 14, 15, 18, 22, 28, 58 |
| 209 | Action Memo re: PME Restructuring | | 15-Feb-1991 | 1, 4, 5, 12, 14, 15, 18, 22, 28, 58 |
| 210 | Memo re: Proposed Reorganization of NCO PME w points to consider | | 1-Mar-1991 | 1, 4, 5, 12, 14, 15, 18, 22, 28, 58 |
| 211 | Memo re: Three-Tier NCO PME system w/ atchs Curriculum and Manpower Auth worksheet 16 pgs | | 14-Mar-1991 | 1, 4, 5, 12, 14, 15, 18, 22, 28, 58 |
| 212 | NCO PME Education curriculum writing/briefing evaluation instrument | | 1-Mar-1991 | 1, 4, 5, 12, 14, 15, 18, 22, 28, 58 |
| 213 | 6597 STUS Inputs/updates to new NCO PME education curriculum 13 Pgs | | 20-Jan-1991 | 1, 4, 5, 12, 14, 15, 18, 22, 28, 58 |
| 214 | Memo re: Proposed Reorganization of NCO PME w/ points to consider | | 1-Mar-1991 | 1, 4, 5, 12, 14, 15, 18, 22, 28, 58 |
| 215 | 3-Teier Manpower NCO PME analysis | | 1-Mar-1991 | 1, 4, 5, 12, 14, 15, 18, 22, 28, 58 |
| 216 | Fax re: Military Studies and AF mission organization | | 1-Mar-1991 | 1, 4, 5, 12, 14, 15, 18, 22, 28, 58 |
| 217 | Fax re: Impact of implementation | | 1-Mar-1991 | 1, 4, 5, 12, 14, 15, 18, 22, 28, 58 |
| 218 | Fax re: summary of proposals for curriculum frojm Det 1 at Goodfellow AFB | | 28-Feb-1991 | 1, 4, 5, 12, 14, 15, 18, 22, 28, 58 |
| 219 | Fax re: Curriculum Revision (6 pgs) | | 20-Feb-2001 | 1, 4, 5, 12, 14, 15, 18, 22, 28, 58 |
| 220 | Memo re: NCO PME Review Panel 3-Tier System Initiative | | 16-Jan-1991 | 1, 4, 5, 12, 14, 15, 18, 22, 28, 58 |
| 221 | Memo re: thoughts Phase NCO PME | | 15-Feb-1991 | 1, 4, 5, 12, 14, 15, 18, 22, 28, 58 |
| 222 | NCO PME Review/Three Tier System Comments | | 31-Jan-1991 | 1, 4, 5, 12, 14, 15, 18, 22, 28, 58 |
| 223 | Memo re: PME Restructuring | | 15-Feb-1991 | 1, 4, 5, 12, 14, 15, 18, 22, 28, 58 |
| 224 | Memo re: PME Restructuring | | 21-Feb-1991 | 1, 4, 5, 12, 14, 15, 18, 22, 28, 58 |

PUBLICATIONS MATRIX

| | | | | |
|---|---|---|---|---|
| 225 | Action memorandum: PME Restructuring | | 15-Feb-1991 | 1, 4, 5, 12, 14, 15, 18, 22, 28, 58 |
| 226 | EPME Policies, Procedures and Guidelines (PPG) w/ atchs ( 28 pgs) | | 1-Oct-1999 | 1, 4, 12, 18, 22, 58 |
| 227 | AUS1 AFI 36-2301 DRAFT | | | 16, 17, |
| 228 | Message: EPME Correspondence Courses (5 pgs) | | 1-Jun-1994 | 16, 36, 56, |
| 229 | ECI Correspondence Courses | | 1-May-1994 | 4, 5, 7 |
| 230 | SSS: Active duty Enrollment in PME Correspondence courses w Academic educ stats | | 27-May-1994 | 16, 18, 36, 56, |
| 231 | Handwritten notes re: NCO PME corres courses from MG McGinty | | 8-Jun-1994 | 4, 5, 7, 16, 18, 36, 58 |
| 232 | CMSAF Pfingston' memo concurring with elimination of corres courses 0001,0006, 0008 | | 8-Jun-2004 | 4, 5, 7, 16, 18, 36, 58 |
| 233 | Memo re: Active duty Enrollment in PME Corres Courses | | 8-Jun-2004 | 4, 5, 7, 16, 18, 36, 58 |
| 234 | Memo: AF fitness, Medical profiles, and Enlisted PME Attendance | | 11-Feb-2004 | 7 |
| 235 | Change ALS, NCO, SNCOA Attendance Requirement | | | 7 |
| 236 | Mask Completion Data for Non-resident NCO PME | | | 5 |
| 237 | Talking Paper on EPME issues | | 15-Sep-1998 | 7 |
| 238 | Talking Paper on EPME issues concerning NCOA Quota Projections | | 24-Jul-1998 | 7 |
| 239 | SSS: Program Guidance Letter for EPME requirement' | | 14-Jul-1998 | 18 |
| 240 | SSS: Enlisted PME Requirements | | 15-Jun-1998 | 7, 18, 28 |
| 241 | Memo: Enlisted PME requirements | | 1-Mar-1998 | 7, 18, 28 |
| 242 | Memo: Enlisted PME requirements AETC/ED ltr 27 May 98 | | 22-Jun-1998 | 7, 18, 28 |
| 243 | Memo re: increasing students throughput at SNCOA | | | 7, 18, 28 |
| 244 | Talking paper on SNCOA | | 27-May-1998 | 7, 18, 28 |
| 245 | Memo re: Responses to AF/DP Questions concering CSAF EPME tasker | | 9-Oct-1998 | 7, 18, 28 |
| 246 | ANG Satellite NCO Academy powerpoint briefing w/ business card | | | 58 |
| 247 | ANG Training Center Letter to CMSAF Murray | | Dec-04 | 46, 48, 58 |
| 248 | Notes from 1999 Worldwide Commandant Conference | | Mar-99 | 1, 4, 8, 12, 13, 28 |
| 249 | Slides from 99 EPME Manager's Conference/Workshop | | Nov-99 | 1, 4, 8, 12, 13, 28 |
| 250 | Notes from EPME Review | | 7-Jul-06 | 13,14, 22, 55, 56, 58 |
| 251 | 2005 Triennial Review of Enlisted PME | | 16-May-05 | 7, 13, 14, 55, 56, 58 |
| 252 | Bullet Background paper on 2005 Review of EPME | | 27-Oct-05 | 7, 13, 14, 55, 56, 58 |
| 253 | Handwritten undated note to Bob about Program Review attached to: | | | 7, 13, 14,18, 55, 56, 58 |
| 254 | Email re: Enlisted PME Policy Changes | | 1-Feb-02 | 7, 13, 14,18, 55, 56, 58 |
| 255 | Enlisted PME Program Review | | 9-Jul-01 | 7, 13, 14,18, 55, 56, 58 |
| 256 | Enlisted PME Program Review- Policy Initiatives | | 8-Nov-01 | 7, 13, 14,18, , 55, 56, 58 |

PUBLICATIONS MATRIX

| | | | | |
|---|---|---|---|---|
| 257 | Memo to AETC/CC from HQ USAF/DP re: 2001 EPME review | | 7-Sep-01 | 7, 13, 14,18, 55, 56, 58 |
| 258 | EMPE Program Review Eglin AFB, FL Agenda and Documents | | 21-Mar-01 | 1, 4, 7, 13, 14,18, 55, 56, 58 |
| 259 | EPME Program Review- start up | | Sep-00 | 18, 55, 58 |
| 260 | Charter Command Board of Advisors Air University | | 3/1/1995/ Jan | 18, 55, 58 |
| 261 | Bullet Background Paper on NCO PME | | 1-May-91 | 12, 14, 18, 55, 58 |
| 262 | 91 Review of EPME w/ talking papers on the courses | | Aug-91 | 1, 7, 12 |
| 263 | Approval of the 1990-1991 SNCOA Curriculum | | Jun-91 | 1, 12, |
| 264 | 91 Review of EPME w/ talking papers on the courses | | 1-Aug-1991 | 1, 4, 5, 7, 12, 14, 15, 18, 22, 28, 58 |
| 265 | Approval of the 1990-1991 SNCOA Curriculum | | 1-Jun-1991 | 28, 48 |
| 266 | FY-07 ANG MOU Maj/Lt Col Promo Board | **previous versions are available for any year specified. | | 5 |
| 267 | July Letter to Airmen | | 7-Jul-2006 | 57 |
| 268 | Air University Instruction (AUI) 36-2304 | | 26-Sep-2003 | 6, 13, |
| 269 | AUI 36-2315, Student Disenrollment Procedures | | 6-May-2005 | 7 |
| 270 | CCAF, Campus Relations Policies, Procedures and Guidelines | | 1-Sep-1999 | 6, 7, 13, |
| 271 | Information Paper Subject: Potential Amendment to Eliminate Section 603 of the Senate FY 2007 NDAA Mark (Similar to Section 606 of the FY 2007 House Mark) | | 22-Jun-2006 | 53 |
| 272 | E-mail Chain: US Army Reserve Command, Subject: Focus Group | | 21-Dec-2004 | 47 |
| 273 | E-mail Chain: US Army Reserve Command, Subject: DL Training Compensation | | 30-Nov-2004 | 47 |
| 274 | E-Mail DA message Subject ALARACT 111/2006 | | 9-Jun-2006 | 15 |
| 275 | Warrant Officers-Federal Recognization and Related Personnel Actions | NGR 600-101 | 1-Oct-1996 | 3,20,24 |
| 276 | Air University Organizational Chart | | 28-Mar-2006 | 54 |
| 277 | Air Force Institute for Advanced Distributed Learning Organizational Chart | | 28-Mar-2006 | 54 |
| 278 | School for Advanced Airpower Studies Organizational Chart | | 28-Mar-2006 | 54 |
| 279 | College of Aerospae Doctrine, Research & Education Org Chart | | 28-Mar-2006 | 54 |
| 280 | Air University Library Organization Chart | | 28-Mar-2006 | 54 |
| 281 | Air Command and Staff College Organziational Chart | | 28-Mar-2006 | 54 |
| 282 | Ira C. Eaker College for Professional Development Organizational Chart | | 28-Mar-2006 | 54 |

| | | | | |
|---|---|---|---|---|
| 283 | Air Force Chaplain Service Institute Organizational Chart | | 28-Mar-2006 | 54 |
| 284 | Commanders Professional Development School Organizational Chart | | 28-Mar-2006 | 54 |
| 285 | Air Force Human Resource Management School Org Chart | | 28-Mar-2006 | 54 |
| 286 | International Officer School Org Chart | | 28-Mar-2006 | 54 |
| 287 | College for Enlisted PME Org Chart | | 28-Mar-2006 | 54 |
| 288 | Headquarters Squadron Officers College Org Chart | | 28-Mar-2006 | 54 |
| 289 | Squadron Officers School Org Chart | | 28-Mar-2006 | 54 |
| 290 | Air & Space Basic Course Org Chart | | 28-Mar-2006 | 54 |
| 291 | Air War College Org Chart | | 28-Mar-2006 | 54 |
| 292 | Air Force Officer Accessions and Training School Org Chart | | 28-Mar-2006 | 54 |
| 293 | Air Force Reserve Officer Training Corps | | 28-Mar-2006 | 54 |
| 294 | Document prepared by the Air Force History Office with attachments (73 pages) | | 21-Jul-2006 | 4, |
| 295 | #2. K239.1616-1 Gen Bakers Correspondence from 1950-1953. No index and no document list available, 37 pages long.- 6 pages provided. | | | |
| 296 | #3 K239.044-38 Squadron Officer Course a Pictorial 1952- 375 pages | | | |
| 297 | #4 K239.01 V.1- | | | |
| 298 | #5 K239.01 V.1- Air University History 1969-1970- Table of Contents provided. Material is 346 pages long. | | | |
| 299 | #6 K239.01 V.3- History of Air University- 1980. List of Supporting Documents provided. Material is 456 pages long. | | | |
| 300 | #7 K239.01 V.1.History of Air University- 1985. Table of Contents provided. Material is 347 pages long. | | | |
| 301 | #8 K239.01 V.1=Air University History 1989-1990- Table of Contents provided. Material is 362 pages long | | | |
| 302 | #9 K239.01 V.1- History of Air University- 1981. Table of Contents provided. Material is 331pages long. | | | |
| 303 | #10 K239.01 V4 History of Air University- 1978. List of Supporting Documents provided. Material is 503 pages long. | | 1-Feb-1996 | |
| 304 | #11, K239.07T - 52 Enlisted Professional Military Education- A journey Through Time. | | | |
| 305 | #12 K239.01 V.1Air University History 1964- Table of Contents provided. Material is 800 pages long. | | | |
| 306 | #13 & 23. K239.07C V.1- History Air Command and Staff School 1954. Table of contents provided. Material is 213 pages long. | | | |

PUBLICATIONS MATRIX

| | | | | |
|---|---|---|---|---|
| 307 | #14 & 24. K239.161D-20 ACSC Correspondence Course April 1958. No Index or List of Supporting Documents. Material is 73 pages long. | | | |
| 308 | #15 K239.07E- History of the Extension Course Institute- 1957. Table of Contents provided. Material is 433 pages long. | | | |
| 309 | # 16 K239.01 V.1- this material was not available for Maj Rockenbach's inspection. Can only be viewed at Maxwell AFB. | | | |
| 310 | #17 K239.07C V.4 History of ACSC, Vol 4.1986-1987 Supporting document list provided. To see full publication must go to Maxwell AFB, AL. Document is 514 pages long. | | | |
| 311 | #18 168.7084-15 Col R.D. Mudd Collection- 250 pages, no index. | | | |
| 312 | #19 K239.043-20 History of ACSC 2000- Table of Contents provided. Document is 267 pages long. | | | |
| 313 | # 20 K239.07C V.1- History of ACSC 1990-1991- Supporting document list provided. Document is 91 pages long. | | | |
| 314 | # 21 K239.07C V.2 - History of ACSC 1989-1900- For Official Use Only. No index to this document. Contains AU regulations relating to ACSC, the 1990 Student Handbook. The Spouses Program regulation, etc. 637 pages of material. | | | |
| 315 | # 22 K239.07E V.1- Unit Activity Report for Extension Course Institute 1990. List of Supporting Documents provided. Material is 427 pages long. | | | |
| 316 | #25- K239.07C History of ACSC 1997-1998- Table of Contents provided. Document is 940 pages long. | | | |
| 317 | Organization of the Army | | | 54 |
| 318 | Organization of TRADOC | | | 54 |
| 319 | DCSOPS&T Organization | | | 54 |
| 320 | Welcome to Combat Logistics Supply and Support | | | 1,4,12,13,18,19,36,37,38,47,51 |
| 321 | Combat Logistics Supply and Support | | | 1,4,12,13,18,19,36,37,38,47,51 |
| 322 | Federal v. State v. Civilian status: Clark, et al. v. US | | | 53 |

PRIVILEGE LOG 22 August 2006

| Doc # | Date | Author | Recipient | Subject | Bates Stamp | Basis for Obj/priv |
|---|---|---|---|---|---|---|
| 1 | December 18, 1980 | DAJA-AL | | Legal Review of AR 140-1, Paragraph 5-4 | 0001 | WP |
| 2 | September 10, 1981 | DAJA-AL | | Legal Review of Proposal to Provide Educational Program | 0002 | WP |
| 3 | March 5, 1982 | DAJA-AL | | Legal Review of Performing Equivalent Training | 0003 | WP |
| 4 | September 26, 1986 | DAJA-AL | | Legal Review that sufficient information was not provided | 0004 | WP |
| 5 | September 3, 1987 | DAJA-AL | | Legal Review to create a student element | 0005 | WP |
| 6 | August 17, 1987 | DAJA-AL | | Legal Review of FORSCOM's Draft Implementation Plan | 0006 | WP |
| 7 | May 11, 1987 | DAJA-AL | | Legal Review of SA to Authorize Additonal IDT Training | 0007 | WP |
| 8 | May 21, 1951 | DAJA-AL | | Legal Review that Secretary of Army may promulgate regulations | 0008 | WP |
| 9 | February 21, 1996 | DAJA-AL | DAJA-ALP | Legal Review of Service Creditable for Retirement Eligibility | 0009 | WP |
| 10 | June 21, 1996 | DAJA-AL | NGB-JAG | NGR (AR) 600-200, Enlisted Personnel Management | 0010 | WP |
| 11 | December 19, 1995 | DAJA-AL | NGB-JA | NGR 600-200 Change 4 | 0011 | WP |
| 12 | October 5, 1994 | DAJA-AL | DAAR-OP | Legal Review of Professional Military Education Test Program | 0012 | WP |
| 13 | August 25, 1993 | DAJA-AL | DAJA-ALP | Legal Review AR 140-1 | 0013 | WP |
| 14 | December 18, 1991 | DAJA-AL | DAAR-PE | Legal Review Retirement Point Credit and IMA Program | 0014 | WP |
| 15 | March 6, 1959 | DAJA-AL | | Legal Review Discussing Applicable Law and Regulations | 0015 | WP |
| 16 | September 15, 1961 | DAJA-AL | | Legal Review of Perceiving No Objection | 0016 | WP |
| 17 | September 24, 1962 | DAJA-AL | | Legal Review of Discussing Basic Training Requirement | 0017 | WP |
| 18 | March 11, 1964 | DAJA-AL | | Legal Review of Inactive Duty Training Drills | 0018 | WP |
| 19 | June 19, 1964 | DAJA-AL | | Legal Review of Expenditure of Appropriated Funds | 0019 | WP |
| 20 | October 28, 1965 | DAJA-AL | | Legal Review of Determination Made in JAGA 1964/41 | 0020 | WP |
| 21 | March 7, 1968 | DAJA-AL | | Legal Review of Disallowance of Equivalent Training | 0021 | WP |
| 22 | June 26, 1975 | DAJA-AL | | Legal Review of AR 140-1 | 0022 | WP |
| 23 | August 14, 1974 | DAJA-AL | | Legal Review of Proposed Legislation | 0023 | WP |
| 24 | May 13, 1974 | DAJA-AL | | Legal Review of AR 140-1, Para 4-13 | 0024 | WP |
| 25 | October 26, 1973 | DAJA-AL | | Legal Review of DOD Dir 1215.6 | 0025 | WP |
| 26 | February 2, 1973 | DAJA-AL | | Legal Review of Reserve Officers Entitled to Subsistence Allowance | 0026 | WP |
| 27 | January 12, 1969 | DAJA-AL | | Legal Review of Entitlement to Pay | 0027 | WP |
| 28 | August 15, 1969 | DAJA-AL | | Legal Review of Entitlement to Pay | 0028 | WP |
| 29 | September 10, 1979 | DAJA-AL | | Legal Review of Proposed change 1 to AR 140-1 | 0029 | WP |
| 30 | December 23, 1977 | DAJA-AL | | Legal Review of Prposed Appendix B AR 140-111 | 0030 | WP |
| 31 | April 28, 1976 | DAJA-AL | | Legal Review of AR 140-185 | 0031 | WP |
| 32 | April 29, 1976 | DAJA-AL | | Legal Review of IAW AR 140-1 | 0032 | WP |

# Exhibit 2
# to Reply Memorandum

DEPARTMENT OF THE AIR FORCE
Headquarters US Air Force
Washington, DC 20330-1030

CFETP 2A6X2
Parts I and II
December 1997
Change 1
2 March 1999

# AFSC 2A6X2

# AEROSPACE GROUND EQUIPMENT

# CAREER FIELD EDUCATION AND TRAINING PLAN

# CAREER FIELD EDUCATION AND TRAINING PLAN
# AEROSPACE GROUND EQUIPMENT SPECIALTY
# AFSC 2A6X2

## Table of Contents


**PART I - Career Field Information** ____ **3**

**Preface** ____ **3**

**Abbreviations and Terms Explained** ____ **4**

**Section A - General Information** ____ **7**
- Purpose of the CFETP
- Use of the CFETP
- Coordination and Approval of the CFETP

**Section B - Career Progression and Information** ____ **8**
- Specialty Description
- Skill/Career Progression
  - Apprentice Level (3)
  - Journeyman Level (5)
  - Craftsman Level (7)
  - Superintendent Level (9)
- Training Decisions
- Community College of the Air Force
- Career Field Path

**Section C - Skill Level Training Requirements** ____ **15**
- Purpose
- Specialty Qualification
  - Apprentice Level (3)
  - Journeyman Level (5)
  - Craftsman Level (7)
  - Superintendent Level (9)

**Section D - Resource Constraints** ____ **19**

**Section E. - Transitional Training Guide** ____ **19**

**PART II - Technical Training Standards** ____ **21**

**Section A - Specialty Training Standard** ____ **21**
- Atch 1 Proficiency Code Key
- Atch 2 AGE Qualitative Requirements
- Atch 3 GTACS Requirements



Supersedes: CFETP, 2A6X2, June 1994

Approved by: HQ USAF/ILMM, (CMSgt L. Funk)
Number of Printed Pages: 72
OPR: 361 TRS/TRR (Mr. McKellip DSN 736-3684)

**Section B - Course Objective List** ____ **61**
**Section C - Support Material** ____ **61**
**Section D - Training Course Index** ____ **62**
**Section E - MAJCOM Unique Requirements** ____ **64**
**Glossary** ____ **65**
**Air Force Publications Training References** ____ **65**
**Technical Order Training References** ____ **66**
**Abbreviations and Acronyms** ____ **68**

# AEROSPACE GROUND EQUIPMENT SPECIALTY
# AFSC 2A6X2
# CAREER FIELD EDUCATION AND TRAINING PLAN

## PART I

### *PREFACE*

☆**1.** Resource constraints in the Air Force impact the availability of our most valuable resource, manpower. This condition will continue unless training for the workforce is effective and efficient to perform duties within each skill level of our Air Force Specialty (AFS). For the Air Force to meet the challenges of tomorrow, a greater emphasis must be placed on career field training. This Aerospace Ground Equipment (AGE) Specialty Career Field Education and Training Plan (CFETP) is a comprehensive management tool. The CFETP enables the Air Force and each MAJCOM to place the needed emphasis on total career field training. The plan is a "training road map" that identifies life-cycle education and training requirements, training support resources, and minimum core task requirements for the AGE Specialty. The CFETP provides personnel a clear career path to success and instills structure in all aspects of career field training. To read, review, or print a copy of the current CFETP, go to the Aircraft Maintenance Homepage at: http://www.il.hq.af.mil/ilm/ilmm/acmaint/index.html. *NOTE:* Civilians occupying associated positions will use Part II to support duty position qualification training.

**2.** The CFETP consists of two parts. Both parts of the plan are used by supervisors to plan, manage, and control training within the career field.
2.1. **Part I** provides information for overall management of the specialty. Section A explains how everyone uses the plan. Section B identifies career field progression information, duties and responsibilities, training strategies, and career field path. Section C associates each level with specialty qualifications (knowledge, education, training, and other). Section D indicates resource constraints (funds, manpower, equipment, and facilities). Section E identifies transition training guide requirements for SSgt through MSgt.
2.2. **Part II** includes the following: Section A, identifies the Specialty Training Standard (STS) and includes duties, tasks, technical references to support training, Air Education and Training Command (AETC) conducted training, wartime course, core task, and correspondence course requirements. Section B is not used. Section C identifies available support materials, such as a Qualified Training Package (QTP) which may be developed to support proficiency training. These packages are identified in AFIND 8, *Numerical Index of Specialized Educational Training Publications.* Section D is an index used to determine resources available to support mandatory and optional training. Section E identifies MAJCOM unique training requirements used to determine additional training required for associated qualification needs.

**3.** Using guidance provided in this CFETP ensures individuals in the AGE specialty receive effective and efficient training at the appropriate point in their career. This plan enables us to train today's work force for tomorrow's jobs.

## *ABBREVIATIONS AND TERMS EXPLAINED*

**Advanced Training (AT).** A formal course that provides individuals who are qualified in one or more positions of their Air Force Specialty (AFS) with additional skills and knowledge to enhance their expertise in the career field. Training is for selected career airmen at the advanced level of the AFS.

**Air Force Specialty (AFS).** A group of positions requiring common qualifications. Each AFS has a title and a code.

**Air Force Job Qualification Standard (AFJQS).** A comprehensive task list that describes a particular job type or duty position. Supervisors use the AFJQS to document task qualifications. The tasks on AFJQS are common to all persons serving in the described duty position.

**Career Field Education and Training Plan (CFETP).** A CFETP is a comprehensive, multipurpose document encapsulating the entire spectrum of education and training for a career field. It outlines a logical growth plan that includes training resources and is designed to make career field training identifiable, to eliminate duplication, and to ensure this training is budget defensible.

**Certification.** A formal indication of an individual's ability to perform a task to required standards.

**Certification Official.** A person whom the commander assigns to determine an individual's ability to perform a task to required standards.

**Continuation Training.** Additional training exceeding AFSC requirements with emphasis on present or future duty assignments.

**Contract Training.** Type I training that receives the same priority funding as Air Force-directed training. It supports initial groups of instructors, operators, and so on, that the Air Force requires for new or modified weapon systems.

**Core Task.** A task Air Force Career Field Managers (AFCFMs) identify as a minimum qualification requirement within an Air Force specialty or duty position, regardless of duty position. Core tasks identified with an *R are optional for ANG and AFRC. Additional core tasks may be added by each MAJCOM, flight chief, or unit supervisor as needed.

**Course Objective List (COL).** A publication, derived from initial and advanced skills course training standards, identifying the tasks and knowledge requirements, and respective standards provided to achieve a 3, 5, or 7-skill level in this career field. Supervisors use the COL to assist in conducting graduate evaluations in accordance with AFI 36-2201, Developing, Managing and Conducting Military Training Programs.

**Course Training Standard (CTS).** A CTS is developed for all courses not governed by an STS, including specialized training packages and computer-based training courses.

**Cross Utilization Training (CUT).** Training designed to qualify personnel to perform tasks that are not established requirements in their awarded AFSC.

**En Route (PCS-Associated) Training.** The training of students undergoing a permanentchange of station (PCS) while in temporary duty (TDY) status.

**Exportable Course.** Instructional packages that personnel design for use in the field. The course may include printed, computer-based, or other audiovisual materials.

**Exportable Training.** Additional training via computer assisted, paper text, interactive video, or other necessary means to supplement training.

**Field Technical Training (Type 4).** Special or regular on-site training conducted by a training detachment (FTD) or by a mobile training team.

**Go/No-Go.** In OJT, the stage at which an individual has gained enough skill, knowledge, and experience to perform the tasks without supervision.

**Instructional System Development (ISD).** A deliberate and orderly, but flexible process for planning, developing, implementing, and managing instructional systems. It ensures personnel are taught in a cost efficient way the knowledge, skills, and attitudes essential for successful job performance. (See AFMAN 36-2234 and AF Handbook 36-2235)

**Initial Skills Training.** A formal resident course that awards the 3-skill level.

**Mission Ready Technician (MRT).** Additional task performance training completed as part of or following initial skills training. This training raises the performance level of the graduate to the 3c, (competent and knows operating principles) "task certified" level. The main focus of this initiative is to provide the customer with a 3-level apprentice technician who is ready to be productive upon arrival in their operational unit.

**Occupational Survey Report (OSR).** A detailed report showing the results of an occupational survey of current tasks performed within the AGE career field.

**On-the-Job Training (OJT).** Hands-on, over-the-shoulder training conducted to certify personnel in both upgrade (skill level award) and job qualification (duty position certification) training.

**Position Qualification Training.** Training designed to qualify an airman in a specific position that occurs after upgrade training.

**Quality Air Force (QAF).** An operating style used by each organization to best accomplish its mission while meeting the needs of the users (customers) of the products or services it provides.

**Qualification Training (QT).** Actual hands-on task performance training designed to qualify an individual in a specific duty position. This portion of the dual channel training program occurs both during and after the upgrade training process, and provides the performance skills required to do the job.

**Qualification Training Package (QTP).** An instructional package designed for use at the unit to qualify, or aid qualification, in a duty position or program, or on a piece of equipment. It may be printed, computer-based, or in other audiovisual media.

**Resource Constraints.** Resource deficiencies, such as money, facilities, time, manpower, and equipment that preclude desired training from being delivered.

**Specialty Training.** A mix of formal training (technical school) and informal training (on-the-job) to qualify and upgrade airmen in the award of a skill level.

**Specialty Training Standard (STS).** An Air Force publication that describes skills and knowledge that airman in a particular Air Force specialty needs on the job. It further serves as a contract between AETC and the user to show the overall training requirements for an AFSC that the formal schools teach.

**Standard.** An exact value, a physical entity, or an abstract concept, established and defined by authority, custom, or common consent to serve as a reference, model, or rule in measuring quantities or qualities, establishing practices or procedures, or evaluating results. A fixed quantity or quality.

**Task Certifier.** See Certification Official.

**Total Force.** All collective Air Force components (active, reserve, guard, and civilian elements) of the United States Air Force.

**Trainer.** A person who teaches airmen to perform specific tasks through OJT methods. Also, equipment that the trainer uses to teach airmen specified tasks.

**Training Detachment (TD).** An AETC detachment that provides maintenance-oriented technical training, at an operational location, on specific systems and their aerospace ground equipment. A TD aims to:

Qualify personnel on new equipment or in new techniques and procedures.
Maintain proficiency and increase skill and knowledge.
Acquaint personnel with specific systems.
Keep personnel aware of changing concepts and requirements.

**Training Impact Decision System (TIDES).** A computer-based decision support technology being designed to assist AFCFMs in making critical judgments relevant to: what training should be provided to personnel within career fields, when training should be provided (at what career points), and where training should be conducted (training setting).

**Upgrade Training (UGT).** Mandatory training that leads to attainment of a higher skill level of proficiency.

**Utilization and Training Workshop (U&TW).** A forum of the AFCFM, MAJCOM functional managers (MFMs), Subject Matter Experts (SMEs), and AETC training personnel that determine career ladder training requirements.

***Section A - General Information***

**1. Purpose.** This CFETP provides information necessary for the AFCFM, MFMs, commanders, training managers, supervisors and trainers to plan, develop, manage, and conduct an effective career field training program. This plan outlines the training that individuals in AFSC 2A6X2 should receive to develop and progress throughout their career. This plan identifies initial skills, upgrade, qualification, advanced, and proficiency training. Initial skills training is conducted by AETC at the 361 TRS, Sheppard AFB TX. Upgrade training identifies the mandatory courses, task qualification requirements, and Career Development Course (CDC) requirements for award of the 3-, 5-, 7-, 9-skill levels. Qualification training is actual hands-on task performance training designed to qualify an airman in a specific duty position. It is designed to provide the performance skills/knowledge required to do the job. Advanced training is formal specialty training used for selected airmen. Proficiency training is additional training, either in-residence or exportable advanced training courses, or on-the-job training provided to personnel to increase their skills and knowledge beyond the minimum required for upgrade. The CFETP has several purposes; some are:

1.1. Serves as a management tool to plan, manage, conduct, and evaluate a career field training program. It is also used to help supervisors identify training at the appropriate point in an individual's career.

1.2. Identifies task and knowledge training requirements for each skill level in the specialty and recommends education/training throughout each phase of an individuals career.

1.3. Lists training courses available in the specialty, identifies sources of training, and the training delivery method.

1.4. Identifies major resource constraints which impact full implementation of the desired career field training process.

**2. Uses.** The plan will be used by MFMs and supervisors at all levels to ensure comprehensive and cohesive training programs are available for each individual in the AFS.

2.1. AETC training personnel will develop and revise formal resident, non-resident, field and exportable training based on requirements established by the users and documented in Part II of the CFETP. They will also work with the AFCFM to develop acquisition strategies for obtaining resources needed to provide the identified training.

2.2. MFMs ensure their training programs complement the CFETP for mandatory, initial, upgrade, and proficiency requirements. Identified requirements can be satisfied by OJT, resident training, contract training, or exportable courses. MAJCOM developed training to support this AFSC must be identified for inclusion into the plan.
2.3. Each individual will complete the mandatory training requirements specified in this plan. The lists of courses in Part II will be used as a reference to support training.

3. **Coordination and Approval.** The AFCFM is the approval authority. MAJCOM representatives and AETC training personnel will identify and coordinate on the career field training requirements. The AETC training manager for this specialty will initiate an annual review of this document by AETC and MFMs to ensure currency and accuracy. Using the list of courses in Part II, they will eliminate duplicate training. Applicable inputs will be routed to: AGE Training Manager, 361 TRS/TRR, 501 Missile Road, Sheppard AFB TX, 76311-2246. The Training Manager may also be reached by phone at DSN 736-3684, or by fax at 736-5308.

***Section B - Career Progression and Information***

4. **Specialty Description.** Inspects, maintains, modifies, tests, services, repairs, and delivers electrical, hydraulic, pneumatic, environmental, and mechanical systems to support world-wide aerospace weapons systems.
4.1. **Specialty Summary.** Maintains aerospace ground equipment (AGE) to support aircraft systems or subsystems. Manages AGE functions and activities. Related DoD Occupational Subgroup: 602.
4.2. **Duties and Responsibilities:**
4.2.1. Plans and organizes AGE maintenance activities. Establishes production controls and standards. Interprets and implements directives and publications pertaining to maintenance, including environmentally safe maintenance practices. Determines resource requirements, including facilities, equipment, and supplies. Inspects maintenance activities and evaluates resource use and recommends corrective actions. Encourages quality Air Force activities.
4.2.2. Diagnoses malfunctions and repairs AGE. Advises and performs troubleshooting on AGE before assigning repair action. Inspects and approves completed maintenance actions. Supervises and prepares AGE for storage and mobility deployment. Solves repair problems by studying drawings, wiring diagrams and schematics, and technical instructions. Uses automated maintenance data systems to monitor maintenance trends, analyze equipment requirements, maintain equipment records, and document maintenance actions. Analyzes and repairs ground support equipment using conventional, computerized and digital analyzers, multimeters, voltmeters, ohmmeters, oscilloscopes, circuit card testers, transistor testers, and hand tools.
4.2.3. Performs scheduled and unscheduled maintenance on AGE. Accomplishes inspections to locate defects and determine equipment serviceability. Tests and operates equipment to determine malfunctions and proper operation according to technical orders. Services equipment with fuel, oil, water, coolant, hydraulic fluid, refrigerant, and compressed air. Diagnoses mechanical and electronic circuitry malfunctions using visual and auditory senses, test equipment, and technical publications. Disassembles and assembles malfunctioning AGE accessories and components. Removes, disassembles, repairs, cleans, treats for corrosion, reassembles, and reinstalls AGE components and accessory systems. Stencils, and marks AGE

in accordance with (IAW) technical publications. Handles, labels, and disposes of hazardous materials and waste according to environmental standards. Operates AGE towing vehicles and positions equipment to support aircraft maintenance and flying operations. Cleans, inspects, and services AGE towing vehicles. Maintains vehicle forms.

5. **Skill/Career Progression.** Adequate training and timely progression from the apprentice to the superintendent skill level plays an extremely important role in the Air Force's ability to accomplish its mission. It is essential that everyone involved in training do their part to plan, develop, manage, and conduct an effective training program. The guidance provided in this part of the CFETP ensures each individual receives viable training at appropriate points in their career.

5.1. **Apprentice (3) Level.** Initial skills training in the AGE specialty consists of the tasks and knowledge training provided in the 3-level resident course located at Sheppard AFB TX. The decision to train specific task and knowledge items in the initial skills course is based on the results of the AGE Utilization and Training Workshop (U&TW) conference. At the U&TW conference Subject Matter Experts reviewed the Occupational Survey Report (OSR) data and used their own background, knowledge, and experience in the specialty to determine course content. Task and knowledge training requirements are identified in Attachment 2 of the Specialty Training Standard (STS). To be awarded AFSC 2A632 individuals must complete the initial skills course. Upon completion of initial skills training, a trainee works with a trainer to enhance knowledge and skills. They utilize CDCs, Task Qualification Training, and other courses available to ensure progress in the AGE career field. Once task qualified, a trainee may perform the task unsupervised.

5.2. **Journeyman (5) Level.** Upgrade training to the 5-level in the AGE specialty consists of tasks and knowledge training. Three months after the completion of the 3-level course the individual starts correspondence training provided by the AGE CDC's. Upgrade and qualification training requirements for the 5-level (core tasks) are identified in the STS listed in Part II of this plan. Once upgraded to the 5-level, journeyman will enter into continuation training to broaden their experience base. Supervisors should ensure 5-levels complete all applicable Training Detachment/exportable courses, and MAJCOM specific training. Active duty personnel will attend the Airmen Leadership School (ALS) after 48 months in the Air Force, and will use their CDCs to prepare for testing under Weighted Airman Promotion System (WAPS). They should also consider continuing their education toward a Community College of the Air Force (CCAF) degree. Five-levels may be assigned job positions such as Quality Assurance, Maintenance Operations Center, Production Control, dispatch, and various staff positions.

5.3. **Craftsman (7) Level.** Upgrade and qualification training requirements for the AGE specialty consists of those items shown in this plan. A craftsman can expect to fill various supervisory and management positions such as shift leader, Combat AGE Team (CAT) leader, element chief, AGE maintenance deployment and production supervisor, and task certifier. They may also be assigned to work in staff positions. For award of AFSC 2A672, an individual must successfully complete all required 7-level training and meet 7-level minimum upgrade requirements (AFI 36-2101 and AFMAN 36-2108). Additionally all individuals must attend the 7-level resident course at 361 TRS, Sheppard AFB TX, before the skill level can be awarded. Continued academic education through CCAF and higher degree programs is encouraged. TSgt and TSgt selectees attend the Noncommissioned Officer Academy in residence. MSgts and MSgt selectees should enroll in course 5 or 8 to further their professional development.

5.4. **Superintendent (9) Level.** A 9-level can expect to fill positions such as flight chief, production superintendent, and various staff positions. Additional training through continued education in the areas of budget, manpower, resources, and personnel management is encouraged. Individuals promoted to SMSgt and selected MSgts attend the Senior Noncommissioned Officer Academy in residence. Additional higher education and completion of courses outside the career field are highly encouraged.

6. **Training Decisions.** The CFETP uses a building block approach (simple to complex) to encompass the entire spectrum of training requirements for the AGE career field. The spectrum includes strategy for when, where, and how to meet these training requirements. The strategy must be apparent and affordable to reduce duplication of training and eliminate a disjointed approach to training. The following training decisions were made at the AGE U&TW held at Sheppard AFB TX, 7 - 11 Apr 97.

☆6.1 **Initials Skills Training.** Changes made to the three level course included adding Core Automated Maintenance Systems (CAMS) to all equipment shops and increasing the proficiency code to the 3c level for task certification on creating and clearing jobs in CAMS. Also, annual inspections are now trained as an all inclusive periodic inspection. The proficiency code was raised to the 3c level and all students are task certified on the carbon monoxide tester used on the H-1 heater. Resistive, capacitive and inductive (RCL) networking was deleted from 3-level training and added to the 7-level course.

The initial skills course provides training to personnel on how to maintain, troubleshoot, and repair AGE systems in an on-equipment environment, in support of aircraft maintenance and operations. Specific training includes; electrical and electronic principles, basic system theory of operation, system component removal and installation, system operation, introduction to maintenance concepts, inspection and maintenance systems; core automated maintenance systems (CAMS), supply discipline, general flightline maintenance practices, use of technical publications, common handtools, special test equipment, forms, equipment familiarization, soldering, hardware, safety wiring, foreign object damage prevention, corrosion control, AGE safety, career progression, security, and hazardous materials and waste handling.
Also, specific training on charging and starting systems, hands-on troubleshooting, correcting malfunctions of gas turbine compressors, diesel generators, motor generators, light carts, air cycle machines, air conditioners, hydraulic test stands, bomblifts, diesel engines, heaters, air compressors, electric motors, load banks, various subsystems, and non-powered AGE.

To further enhance the performance training, each student operates all configured equipment while performing operational checks, service inspections, troubleshooting, and correcting malfunctions. Additionally, the performance of refrigeration recovery and system evacuation procedures for capturing chlorofluorocarbons (CFC) on flightline air conditioners and Department of Defense (DoD) Environmental Protection Agency (EPA) refrigeration certification is accomplished. The Mission Ready Technician (MRT) program provides training to the 3c proficiency code level. Under the MRT program each student receives hands-on training on flightline operational equipment and are task certified to AETC standards using qualified and validated learning objectives. Each task is certified and signed off by a qualified instructor as outlined in AFI 36-2201, para 4.9.1.7. and 4.9.1.8. "EXCEPTION." This training includes service inspections, operational checks, and load tests on the A/M32A-86 and A/M32A-60 Generators. Service inspections and operational checks include the NF-2D Light Cart, MC-1A Air Compressor, A/M32C-5 (R-134) Air Conditioner, H-1 Heater, A/M27T-2 Hydraulic Test

Stand, and MJ-1B Bomblift. Additionally, task certification on wheel and tire maintenance is accomplished.

6.2. **Five Level Upgrade Requirements.** Decisions regarding upgrade training included realigning the five skill level core tasks. There were 8 equipment core tasks eliminated on non-essential equipment and 11 core tasks added to new, essential units. As a result there are 31 five level core tasks listed in the STS of which 20 are task certified in resident training.

6.3. **Seven Level Upgrade Requirements.** The 7-level AFSC awarding courses for active duty and ANG/AFRC were reviewed. The A/M32A-60 Gas Turbine Generator was added to the active duty course. Proficiency code levels were added to the STS for both courses to reflect training on electrical/electronic tasks and added resistive, capacitive and inductive (RCL) networking. Core tasks for 7-level training were deleted. All students attaining the desired proficiency level will be signed-off in their STS. Portions of management training were deleted and the time was converted to incorporate more hands-on troubleshooting into the course. The addition of scenarios as homework assignments includes logistics maintenance management and maintenance accountability. A new 7-level CDC volume will be developed to include information on Maintenance Supervision and Management. Implementation is scheduled for Nov/Dec 97. This CDC will be mandatory for all students prior to attending in-resident training.

6.4. **Proficiency Training.** Any additional knowledge and skill requirements that were not taught through initial skills or upgrade training were assigned to continuation training. The purpose of the proficiency training program is to provide additional training, exceeding minimum upgrade training requirements with emphasis on present and future duty positions. To provide additional training in this area, MAJCOMs should develop a continuation training program that ensures individuals in the AGE career field receive the necessary training at the appropriate point in their career.

7. **Community College of the Air Force.** Enrollment in CCAF occurs upon completion of basic military training. CCAF provides the opportunity to obtain an Associates in Applied Sciences Degree. In addition to the associates degree program, CCAF offers the following:

7.1. **Occupational Instructor Certification.** Upon completion of instructor qualification training (consisting of the instructor methods course and supervised practice teaching) CCAF instructors who possess an associates degree or higher may be nominated by their school commander/commandant for certification as an occupational instructor.

7.2. **Trade Skill Certification.** When a CCAF student separates or retires, a trade skill certification is awarded for the primary occupational specialty. CCAF uses a competency based assessment process for trade skill certification at one of four proficiency levels: Apprentice, Journeyman, Craftsman/Supervisor, or Master Craftsman/Manager. All are transcribed on the CCAF transcript.

7.3. **Degree Requirements.** Prior to completing an associates degree, the 5-level must be awarded and the following requirements must be met:

| | Semester Hours |
|---|---|
| Technical Education | 24 |
| Leadership, Management, and Military Studies | 6 |
| Physical Education | 4 |
| General Education | 15 |
| Program Elective<br>Technical Education; Leadership, Management, and Military Studies; or General Education | 15 |
| Total | 64 |

7.3.1. **Technical Education** (24 Semester Hours): A minimum of 12 semester hours of technical core subject courses must be applied and the remaining semester hours applied from technical core to technical elective courses.

7.3.2. **Leadership, Management, and Military Studies** (6 Semester Hours): Professional military education and/or civilian management courses.

7.3.3. **Physical Education** (4 Semester Hours): This requirement is satisfied by completion of Basic Military Training.

7.3.4. **General Education** (15 Semester Hours): Applicable courses must meet the criteria for application of courses to the General Education Requirements (GER) and be in agreement with the definitions of applicable general education subjects or courses as provided in the CCAF General Catalog.

7.3.5. **Program Elective** (15 Semester Hours): Satisfied with applicable technical education; leadership, management, and military studies; or general education subjects or courses, including courses meeting GER application criteria. Six semester hours of CCAF degree applicable technical credit otherwise not applicable to this program may be applied. See the CCAF General Catalog for details regarding the Associate in Applied Science for Aerospace Ground Equipment Technology.

7.4. Additional off-duty education is a personal choice that is encouraged for all. Individuals who desire to become an AETC instructor should actively pursue an associates degree. A degreed faculty is necessary to maintain accreditation through the Southern Association of Colleges and Schools.