# In the United States Court of Federal Claims

### No. 00-644C
### (Filed: August 13, 2010)*
### *OPINION ORIGINALLY FILED UNDER SEAL ON AUGUST 2, 2010

| | | |
|---|---|---|
| \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* | \* | |
| **WILLIAM A. CLARK, et al.,** | \* | **Cross-Motions for Summary** |
| | \* | **Judgment, RCFC 56; Military Pay for** |
| **Plaintiffs,** | \* | **National Guard Training, 37 U.S.C. §** |
| | \* | **206; Correspondence Courses of the** |
| **v.** | \* | **Uniformed Services; Air National** |
| | \* | **Guard; Army National Guard;** |
| **THE UNITED STATES,** | \* | **Equivalent Training; Air National** |
| | \* | **Guard Instruction 36-2001; National** |
| **Defendant.** | \* | **Guard Regulation (Army) 350-1** |
| | \* | |
| \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* | \* | |

*Robert Haymes Cox,* Washington, DC, for plaintiffs.

*Douglas K. Mickle,* U.S. Department of Justice, Washington, DC, with whom were *Tony West,* Assistant Attorney General, and *Jeanne E. Davidson,* Director, for defendant. *Captain Patrick Grant*, U.S. Army Litigation Division, *Lt. Colonel Brian Roou*, U.S. Air Force General Litigation Division, and *Maximino Gonzalez, Jr.*, National Guard Bureau Office of Chief Counsel, Arlington, VA, of counsel.

### OPINION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

**FIRESTONE**, *Judge*.

Pending before the court are the parties' cross-motions for summary judgment.[1]  At

issue are the claims of the plaintiffs, all former or current members of the Army National

Guard or the Air National Guard of their states of residence (collectively, "the National

---

[1]This is the fifth opinion in this case.  See Clark v. United States, 50 Fed. Cl. 727 (2001) ("Clark I"), rev'd and rem'd by Clark v. United States, 322 F.3d 1358 (Fed. Cir. 2003) ("Clark II"); Clark v. United States, 69 Fed. Cl. 443 (2006) ("Clark III"); Clark v. United States, 2007 WL 2142652 (Fed. Cl. 2007) ("Clark IV").

Guard"[2]).  In their motion, the plaintiffs argue that they are entitled to compensation under

37 U.S.C. § 206(a) (1994) ("Section 206(a)") for the time they spent completing

correspondence courses that they claim qualify as "equivalent training" within the

meaning of 37 U.S.C. § 206(a)(2) (1994) ("Section 206(a)(2)").  The version of Section

206(a) in effect at the time the original complaint was filed provided in relevant part:

> [u]nder regulations prescribed by the Secretary concerned, and to the extent
> provided for by appropriations, a member of the National Guard or a member
> of a reserve component of a uniformed service who is not entitled to basic pay
> . . . is entitled to compensation . . . (2) for the performance of such other
> equivalent training, instruction, duty, or appropriate duties, as the Secretary may
> prescribe . . . .

Section 206(a).

The plaintiffs contend that they have shown with undisputed facts that the

correspondence classes they took were "prescribed" by the "Secretaries concerned" for Air

National Guard and Army National Guard members seeking to remain or advance in the

---

[2]The plaintiffs are also members of the Army National Guard of the United States and the Air
National Guard of the United States.  Unless otherwise indicated, the term "National Guard" refers to the
state-level "Air National Guard" and "Army National Guard" organizations, not the federal-level "Army
National Guard of the United States" or "Air National Guard of the United States."  The Federal Circuit
has explained the distinction as follows:

> . . . National Guard members from every state and the District of Columbia[ ] are also
> required to enlist as members of the National Guard of the United States.  10 U.S.C. §
> 12107(b)(1) [(2003)] ("Under regulations to be prescribed by the Secretary of the Army, a
> person who enlists in the Army National Guard, or whose term of enlistment in the Army
> National Guard is extended, shall be concurrently enlisted, or his term of enlistment shall
> be concurrently extended, as the case may be, as a Reserve of the Army for service in the
> Army National Guard of the United States.").  The National Guard of the United States is
> a reserve component of the uniformed services that may, under the first Militia Clause of
> the Constitution, be called into federal service by Congress in order "to execute the Laws
> of the Union, suppress Insurrections and repel Invasions."  U.S. Const. art. I, § 8, cl. 15.

Clark IV, 322 F.3d at 1361.

National Guard.  They contend that they have also shown that the correspondence courses were "equivalent" to in-residence or other training courses for which payment is undisputably provided and are thus entitled to summary judgment.

The government argues that these plaintiffs are not entitled to federal reimbursement for the time spent completing their correspondence courses because under the regulations "prescribed" by the "Secretaries concerned," namely, the Secretary of the Air Force, the Secretary of the Army and the Chief of the National Guard Bureau (collectively, "the Service Secretaries") and the Secretary of Defense, members of the National Guard are entitled to compensation under Section 206(a)(2) only for training and instruction, including "equivalent training and instruction," which they have been directly "ordered" to take.  The government argues that the undisputed facts show that none of the plaintiffs in this case received "orders" from their state National Guard commanders to take the correspondence courses for which they seek compensation.  Therefore, the government argues, it is entitled to summary judgment.

The court finds that, as a matter of law, the plaintiffs are not entitled to federal compensation for the correspondence courses that they completed because the plaintiffs did not complete the correspondence courses pursuant to appropriate orders as required by the regulations prescribed under Section 206(a)(2).  Accordingly, the government's motion for summary judgment is **GRANTED** and the plaintiffs' cross-motion for summary judgment is **DENIED**.

**FACTS**

**I.      Litigation History**

This case has a long and protracted history.[3]  It was originally filed in 2000 as a

class action on behalf of "past and present National Guard members who [have] taken

correspondence courses as a condition of remaining or advancing in grade in the National

Guard, and who have taken those courses without payment of any compensation for the

time required to complete the courses."  (Original Compl. ¶ 8.)  William A. Clark ("Mr.

Clark") was the sole named plaintiff.  Mr. Clark's claim was based on Section 206(a),

which, as noted above, provided:

> Under regulations prescribed by the Secretary concerned, and to the extent
> provided for by appropriations, a member of the National Guard or a member
> of a reserve component of a uniformed service who is not entitled to basic pay
> . . . is entitled to compensation . . . (2) for the performance of such other
> equivalent training, instruction, duty, or appropriate duties, as the Secretary may
> prescribe . . . .

Section 206(a).  The government moved to dismiss the case on the grounds that subsection

(d) of the same statute provided that "[t]his section does not authorize compensation for

work or study performed by a member of a reserve component in connection with

correspondence courses of an armed force."  See 37 U.S.C. § 206(d) (1994) ("Section

206(d)").  The government argued that the case had to be dismissed for lack of jurisdiction

based on Section 206(d), or, in the alternative, for failure to state a claim upon which relief

---

[3]For purposes of judicial economy, the court will incorporate portions of its opinion in Clark IV,
2007 WL 2142652, without further citation.

could be granted.  On November 29, 2001, the trial court found that it had jurisdiction, but

granted the government's motion to dismiss Mr. Clark's complaint for failure to state a

claim upon which relief could be granted pursuant to Rule 12(b)(4) of the Rules of the

United States Court of Federal Claims ("RCFC").[4]  Clark I, 50 Fed. Cl. at 734.

Mr. Clark appealed the dismissal to the United States Court of Appeals for the

Federal Circuit, which reversed the decision to dismiss the case.  Clark II, 322 F.3d 1358.

The Circuit rejected the government's argument that Mr. Clark was at all times a member

of a "reserve component" and was thus barred from receiving compensation by Section

206(d)[5] and stated that "Mr. Clark has asserted a non-frivolous claim under [Section

206(a)] for compensation for mandatory correspondence courses that he took as a member

of the Alabama National Guard" and that Mr. Clark's claim was not barred by Section

206(d).  Id. at 1363.  The Circuit determined that while the Army National Guard of the

United States is a "reserve component," Mr. Clark's "functions in the state National Guard

---

[4]When Clark I was decided in 2001, RCFC 12(b)(4) governed motions to dismiss for failure to state a claim upon which relief could be granted.  Such motions are now governed by RCFC 12(b)(6).

[5]In its brief before the Federal Circuit, the government argued:
The plain language of title 37 establishes that [Section] 206(d) bars Mr. Clark from the receipt of the compensation he seeks.  Subsection 101 of title 37 provides that "[t]he term 'member' means a person appointed or enlisted in, or conscripted into, a uniformed service."  Subsection 101(24), in turn, provides that "[t]he term 'reserve component' means -- (A) the Army National Guard of the United States; . . . ."  As discussed above, it is undisputed that Mr. Clark is a member of the National Guard of the United States.  Thus, the definitions in title 37 establish that Mr. Clark is a member of the Army National Guard of the United States, which is a part of the National Guard of the United States and which is a reserve component.  From the above, it necessary follows that Mr. Clark was "a member of [a] reserve component," as that term is defined in title 37 and used in [Section] 206[(d)]."
(Brief for the Defendant, Clark II, 322 F.3d 1358 (No. 02-5062).)

and the federal National Guard of the United States are mutually exclusive." Id. at 1368. The Circuit stated that "members of the [N]ational [G]uard only serve the federal military when they are formally called into the military service of the United States.  At all other times, National Guard members serve solely as members of the State [national guard] . . . ." Id. at 1366 (citing Perpich v. Dep't of Def., 496 U.S. 334, 347 (1990)).  The Circuit found that to the extent Mr. Clark sought compensation for correspondence courses taken while in service exclusively to the state National Guard, his claim was not barred by Section 206(d).  Id. at 1368.  The Circuit remanded the case and stated that "[o]n remand, . . . Mr. Clark must establish which classes the Secretary of the Army required, if any, and which classes he took to satisfy those requirements" as well as "the amount of compensation he is due under [Section 206(a)]."  Id.  In this connection, the Circuit rejected the government's argument that the Secretary of the Army had the discretion to decide whether or not to pay Mr. Clark for any "equivalent training" that was "required" of him and that Mr. Clark's case failed because he did not allege that the Secretary of the Army had exercised his discretion to provide by regulation for payment of his correspondence courses.  More specifically, the government had argued that use of the term "may" in 37 U.S.C. § 206(b) (2000) ("Section 206(b)")[6] demonstrated that providing

---

[6]Section 206(b) provides:
(b) The regulations prescribed under subsection (a) for each uniformed service, the National Guard, and each of the classes of organization of the reserve components within each uniformed service, may be different.  The Secretary concerned shall, for the National Guard and each of the classes of organization within each uniformed service, prescribe--

   (1) minimum standards that must be met before an assembly for drill or other equivalent period of training, instruction, duty, or appropriate duties may be

pay for equivalent training was discretionary with the Secretary.  The Circuit rejected that

argument and held that the plaintiff must be paid for "equivalent training that the Secretary

[under Section 206(a)(2)] prescribes."[7]  Id.  The Circuit left for the trial court to determine

on remand which of Mr. Clark's courses had been prescribed as "equivalent training."  Id.

at 1368.

On remand, Mr. Clark amended his complaint to add other members of the Army

National Guard and the Air National Guard as plaintiffs.  The government then filed a

motion for summary judgment, asserting that the plaintiffs could not meet the

requirements for compensation established by Section 206(a) as a matter of law.  The

motion was denied.  Clark III, 69 Fed. Cl. at 444.  The government argued that Section

206(a) applies to unit training only.  However, the court determined that Section 206(a)

applies to both individual and unit training, citing 32 U.S.C. § 502(f) (1993), which

---

credited for pay purposes, and those standards may require the presence for duty of
officers and enlisted members in numbers equal to or more than a minimum number
or percentage of the unit strength for a specified period of time with participation
in a prescribed kind of training;
(2) the maximum number of assemblies or periods of other equivalent training,
instruction, duty, or appropriate duties, that may be counted for pay purposes in
each fiscal year or in lesser periods of time; and
(3) the minimum number of assemblies or periods of other equivalent training,
instruction, duty, or appropriate duties that must be completed in stated periods of
time before the members of units or organizations can qualify for pay.
Section 206(b) (emphasis added).  Section 206(b) has remained unchanged since 1991.

[7]The Circuit based this ruling on the plain language of Section 206(a).  The Circuit did not
reference any of the regulations prescribing equivalent training under Section 206(a) or any other
National Guard training regulations.  As discussed infra, the Circuit did not rule on what training would
be deemed "equivalent" or whether the regulations could establish prerequisites for payment of
equivalent training.

provides, "Under regulations to be prescribed by the Secretary of the Army or Secretary of

the Air Force . . . a member of the National Guard may . . . with his consent, either with or

without pay or allowances[,] be ordered to perform training or other duty in addition to

[unit training]."[8]  Id. at 446-47.  The court also held that "equivalent training" under

Section 206(a)(2) could include correspondence courses, finding that nothing in the

language of 37 U.S.C. § 206 (1994) ("Section 206") specifically precluded the Secretaries

from prescribing correspondence course training by regulation for a member of the

National Guard.  Id. at 448-49.  The court ultimately determined, however, that genuine

issues of material fact existed regarding whether, in fact, any of the correspondence

courses taken by the plaintiffs had been "prescribed" as equivalent training within the

meaning of Section 206(a)(2).

　　　After the trial court's ruling denying summary judgment, Congress amended

Section 206(d) on January 6, 2006 to add: "Except as provided in paragraph (2),[9] this

section does not authorize compensation for work or study performed by a member of a

---

[8]Although 32 U.S.C. § 502(f) was amended in 2006, the language of the earlier version quoted herein has remained the same.

[9]The exception under paragraph (2) is not relevant to the case at hand.  It provides:
　　A member of the Selected Reserve of the Ready Reserve may be paid compensation under this section at a rate and under terms determined by the Secretary of Defense, but not to exceed the rate otherwise applicable to the member under subsection (a), upon the member's successful completion of a course of instruction undertaken by the member using electronic-based distributed learning methodologies to accomplish training requirements related to unit readiness or mobilization, as directed for the member by the Secretary concerned.  The compensation may be paid regardless of whether the course of instruction was under the direct control of the Secretary concerned or included the presence of an instructor.
37 U.S.C. § 206(d)(2) (2006).

8

reserve component <u>or by a member of the National Guard while not in Federal service</u> in connection with correspondence courses of a uniformed service." National Defense Authorization Act for Fiscal Year 2006, Pub. L. No. 109-163, § 604, 119 Stat. 3136, 3287 (2006) (emphasis added).[10] This new language extended the prohibition on receiving pay for correspondence courses of a uniformed service to explicitly include National Guard members. On September 8, 2006, the parties jointly moved to stay discovery pending the enactment of the John Warner National Defense Authorization Act for Fiscal Year 2007 ("2007 NDAA"), Pub. L. No. 109-364, § 607, 120 Stat. 2083, 2247 (2006), which contained a provision designed to further amend Section 206. That Act, which was signed into law on October 17, 2006, added the following language to Section 206(d):

> The prohibition in paragraph (1), including the prohibition as it relates to a member of the National Guard while not in federal service, applies to – (A) any work or study performed on or after September 7, 1962, unless that work or study is specifically covered by the exception in paragraph (2); and (B) any claim based on that work or study arising after that date.

<u>Id.</u>

Following the enactment of the 2007 NDAA, the plaintiffs filed a second amended complaint on December 5, 2006. The plaintiffs' first cause of action, seeking compensation for correspondence courses taken pursuant to Section 206, was unchanged from the previous complaint, but the amended complaint contained a new, second cause of action alleging various constitutional claims. The plaintiffs contended that Congress could

---

[10]The case was transferred from the original trial court judge to this court on April 17, 2006.

not act to retroactively deprive them of a previously-valid cause of action.  Alternatively,

they claimed that, to the extent the 2007 NDAA could be constitutionally applied to

eliminate their claims for compensation, they should be compensated by the government

for a taking of their right to compensation under the Fifth Amendment.

The government next filed a motion to dismiss the first cause of action pursuant to

RCFC 12(b)(1) for lack of subject matter jurisdiction and to dismiss the complaint in its

entirety pursuant to RCFC 12(b)(6) for failure to state a claim upon which relief can be

granted.  Specifically, the government asserted that the amended version of Section 206

now barred the plaintiffs' claims.  The plaintiffs filed a cross-motion for summary

judgment contending that the 2007 NDAA was an impermissible attempt by Congress to

direct a judgment and therefore could not be applied.  In the alternative, the plaintiffs

argued that, should the court apply the amended version of Section 206 and bar their

claims for compensation, they would be entitled to compensation under the Fifth

Amendment for a taking of their right to compensation.  The plaintiffs argued that the

court had jurisdiction to hear their takings claim.

The court agreed with the plaintiffs that it had jurisdiction to consider their

constitutional claims.  Clark IV, 2007 WL 2142652, at *6-7.  The court determined that

before reaching these constitutional claims, however, it "should first determine whether

the plaintiffs were entitled to compensation for correspondence courses under the law in

effect at the time their claims were filed."  Id. at *7.  The court reasoned that

[i]f the plaintiffs were not entitled to compensation for correspondence courses [under the earlier version of Section 206], then a determination regarding the constitutionality of the 2007 NDAA amendment would not be necessary, as the plaintiffs would not be able to recover under [Section] 206 regardless of whether Congress impermissibly directed a judgment in favor of the government.

Id.

The plaintiffs filed a third amended complaint on August 21, 2007 for purposes of naming one of the plaintiffs, identified in the second amended complaint as "Jane Doe 1."[11] The parties then embarked on discovery regarding the correspondence courses taken by the plaintiffs, each plaintiff's status while taking the courses, the extent to which the courses they took were "prescribed" by the relevant "Secretaries concerned," and whether the courses provided "equivalent training" for the purposes of receiving payment under Section 206(a)(2).

## II.    Undisputed Facts Regarding Plaintiffs' Correspondence Courses

### A.    William A. Clark

Plaintiff, William A. Clark ("Mr. Clark"), dually enlisted as an E-4, Specialist, in the Alabama Army National Guard and the Army National Guard of the United States on April 28, 1987. He served as a saxophonist in the Army Band and was eventually promoted to leader of the saxophone section. He has since retired from both the Army National Guard and the Army National Guard of the United States.

---

[11]The Third Amended Complaint lists six named plaintiffs, four "John Does," and two "Jane Does." (3d Am. Compl. ¶ 42.)

11

As an exhibit to his declaration, Mr. Clark filed a copy of his enrollment history in

"The Army Distance Learning Program" ("TADLP").  These forms show that he enrolled

in five correspondence courses between 1994 and 2002.  (See App. to Pls.' Opp. 18-23

(Ex. A to Clark Decl.).)  The first course was Phase 2 of the Reserve Component Basic

Non-Commissioned Officer ("NCO") Course ("RC-BNCOC"), in which he enrolled on

August 11, 1994.  At the time, RC-BNCOC was a three-phase course, the second phase of

which was tailored to a Guard member's Military Occupational Specialty ("MOS") and

was offered only by correspondence.  (See App. to Pls.' Opp. 362-63 (McNamara Dec. ¶

16) ("McNamara Dec.").).)[12]  Mr. Clark had completed the first phase by this time and was

---

[12]During Mr. Clark's time in the National Guard, the RC-BNCOC for those in his MOS evolved
from a two-phase course to a three-phase course.  One of the government's two RCFC 30(b)(6)
witnesses, Command Sergeant Major (Retired) Thomas M. McNamara, Jr. ("Mr. McNamara") explained
this as follows:

> The BNCOC for years had two phases: Phase 1, the Common Core of basic military
> leadership subjects common to every NCO in the grade of Staff Sergeant . . . , and Phase 2,
> the Technical Phase particular to the MOS of the NCOs being trained.  A common problem
> for many [reserve component] units is the low number of soldiers in a particular grade and
> MOS in a State or Command.  The Trainer's Guide . . . states the minimum number of
> students it takes to conduct a class . . . .  [T]here must be enough NCOs to meet the class
> training objective.  In the case of the Army Bands, there are typically about forty to fifty
> musicians in the MOS 02-series in each State.  Of those, only a few might be promoted to
> [Staff Sergeant] each year and, thus, require BNCOC.  The easy solution would be to send
> all Musician NCOs to the School of Music . . . , but that is not feasible for many [reserve
> component] NCOs.
> . . . .
> The School of Music identified a workable solution for a difficult task: To train [reserve
> component], [Army National Guard of the United States] and [United States Army Reserve]
> Musicians in the critical tasks of the eight-week active duty Phase 2, it added to the RC[-
> ]BNCOC a self-paced correspondence Phase 2 as a bridge from the Common Core Phase
> 1 to what is now the two-week technical Phase 3.

(McNamara Decl. ¶¶ 15-16.)  Mr. McNamara is a forty-year veteran of the armed services.  From May
1987 to February 1990, and again from July 1994 to June 2000, Mr. McNamara served as the Senior
Staff NCO for Enlisted Personnel, Army Personnel and Policy Division in the Army National Guard
Directorate of the National Guard Bureau.  Mr. McNamara explained his experience and qualifications as

thus eligible for enrollment in Phase 2.  Mr. Clark's TALDP enrollment history shows that

this course consisted of six subcourses, "Scales and Key Signatures," "Intervals and

Triads," "Musical Terms," "Section Rehearsal Techniques," "Drum Majoring," and

"Traditional Harmony I."  (App. to Pls.' Opp. 22.)  Of these subcourses, Mr. Clark

completed only the first, "Scales and Key Signatures."  As a result, he did not successfully

complete Phase 2.  Mr. Clark made a second attempt to complete Phase 2 of RC-BNCOC,

enrolling on May 16, 1997.  Although he was exempted from the "Scales and Key

Signatures" subcourse, he completed only one additional subcourse, "Musical Terms."

Thus, he did not successfully complete Phase 2 at that time.

On November 7, 1997, Mr. Clark was promoted from E-5, Sergeant, to E-6, Staff

Sergeant, in both the Army National Guard of the United States and the Alabama Army

National Guard.  The promotion was conditioned upon his completion of Phase 2 of RC-

---

follows:

> In my forty years of military service, I have extensive experience with and knowledge of National Guard training requirements, the individual military education system, National Guard promotion and retention policies and procedures, and the Army Correspondence Course Program ("ACCP") from both a personal and management perspective.  In the twenty-four years from 1976 to 2000, I served two tours at the Army's Recruiting and Retention School as an Instructor and as a Training Development NCO (writing resident and correspondence course materials and supervising teams involved in those efforts); three tours at the National Guard Bureau as a Senior Staff NCO developing future plans for and providing input to The Army School System and NCO course curriculum; and a tour as the State Command Sergeant Major for the New Hampshire Army National Guard responsible for monitoring subordinate units' requirements for and use of all available means for completion of NCO professional development courses, as well as participating in Department of the Army groups and panels to shape the future of these courses and the basic program. . . . I wrote and helped develop[ ] the current [Army National Guard of the United States] enlisted promotion system, which uses the ACCP as one of the areas with which soldiers may broaden their knowledge and earn enlisted "promotion points."

Id. at ¶ 2.

13

BNCOC.  Mr. Clark enrolled in a different correspondence course, the Basic Enlisted

Professional Development Course on September 21, 1999, but he did not attempt the RC-

BNCOC again at this time.  On October 7, 1999, Mr. Clark was reduced in grade for

failure to complete Phase 2.  Subsequent to the filing of this lawsuit, Mr. Clark was

conditionally promoted back to Staff Sergeant in February 2002, pending completion of

RC-BNCOC.  Mr. Clark successfully completed RC-BNCOC Phase 2 by correspondence

on May 23, 2002.  He completed Phase 3 in residence on June 14, 2002.[13]

With regard to whether these correspondence courses were "prescribed" or

"required" by the Service Secretaries or by the state Army National Guard as equivalent

training, the following undisputed evidence was submitted.

In his declaration, Mr. Clark explained that he was not "required" to take

correspondence courses by his state commanders.  He stated:

> In the spring of 1994, then-commander, Chief Warrant Officer 4 Roy Rush
> Gavin, informed our entire unit that the Readiness/Training NCO would
> automatically enroll everyone in the unit in a required correspondence course,
> and that it would be our responsibility to complete these courses on our own
> time and not while performing unit drill.  We were told that the completion of
> the required courses would reflect positively on our evaluations, but were not
> told that the courses were requisites for promotion to specific ranks.

---

[13]Mr. Clark also enrolled in the Advanced Enlisted Professional Development Course, a
correspondence course, on October 24, 2000, a few days before the original complaint was filed.  He
completed only the "Nonharmonic Tones" subcourse and was exempted from several others, including
"Jazz Harmony II – Chord Progression," "Executing and Assessing Training" and "Role of the NCO in
Leadership" Parts I and II.  However, he failed to complete the other five subcourses and thus did not
successfully complete this course.  Mr. Clark also completed Phase 2 of the Reserve Component
Advanced Noncommissioned Officer Course by correspondence in 2006, subsequent to the filing of this
lawsuit.

(App. to Pls.' Opp. 8 (Clark Aff. ¶ 9) ("Clark Aff.") (emphasis added).)  During his deposition, Mr. Clark explained that his unit commander "said that we were all going to be enrolled in [correspondence courses] and that we were expected to complete them on our own time, . . . <u>but they did not say that they were required</u>.  They said that they would be helpful, that we could earn promotion points by doing them."  (App. to Def.'s Mot. Summ. J. 152-53 (Clark Dep. 45:19 to 46:4, Jan. 7, 2008) ("Clark Dep.") (emphasis added)).  Mr. Clark also testified that he completed the correspondence courses while in "civilian status" and while "still a member" of both the Army National Guard and "the Reserves."  (Clark Dep. 38:8 to 39:5.)  When asked at his deposition, "Were you subject to a written order [to take correspondence courses]?", Mr. Clark answered, "No."  (<u>Id.</u> at 39:21 to 40:4; <u>see also</u> <u>id.</u> at 40:10-11 (Mr. Clark testifies that "<u>there were no written orders.  I can't produce a document for you</u>." (emphasis added))).  Finally, Mr. Clark testified that in 1994, "I also asked if we could do those courses during [Inactive Duty Training], drill time, and they said no."  (<u>Id.</u> at 46:13-14.)

    <u>B.</u>    <u>James P. Davern</u>

    Plaintiff, James P. Davern ("Mr. Davern"), is a Master Sergeant in the Minnesota Air National Guard.  On November 21, 1981, he dually enlisted in the Minnesota Air National Guard and the Air National Guard of the United States in the rank of E-4, Senior Airman.  Since 1985, he has also been employed full-time as a civil technician with the National Guard.  During the period within this court's statute of limitations, Mr. Davern

successfully completed several correspondence subcourses of the NCO Leadership Course

and the Senior NCO Leadership Course.  Mr. Davern did not receive military pay for this

correspondence coursework.  Mr. Davern testified that he completed these subcourses at

home during his "spare time."  (App. to Def.'s Mot. Summ. J. 11 (Davern Dep. 38:16,

Dec. 21, 2007) ("Davern Dep.").)

With regard to whether the correspondence courses were "prescribed" or "required"

by the Service Secretaries or his state Air National Guard commander as equivalent

training, the following undisputed evidence was submitted.

At his deposition, Mr. Davern testified that he was not required or ordered to take

correspondence courses.  With regard to the Senior NCO Leadership Course, he

explained:

> [Mr. Davern:] . . . I got promoted in 2000, and my commander – as soon as I
> got promoted in 2000, she ordered [the course] for me the next month.  <u>She
> politely asked for me to do it.</u>
> [Mr. Mickle:[14]]  What do you mean politely asked you?
> [Mr. Davern:]  Well, she just – I really didn't want to.  <u>I wasn't planning on
> doing the Senior NCO [Leadership Course] because the chances of me making
> Senior were pretty slim.  In the position I'm at, my job, Master is pretty much
> as high as I can go, but she's a very nice person that likes to see people keep
> advancing, so she asked if I would do it, and I said I would.</u>
> [Mr. Mickle:]  <u>But you could have said you didn't want to do it?</u>
> [Mr. Davern:]  <u>Yes, I'm sure I could have</u>, but I wouldn't have done that.  I
> mean, to me, if I would have said that to her, it would have been like a slap in
> the face to her, and I respect her, so –
> [Mr. Mickle:]  Well, I'm assuming your unit is comprised of airmen like other
> units, and that is everybody wants to do their best to –
> [Mr. Davern:]  Oh, yes.

---

[14]Mr. Mickle is counsel for the government.

[Mr. Mickle:]  – to make it function better?
[Mr. Davern:]  Yes.  And everybody knows everybody.  Like I say, it's an
extended family, so –
[Mr. Mickle:]  If you decided not to do it, you would be disappointing like a
brother or a sister, right?
[Mr. Davern:]  Yes, exactly.

(Davern Dep. 44:5 to 45:13 (emphasis added).)

In his deposition, Mr. Davern testified that prior to seeing an article about this lawsuit in or around 2005, he had never claimed compensation for a correspondence course.  (Davern Dep. 16:21 to 17:12.)  When asked if he ever thought he was entitled to compensation before then, Mr. Davern testified, "I never really thought about it until I saw the article, but when it went around the base, it was kind of one of them [sic] things that we all thought that this would be a good thing as far as the Guard goes."  (Davern Dep. 17:15-19.)

C.     Robert E. Freeburg

Plaintiff, Robert E. Freeburg ("Mr. Freeburg"), is a retired Lieutenant Colonel in the Hawaii Air National Guard.  He dually enlisted in the Hawaii Army National Guard and the Army National Guard of the United States in April 1978 and transitioned to the Hawaii Air National Guard and the Air National Guard of the United States in 1991.  The parties agree that throughout the course of his National Guard career, Mr. Freeburg successfully completed several correspondence courses without military pay.  However, he identifies only one such course that he took within the statute of limitations, the Air Command and Staff College.  While Mr. Freeburg alleges that he took this as a

17

correspondence course, the government disagrees and claims that he completed this course "via a multimedia seminar program."  (Def.'s Resp. PPFUF ¶ 147.)[15]

At his deposition, Mr. Freeburg testified that he completed the correspondence courses on weekday evenings, out of uniform, and under no direct supervision.  (App. to Def.'s Mot. Summ. J. 221 (Freeburg Dep. 42:12 to 43:3, Jan. 9, 2008) ("Freeburg Dep.").)  In a declaration dated October 9, 2009, Mr. Freeburg stated,

> It has always been my understanding that I should have been compensated for the time I spent taking required correspondence courses.  <u>I also understand, however, that the policies of the Service Secretaries and the National Guard prevented me from being paid for this coursework.</u> . . . When I stated in my deposition that I had not contemplated seeking compensation for correspondence courses prior to this lawsuit, that was a reflection of the Service Secretaries['] and National Guard['s] policies, not what is right.[16]

(App. to Pls.' Opp. at 117 (Freeburg Decl. ¶ 15, Oct. 9, 2009) (emphasis added).)  Mr. Freeburg did not present any evidence to suggest that the correspondence courses he took

---

[15]In a declaration filed at an earlier stage of this case, Mr. Freeburg stated,
I first enrolled in Air Command and Staff College by correspondence in 1995, but could not complete the course due to competing demands on my time . . . . <u>In 1996, I enrolled in the seminar version of the course, which also is a type of correspondence course.</u>  Each seminar consists of twenty students who met weekly for one year.
(App. to Pls.' Opp. 124 (Freeburg Decl. ¶ 15, June 8, 2005) (emphasis added).)

[16]At his deposition, Mr. Freeburg testified as follows:
[Mr. Mickle:] How did you become involved in this lawsuit?
[Mr. Freeburg:] There was a notice in the National Guard magazine about this particular situation with an e-mail response, and I chose to go on the web, and I filled out a form that was available on the Howrey website.
. . . .
[Mr. Mickle:] <u>Prior to that, had you ever contemplated seeking compensation for completing correspondence courses?</u>
[Mr. Freeburg:]: <u>No.</u>
(Freeburg Dep. 32:19 to 33:10 (emphasis added).)

were "prescribed" or "required" by the Service Secretaries or his state commander as "equivalent training" under Section 206(a)(2).

D.    Carol Risser

Plaintiff, Carol Risser ("Ms. Risser"), is a Master Sergeant in the Pennsylvania Air National Guard.  In July 1984, Ms. Risser dually enlisted in the Pennsylvania Air National Guard and the Air National Guard of the United States in the rank of E-4, Senior Airman. Her Air Force Specialty was Aerospace Ground Equipment.  On May 14, 1999, Ms. Risser completed a Refrigerant Recovery Course by correspondence.  To qualify for promotion to Master Sergeant, E-7, Ms. Risser completed the NCO Leadership Course by correspondence.  Ms. Risser received no military pay for the time spent completing these courses.[17]

At her deposition, Ms. Risser testified that she completed these courses at home, unsupervised, in the evenings and on weekends.  She also stated that she was not on drill while completing the courses.  When asked by counsel for the government whether she ever had any written orders to take these classes, she responded, "Not that I'm aware of." (App. to Def.'s Mot. Summ. J. 259 (Risser Dep. 55:6, Jan. 16, 2008) (emphasis added).)

E.    Willie R. Johnson

Plaintiff, Willie R. Johnson ("Mr. Johnson"), is a retired Brigadier General in the

---

[17]Throughout her National Guard career, Ms. Risser successfully completed several Career Development Courses by correspondence.  However, these classes all fall outside of the six-year statute of limitations period.

North Carolina Army National Guard.  He joined both the North Carolina Army National Guard and the Army National Guard of the United States on June 1, 1963.  He also served as the commander of the 60th Troop Command of the North Carolina National Guard from 1998 until his retirement and, before that, as Deputy to the Adjutant General for the North Carolina National Guard.  Throughout his National Guard career, Mr. Johnson successfully completed several correspondence courses enabling him to advance both in state Army National Guard and the Army National Guard of the United States without military pay.  While many of these classes were taken outside of this court's six-year statute of limitations, Mr. Johnson completed the Army War College course within this period.  As part of the Army War College course, Mr. Johnson completed two in-residence phases and ten correspondence phases.  Mr. Johnson completed the course in 1997.  Mr. Johnson testified that he completed the correspondence phases "at home," (App. to Def.'s Mot. Summ. J. 60 (Johnson Dep. 65:11, Jan. 4, 2008) ("Johnson Dep.")), and that he had no expectation of payment, (Johnson Dep. 22:21 to 23:1).  Mr. Johnson did not present any evidence to suggest that he had received "orders" requiring him to take the correspondence courses as a form of "equivalent training."[18]

---

[18]The court notes that a sixth named plaintiff, Robert A. Mustin ("Mr. Mustin"), was identified at earlier stages of this litigation and is still included in the captions of the parties' filings.  However, neither the plaintiffs nor the defendant made any reference to Mr. Mustin in their Proposed Findings of Uncontroverted Fact or in the pending cross-motions for summary judgment.  Further, the plaintiffs' cross-motion for summary judgment references only "[t]he five named plaintiffs in this case – William Clark, James Davern, Robert Freeburg, Willie Johnson, and Carol Risser" and does not discuss Mr. Mustin.  (Pls.' Cross-Mot. Summ. J. 5.)

## STANDARD OF REVIEW

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  RCFC 56(c)(1); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Casitas Mun. Water Dist. v. United States, 543 F.3d 1276, 1283 (Fed. Cir. 2008); Telemac Cellular Corp. v. Topp Telecom, Inc., 247 F.3d 1316, 1323 (Fed. Cir. 2001) (citation omitted).  In considering a motion for summary judgment, the court's role is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Liberty Lobby, 477 U.S. at 249.  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. at 255; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986); Lathan Co., Inc. v. United States, 20 Cl. Ct. 122, 125 (1990); Casitas Mun. Water Dist., 543 F.3d at 1283.  Cross-motions for summary judgment do not constitute admissions that no genuine issues of material fact remain.  See Massey v. Del Labs., Inc., 118 F.3d 1568, 1573 (Fed. Cir. 1997).  "Each party carries the burden on its own motion to show entitlement to judgment as a matter of law after demonstrating the absence of any genuine disputes over material facts." Id.

## DISCUSSION

**I.      The Law of the Case Doctrine Does Not Bar the Government's Reliance on the Specific Regulations Implementing Section 206(a).**

As an initial matter and before discussing the specific regulations prescribing training under Section 206(a), the court turns to the plaintiffs' claim that the government's arguments based on regulations that establish prerequisites for payment under Section 206(a) are barred from consideration by the court under the law of the case doctrine. According to the plaintiffs, the Federal Circuit has determined that the plaintiffs are due compensation for the correspondence courses they were "required" to take as equivalent training in their "state status" by the Service Secretaries without regard to any regulations prescribing payment.  According to the plaintiffs, this court has been left on remand with determining only whether the plaintiffs' correspondence courses were "required" by the Service Secretaries in order for plaintiffs to remain or advance in the National Guard. (Pls.' Cross-Mot. Summ. J. 42-46.)  The plaintiffs assert that "the only real issue remaining is what courses the Secretaries have prescribed pursuant to [S]ection 206" and that any arguments relating to pay status or other prerequisites for pay eligibility set by regulations under Section 206 are barred by the law of the case doctrine.  (Pl.'s Supp. Br. 3.  See also Pls.' Supp. Reply Br. 3 ("[T]he regulations cited by the government have no relevance to the only two questions that have remained in this litigation since the Federal Circuit's 2003 decision: what courses, if any, the [S]ervice Secretaries prescribed, and whether plaintiffs completed those courses.").)  In particular, the plaintiffs argue that the Federal Circuit has determined that regulations prescribing payment are not required under Section 206(a)(2), based on the following statement by the Federal Circuit in Clark II:

22

"Section 206(a)(2) requires payment for equivalent training that the Secretary prescribes. It does not require that the Secretary prescribe payment." Clark II, 322 F.3d at 1368.   In this section of the opinion, the Federal Circuit rejected the government's argument that Clark had failed, in his complaint, to allege that the Secretary of the Army had specifically prescribed payment for correspondence courses.   The Federal Circuit rejected the government's reading of Section 206 and held that the Service Secretaries are not required by statute to "prescribe" payment for correspondence courses.

The government argues that the law of the case doctrine does not bar its arguments regarding the application of the regulations implementing Section 206, including the provisions that establish prerequisites for payment.   Section 206 is, after all, a payment provision, as the government asserts.[19]   In addition, the government argues, the Federal Circuit did not address any of the regulations implementing Section 206 in its opinion and that none of the applicable regulations "prescribing" compliance with Section 206 were before the Circuit.   Thus, the government concludes, to the extent that the regulations implementing Section 206 require that a National Guard member obtain written orders or be placed in a pay status to receive federal payment for his or her training, those regulations must be followed in order to receive payment.

The court finds that the government's arguments regarding the applicability of the regulations, including prerequisites for pay set by those regulations, are not barred by the

---

[19]Title 37 of the U.S. Code, which contains Section 206, is entitled "Pay and Allowances of the Uniformed Services."

law of the case doctrine.

The Federal Circuit has explained the law of the case doctrine as follows:

> The doctrine of law of the case generally bars retrial of issues that were previously resolved.  See, e.g., Messenger v. Anderson, 225 U.S. 436, 444, (1912) (law of the case doctrine "expresses the practice of courts generally to refuse to reopen what has been decided"); DeLong Equip[.] Co. v. Wash[.] Mills Electro Minerals Corp., 990 F.2d 1186, 1196 (11th Cir. 1993) ("the general rule is that 'an appellate court's decision of issues must be followed in all subsequent trial or intermediate appellate proceedings in the same case' except when there are 'the most cogent of reasons'"); . . . United States v. White, 846 F.2d 678, 684 (11th Cir. 1988) (the doctrine of law of the case encompasses not only matters decided explicitly in earlier proceedings, but also matters decided by necessary implication); Terrell v. Household Goods Carriers' Bureau, 494 F.2d 16, 19-20 (5th Cir. 1974) (district court on remand should generally follow the appellate court's decision).

Intergraph Corp. v. Intel Corp., 253 F.3d 695, 697-98 (Fed. Cir. 2001).  In Intergraph Corp., the Federal Circuit also stated that "[r]easons that may warrant departure from the law of the case . . . include the discovery of new and different material evidence that was not presented in the prior action, or an intervening change in legal authority, or when the prior decision is clearly incorrect and its preservation would work a manifest injustice." Id. at 698.

In Clark II, the Federal Circuit stated that the court on remand will have the following responsibility:

> On remand, of course, Mr. Clark must establish which classes the Secretary of the Army required, if any, and which classes he took to satisfy those requirements.  Moreover, he must establish the amount of compensation he is due under the statute.

Clark II, 322 F.3d at 1368.  Thus, this court interprets its responsibility on remand to

24

include determining whether the plaintiffs also satisfied the requirements for compensation under the regulations prescribed pursuant to Section 206(a).

The plaintiffs' contention that the Federal Circuit has already determined that plaintiffs have met the prerequisites for payment so long as the courses they took were "required" reads too much into the Federal Circuit's holding regarding Section 206(a)(2). The Federal Circuit read Section 206(a)(2) to mean that the Service Secretaries are not required by law to specifically prescribe payment of correspondence courses by regulation. However, the Federal Circuit did not state that the Service Secretaries were precluded by Section 206 from establishing prerequisites for payment of training courses generally. Indeed, as noted above, the court is mindful of the fact that Section 206 is a "payment" statute.  Title 37, which has been in place since 1962, is entitled "Pay and Allowances of the Uniformed Services."  The enacting legislation for Title 37 stated "[t]hat the law relating to pay and allowances of the uniformed services of the United States are revised, codified, and enacted as title 37 of the United States code, entitled 'Pay and Allowances of the Uniformed Services.'"[20]  Act of September 7, 1962, Pub. L. No. 87-649, § 1, 76 Stat. 451, 451 (1962).  In this connection, Section 206(a)(2) must be read together with the antecedent language of 206(a), which states: "<u>Under regulations prescribed by the</u>

---

[20]Title 37 cross-references Title 10, which governs the "Armed Forces," and Title 32, which governs the "National Guard."

Secretary concerned,[21] and to the extent provided for by appropriations, a member of the

National Guard . . . is entitled to compensation . . . (2) for the performance of such other

equivalent training, instruction, duty, or appropriate duties, as the Secretary may

prescribe."  Section 206(a) (emphasis added).  Under the statute, the "Secretary

---

[21]37 U.S.C. § 101(5) (1993) explains that for purposes of title 37, "The term 'Secretary
concerned' means – (A) the Secretary of the Army, with respect to matters concerning the Army; . . .
[and] (C) the Secretary of the Air Force, with respect to matters concerning the Air Force . . . ."
Subsequent amendments have not altered this definition.  However, some authority to prescribe
regulations for the national guard has also been delegated to the Chief of the National Guard Bureau.  10
U.S.C. § 10503 (1994) provides, in pertinent part:

> The Secretary of the Army and the Secretary of the Air Force shall jointly develop and
> prescribe a charter for the National Guard Bureau.  The charter shall cover the following
> matters:
>  . . . .
> (2) Prescribing the training discipline and training requirements for the Army National
> Guard and the Air National Guard and the allocation of Federal funds for the training of the
> Army National Guard and the Air National Guard.
> (3) Ensuring that units and members of the Army National Guard and the Air National
> Guard are trained by the States in accordance with approved programs and policies of, and
> guidance from, the Chief [of the National Guard Bureau], the Secretary of the Army, and
> the Secretary of the Air Force.
>  . . . .
> (5) Planning and administering the budget for the Army National Guard of the United States
> and the Air National Guard of the United States.
>  . . . .
> (9) Supervising and administering the Active Guard and Reserve program as it pertains to
> the National Guard.
> (10) Issuing directives, regulations, and publications consistent with approved policies of
> the Army and Air Force, as appropriate.

10 U.S.C. § 10503 (emphasis added) (an amendment in 2008 resulted in the renumbering of subsections
5, 9, and 10 but did not affect the quoted language).  Note, however, that 32 U.S.C. § 501 (1988) states,
in pertinent part, "(a) The discipline, including training, of the Army National Guard shall conform to
that of the Army.  The discipline, including training, of the Air National Guard shall conform to that of
the Air Force."  Thus, while Congress has granted the Chief of the National Guard Bureau authority to
promulgate regulations regarding training of the National Guard, training regulations governing the state
National Guard organizations must conform with those of the Army or Air Force.  When read together,
therefore, these statutes make clear that the Chief of the National Guard Bureau, the Secretary of the
Army, and the Secretary of the Air Force may all promulgate regulations that prescribe training to be
administered by the state National Guard organizations (that is, training completed in "state status").  As
indicated above, these three secretaries are referred to collectively in this opinion as the "the Service
Secretaries."

concerned" is authorized to prescribe rules establishing prerequisites for compensation in addition to regulations which specify what "equivalent training, instruction, duty or; appropriate duties," qualify for payment under Section 206(a)(2). <u>Id.</u> Thus, to the extent the Service Secretaries have established rules regarding the prerequisites for obtaining payment for equivalent training or instruction, this court must apply those requirements in deciding this case. At this stage of the proceedings, the plaintiffs must show that they are entitled to compensation under the applicable Section 206 regulations. The Federal Circuit has not opined on those regulations and the plaintiffs, having failed to challenge those regulations, are bound by them.[22]

## II.    The Plaintiffs Are Not Entitled to Compensation under the Regulations Implementing Section 206(a) That Were in Effect at the Time They Completed the Correspondence Courses.

### A.    The Positions of the Parties Regarding the Applicable Regulations under Section 206

One of the most vexing problems the court has faced in deciding whether plaintiffs are entitled to compensation under Section 206 has been identifying the rules that implement Section 206. Since the case was remanded, the parties have identified over eighty different regulations and multiple versions thereof that touch upon National Guard training. These include rules and guidance issued by the Department of Defense, the Secretary of the Army, the Secretary of the Air Force, and the National Guard Bureau. To

---

[22]Although the plaintiffs are not contesting the validity of these regulations, the court notes that great deference is owed to regulations issued pursuant to an express delegation of authority by Congress, as exists here. <u>See</u> <u>Favreau v. United States</u>, 317 F.3d 1346, 1358 (Fed. Cir. 2002).

better understand which regulations were "prescribed" under Section 206 and how they apply to the instant case, the court ordered supplemental briefing in which the parties were instructed to identify and address the regulations they believe to be controlling.  Both the government and the plaintiffs agree that the training regulations issued by the National Guard Bureau are a starting point for the court's inquiry as to what training the plaintiffs were "required" to complete as "equivalent training" under Section 206.  The parties do not agree, however, on which regulations are controlling or which were "prescribed" under Section 206 of Title 37.[23]

The plaintiffs argue that the key rules for the Army National Guard are National Guard Regulation ("NGR") 351-1, Individual Military Education and Training (Oct. 15, 1987); NGR (AR)[24] 600-100, Commissioned Officers – Federal Recognition and Related Personnel Activities (Apr. 15, 1994); NGR (AR) 600-101, Warrant Officers – Federal Recognition and Related Personnel Actions (Oct. 9, 1987 and Oct. 1, 1996); NGR (AR) 600-200, Enlisted Personnel Management (Mar. 1, 1997 and July 1, 1989); and Department of Army Pamphlet 350-59, Army Correspondence Course Program Catalog

---

[23]"Prescribe" appears two times in Section 206(a), both of which are relevant to the instant case. The first usage subjects pay to the "regulations prescribed by the Secretary concerned" and relates to all of Section 206(a).  In the second instance, in Section 206(a)(2), the statute designates "equivalent training . . . as the Secretary may prescribe" as one of the categories of training for which the Secretary concerned may prescribe such regulations.

[24]"AR" is short for "Army Regulation."  Regulations that begin with "NGR (AR)" apply to the Army National Guard.

(Oct. 1, 2002).[25]  (Pls.' Supp. Br. 2-3.)  With respect to the Air National Guard, the

plaintiffs assert that the key rules are Air Force Policy Directive 36-23, Military Education

(Sept. 27, 1993); Air Force Instruction ("AFI") 36-2618, The Enlisted Force Structure

(Apr. 1, 1999); Air Force Regulation ("AFR") 53-39, Noncommissioned Officer

Professional Military Education (Mar. 17, 1990); AFI 36-2301, Professional Military

Education (July 22, 1994 and June 1, 2000); USAF Extension Course Institute Catalog and

Price Listing, Air University (May 1, 1994); Air National Guard Instruction ("ANGI") 36-

2502, Promotion of Airmen (Oct. 15, 1993 and Aug. 25, 2000); and ANGI 36-2504,

Federal Recognition of Promotion in the Air National Guard (ANG) and as a Reserve of

the Air Force Below the Grade of General Officer (July 28, 2004),[26] and NGR (AF)[27] 36-3,

Federal Recognition Boards for Appointment or Promotion in the Air National Guard

below General Officer (May 28, 1993).  (Id. at 3.)  In their supplemental reply brief, the

plaintiffs offer a pared-down list, stating that "at a minimum: NGR [(AR)] 600-100, NGR

[(AR)] 600-101, NGR [(AR)] 600-200, ANGI 36-2504, NGR (AF) 36-3, AFI 36-2301,

and AFR 53-39" are controlling.  (Pls.' Supp. Reply Br. 2.)  The plaintiffs argue that these

---

[25]The court notes that this version was not in effect at the time the plaintiffs completed the correspondence courses for which they seek payment.  Given the plaintiffs' caveat that "[i]n some cases, plaintiffs do not have a complete historical set of a regulation dating back to when plaintiffs took their courses," (Pls.' Supp. Br. 3 n.3), the court assumes that the plaintiffs were unable to obtain the earlier version or versions of this publication.

[26]The court notes that this regulation was not enacted until July 28, 2004 and that it superceded NGR (AF) 36-4 (Feb. 1, 1992).

[27]AF is short for "Air Force."

regulations specify the training that a member of the National Guard must take in order to remain or advance in the National Guard.  The plaintiffs further argue that none of these regulations require that a member of the National Guard be "ordered" to take a class or be placed into a specific "pay status" in order to receive compensation under Section 206(a). The plaintiffs argue that the payment requirement in Section 206(a) is self-implementing. As long as the correspondence course was taken in "state status" to remain or advance in the National Guard, they argue, the plaintiffs must be paid.

The government argues that Section 206(a) is not self-implementing and that there are two primary National Guard Bureau regulations that control whether a member of the Army or Air National Guard may be paid for "equivalent training": NGR (AR) 350-1, Training: Army National Guard Training (Jun. 3, 1991), and ANGI 36-2001, Management of Training and Operational Support Within the Air National Guard (Jan. 15 1997).[28]  The government further argues that these National Guard Bureau regulations also implement directives from the Department of Defense issued pursuant to Section 502 of Title 32,[29] which is the Title governing all matters involving the "National Guard."  More specifically, the government contends that Congress has mandated that any training

---

[28]ANGI 36-2001 superceded NGR (AF) 50-1, Management of Active and Inactive Duty for Training and Operational Support within the Air National Guard (Apr. 15, 1993), which was promulgated by the Air Force and applied to "all Air National Guard organizations and individuals not in the active Federal Service."  NGR (AF) 50-1 at 1.  NGR (AF) 50-1 was the regulation in effect when Mr. Freeburg completed courses in 1995 and 1996 for which he seeks payment.  Because the provisions of NGR (AF) 50-1 that apply to this case do not meaningfully differ from those in ANGI 36-2001, anything contained herein regarding ANGI 36-2001 shall also apply to NGR (AF) 50-1 unless otherwise indicated.

[29]32 U.S.C. § 502 (2006) is entitled "Required drills and field exercises."

prescribed by the Secretary of the Army or Secretary of the Air Force is "[s]ubject to the authority, direction, and control of the Secretary of Defense" under 10 U.S.C. § 3013(b) (1986)[30] and 10 U.S.C. § 8013(b) (1986).[31]   According to the government, under the applicable DOD guidance documents, as well as NGR (AR) 350-1 (governing Army National Guard Training) and ANGI 36-2001 (governing Air National Guard Training), a member of the National Guard in "state status" is entitled to pay under Section 206 only if the member has received written orders placing him or her into inactive-duty training status, active duty status, or full-time National Guard duty in advance of the prescribed training.[32]

   B.    ANGI 36-2001 and NGR(AR) 350-1 Implement Section 206.

   The court agrees with the government that Section 206 is not self-implementing and

---

[30]10 U.S.C. § 3013(b) states:
   Subject to the authority, direction, and control of the Secretary of Defense and subject to the provisions of chapter 6 of this title, the Secretary of the Army is responsible for, and has the authority necessary to conduct, all affairs of the Department of the Army, including the following functions . . . (5) Training.
10 U.S.C. § 3013(b) (emphasis added).  A subsequent amendment, in 2003, did not affect this provision.

[31]10 U.S.C. § 8013(b) states:
   Subject to the authority, direction, and control of the Secretary of Defense and subject to the provisions of chapter 6 of this title, the Secretary of the Air Force is responsible for, and has the authority necessary to conduct, all affairs of the Department of the Air Force, including the following functions: . . . (5) Training.
10 U.S.C. § 8013(b) (emphasis added).  As with 10 U.S.C. § 3013(b), a subsequent amendment, in 2003, did not affect this provision.

[32]The court notes that requiring a National Guard member to be placed in a specific pay status does not mean that he or she is no longer training in "state status."  Rather, as explained above, the state unit commander has the authority under the applicable regulations to order training, including equivalent training, and to place the Guard member into a pay status so that they can receive federal pay under Title 37.  In other words, being in a federal "pay status" does not mean that a member of the National Guard is no longer in "state status" when in training for National Guard only purposes.

that under the regulation implementing Title 37, ANGI 36-2001and NGR(AR) 350-1 are

the regulations "prescribed" under Section 206(a) of Title 37.  As discussed below, under

these "prescribed" regulations, the plaintiffs in the Air National Guard and the Army

National Guard, respectively, needed written orders directing them to complete training in

order to receive payment in this action.

1. ANGI 36-2001

By its terms, ANGI 36-2001 (Jan. 15, 1997) states that it "implements the

provisions to Titles 10, 32 <u>and 37</u>[33] of the United States Code and current [Department of

Defense] directives" and for all relevant time periods applied to "all Air National Guard

organizations and individuals <u>not</u> in the active Federal service."  ANGI 36-2001 at 1

(emphasis added).[34]

From the outset, the regulations make clear that in order to be compensated for

training under Title 37 (including Section 206), a member of the National Guard must

receive express, written "orders."  Under paragraph 1.4 of this regulation, entitled

"Mission," Air National Guard training is defined as follows: "1.4.1. Federal or State.  To

provide units organized, equipped, and trained to function efficiently in the protection of

life and property and the preservation of peace, order, and public safety <u>under competent</u>

---

[33]As stated above, Title 10 of the United States Code is entitled "Armed Forces," Title 10 is
entitled "National Guard" and Title 37 is entitled "Pay and Allowances of the Uniformed Services."   As
discussed <u>infra</u>, none of the regulations identified by the plaintiffs implement Title 37.

[34]Identical language is found in NGR (AF) 50-1.  <u>See</u> NGR (AF) 50-1 at 1.

orders of Federal or State authorities."[35]   Id. at ¶ 1.4.1 (emphasis added).  The regulation

provides that training is also authorized "[t]o fully qualify members in the authorized

grade and position to which they are assigned" and "[t]o establish a continuing training

program designed to provide the necessary knowledge for an individual to compete for

advancement to the next higher grade level."  ANGI 36-2001, ¶¶ 1.6.1, 1.6.1.1.

The regulation further provides that Air National Guard training is under the control

of the state commanders and that to obtain federal payment for state-status training,

"written authorization" is required.  See id. at ¶ 1.10 (described in detail infra).  Paragraph

1.8 of this regulation, entitled "Conduct of Training," states:

> Under the Constitution and federal law[,] training of the [Air National Guard]
> is conducted under the command of State authorities.  Such training will be
> conducted as prescribed by the respective [Air National Guard] commanders
> in accordance with [Air National Guard] directives; applicable Air Force
> gaining command training policies, standards, and programs; and as directed
> by the State adjutants general.  State headquarters detachments will conduct
> skill level training in accordance with training programs established by the State
> adjutants general.[36]

Id. at ¶ 1.8 (emphasis added).

Paragraph 1.10, entitled "Training Authorization," states:

> Authorization of pay, entitlement to retirement points, and any claim or benefit
> that may arise as a result of military service requires documentary evidence that

---

[35]This mission is distinct from the purely federal mission, which is defined in the immediately
following subsection as "[t]o develop, maintain, and provide the Air Force with operationally ready units
to augment the Active Air Force upon mobilization, and support [Department of Defense] peacetime
operations."  ANGI 36-2001, ¶ 1.4.2.

[36]The state adjutant general is a state's senior military officer.

the member was in a duty status as authorized by Federal law or regulation. Unit commanders will issue written authorization governing training, in a pay or non-pay status, in advance of such training. . . .

1.10.1. Written authorization may contain the schedule of training for the entire organization, subordinate elements, or individual members.   AF Form 40, Authorization for Inactive Duty for Training; NGB Form 105m/s, Authorization for Individual Inactive Duty for Training; NGB Form 633, Attendance Roster; or authorized substitute, may be used to satisfy this requirement, where feasible.

Id. at ¶¶ 1.10, 1.10.1 (emphasis added).   Additionally, Table 6-1 of ANGI 36-2001

explains that the unit commander is the official with approval authority for equivalent

training with or without pay.

Thus, under ANGI 36-2001, in order for the Air National Guard plaintiffs to

receive payment for the correspondence courses they claim they took as "equivalent

training"[37] under Section 206, they have to demonstrate that they received "written

---

[37]The court notes that ANGI 36-2001 "prescribes" the following with regard to "equivalent training":

6.2.  Definitions:

. . . .

6.2.4.  Equivalent Training (EQT).  A 4-hour supervised training period designed to allow an individual member to make up an excused absence (for pay) or unexcused absence (for retirement points only)) from a [Unit Training Assembly ("UTA")], [Split Unit Training Assembly], or [Rescheduled Unit Training Assembly].  (See paragraph 6.6.)

. . . .

6.6.  Equivalent Training (EQT).  A member [of the Air National Guard] may be allowed to make up a UTA that was missed even if the UTA was missed without prior approval. EQTs can be performed in a pay status for excused absences and in a non[-]pay status (retirement points only) for unexcused absences.

6.6.1.  Commanders may allow individuals to make up a maximum of four missed UTA periods in a paid EQT status per fiscal year [U.S.C. Title 37, Section 206(e)].  An EQT in a pay status must be performed within 30 calendar days of the missed scheduled UTA period and within the same fiscal year.

6.6.2.  An EQT period without pay (for retirement points only) may be performed outside of 30 calendar days of the missed scheduled UTA period but within the member's anniversary year. . . .

6.6.3.  The training received during an EQT must be of similar nature and quality to that

authorization" from their unit commander for such individual training and were placed in a

"duty status" authorizing payment under federal law.[38]

### 2.    NGR (AR) 350-1

For the Army National Guard, the principal regulation implementing Title 37 in

effect at the time the plaintiffs completed the subject correspondence courses was NGR

(AR) 350-1, entitled "Training: Army National Guard Training."[39]  This regulation, the

―――――――――――――

> which was missed.  EQT will be appropriate to and enhance ability of the individual to
> accomplish the duties of the position to which he or she is assigned. . . .
> 6.6.4.  Paragraphs 6.3.2., 6.3.4., 6.3.5., and 6.3.6. also apply to EQTs.

ANGI 36-2001 (emphasis added) (brackets under subparagraph 6.6.1. in original).  The three paragraphs cited in Paragraph 6.6.4. above are contained in ANGI 36-2001, ¶ 6.3., "Unit Training Assemblies." Generally, these paragraphs permit members to perform UTAs with other units under certain circumstances and with the approval of the state adjutants general.  See, e.g., ANGI 36-2001, ¶ 6.3.4.2 ("A[n Air National Guard] member may train with other reserve components subject to the concurrence of the State adjutants general and the approving authority of the reserve component.").

> 37 U.S.C. § 206(e), cited in paragraph 6.6.1. of ANGI 36-2001, states as follows:
> A member of the National Guard or of a reserve component of the uniformed services may
> not be paid under this section for more than four periods of equivalent training, instruction,
> duty, or appropriate duties performed during a fiscal year instead of the member's regular
> period of instruction or regular period of appropriate duty during that fiscal year.
> (Emphasis added.)

This provision of Section 206 was added in 1984 and has not been affected by subsequent statutory amendments.  Although the prior trial judge determined that this provision did not bar compensation for correspondence courses, Clark III, 69 Fed. Cl. at 448, the regulations "prescribed" by the Secretaries concerned under this provision clarify that "equivalent training" is a term of art and does not exempt a National Guard member from needing orders or written authorization prior to commencing training, regardless of whether that training is completed in a pay or non-pay status.

[38]The government also presents the court with Air National Guard Instruction 65-101 (Apr. 15, 1994) ("ANGI 65-101"), entitled "Air National Guard (ANG) Workday Accounting and Reporting Procedures."  This regulation governs payment for, inter alia, certain types of training.  However, ANGI 65-101 focuses on the nuts and bolts of what forms are required to authorize payment for training.  The need for orders is established in the first instance in ANGI 36-2001.

[39]This regulation was not superceded until August 4, 2009 and was thus in effect when all of the Army National Guard plaintiffs took the correspondence courses that fall within this court's six-year statute of limitations.

Army National Guard companion to the Air National Guard's ANGI 36-2001, was promulgated by the National Guard Bureau and applied "to the 54 States, Territories, and the District of Columbia who execute policies and procedures for training units of the Army National Guard . . . not in active military service.  It [did] not apply to the Active Army or U.S. Army Reserve."  Id. at 1 (emphasis added).[40]  Thus, this was the regulation governing training for Army National Guard members in their state status.  Id. at ¶ 1-1.

In his declaration, Mr. McNamara provided the following explanation of NGR (AR) 350-1, which the plaintiffs did not refute:

> [Army National Guard ("ARNG")] training is conducted pursuant to Title 32 of the U.S. Code, and is governed by [NGR (AR)] 350-1, Training: Army National Guard Training.  Although this training is performed while in a state status, it is federal training performed for the purpose of maintaining current

---

[40]NGR (AR) 350-1 does not expressly reference Tile 37.  However, as Mr. McNamara's undisputed testimony states,  NGR (AR) 350-1 provides for federal payment of the training authorized by Section 206.  NGR (AR) 350-1 also identifies the "equivalent training" prescribed by Section 206(a)(2).  (See McNamara Decl. ¶ 6.)

> In his declaration, Mr. McNamara explained equivalent training as follows:
> "Equivalent training" is allowed only in the following situation: "When an individual misses the regularly scheduled period of instruction or duty due to unforeseen emergency situations of a personal nature, the training may be made up with pay according to the following guidelines [sic]. . . ." as stated in NGR [(AR)] 350-1[,] para[.] 2-1d(7) (based on 37 U[.]S[.]C[.] [§] 206(e)).  Each soldier is limited to four equivalent training assemblies per fiscal year.  In addition, the soldier must be in uniform, and the training must be of a "similar nature" to the missed training.  In other words, like all [inactive duty training], this is a formal, supervised period of training.  In my forty years of service, I have never known equivalent training to be anything other than training performed in lieu of regularly scheduled training assemblies in accordance with the criteria set forth in NGR [(AR)] 350-1.  To perform [equivalent training], in addition to the training schedule, the soldier's commander must specifically authorize the [equivalent training] in writing, and certify the successful performance of the training.

(Id. (emphasis added).)  Mr. McNamara also explained that "[c]orrespondence courses cannot qualify as a regularly scheduled Unit Training Assembly . . . and may not be used to substitute for missed drills. . . . To the best of my knowledge and experience, the ARNG has never understood correspondence course work to meet the definition of permissible regular or equivalent training."  (Id. at ¶ 21.)

unit readiness in anticipation of post-mobilization requirements – that is, federal active duty as a reserve force. . . . This training is conducted to meet both the Militia clause requirements of the ARNG,[41] as well as reserve component requirements prescribed in Title 10 of the U.S. Code for the [Army National Guard of the United States ("ARNGUS")]. . . .

Per NGR (AR) 350-1, there are three basic types of training duty that ARNG/ARNGUS soldiers perform: Inactive Duty Training ("IDT"), Annual Training ("AT"), and Active Duty for Training ("ADT") (also referred to as "full time National Guard duty".) . . . . <u>All ARNG training, whether performed in a pay or non-pay status, must be pre-approved by the command on either published order or Unit Training Schedules in a detailed process.</u>

(McNamara Decl. ¶¶ 3-4 (emphasis added).)  One of the plaintiffs, Mr. Johnson, testified that the approach to training quoted above was the approach followed in the National Guard brigade he commanded.  He explained:

[Mr. Johnson:] . . . [I]t starts with the [state] adjutant general, . . . he gives guidance to the one-star commands, and then we give our guidance and pass it on down, including any priorities that all the command levels have on training our units.

[Mr. Mickle:] So from the general guidance, then, the adjutant general formulates the plan for training?

[Mr. Johnson:] For the state.  Then we implement it in each of our brigades.

[Mr. Mickle:] And the state plan is to meet the state's requirement for being part of the Army Reserve?

[Mr. Johnson:] Being part of the Army Reserve for North Carolina and the U.S., yes, and of course we get guidance from the National Guard Bureau, which gets it from the Department of the Army, to be sure we're qualified to go to war with the larger Army if required.  It's not just a state training plan; it's a federal plan that trickles down, and we're told to do our part.

---

[41]The second Militia Clause of the Constitution grants Congress the power:

[t]o provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, <u>and the Authority of training the Militia according to the discipline prescribed by Congress</u>[.]

U.S. Const. art. I, § 8, cl. 16 (emphasis added).

(Johnson Dep. 71:19 to 72:15.)

Turning now to the language of NGR (AR) 350-1, Paragraph 1-4(b), entitled "State

Adjutants General," states:

> State Adjutants General will train all [Army National Guard] units within their
> state or territory.  As such, [the Adjutants General] will implement the policies
> and instructions contained here and ensure that training is conducted according
> to [Department of the Army] doctrine, [National Guard Bureau] directives, and
> [U.S. Army Forces Command] training criteria.  In addition, State Adjutants
> General will plan, program, and budget for [Annual Training], [Inactive Duty
> Training], [Active Duty Special Work], [Active Guard Reserve], and
> supplemental training of personnel and units under their jurisdiction.  Annual
> budget (fiscal year) requests will include consideration for all training activities,
> training conferences, reconnaissances, and other man-day requirements.  Funds
> to support approved State training programs will be allotted on an annual basis
> by the [National Guard Bureau] in the annual funding guidance.  State
> Adjutants General should submit requests for support of training requirements
> to the [Chief of the National Guard Bureau], either on a case-by-case basis or
> as part of the program and budget review.

NGR (AR) 350-1, ¶ 1-4(b).  Paragraph 1-5(b) defines the dual federal/state mission of the

Army National Guard training as follows: "To provide units organized, equipped, and

trained in the protection of life and property and the preservation of peace, order, and

public safety, under competent orders of Federal or State authorities."[42]  NGR (AR) 350-1,

¶ 1-5(b) (emphasis added).

With regard to training authorization, NGR (AR) 350-1, ¶ 2-1, states, in pertinent

part:

---

[42]This mission is distinct from the purely federal mission, which is defined in the immediately
preceding subsection as "provid[ing] units organized, equipped, and trained to fight and win in time of
war or national emergency in support of the Army's war plans."  NGR (AR) 350-1, ¶ 1-5(a).

> c.  Training authorization.  Authorization of pay . . . require[s] documentary evidence that the individual was in a duty status as authorized by Federal law or regulations.  Accordingly, to protect the interests of the individual and those of the government[,] commanders will issue written orders or letters of authority governing training in a pay or nonpay duty status in advance of such training.  (Emphasis added.)

NGR (AR) 350-1, ¶ 2-1(c).  In other words, as with the Air National Guard, Army National Guard commanders were to issue "written orders or letters of authority" ordering an Army National Guard member to "a pay or nonpay duty status" before that member commenced training in order to ensure payment.  Id. [43]

The need for written orders placing a National Guard member into a pay status before unit or individual training is reiterated in NGR (AR) 37-104-3 ("NGR (AR) 37-104-3") (May 1, 1991),[44] entitled "Military Pay and Allowances – Army National Guard," which states:

> a.  National Guard Bureau . . . Policy, guidance and administrative procedures relative to Federal pay and allowances authorized soldiers of the Army National Guard . . . for all active and inactive duty, other than extended active duty, performed under Titles 10 and 32, [United States Code], as prescribed by National Guard regulations or as otherwise directed by the Chief, National Guard Bureau . . . ; continuation pay and allowances for injury or disease; and the settlement of accounts of deceased soldiers.

---

[43]The court reemphasizes that the need for orders placing individuals in an appropriate "pay status" does not mean that the service member was no longer in his or her "state status" when training. As the above-cited regulations make clear, National Guard commanders are authorized to place state members into a federal pay status, under NGR (AR) 350-1.

[44]NGR (AR) 37-104-3 prescribes "National Guard Bureau . . . policy, guidance and administrative procedures relative to Federal pay and allowances authorized soldiers of the Army National Guard . . . for all active and inactive duty . . .  performed under Titles 10 or 32, U.S.C., as prescribed by National Guard regulations, or as otherwise directed by the Chief, National Guard Bureau . . . ." NGR (AR) 37-104-3, ¶ 1-1.

b.  Required coordination for the State military personnel management office
. . . and support personnel management office . . . relating to Federal military
pay and allowances for [Army National Guard] soldiers.

NGR (AR) 37-104-3, Para 1-1.

Paragraph 1-6 of this regulation, entitled "Organizational and individual training,"

states that "[p]ayments to [Army National Guard] soldiers <u>must be supported by competent</u>

<u>orders</u>, training schedules, or training authorities issued in accordance with specific or

general instructions to the State Adjutant General from the [Chief, National Guard

Bureau].  Pay[-]related actions must be substantiated by documentation on file."  NGR

(AR) 37-104-3, ¶ 1-6 (emphasis added).  Thus, orders are required for "individual

training."

> 3.      <u>None of the Regulations Identified by the Plaintiffs Exempt Them
> from the "Written Orders" Requirements Prescribed by the
> Regulations Implementing Section 206.</u>

The court has examined the regulations identified by the plaintiffs and finds that

none of them excused the plaintiffs from compliance with the requirements for written

orders in order to receive federal payment for equivalent training.[45]  NGR (AR) 351-1 and

Air Force Policy Directive 36-23, which deal with Individual Military Education and

Training and Professional Military Education, respectively, do not create an exception

from the "orders" requirements set in NGR (AR) 350-1 or ANGI 36-2001.  NGR (AR)

---

[45]The court notes that while it makes no finding as to whether these correspondence courses
were, in fact, "equivalent training," equivalent training is a term of art and refers only to drill training.
<u>See</u> discussions <u>supra</u> note 37 and <u>infra</u> note 54.

351-1 cross-references Department of the Army Pamphlet 350-59, the Army

Correspondence Course Catalog (Oct. 1, 2002) ("DA PAM 350-59"), which in turn states

that it "applies to active duty military of all branches, foreign military, Army National

Guard of the United States, Reserve personnel, and Department of Defense civilians."  DA

PAM 350-59, p. i, "Applicability."  Thus, it provides individual training requirements for

members of the Army National Guard of the United States, not the state Army National

Guard organizations.  Plaintiffs, of course, contend that while they were members of a

reserve component of the uniformed forces at all times (i.e., the Army National Guard of

the United States), they were in "state status," not "reserve status" when they took their

correspondence classes.[46]  National Guard members taking correspondence courses in

reserve status are, of course, not entitled to federal payment by law.

Similarly, Air Force Policy Directive 36-23, Professional Military Education, which

spells out which professional military education courses are required for commissioned

and noncommissioned officers, refers to "non-resident" professional military education.

However, those non-resident courses (which presumably include correspondence courses)

apply only to "Air Reserve Component personnel."  Again, the plaintiffs assert that they

were not in their reserve component status but in "state status" when they were taking

---

[46]The plaintiffs have not provided the court with the version or versions of DA PAM 350-59 that were in effect at the time the plaintiffs completed their correspondence courses.  Therefore, the court is unable to address those versions.  The court predicates its discussion of this pamphlet on the assumption that the applicable versions do not contain language stating that they apply to the state National Guard organizations.  Neither party has alleged that the applicable versions contain any such language.

correspondence courses.[47]

Further, none of the other regulations identified by the plaintiffs contradict the application of NGR (AR) 350-1, ¶ 1.5(b), or ANGI 36-2001, ¶ 1.10, to this case.  To the contrary, the regulations identified by the plaintiffs cross-reference the regulations the government has identified as controlling or specific pay regulations that implement those regulations.  As stated above, the plaintiffs assert in their supplemental reply brief that "at a minimum: NGR [(AR)] 600-100, NGR [(AR)] 600-101, NGR [(AR)] 600-200, ANGI 36-2504, NGR (AF) 36-3, AFI 36-2301, and AFR 53-39" are controlling.  (Pls.' Supp. Reply Br. 2.)  The court will address these in turn.

As the plaintiffs correctly state, "[t]he three [Army National Guard] personnel management regulations – NGR [(AR)] 600-100 for commissioned officers, NGR [(AR)]

---

[47]The court pauses to address certain other regulations cited by the government in its supplemental briefs.  The government asserts that "the primary regulation that sets forth pay policy in the several Reserve Components, including for the Army and Air National Guard in training, is DOD 7000.14-R, Department of Defense Financial Management Regulation, Vol. 7A [(2000)]."  (Def.'s Supp. Br. 2.)  Specifically, the government points to Chapter 58, Pay and Allowances for Inactive Duty Training.  Paragraph 580101 of this chapter states, in pertinent part:

> A member of a Reserve Component is entitled to compensation at the one-thirtieth of the basic pay prescribed for grade and years of service for the performance of each period of:
> 1. Regular inactive duty training (drill or unit training assembly . . .);
> 2. Equivalent training, instruction or duty; . . . or . . .
> 5. Additional inactive duty training.

DOD 7000.14-R, Vol 7A, ¶ 580101.  However, by its terms, this regulation applies to members of a reserve component.  Thus, for purposes of this decision, this court will not look to regulations, such as this, that do not explicitly apply to the state National Guard organizations.  For this same reason, the court will not apply certain other regulations presented by the defendant, namely, DOD Directive 1215.6, Uniform Reserve, Training and Retirement Categories (Mar. 14, 1997);  DOD Directive 1215.13, Reserve Component Member Participation Policy (Dec. 14, 1995); DOD 1215.5, Participation in Reserve Training Programs (May 25, 1979); DOD Instruction 1215.19, Uniform Reserve, Training and Retirement Category Administration (Dec. 12, 2000).

600-101 for warrant officers, and NGR [(AR)] 600-200 for noncommissioned officers –

specify which courses . . . are tied to promotion to specific ranks and skill levels for Army

National Guard members." (Pls.' Supp. Br. 7-8 (citations omitted).) Paragraph 1-2 of

NGR (AR) 600-100 references Appendix A of that regulation, which, in turn, references

NGR (AR) 37-104-3. As explained above, NGR (AR) 37-104-3 states that "[p]ayments to

[Army National Guard] soldiers must be supported by competent orders, training

schedules, or training authorities issued in accordance with specific or general instructions

to the State Adjutant General from the [Chief, National Guard Bureau]. Pay[-]related

actions must be substantiated by documentation on file." NGR (AR) 37-104-3, ¶ 1-6

(emphasis added). Thus, NGR (AR) 600-100 does not exempt the Army National Guard

plaintiffs from the requirement of written orders.

Paragraph 1-2 of NGR (AR) 600-101 states, "Related publications are listed in

[A]ppendix A." Appendix A, in turn, lists NGR (AR) 350-1 as a related publication. As

explained above, NGR (AR) 350-1 requires written authorization to get paid for training:

> c. Training authorization. Authorization of pay . . . require[s] documentary
> evidence that the individual was in a duty status as authorized by Federal law
> or regulations. Accordingly, to protect the interests of the individual and those
> of the government[,] commanders will issue written orders or letters of
> authority governing training in a pay or nonpay duty status in advance of such
> training.

NGR (AR) 350-1, ¶ 2-1(c) (emphasis added).[48] Similarly, Paragraph 1-2 of NGR (AR)

600-200 states, "Required and related publications are listed in [A]ppendix A." As with

---

[48]The same is true of both the 1989 and 1996 versions of NGR (AR) 600-101.

NGR (AR) 600-101, Appendix A to that regulation lists NGR (AR) 350-1 as a required

and related publication.  See App. A to NGR (AR) 600-200 (July 1, 1989).[49]  Thus, neither

NGR (AR) 600-101 nor NGR (AR) 600-200 excuse the Army National Guard plaintiffs

from the need to have written orders in order to be paid in accordance with NGR (AR)

350-1.

In their supplemental brief, the plaintiffs also assert, "The regulations that

definitively link completion of the prescribed courses to promotion to specific ranks and

skill levels in the Air National Guard are as follows: ANGI 36-2504 and NGR (AF) 36-3

for commissioned officers and ANGI 36-2502 for noncommissioned officers."  (Pls.'

Supp. Br. 10 (citations omitted).)  Turning first to ANGI 36-2504, the court notes that this

regulation was not enacted until July 28, 2004 and that it superceded NGR (AF) 36-4,

Federal Recognition of Promotion in the Air National Guard of the United States and as a

Reserve of the Air Force Below the Grade of General Officer (Feb. 1, 1992), which the

plaintiffs did not mention in their supplemental briefs.  The preface to NGR (AF) 36-4

explains that "[i]t implements appropriate provisions of Title[s] 10 and 32 . . . ."  NGR

(AF) 36-4 at 1.  It does not, however, implement the provisions of Title 37, which, as

explained above, is the Title that contains Section 206 and which is expressly referenced in

---

[49]Although the copy of the 1997 version of this regulation provided by the plaintiffs did not include Appendix A, the copy of the 1989 version they provided did include Appendix A.  The 1997 version, which states that it supercedes the 1989 version, is prefaced by a four-page list of changes to the earlier version.  As that list does not include any modifications to Appendix A, the court presumes that the reference to NGR (AR) 350-1 is also contained in the 1997 version of the regulation.

ANGI 36-2001.  The same is true of ANGI 36-2504.  However, the two regulations differ

in one important respect: the earlier regulation, which was in effect at the time the

plaintiffs took their correspondence courses, applies only to the Air National Guard of the

United States and the Air Force Reserve, not to the state Air National Guard.  NGR (AF)

36-4 states, "This regulation prescribes general policies and eligibility requirements for

federal recognition of officer promotions in the Air National Guard of the United States

and as a Reserve of the Air Force below the grade of brigadier general."  NGR (AF) 36-4

at 1 (emphasis added).  In contrast, ANGI 36-2504 "prescribes policies and eligibility

requirements for Federal recognition of officer promotions in the Air National Guard

(ANG) and as a Reserve of the Air Force below the grade of brigadier general."  ANGI

36-2504 at 1 (emphasis added).  Thus, NGR (AF) 36-4 does not apply to the state Air

National Guard by its plain terms, while ANGI 36-2504 does not apply because it was not

promulgated until after the plaintiffs had completed the courses at issue and, as with the

earlier regulation, it applies only to federal recognition of promotions and does not

mention or cross-reference any of the pay regulations.

NGR (AF) 36-3 "provides the authority and guidance for appointing and composing

Federal Recognition Boards" and "outlines the procedures for conducting such boards to

determine the qualifications of individuals recommended for appointment or promotion in

the Air National Guard of the United States and as a Reserve of the Air Force."  NGR

(AF) 36-3 at 1.  It deals with training requirements only obliquely, in that satisfaction of

them is to be considered by the boards that consider whether to extend federal recognition to promotions in the state Air National Guard.[50]   NGR (AF) 36-3 "implements title 32 U[.]S[.]C[.] chapters 307 and 308,[51] and DOD Directive 1320.12, 4 February 1992."[52]  Id. Thus, by its own terms, it does not implement Title 37 and does not discuss or cross-reference any of the regulations "prescribed" under Section 206.

The plaintiffs point also to AFI 36-2301, which sets forth requirements for professional military education.  The preface to AFI 36-2301 states, "This instruction implements AFI 36-23, . . ."  AFI 36-2301 at 1.  As explained above, Air Force Policy Directive 36-23 spells out which professional military education courses commissioned and noncommissioned officers are required to take.  However, that directive only refers to "non-resident" professional military education with regard to "Air Reserve Component personnel."  As the plaintiffs assert that they were not in their reserve component status when they were taking correspondence courses, this directive and the regulation implementing it, AFI 36-2301, are inapposite because they apply only to the Air National

---

[50]Promotion to a higher rank within the state National Guard does not automatically result in promotion to that higher rank in the National Guard of the United States.  Rather, a Federal Recognition Board must decide whether to recognize that promotion.

[51]32 U.S.C. § 307 (1994) and 32 U.S.C. § 308 (1994) concern federal recognition of officers in the National Guard.  Subsequent amendments to these statutes have no bearing on this case.

[52]Neither party asserts that DOD Directive 1320.12, entitled "Commissioned Officer Promotion Program," is applicable to the instant case.

Guard of the United States and the other reserve components.[53]

Finally, the plaintiffs contend that AFR 53-39 is controlling.  However, this regulation was superceded by AFI 36-2301 on July 22, 1994 and was thus not in effect during the period within this court's six-year statute of limitations.  As explained in the paragraph above, AFI 36-2301 does not apply to the Air National Guard.  It applies only to "Air Reserve Component" personnel.

In short, all of the regulations relied upon by the plaintiffs are either inapplicable or reference the training authorization identified by the government requiring "orders" before completing training.

 C. <u>None of the Plaintiffs Have Met the Prerequisites for Payment Under Section 206 Because None of the Plaintiffs Was Issued Written Orders by His or Her State Commander to Take Any of the Correspondence Classes at Issue and None Was Placed in the Duty Status "Prescribed" by the Service Secretaries in the Regulations Implementing Section 206.</u>

The undisputed facts establish that none of the plaintiffs received written orders or authorizations from their state commanders in connection with any of the correspondence courses they took.  Thus, none of them were placed in a duty status necessary for federal payment as "prescribed" by the Secretary concerned by the regulations implementing Section 206 of Title 37.  As set forth in detail above, none of the plaintiffs were able to identify orders issued to them requiring them to complete any of the training for which they seek compensation.  Several testified that they had not received orders.  For example,

---

[53]Of course, if the plaintiffs were, indeed, serving as members of a reserve component at the time they took their classes, their claims would be barred by Section 206(d).

when Mr. Clark was asked whether he was subject to a written order during his deposition, he replied, "No." (Clark Dep. 39:21 to 40:4.) He then elaborated that "there were no written orders. I can't produce a document for you." (Id. at 40:10-11 (emphasis added).) Similarly, when Ms. Risser was asked at her deposition, "Did you ever have any written orders to take these courses?", she replied, "Not that I'm aware of." (Risser Dep. 55:4-6 (emphasis added).) Mr. Davern's description of the circumstances that led to his enrollment in the Senior NCO Leadership Course established that he had not received written orders. In fact, his testimony established that he did not believe he was even required to complete the subject courses. Mr. Davern testified that he agreed to take the course because his commander is "a very nice person that likes to see people keep advancing" and that he was "sure he could have" declined to take the course. (Davern Dep. 44:5 to 45:13.)

Nor did the other two plaintiffs claim to have been issued written orders to take the courses. Mr. Johnson did not present any evidence to show that he had received written orders authorizing his correspondence course training and placing him in a duty status for pay under NGR (AR) 350-1. Similarly, Mr. Freeburg also failed to provide any such evidence that he had received written orders or authorization for his correspondence course training as required by ANGI 36-2001.

Because the court finds that none of the plaintiffs meets the prerequisites for payment under the regulations prescribed by the Secretaries under Section 206 of Title 37,

the court is forced to conclude that none of the plaintiffs is entitled to payment under

Section 206 and therefore their claims must be dismissed.[54]

---

[54]It is for this reason that it is not necessary for the court to examine the specific correspondence courses each of the plaintiffs took in order to determine whether the courses were "required" by the Secretary or otherwise meet the definition of "equivalent training" under Section 206(a)(2). In this connection, the court notes that under the relevant regulations the "equivalent training" prescribed by the Service Secretaries under Section 206(a)(2) does not include individual training for advancement. See supra n.37. The equivalent training contemplated by the regulations appears to cover only unit training that an individual missed and then has to make up. The applicable Air National Guard regulation, ANGI 36-2001, states:

> 6.6 Equivalent Training (EQT). . . . A member may be allowed to make up a [unit training assembly] that was missed even if the [unit training assembly] was missed without prior approval. EQT can be performed in a pay status for excused absences and in a non[-]pay status . . . for unexcused absences.
> 6.6.1. Commanders may allow individuals to make up a maximum of four missed [unit training assemblies] in a paid EQT status per fiscal year[.] U.S.C. Title 37, Section 206(e). An EQT in a pay status must be performed within 30 calendar days of the missed scheduled [unit training assembly] period and within the same fiscal year. . . .

ANGI 36-2001, ¶ 6.6 (brackets in original omitted) (emphasis added).

The applicable Army National Guard regulation, found in Paragraph 2-1(d)(7) of NGR (AR) 350-1 defines "equivalent training," in pertinent part, as follows:

> (7) Equivalent Training (ET) . . . . When an individual misses the regularly scheduled period of instruction or duty due to unforeseen emergency situations of a personal nature, the training may be made up with pay according to the following guidance:
> (a) No more than four periods may be made up with pay during the fiscal year.
> (b) ET will be of a similar nature and quality to that which was missed.
> (c) ET must be performed in uniform within 60 calendar days after the missed period of instruction.
> (d) ET must be at least equal in duration to that which was missed. . . .

NGR (AR) 350-1, ¶ 2-1(d)(7) (emphasis added). Further, the glossary contained in Appendix A to this regulation defines "Equivalent Training" as "[t]hose activities performed after and [in lieu of] a regularly scheduled training assembly or drill." App. A to NGR (AR) 350-1 at 35 (emphasis added).

49

**CONCLUSION**

For all the foregoing reasons, the defendant's motion for summary judgment is

**GRANTED** and the plaintiffs' cross-motion for summary judgment is **DENIED**.[55]  The

Clerk is directed to enter judgment for the defendant.  Each party is to bear its own costs.

**IT IS SO ORDERED.**

**s/Nancy B. Firestone**
NANCY B. FIRESTONE
Judge

---

[55]Because the court finds that the plaintiffs were not entitled to compensation under the version of Section 206 that was in effect at the time the plaintiffs took their correspondence courses, it has no occasion to consider the plaintiffs claims that the later amendments to Section 206 were unconstitutional or resulted in an unconstitutional taking of their right to payment.